

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE E.W. SCRIPPS COMPANY          )
AND SUBSIDIARIES,                 )
                                  )    CASE NO. C-1-01-434
        Plaintiff,                )
                                  )    HONORABLE SUSAN DLOTT
                                  )
vs.                               )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
        Defendant.                )

## PLAINTIFF THE E.W. SCRIPPS COMPANY AND SUBSIDIARIES' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff, The E. W. Scripps

Company and its subsidiaries ("Scripps"), hereby moves this Court for summary judgment in its

favor on its claims against the Internal Revenue Service ("IRS"). As set forth more fully in the

attached Memorandum, this dispute presents no genuine issues of material fact and Scripps is

entitled to judgment in its favor as a matter of law.

Paul P. Eyre (by Cindy)

Paul P. Eyre, *Trial Attorney* (0025756)
William M. Toomajian (0025740)
Thomas R. Lucchesi (0025790)
BAKER & HOSTETLER LLP
3200 National City Center
Cleveland, Ohio 44114-3485
(216) 621-0200

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **THE E.W. SCRIPPS COMPANY** | ) |
| **AND SUBSIDIARIES**, | ) |
| | ) CASE NO. C-1-01-434 |
| Plaintiff, | ) |
| | ) JUDGE DLOTT |
| vs. | ) |
| | ) |
| **UNITED STATES OF AMERICA,** | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **PLAINTIFF'S MOTION FOR SUMMARY** |
| Defendant. | ) **JUDGMENT** |

## PRELIMINARY STATEMENT

Scripps was forced to commence this litigation to collect interest on a $3,500,000 tax

overpayment for the 1986 tax year that it made in 1990–a payment that was refunded by the IRS

seven years later, without interest. The resolution of this matter turns on the characterization of the

1990 payment. If it was a payment of tax, as Scripps contends and as the evidence demonstrates,

then Scripps is entitled to interest. If the remittance is properly characterized as a deposit in the

nature of a cash bond, then the IRS will prevail and Scripps is not entitled to interest.

The facts are not in dispute. Scripps paid $7 million in 1990 with the belief that taxes

were due and owing for the 1985 and 1986 tax years. At the time of the payment, Scripps clearly

and unequivocally expressed in writing and orally its intention that the payment be a payment of

tax, rather than a cash bond. The IRS was aware of Scripps' intention and affirmatively,

specifically, and repeatedly represented to Scripps that the payment would be treated as a

payment of tax. In fact, the IRS internally treated the $7 million payment as a payment of tax.

Indeed, it was not until several years later, shortly before Scripps was granted a refund of the $3,500,000 that it had overpaid for 1986, that the IRS seemingly changed its mind and, for the first time, claimed that the payment was a cash bond. The IRS took that position–a position that is contrary to the parties' expressed mutual understanding at the time the payment was made and contrary to the IRS' own internal treatment of and accounting for the payment–to avoid paying interest to Scripps for the use of that $3,500,000 for the previous seven years.

The uncontroverted facts and the established applicable law lead to the inescapable conclusion that Scripps' payment was not and was never intended to be a cash bond, nor was it ever treated as such by either party. The IRS' position is completely unsupportable. Consequently, Scripps is entitled to summary judgment in its favor.

## STATEMENT OF FACTS

The factual record in this case has been developed through the depositions of a number of individuals with knowledge of the events leading up to Scripps' $7 million tax payment in 1990 and the IRS' treatment and later attempt to recharacterize the payment as the mere deposit of a cash bond in order to avoid the accrual of interest. Scripps cites liberally to the transcripts of these depositions in this Memorandum.[1]  To aid the Court, the following is an alphabetical listing of the deponents cited and a brief description of their title or role in this dispute:

- Michael Carroll, Scripps' Corporate Tax Director;
- Jerome Hackman, Scripps' Federal Tax Supervisor;
- David Holscher, IRS Revenue Agent Reviewer;
- George Imwalle, IRS Audit Examination Team Coordinator for the IRS' audits of Scripps' 1980 through 1984 tax years;
- Will Jackson, IRS Case Manager for the IRS' audit of Scripps' 1990 tax year;

---

[1] Scripps' citation format will include the witness' last name followed by a reference to the particular pages of the deposition transcript on which the relevant testimony appears. For example, "(Saewitz Dep. 47)" would refer to page 47 of the transcript of IRS Agent Sidney Saewitz. Pursuant to Local Rule 7.2(f), referenced portions of these transcripts are attached to this Memorandum as Exs. A-G.

2

- Amy Ravenscraft, designated as the IRS' 30(b)(6) deponent;
- Sidney A. Saewitz, IRS Agent and/or Audit Examination Team Coordinator for several IRS audits of Scripps, including the 1986 and 1990 tax years.

## A.    Scripps And Its Binding Agreement With The IRS To Change Its Method Of Accounting For The 1985 And 1986 Tax Years.

Scripps is engaged in the business of publishing and distributing newspapers, owning and operating television stations and cable networks, and marketing and licensing intellectual property. Due to the size and complexity of Scripps' business operations, IRS agents are resident at Scripps' corporate office to audit its tax returns. For the relevant time period, one of those agents was Sidney Saewitz. (Saewitz Dep., 8, 10, 13-14.)

Historically, Scripps used the "cash method" of accounting for tax purposes. (Imwalle Dep. 20.) In June 1988, however, Scripps entered into a binding agreement with the IRS to switch its publishing affiliates to the "accrual method" of accounting retroactive to the 1980 tax year. (Imwalle Dep. 20-24; Carroll Dep. 7 & Ex. 47 thereto.) Under this agreement, Scripps was required to apply retroactively the accrual method to the 1985 and 1986 tax years, even though, at the time of this binding agreement, Scripps had already filed tax returns for those years under the cash method. (Imwalle Dep. 23-24; Hackman Dep. 20-22; Carroll Dep. Ex. 47.)

The accrual method of accounting requires the inclusion of income at an earlier time than the cash method. (See Treas. Reg. § 1.446-1(c).) It is undisputed that application of the accrual method thus increased Scripps' taxable income and overall tax liability for the 1985 and 1986 tax years. As a result, Scripps believed that it owed significant additional taxes for 1985 and 1986. (Carroll Dep. 7 & Ex. 47 thereto.)

## B.    Scripps Pays $7 Million To Cover Its Additional Tax Liabilities For 1985 And 1986.

Agent Saewitz supervised the audit of Scripps' 1985 and 1986 tax years. That audit began in February 1990. (Saewitz Dep. 14-15.) Scripps wanted to pay the additional tax and related

3

Office and paid this sum–$7 million–to the U.S. Government. (Hackman Dep. 7-8, 11 & Exs. 4 & 47 thereto.)

## C. Scripps Clearly Expressed Its Intention That The $7 Million Payment Be A Payment Of Tax, Not A Cash Bond.

The December 31, 1990 payment of $7 million was arranged in advance with the IRS through Agent Saewitz. (Hackman Dep. Ex. 47.) As agreed, on that date, Mr. Hackman delivered to Agent Saewitz a check payable to the IRS in the amount of $7 million, together with a transmittal letter. (Hackman Dep. 7-8, 11 & Exs. 4 & 47; Saewitz Dep. 26-27, 58 & Ex. 6.) At that time, Mr. Hackman told Agent Saewitz that Scripps "intend[ed] to pay the additional tax and interest that [Scripps] owed[d] for the years 1985 and 1986 as a result of the . . . agreement" to change to the accrual method. (Hackman Dep. 11-12, 15.) For his part, Agent Saewitz does not deny that Mr. Hackman made this statement–rather, he simply claims not to recall either this or any of Mr. Hackman's other specific statements to him. (Saewitz Dep. 26-29, 43, 58, 75-76.)

Indeed, Agent Saewitz–although admitting that he received Scripps' cover letter–cannot recall whether he actively looked at it prior to submitting Scripps' check. (Saewitz Dep. 28, 56.) Had Agent Saewitz bothered to read the letter, he would have seen additional clear evidence of Scripps' intention to make a payment of tax. The letter stated:

*As we have discussed previously, The E.W. Scripps Company and subsidiaries' desire to prepay and thereby stop the interest accumulation on the 1985-86 adjustments anticipated as a result of our previous settlement with the Internal Revenue Service, which changed our publishing affiliates' method of reporting from the cash method to the accrual method as of 1980.*

Our check for $7,000,000 is being hand-delivered with this authorization letter by our Jerome P. Hackman to you today. It covers the following years now under audit:

|                  | 1985        | 1986        | TOTAL       |
|------------------|-------------|-------------|-------------|
| Tax Adjustment   | $2,000,000  | $2,000,000  | $4,000,000  |
| Interest Thereon | 1,500,000   | 1,500,000   | 3,000,000   |
|                  | $3,500,000  | $3,500,000  | $7,000,000  |

Please have the duplicate copy of this letter date-stamped and given to Mr. Hackman as our evidence of the Internal Revenue Service's receipt of this *payment*.

(Carroll Dep. Ex. 4) (emphasis added).

Scripps deliberately used the words "prepay" and "payment" when referring to the $7 million remittance because Scripps was well aware of the difference between a payment of tax and the mere posting of a cash bond. As Mr. Carroll confirms, Scripps "purposely did not refer to [the $7 million payment] as a cash bond, because we did not want it to be a cash bond. We wanted it to be a prepayment of the tax deficiency and related interest."[5] (Carroll Dep. 10-13 & Exs. 1, 4 & 47 thereto.)

## D. The IRS Assured Scripps That The $7 Million Remittance Would Be Accepted As A Payment Of Tax And Not A Cash Bond.

In connection with the delivery of the $7 million payment to the IRS' Cincinnati Field Office, Agent Saewitz prepared and submitted a "Form 3244-A Payment Posting Voucher."[6] (Hackman Dep. 8-9, 14 & Exs. 5 & 47 thereto.) Mr. Hackman saw the Voucher prior to the submission of the payment. He immediately questioned the check mark in the box next to the words "Cash bond" appearing on the bottom left side of the Voucher. Specifically, he told Agent Saewitz that the Voucher was "incorrect" and that the cash bond box should not be checked

_____

[5] Prior to paying the $7 million, Scripps researched the scenarios under which the IRS would permit the deduction of interest associated with a payment of tax. Scripps learned that when the taxpayer has a known additional liability, the taxpayer could pay the tax and the associated interest and obtain a deduction for the interest portion in the year the interest was paid. Because it had agreed to the method switch, Scripps believed that it had a known additional tax liability for 1985 and 1986, and determined that it could properly pay its liability and deduct the interest portion on its 1990 tax return. As part of this research, Scripps learned that making a cash bond deposit only stopped the accumulation of interest and did not permit the taxpayer to take an interest deduction. (Carroll Dep. 10-13 & Exs. 1, 4 & 47 thereto; Hackman Dep. 32-36 & Ex. 48 thereto.)

[6] Actually, it is a bit of an overstatement to say that Agent Saewitz prepared the Voucher–he had a secretary do it. In fact, according to his own testimony, Agent Saewitz had "no knowledge" regarding how to fill out a voucher and is not even aware of who was responsible for completing a voucher. (Saewitz Dep. 38, 40, 41.) Indeed, he testified that "a secretary" told him that the cash bond box "had to be checked . . . that's the only way we could do it. I don't know why." (Saewitz Dep. 23.)

because Scripps did "not [want to make] a cash bond or deposit," but instead intended "to make a payment of tax and interest for the amounts that [Scripps] owed for the additional tax liabilities that [Scripps] knew [it owed] and interest that [Scripps] owed for years 1985 and 1986." (Hackman Dep. 14-15 & Ex. 47 thereto.)

In response to Mr. Hackman's concerns, Agent Saewitz stated that the IRS could not process the transaction unless the box was checked. (Saewitz Dep. 21-23, 41; Hackman Dep. 15-16, 53-54 & Ex. 47 thereto.) Agent Saewitz assured Scripps that, although the cash bond box had been marked, the $7 million payment would nevertheless be treated as a payment of tax and not as a cash bond. (Hackman Dep. 15-17, 42-43, 56-57 & Ex. 5 thereto.) Mr. Hackman's concerns were further allayed by Agent Saewitz's assurance that he would be Scripps' team coordinator for the 1990 tax cycle and that he was aware of Scripps' intent that the remittance be a payment. Additionally, Agent Saewitz said that, by adding in the "Remarks" section of the Voucher (which had previously been blank) a reference to "tax adjustment" and "interest" designated by Scripps, the Voucher would "clearly show" Scripps' intent to make a tax payment and not a cash bond deposit. Agent Saewitz had the Voucher revised accordingly and submitted it with the $7 million payment. (Hackman Dep. 15-17, 42-43, 56-57 & Exs. 5 & 47 thereto.)

For his part, Agent Saewitz confirms that Mr. Hackman expressed a concern over the Voucher. (Saewitz Dep. 29.) Agent Saewitz acknowledges that Mr. Hackman told him that he did not want the "Cash bond" box on the Voucher to be checked. However, Saewitz says "I really did not have a say in the matter [because] I was told that this is the way that you have to post it." (Saewitz Dep. 32.) Agent Saewitz claims to not recall the other events and details that Mr. Hackman remembers. (Saewitz Dep. 26-29, 33-34, 43, 58, 76.)

Based upon Agent Saewitz's assurances, Scripps believed that the IRS would treat the December 1990 remittance as a payment of tax and not as a cash bond. As Mr. Hackman put it, "ultimately I relied upon Sid that he would be, you know, he was trustworthy as far as I was concerned up to that point, and I always felt . . . that we could trust each other and I trusted him that when he said that it would be posted as a payment of tax and interest, I took him . . . at his word." (Hackman Dep. 42-43, 52.)[7]

Following the payment, Scripps did attempt to verify its proper treatment by the IRS. Specifically, Mr. Hackman obtained copies of Scripps' 1985 and 1986 account transcripts from Agent Saewitz. Those transcripts described the remittance as "Advance Payment of Tax Deficiency." Scripps understood this description to mean that the IRS had treated the $7 million payment as a prepayment of tax and interest and not as a cash bond. Agent Saewitz, who now purports not to know the significance of this description, did not tell Scripps that its understanding was incorrect. (Carroll Dep. 15, 26-27, 30; Hackman Dep. 54-55; Saewitz Dep. 66, 78.)

## E.    The IRS Treated The $7 Million Payment As A Payment Of Tax And Not As A Cash Bond.

The IRS' internal treatment of a payment of tax differs from its treatment of a cash bond. (Ravenscraft Dep. 13-15, 27-30.) The IRS concedes that, in this instance, it treated Scripps' payment as a payment of tax and not as a cash bond. On cross-examination, the IRS' designated Rule 30(b)(6) witness, Amy Ravenscraft,[8] testified as follows:

---

[7] Mr. Hackman's belief that he could trust Agent Saewitz was entirely reasonable under the circumstances. Agent Saewitz was responsible for auditing Scripps' tax returns for approximately ten years. (Saewitz Dep. 8; Hackman Dep. 51.) During that time, Agent Saewitz had his own office at Scripps and was there on a daily basis. The two men worked together regularly and, as Agent Saewitz himself put it, "I lived [t]here." (Saewitz Dep. 8-10, 15.)

[8] Ms. Ravenscraft was designated by the IRS to testify on its behalf regarding, among other things, the IRS' internal treatment of and accounting for Scripps' $7 million payment. (Ravenscraft Dep. 13 & Ex. 12.)

Q: In your looking at the [account transcripts] regarding this payment of 12/31/90, did you see anything in there that helped you or told you that it was treated as a cash bond?

A: No.

Q: Anything you saw indicated that the Internal Revenue Service was treating it as a prepayment of tax?

A: That's correct.

\* \* \*

Q: Other than the form 3244-A where the cash bond is checked, in all the records of the IRS, any other records, including computer records, the payment was treated as a prepayment of tax and not a cash bond.

A: The records that I viewed, yes, that's exactly correct.

Q: And you, I assumed, reviewed the appropriate records in the entire group of records you could to ascertain how the payment was being treated internally.

A: Yes, but there were documents I was unable to obtain.

Q: Which documents are those?

A: The payment posting voucher. I wanted to–there was a refund issued. I was unable to secure the information related to that refund. Those two things.

Q: You have no reason to believe that anything you would have seen, other than what you already saw, would have changed your view that this was treated as a prepayment of tax?

[Objection omitted.]

A: I can't agree or disagree. I would have to see what they had to say.

Q: But you're here today to testify that, based on your getting ready for this deposition and the records you reviewed, the IRS internally treated the 12/31/90 payment as a prepayment of tax.

A: I'm here to explain our processes and procedures regarding a cash payment.

Q: And you would agree with me, that's how it was treated in this instance.

A: Yes, with the information I have.

\* \* \*

Q: There's nothing else internally that you have that can show that this payment was treated as a cash bond, right? I mean, the only thing you've ever referred to is the original 3244-A.

A: Right. Computer-wise, there's no indication it was a cash bond.

Q: Right, so anything else you looked at internally . . . confirmed for you that it was treated as a prepayment of tax, internally.

A: Yes, it was.

\* \* \*

9

Q:    You, being the IRS, processed it as a prepayment of tax.

A:    Yes we did.

(Ravenscraft Dep. 31-32, 34-35, 47, 54.)

## F.    Scripps Overpaid The Tax Due For 1986.

In early 1995, it was determined that Scripps had overpaid the tax that it owed for the 1986 tax year. (Carroll Dep. 27-29 & Ex. 16 thereto.) Scripps sought a return of the overpaid sums. In response, Agent Saewitz advised that, because the $7 million payment (of which $3.5 million related to the 1986 tax year) was a payment of tax and not a cash bond, the payment could not be returned until the IRS formally closed the 1986 tax year. Agent Saewitz assured Scripps, however, that the refund would include interest on the overpaid amounts. (Carroll Dep. 26-29 & Ex. 16 thereto.)

## G.    The Great Switcheroo.

At some point between October 1995 and April 1996, during the auditing of Scripps' 1990 tax year, Agent Saewitz informed Scripps that–contrary to his earlier representations–the IRS would treat Scripps' $7 million payment as a cash bond, rather than a payment of tax as intended by Scripps. Thus, Agent Saewitz told Scripps, the interest portion was not properly deductible on Scripps' 1990 tax return and any amounts refunded to Scripps would not bear interest.[9] Agent Saewitz offered no explanation for the IRS' change in position. (Carroll Dep. 31-33 & Ex. 47 thereto; Hackman Dep. 43-45; Saewitz Dep. 59-61.) Apparently, nobody from the IRS ever questioned or interviewed Agent Saewitz about the circumstances under which the $7 million payment was made by Scripps in December 1990. (Saewitz Dep. 84-85.)

---

[9]  If a taxpayer makes a prepayment of tax, the interest portion of that payment can be deducted in the year the payment was made. If, however, the taxpayer makes a cash bond deposit, an interest deduction is not allowed. (Jackson Dep. 8; Saewitz Dep. 59-61.)

10

Scripps objected to this recharacterization, noting that the IRS had been telling Scripps all along that its remittance was a payment of tax and not a cash bond. (Carroll Dep. 33 & Ex. 47 thereto.) Subsequently, in January 1998, the IRS closed Scripps' 1990 tax year. Consistent with the treatment of the $7 million remittance as a payment of tax, the IRS allowed Scripps to deduct on its 1990 return the interest portion of the remittance. (Jackson Dep. 11-13; Saewitz Dep. 61.)

## H.   Scripps' Entitlement To Interest.

On September 5, 1997, Scripps received a refund of $3,500,000. This sum represents a return of Scripps' payment for the 1986 tax year, without interest. (Carroll Dep. Ex. 47.) Because taxpayers are entitled to receive statutory interest on tax overpayments, Scripps should have received interest at that time of $2,124,734.22. In addition, Scripps is entitled to interest on the unpaid interest from September 5, 1997, through the date of payment. As of March 15, 2003, the total amount due was $2,827,711.91.[10] See 26 U.S.C. §§ 6611(a), 6621.

On September 28, 1998 Scripps filed a timely claim with the IRS' Cincinnati Service Center requesting payment of the interest it is due. By Notice of Disallowance dated November 6, 2000, the IRS notified Scripps that it had disallowed its claim. (See Ravenscraft Dep. Ex. 13.) This suit followed.

## LAW AND ARGUMENT

## I.   THE STANDARD FOR SUMMARY JUDGMENT.

A party is entitled to summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

---

[10]  Scripps believes that neither of these amounts is in dispute. Scripps computed these amounts using a computer program specifically designed to calculate interest on tax refunds and deficiencies according to federal statutory and IRS regulatory requirements. The Court may rule on liability and, in the event the government does dispute the interest amount, hold an evidentiary hearing on this issue at a later date.

## II. THE UNDISPUTED FACTS ESTABLISH THAT SCRIPPS' $7 MILLION REMITTANCE WAS A PAYMENT OF TAX.

### A. The Taxpayer's Intent In Making A Remittance Is Particularly Important In Determining Whether The Remittance Is A Payment Of Tax Or A Cash Bond Deposit.

The Sixth Circuit utilizes a "facts and circumstances" approach to determine whether a

taxpayer's remittance made during an audit is a payment of tax or a deposit in the nature of a cash

bond. Gabelman v. Commissioner, 86 F.3d 609, 613 (6th Cir. 1996). The following factors

determine the proper characterization of a taxpayer's remittance: (1) when the tax liability was

defined; (2) the taxpayer's intent; and (3) the manner in which the IRS internally treated the

remittance. Ameel v. United States, 426 F.2d 1270, 1273 (6th Cir. 1970) (as applied); Ewing v.

United States, 914 F.2d 499, 503 (4th Cir. 1990); Blatt v. United States, 34 F.3d 252, 255 (4th Cir.

1994); Moran v. United States, 63 F.3d 663, 668 (7th Cir. 1995).[11]

The taxpayer's subjective, good faith intent is critical in determining the proper

categorization of a remittance. As stated by the Sixth Circuit, "[a]n essential factor in 'payment'

before assessment is the satisfaction or discharge *of what the taxpayer deems a liability*."

Ameel, 426 F.2d at 1273 (emphasis added). The taxpayer need not memorialize its recognition

of a tax liability in any specific manner for a remittance to constitute a payment. Instead, "a

payment results from the remittance by a taxpayer concomitant with the recognition of a tax

obligation whether by filing with a return, resolution of a dispute by an agreement . . . or

otherwise." Ewing, 914 F.2d at 504.

---

[11] Rejecting a per se rule to the contrary, the Sixth Circuit has made clear that a taxpayer's remittance to the IRS may constitute a payment of tax even though the government has not formally assessed the tax at the time the remittance was made. E.g., Ameel, 426 F.2d at 1273; Ewing, 914 F.2d at 503; Moran, 63 F.3d at 666-68 (noting that assessment is simply a "bookkeeping procedure").

12

In our case, Scripps had a subjective, good faith belief that the change in accounting methods would result in an increased tax liability for the 1985 and 1986 tax years. In making the \$7 million remittance, Scripps went to great lengths to indicate its intent to make a payment as opposed to a cash bond. Notably, Scripps discussed its intentions with Agent Saewitz; expressed its intentions in a written transmittal letter that accompanied the \$7 million remittance; challenged Agent Saewitz's marking of the Voucher's cash bond box; and, later, followed up by reviewing its accounts to ensure that the remittance was treated in accordance with its intentions. There can be no question of Scripps' intent.

Although the calculations Scripps performed prior to making the \$7 million payment indicated to Scripps that it had an additional tax liability, because of a net operating loss that could be carried back to prior tax years, Scripps did not in fact owe additional tax in 1986, but instead, owed it in a prior carryback year. (Carroll Dep. 24-27, 41-44; Hackman Dep. 30-32.) This, however, is irrelevant because the remittance still constituted an overpayment entitled to interest. Section 6401(c) of the Internal Revenue Code provides,

> Amounts treated as overpayments.
> * * *
> (c)    Rule where no tax liability. An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid.

26 U.S.C. § 6401(c). Nor does the fact that a taxpayer did not precisely calculate the amount of a tax liability or submit the exact amount of tax due prevent a remittance from constituting a payment of tax. Blatt, 34 F.3d at 255; Gabelman, 86 F.3d at 610

## B.    The Undisputed Evidence Shows That The \$7 Million Remittance Was A Payment Of Tax.

Application of the relevant factors to the undisputed facts of this case require the conclusion that Scripps made a payment of tax.

### 1. Scripps Had a Defined Tax Liability Due to Its Binding Agreement with the IRS to Change Its Method of Accounting.

At the time Scripps made the $7 million remittance, its additional tax liability was defined. As of June 1988, Scripps and the IRS had entered into an agreement that bound Scripps to apply the accrual method of accounting. The accrual method resulted in increasing Scripps' taxable income for the 1986 tax year, which increased Scripps' overall tax liability. Scripps' tax payment for the 1986 tax year was due to be paid as of March 15, 1987. See 26 U.S.C. §§ 6012, 6072(b), 6151; Blatt, 34 F.3d at 256-57 (noting that an extension of time to file a return does not extend the time for payment of the tax due). Interest on any tax due would run from that date. Thus, upon agreeing to change its accounting method in June 1988, Scripps had a then-existing obligation for any additional liability.

Scripps made a detailed calculation of its additional tax liability and paid the IRS an amount that Scripps believed would cover most of the additional liability. The fact that Scripps, rather than the IRS, calculated the tax, or that Scripps' payment was not in the exact amount thought to be owed does not prevent the $7 million remittance from constituting a payment of tax. See Blatt, 34 F.3d at 255; Gabelman, 86 F.3d at 610.

### 2. Scripps Intended to Pay an Additional Tax Liability for 1985 and 1986 and Expressed This Intent to the IRS.

All evidence of record shows that Scripps intended the $7 million payment to be a payment of tax and not a deposit in the nature of a cash bond. First, Scripps expressly requested, both orally and in writing, that the remittance be treated as a payment of tax and not as a cash bond. See, e.g., Moran, 63 F.3d at 668 (characterizing remittance as payment of tax because the taxpayer expressly requested that the remittance be treated as a payment and the taxpayer demonstrated "a clear understanding of the difference between the two classifications, and a desire to chose one rather than the other"). In addition to stating that it wanted to make a

14

"payment," Scripps designated how that payment was to be allocated between principal and

interest for each of these tax years. Incredibly, the IRS apparently concedes that it should have

treated Scripps' payment as a payment of tax:

> Q:    When the taxpayer makes a remittance [and] states their intention how
>       they want it treated, is it the agent, then, that determines whether it should
>       be treated as a cash bond or a payment?
>
> A:    No. It should be the taxpayer who will be–if they would like it as a cash
>       bond they should be stating to the agent that we want this payment posted
>       as a cash bond or we are making a cash bond, they may say.
>
> Q:    And the agent is just supposed to do what the taxpayer conveys to the
>       agent?
>
> A:    Yes.
>
> * * *
>
> Q:    Will you agree with me that nothing in [Scripps' December 31, 1990
>       transmittal letter] says that . . . the taxpayer is requesting treatment of their
>       remittance as a cash bond; is that correct?
>
> A:    I agree.
>
> Q:    So under what you just said to me a few minutes ago, this remittance
>       should be treated as a payment? [Objection omitted]
>
> A:    From what I can tell, yes.

(Holscher Dep. 29, 31.)

In addition, the IRS expressly acknowledged Scripps' concern about the marking of the

Voucher's cash bond box and assured Scripps that the IRS would nevertheless post and treat the

$7 million remittance as a payment of tax.

The timing of Scripps' payment is further evidence of Scripps' intent to make a payment

of tax. Scripps had advised Agent Saewitz on numerous occasions of its desire to pay any

additional tax by year-end in order to take an interest deduction on its 1990 tax return. The

payment was made on December 31, 1990. If Scripps had intended the payment to be a cash

bond, there would have been no interest deduction issue and, consequently, no critical reason to

make the payment prior to year-end. (See Hackman Dep. 51-52.)

15

### 3.    The IRS Treated the $7 Million Remittance as a Payment of Tax.

The IRS representative explicitly and repeatedly conceded that the IRS treated Scripps'

$7 million payment as a payment of tax. An objective review of the IRS internal processing of

the $7 million payment confirms this concession.

The IRS is required to comply with defined procedures in its internal processing of a cash

bond. First, when a taxpayer deposits a cash bond, the IRS must mark the "Send 316(c)" box on

Form 3244-A. According to the IRS, marking this box is "important" because it causes the

taxpayer to receive written notice of the following: (1) that the IRS intends to treat the remittance

as a cash bond; (2) that interest on the remittance will not be paid in the event money is returned;

and (3) that designation as a cash bond carries with it other rights and restrictions. (Ravenscraft

Dep. 13, 24-25, 47-49 & Ex. 14 thereto.) Failure to mark this box when receiving a cash bond is

"not consistent with the IRS rules and regulations." (Ravenscraft Dep. 13-14.) Notably, the

"Send 316(c)" box is not marked and a 316(c) notice is not sent when a remittance is a

prepayment of tax. (Ravenscraft Dep. 29.)

In our case, the IRS did not mark the 316(c) box on the Form 3244-A.[12] (See Saewitz

Dep. Ex. 7.) Further, no 316(c) notice was ever prepared or sent to Scripps in connection with

the payment. (Int. Ans. 6, attached hereto as Ex. H.) The IRS concedes that this demonstrates

that the IRS internally treated the remittance as a payment. (Ravenscraft Dep. 13-14, 25, 27-29.)

Second, when a cash bond is received, the IRS assigns a specific individual "document

locator number" ("DLN") to the remittance. All DLNs include a "blocking series," which is a

code designed to give information about a transaction posted to a taxpayer's account. In 1990,

---

[12]  Although Agent Saewitz did mark the Voucher's "Cash bond" box, he repeatedly assured Scripps that
its payment would nonetheless be treated as a payment of tax.

16

the IRS used "999" as the blocking series to designate cash bond remittances. If the 999

blocking series was not included in the DLN for a particular remittance, "it was not a cash

bond." (Ravenscraft Dep. 14-15, 30, 46-47.)

The IRS did not use a 999 blocking series in the DLN assigned to Scripps' payment.

(Ravenscraft Dep. at 14-15, 37-38, 40-44 & Ex. 9 thereto.) The IRS expressly admits that the

absence of the 999 blocking series "is inconsistent with internally treating [the payment] as a

cash bond." (Ravenscraft Dep. 14-15.) The IRS further admits that the absence of the 999

blocking series demonstrates that the IRS internally treated the payment as a "prepayment of tax"

and that the IRS did not post the $7 million payment to Scripps' account as a cash bond.

(Ravenscraft Dep. 15.) In addition, consistent with treatment as a payment, the IRS allowed

Scripps to deduct the interest portion of the $7 million remittance on its 1990 tax return.

In sum, the undisputed evidence shows that Scripps' $7 million payment was a payment

of tax. As such, because Scripps overpaid its taxes by $3,500,000, Scripps is entitled to receive

interest on this amount.

## III.    THE UNDISPUTED FACTS ESTABLISH THAT THE IRS IS EQUITABLY ESTOPPED FROM CLAIMING THAT THE $7 MILLION PAYMENT WAS NOT A PAYMENT OF TAX.

The IRS' affirmative misrepresentations to Scripps regarding the treatment of the $7

million payment estops the IRS from now claiming that the payment was a cash bond.

### A.    The Doctrine Of Equitable Estoppel Applies To The Government When The Government Makes An Affirmative Misrepresentation. _____ __ __ __ __

The Supreme Court has refused to find that there are no circumstances in which the

government can be liable under a claim of estoppel. Heckler v. Community Health Servs., 467

U.S. 51, 60-61 (1984). Citizens have an interest "in some minimum standard of decency, honor,

and reliability in their dealings with their Government." Id. at 61. "To say to these appellants,

17

'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government."
Id. at 61 n.13 (quoting Brandt v. Hickel, 427 F.2d 53, 57 (9th Cir. 1970)). Moreover, "[i]t is well
settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate
caution, may be invoked against the United States in cases involving internal revenue taxation."
Simmons v. United States, 308 F.2d 938, 945 (5th Cir. 1962).

To establish a claim of equitable estoppel, Scripps must demonstrate: (1) affirmative
misconduct by way of an affirmative misrepresentation or concealment of a material fact by the
IRS;[13] (2) that the IRS had reason to believe that Scripps would rely upon the representation; (3)
that, in reliance on the representation, Scripps changed its position to its detriment; and (4) that
Scripps' reliance was reasonable under the circumstances. See Heckler, 467 U.S. at 59-61;
Reich v. Youghiogheny & Ohio Coal Co., 66 F.3d 111 (6th Cir. 1995); Watkins v. United States
Army, 875 F.2d 699, 707 (9th Cir. 1989). An analysis of these factors leads to the inescapable
conclusion that Scripps should prevail.

## B. The IRS Misled Scripps Regarding The Treatment Of Its Payment.

The IRS, through Agent Saewitz, made at least two affirmative misrepresentations to
Scripps. First, Agent Saewitz specifically told Scripps that, even though he had marked the
Voucher's "cash bond" box, the $7 million payment would be accepted and treated by the IRS as
a payment of taxes and related interest and not as a cash bond.

Second, after Scripps discovered that it had overpaid its tax liability and asked whether it
was possible to have any of the $7 million returned, Agent Saewitz continued to misrepresent to
Scripps that the payment was being treated by the IRS as a payment of tax. Indeed, such

---

[13]  Although affirmative misconduct requires an affirmative misrepresentation or concealment of a
material fact, it does not require an intent to mislead. Jablon v. United States, 657 F.2d 1064, 1067 n.5
(9th Cir. 1981).

18

treatment was the very basis on which Agent Saewtiz stated that any overpayment could not be returned until the IRS formally closed the tax year. At that time, Agent Saewitz further represented that any overpayment returned would bear interest.

## C.    The IRS Had Reason To Believe That Scripps Would Rely On Its Representations.

Agent Saewitz had reason to believe–indeed, he clearly knew–that Scripps would rely on his representations concerning the treatment of the payment. For example, Agent Saewitz was aware that the only reason for making the payment prior to the end of 1990 was because it was to be a payment of tax–thereby allowing Scripps a deduction on its 1990 tax return. Moreover, Agent Saewitz and Mr. Hackman discussed at length Mr. Hackman's concern that the Voucher was incorrectly marked. In response to Mr. Hackman's protest, Agent Saewitz informed Mr. Hackman that Agent Saewitz would be the auditor for the 1990 tax year; he assured Mr. Hackman that he understood Scripps' intent to make a payment of tax and would allow the associated interest deduction. Agent Saewitz also told Mr. Hackman that having the secretary add the "tax adjustment" and "interest" designations to the Voucher's Remarks section would "clearly show" Scripps' intent to make a payment of tax. Agent Saewitz knew that Mr. Hackman allowed the payment to be made as a result of these assurances and representations.

## D.    Scripps Relied On The IRS' Representations To Its Detriment.

Scripps detrimentally relied on Agent Saewitz's misrepresentations. Based on Agent Saewitz's assurances that the remittance would be treated as a payment, Mr. Hackman made the payment. He would not have done so had he known that the IRS would treat the remittance as a cash bond. Such a mischaracterization deprived Scripps of more than seven years' interest that had accrued while the IRS has held Scripps' money.

19

## E.   Scripps' Reliance Was Reasonable Under The Circumstances.

As a practical matter, taxpayers do not have access to the IRS' internal records; thus,

Scripps' reliance on Agent Saewitz's representations was reasonable. Mr. Hackman and Agent

Saewitz had a long history of working together on Scripps tax matters and, to that point in time,

Mr. Hackman had no reason to believe that Agent Saewitz could not be trusted. Further, the IRS

never sent Scripps a 316(c) notice, and therefore Scripps was never made aware of the possibility

that the IRS was not treating the payment in accordance with Scripps' expressed intent.

Moreover, an account transcript Agent Saewitz gave to Scripps when it sought to confirm that the

remittance had been properly posted described the remittance as an "advance payment of tax."

Scripps' conclusion that this designation indicated a payment of tax was inherently reasonable.

In sum, the undisputed facts show that, as a matter of law, the IRS is estopped from

claiming that the $7 million remittance was not a payment of tax.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment in favor of Scripps

and award it statutory interest, as allowed by law, on its $3,500,000 overpayment to the IRS for

the 1986 tax year.

Respectfully submitted,

Paul P. Eyre ( by any ?

Paul P. Eyre, *Trial Attorney* (0025756)
William M. Toomajian (0025740)
Thomas R. Lucchesi (0025790)
BAKER & HOSTETLER LLP
3200 National City Center
Cleveland, Ohio 44114-3485
(216) 621-0200
Attorneys for Plaintiff

20

## CERTIFICATE OF SERVICE

A copy of the foregoing Plaintiff's Motion for Summary Judgment and Memorandum in

Support thereof was served by first-class U.S. mail, postage prepaid, upon Stacey S. Hallett,

attorney for the defendant, at Tax Division, Department of Justice, P.O. Box 55, Ben Franklin

Station, Washington, D.C. 20044, on this 1ˢᵗ day of April, 2003.

Rebecca Hutcko (by Amy St. Sdua Ǫ)
One of the Attorneys for Plaintiff

G:\CLdata\R!3825\95070\00020\Pleadings\MSJ-rev-2.doc

1         IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                  - - -

5   THE E.W. SCRIPPS COMPANY    :

6   AND SUBSIDIARIES            :

7        PLAINTIFF        :CASE NO.C-1-01-434

8   VS                          :

9   UNITED STATES OF AMERICA    :

10       DEFENDANT            :

11                  - - -

12

13       Deposition of MICHAEL W. CARROLL, a witness

14   herein, taken by the defendant as upon

15   cross-examination pursuant to the Federal Civil

16   Rules of Procedure and pursuant to agreement among

17   counsel as to time and place and stipulations

18   hereinafter set forth, on December 6, 2002, at

19   9:35 a.m., at the offices of Baker & Hostetler,

20   312 Walnut Street, Cincinnati, Ohio 45202, before

21   Sharlene D. Hall, Official Court Reporter within

22   and for the State of Ohio.

23

24

25                                          



1  to?

2        A.   Yes.

3        Q.   Okay.

4        A.   Exhibit 1, the letter dated December

5  22nd, 1988.  I prepared this letter as a

6  transmittal letter to go with our payment to the

7  IRS in 1988, because we had recently settled with

8  the IRS and agreed to switch our newspaper

9  divisions from the cash method to the accrual

10  method of accounting, as of 1980.  And we -- even

11  though the audit was not finished yet, we wanted

12  to prepay the majority of what we owed on the

13  conversion from cash to accrual, and to stop the

14  running of the interest on that portion.

15        Q.   Okay.  Now, with this transmittal

16  letter, did you also submit a check to the

17  Internal Revenue Service?

18        A.   Yes.

19        Q.   And what was the amount of that check?

20        A.   Would have been for the amount here on

21  the letter, which is $9 million.

22        Q.   Okay.  Now, there are some

23  calculations on the letter that show tax

24  adjustment and interest.

25        A.   Yes.

1        Q.    Did you make those calculations?

2        A.    I don't know if I made them.  I

3    probably had someone 8½h my staff make them.

4        Q.    Okay.

5        A.    But approved them, yes.

6        Q.    Okay.  Would you have reviewed the

7    calculations?

8        A.    Yes.

9        Q.    Okay.  Now, as to the second letter,

10   Exhibit Number 4, can you tell me what that is?

11       A.    This letter, Exhibit 4, which is dated

12   December 31st, 1990, was also a transmittal that I

13   had prepared and I signed, which went with our

14   prepayment of tax and interest for the years 1985

15   and '86.  Again, on the agreement that we had with

16   the IRS to change the reporting for our publishing

17   subsidiary units from the cash method to the

18   accrual method of accounting.

19       Q.    Okay.  Now there's -- with this

20   letter, was there also submitted a check to the

21   Internal Revenue Service?

22       A.    Yes, there was.

23       Q.    In the amount of $7 million?

24       A.    That is correct.

25       Q.    Now, this letter also indicates a

1    break out of taxes and interest; is that correct?

2          A.    That is correct.

3          Q.    Did you make that calculation for

4    those dollar amounts?

5          A.    I asked Jerry Hackman on my staff to

6    make the calculation.  I looked it over and agreed

7    that that's the proper amount of money that we

8    should pay.

9          Q.    When you say you looked it over, do

10   you recall what documents you looked over?

11         A.    He, Jerry, prepared a summary of

12   showing, by newspaper subsidiary unit, the

13   calculations of what additional tax and related

14   interest that we would owe for these years.  And I

15   looked over that summary.  I did not look over all

16   the details that went into preparing that summary.

17         Q.    Showing you what's been marked as

18   Exhibit Number 50.  Does that appear to be the

19   summary Mr. Hackman prepared?

20               MS. HALLETT:  I think you have it.

21         It's the same as 49.

22               MS. LUTZKO:  Okay.

23               MS. HALLETT:  I don't know why there's

24         two.

25               MS. LUTZKO:  Okay.

1          MS. HALLETT:  Solves my problem.  Took

2     49 yesterday.

3          MS. LUTZKO:  Forty-nine and 50 are

4     equivalent, as far as we know.  Yeah.

5     Okay.

6     A.   Yes.  I believe this is the summary

7     that Mr. Hackman prepared.  Looks like the left

8     edge is missing a little bit, but I can make out

9     those, that those are the names of our newspaper

10    subsidiary companies.

11         Q.   Okay.  Great.  Now, I notice in the

12    letter dated December 22nd, 1988, Government

13    Exhibit 1, you referred to the remittance to the

14    Internal Revenue Service as a cash deposit, I

15    believe is the word you used.

16         A.   I referred to it as a cash bond.

17         Q.   Cash bond.  I'm sorry.  As a cash

18    bond.  Now, do you know why you used that word in

19    that letter?

20         A.   I believe before we made this payment

21    we did some research on how such a payment should

22    be made.  And at that time we felt that it should

23    be referred to as a cash bond.

24         Q.   Okay.  And the second letter,

25    Government Exhibit Number 4, you do not refer to

1  the remittance as a cash bond.  Is that your
2  intent?

3       A.    That is correct.  That was definitely
4  our intent, because between the time that we made
5  the prepayment for 1988 and as we were researching
6  the proper way to make the payment for 1990, we, I
7  guess, we better understood the government's
8  guidance, and we definitely wanted not only to
9  stop the running of the interest, but also to be
10 able to deduct the interest portion of the
11 prepayment on our 1990 return.

12       So upon further educating ourselves on
13 the best way to do that, we purposely did not
14 refer to this as a cash bond, because we did not
15 want it to be a cash bond.  We wanted it to be a
16 prepayment of tax deficiency and related interest,
17 so I, specifically -- in fact, I used this letter
18 as a reference in preparing the 1990 letter.

19       Q.    You mean the letter dated December
20 22nd, 1988?

21       A.    Yes.  I took the -- yes, ma'am.  I
22 took the 1988 letter as a reference, specifically
23 removed references to a cash bond because we did not
24 want it to be a cash bond.

25       Q.    Okay.

1        A.    We wanted it to be an advance payment
2    of tax and interest.

3        Q.    Okay.  With respect to the December
4    22nd, 1988 remittance, I believe there was an
5    amount of $9 million.  Do you know whether the
6    Internal Revenue Service treated that as a cash
7    bond?

8        A.    I -- I'm not sure how they treated it
9    on their records.

10        Q.    At any time did you become aware of
11    how the IRS treated it on their records?

12        A.    We may have after the fact.  I don't
13    know.  I do know that when the 1988 audit was
14    closed, that they allowed us to take the interest
15    as a deduction in 1988, although normally, as we
16    found out later, if a payment is a cash bond, you
17    can't take the deduction.  But they did allow a
          until the tax year is closed.
18    deduction of it in 1988.

19        Q.    Okay.  Then that was for the 1988
20    payment?

21        A.    Yes.

22        Q.    Okay.  Now, with respect to the
23    December 31st, 1990 remittance, do you know
24    whether the -- how the IRS treated that?  Did they
25    treat that as a cash bond?

```
 1        A.    That's why we are here today.  By this
 2   letter and by verbally telling our team
 3   coordinator, Sid Saewitz, we told the IRS, and Sid
 4   Saewitz knew that we wanted this payment to be a
 5   prepayment of tax and interest and not a cash
 6   bond.  That's why I, specifically, removed any
 7   reference to cash bond on this letter.  And it was
 8   our intent to be a payment of tax.  That's the way
 9   we thought that it was processed.  That's the way
10   Sid told us it was processed, until years later.
11        Q.    When you say "we," who are you
12   referring to?
13        A.    "We" would be Scripps, in general,
14   specifically myself and Mr. Hackman.
15        Q.    Okay.  Do you recall, specifically,
16   telling Mr. Saewitz that you want the remittance
17   treated as a payment for the remittance that was
18   made December 31st, 1990?
19        A.    Before we made this payment, I went to
20   Mr. Saewitz and asked him if he would do the
21   calculation of what the additional taxable income
22   would be for these two years, 1985 and '86.  He
23   told me that he would not be able to do that for
24   me before year-end.  I then told him that we
25   wanted to pay roughly what we owed on that agreed
```

14

1    adjustment, because we had agreed with the signing

2    of the Form 870-AD, back in 1988 I believe, that

3    we would switch all of our ~~publishing~~ subsidiaries

4    ~~to~~ the cash method to the accrual method of

5    accounting. And, in fact, on the previous two

6    audit cycles, all of those calculations through

7    the year 1984 had already been made and agreed to

8    and paid. So the only thing left was these two

9    years, because in 1985 and 1986, when we filed our

10   returns, we had filed them under the cash method.

11             So I had told him that, you know,

12   since ~~then,xx~~ and this was an agreed ~~case~~ change, it was

13   just a matter of calculating the additional tax,

14   that we wanted to go ahead -- and no later than

15   the end of 1990 -- make that payment, to not only

16   stop the running of the interest, but also to get

17   a deduction for the interest on our 1990 return.

18   So Sid knew that that's what we wanted to do.

19        Q.   Did you have more than one

20   conversation with Mr. Saewitz about this before

21   you actually made the remittance?

22        A.   I can't give you dates or numbers of

23   times, but I would say I probably had more than

24   one discussion with him about that, yes.

25        Q.   Okay. Okay. And I don't believe you

1   answered my question, but my question was:  Do you
2   know how the IRS treated the December 31st, 1990
3   remittance?  Did they treat it as a cash bond?
4              MS. LUTZKO:  Objection, to the extent
5          you know.
6        A.    I'm sorry.  Repeat the question.
7        Q.    Do you know how the IRS treated the
8   December 31st, 1990 remittance?
9        A.    When -- sometime after this we asked
10  for and received a transcript of our account.  And
11  on the transcript it said Advance Payment of Tax
12  Deficiency.  To me -- that clearly indicated to me
13  that the IRS was treating it as a prepayment of
14  tax and interest and not as a cash bond.
15       Q.    Okay.  And when you say "sometime
16  after this," you mean sometime after December
17  31st, 1990?
18       A.    Yes.
19       Q.    Okay.  And who showed you the IRS
20  transcript, do you recall?
21       A.    I believe Mr. Saewitz gave it to Jerry
22  Hackman, and Jerry Hackman showed it to me.
23       Q.    Okay.  Mr. Carroll, I'm going to show
24  you what's been marked as Government's Exhibit
25  Number 7.  If you can take a look at that exhibit,

1    it would be 13.8 million in tax and 19.7 million

2    in interest?

3            A.    That is correct, yes.

4            Q.    Okay. Does that mean that the 1983 tax

5    liability was increased by 13.8 million?

6            A.    From where it was at this point in

7    time, it went up $33 million tax and interest.

8            Q.    Tax and interest.  So from December

9    30th, 1994?

10           A.    Right.  That would be after we had

11   carried back the 1986 loss to the 1983 year.

12           Q.    Okay.

13           A.    Reducing its taxable income to a

14   smaller amount, and now we were adjusting this to

15   that backup for these adjustments.

16           Q.    Does that mean the 1986 net operating

17   loss was reduced?

18           A.    Well, during the course of the audit

19   for 1986 there were several adjustments that

20   affected that 1986 tax return, and issues that

21   were related to it.  And as the 1986 adjustments

22   reduced the 1986 tax loss, since we had already

23   carried back the full amount of the loss on the

24   original return to 1983, we also had to take those

25   net adjustments and adjust the adjustment to the

1    settlement, we have confirmed from the IRS and

2    from obtaining copies of our tax accounts for

3    years 1983 through 1993, that our $7,000,000

4    prepayment in December 1990 and our $45,000,000

5    prepayment in December 1994 were both recorded as

6    Advance Payments on IRS Examination Tax

7    Deficiencies, and not as deposits or cash bonds."

8              Is that what it states?

9         A.    Yes.

10        Q.    Okay.  Now, with respect to the

11   December of 1990 and $7 million figure, you state

12   you "Have confirmed from the IRS from obtaining

13   copies of our tax accounts."  When you state "We

14   have confirmed from the IRS," how did you confirm

15   from the IRS?

16        A.    That would be with discussions that I

17   had with Mr. Saewitz.

18        Q.    Okay.  You had specific discussions

19   with Mr. Saewitz?

20        A.    Yes.

21        Q.    Do you recall when those discussions

22   took place?

23        A.    I would assume it would be shortly

24   before the date of this memo, which was March 8th,

25   1995.

1      Q.    Okay.  And do you recall the substance
2      of those discussions?

3      A.    Well, when we made the 1994 payment of
4      $45 million, we anticipated that was what we owed
5      in additional tax and interest for all of the
6      agreed issues.

7      Q.    Okay.

8      A.    We, in the process of closing those
9      tax years, and then shortly thereafter, we
10     realized that we had made a calculation error, we
11     didn't really owe $45 million.  So I asked
12     Mr. Saewitz if it was possible, now that we
13     realized we made an error, to get back the
14     overpayment portion of that $45 million, and he
15     said that no, that was not possible because that
16     payment was a payment of tax and interest and not
17     a cash bond and that you can only get back
18     overpayments to the IRS prior to the closing of a
19     tax year, if it was a cash bond.  And since both
20     our 1990 and our 1994 payments were payments of tax
21     and interest and were not payments in the nature
22     of a cash bond, we could not get back those moneys
23     now.  But when we finally did close those years
24     and we finally did get the refund for the
25     overpayments, we would also get interest on those

1   refunds.

2         Q.    Okay.  Did Mr. Saewitz, specifically,

3   refer to the December 1990 $7 million remittance?

4         A.    There were several conversations.  The

5   very first conversation was brought about because

6   we discovered we had overpaid in 1994.  But in

7   subsequent conversations both prepayments were

8   discussed.

9         Q.    Okay.  And you, specifically, remember

10  that today?

11        A.    I cannot tell you dates or numbers of

12  times, but I know we discussed both prepayments as

13  reflected in this memo.

14        Q.    Okay.  And did you discuss it with

15  anyone else from the IRS, other than Mr. Saewitz?

16        A.    I would doubt it, probably just with

17  Mr. Saewitz.

18        Q.    Okay.  Do you recall how much of the

19  $45 million was over paid?

20        A.    I don't believe it refers to it in

21  this memo, but it was -- it was millions.  I don't

22  remember how many millions.  It was enough that we

23  asked if there was any way we could get it back.

24        Q.    Do you recall which tax years it

25  related to?

1          A.   No, I don't.  It was -- as you can see

2  on the previous exhibit, there were 10 or 12 years

3  involved.

4          Q.   Okay.  You also state in this memo

5  that you confirmed from the IRS and from obtaining

6  copies of our tax accounts for the years 1983

7  through years 1993.  Is that referring to the

8  transcript you talked about earlier?

9          A.   As I understand it, there's different

10  types of transcripts, and over the course of time

11  we have obtained different types of transcripts

12  through Mr. Saewitz getting them and then showing

13  them to us.  So I don't know if these sets of

14  transcripts are the same as the previous

15  transcripts, but on the transcript it refers to

16  our prepayments as Advance Payment of Tax

17  Deficiency.

18          Q.   But this does specify what you are

19  speaking of here are IRS transcripts?

20          A.   Yes.  We obtained them from the IRS,

21  yes.

22          Q.   Okay.

23          THE WITNESS:  Can we take a short

24      break?

25          MS. HALLETT:  Absolutely.

```
 1                    THE WITNESS:  Thanks.

 2                 (A short recess was had from

 3           10:25-10:32.)

 4         Q.    Mr. Carroll, I'm going to show you

 5   what's been marked as Exhibit Number 21.  If you

 6   can take a look at that document for me, please?

 7         A.    Yes, I recognize this document.

 8         Q.    Okay.  Is this in your handwriting?

 9         A.    Yes, it is.

10         Q.    Can you tell me what that reflects?

11         A.    This also refers to the prepayment of

12   tax and interest.

13         Q.    Okay.  And it is dated June 19th,

14   1996; is that correct?

15         A.    That is the date, yes.

16         Q.    With respect to the number 2, about a

17   quarter of the way down the page, can you read

18   what that says?

19         A.    You can't read my writing?

20         Q.    An occasional word.

21         A.    Regarding 1988 and 1990 prepayments,

22   Rick -- and I'm trying to determine which Rick I'm

23   referring to, because I think it must have been

24   Rick O'Connor, who is an IRS appeals' officer.

25         Q.    Okay.
```

1        A.    Because there was one issue for that

2    year that we took to appeals, and it was on our

3    foreign tax credits, which is what number 1 refers

4    to.

5        Q.    Okay.

6        A.    So I'm not a hundred percent sure, but

7    I believe when I'm referring to Rick, it is Rick

8    O'Connor, IRS appeals' officer.

9        Q.    Okay.

10       A.    Rick has been advised, and may bring

11   it up, that Sid & IRS attorney now feel, unlike

12   they have said for over one year now, that, one,

13   we should be entitled to get our money back now as

14   a cash bond, only problem, it is a joint committee

15   case.

16              Two, with interest.

17              Three, but we can't deduct the

                (interest)
18   x͟n͟t͟e͟r͟e͟s͟t͟ in the years paid as no tax interest

19   liability to tie it to yet.  And then I have in

20   parenthesis "then" -- I'm not sure what that

21   refers to -- as per the 5701s we now have from Sid

22   on this, which JPH -- again, reference to Jerry

23   Hackman -- argued with Sid on, but $͟x͟x͟v͟ñ͟x͟ not yet

24   done with Sid, since Sid helped us do the 1990 and

25   1994 prepayments as payments of tax not cash

1   bonds, they should be deductible when paid.  I

2   need to point this out.  And I guess that last one

3   is ASAP, as soon as possible.

4         Q.   Okay.  Now, was this the first time

5   you learned that they you should be entitled to

6   get the money back now, referring to June 19th of

7   1996, I assume?

8               MS. LUTZKO:  Objection.  You can

9         answer the question.

10        A.   I don't -- I don't know exactly when

11  the IRS informed us that they were no longer .

12  treating the 1990 payment as a payment of tax and

13  interest and not as a cash bond.  But at some

14  point in time, after early 1995, we found out that

15  they were now treating our prepayment as if it was

16  a cash bond.

17        Q.   How did you find out?

18        A.   I believe Mr. Saewitz told Jerry

19  Hackman and myself that.

20        Q.   Okay.

21        A.   To which we strongly objected because

22  they had been telling us all along that it was a

23  payment of tax and not a cash bond.

24        Q.   Before this date of June of 1996, had

25  you asked for the money back?

1   to last exhibit is Exhibit Number 46.  If you can

2   take a look at that for me, please.

3            MS. LUTZKO:  Thanks.

4        A.   Okay.  I do recognize this document.

5        Q.   Okay.  Is this in your handwriting?

6        A.   Yes, it is.

7        Q.   Can you tell me what that document

8   represents?

9        A.   This is notes, again, per a

10  conversation that I had with Jerry Hackman with

11  regard to developments in our appeal case on the

12  interest claim.  Mr. Rick O'Connor, the IRS

13  appeals' officer, was reviewing our claim as to

14  whether or not we were entitled to interest on the

15  refund of our 1990 prepayment of tax and interest.

16       Q.   Okay.  The second page, marked 250 at

17  the bottom.  There are two stars that appear in

18  the left.

19       A.   Yes.

20       Q.   Can you read that portion, starting

21  from there down the page?

22       A.   Okay.  It says, "I like Rick's point"

23  -- again, referring to Rick O'Connor, IRS appeals'

24  officer.

25       Q.   Okay.

1      A.    Regarding our filing of a Form 1139 to
2    carryback the 1986 net operating loss when
3    originally filed.
4      Q.    Can I stop you? That "C/B" means
5    carryback?
6      A.    C/B means carryback.
7      Q.    I'm sorry. Go ahead.
8      A.    Not only do you have to read my
9    handwriting, you have to understand my shorthand,
10   yes.
11           To carryback the 1986 net operating,
12   loss when originally filed to earlier tax years,
13   as Rick indicated this carryback, done prior to
14   this audit or prepayment, put our 1986 account at
15   taxable income of 0. So the 1986 RAR, which
16   stands for revenue agent report, gave our 1986 tax
17   year a tax liability as 1986 taxable income was
18   increased.
19           By this issue, by $5-6 million and by
20   all issues by $3 million, as opposed to IRS's
21   chief argument that we never had a 1986 tax
22   liability and we should have known that we would
23   never have one. Subsequently, this 1986 tax
24   liability was also carried back to prior tax
25   years, with the 1986 tax year liability ultimately

1    being 0 after this carryback, but we did have a
2    1986 tax liability. These revenue agent report
3    adjustments increased 1986 taxable income. As JPH
4    -- again reference to Jerry Hackman -- as JPH
5    points out, the 1986 revenue agent report ends up
6    with additional taxable income on this accrual
7    issue of about $5-6 million, which resulted in a
8    tax liability of $2.5 to $3 million, which is
9    close to what we decided to prepay in December of
10   1990.

11            At least in theory, and Rick seems to
12   agree with us, and with the support of the cases
13   cited by the IRS, we should be entitled to treat
14   our December 1990 remittance as a payment of tax
15   and interest and not as a cash bond. And,
16   therefore, we should be entitled to interest on
17   the $3 million returned to us.

18            While reconciling our number to the
19   revenue agent report number is problematic, many
20   revisions/agreements on the various facets of this
21   accrual method change occurred from December 1990
22   to the revenue agent report in 1996, it should not
23   matter if the numbers can be reconciled. It is
24   only relevant that we had a tax liability, and we
25   paid a portion of it, and we did not designate it

```
1    to be a cash bond.
2            Q.   Great.  Thank you.  And, finally, the
3    very last, I'm going to show you what's been
4    marked as Government Exhibit 47.
5            MS. LUTZKO:  That was an affidavit.
6            MS. HALLETT:  That's the affidavit.
7        Starting at pages marked 253 to 257.  If
8        you could take a look at that document and
9        identify it for me, please.
10           Q.   I'm not going to ask you --
11           A.   Are you going to ask me questions
12   about this?
13           Q    No.
14           A.   That's fine.
15           Q.   Can you identify that document?
16           A.   Yes, I can.
17           Q.   What is it?
18           A.   This is my letter to Rick O'Connor,
19   the appeals' officer, in 1999, with regard to our
20   position that the prepayment in 1990 of tax and
21   interest was a payment of tax and interest and not
22   a cash bond, and, therefore, we were entitled to
23   interest when they refunded the money to us.
24           Mr. O'Connor had asked Mr. Hackman and
25   I to prepare and sign written affidavits attesting
```

```
1    to that.  And that is what these are.
2         Q.    Okay.  And that is your signature on
3    the affidavit?
4         A.    Yes.  Yes, it is.
5         Q.    Okay.  And sitting here today, is
6    everything in that affidavit true and correct to
7    the best of your knowledge?
8              MS. LUTZKO:  Objection.  Answer the
9         question.
10        A.    Yes, it is.
11             MS. HALLETT:  Okay.  Thank you.  I
12        have no further questions.  I appreciate
13        your time.
14             THE WITNESS:  Sure.
15             MS. LUTZKO:  We are not going to waive
16        signature.
17             (Deposition concluded at 11:21)
18
19                 Michael W. Carroll
20
21        STATE OF OHIO  )
22                       )  ss.
                COUNTY OF HAMILTON )
23
          Subscribed and sworn to before me this 7th day of February, 2003.
24
25                                     STANLEY C. FETTERS
                  Notary Public        NOTARY PUBLIC STATE OF OHIO
                                       MY COMMISSION EXPIRES 5/6/2003
```

TO THE REPORTER: I have read the entire transcript of my deposition taken on this ___6th___ day of ___December___, 2002, or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the signature page and authorize you to attach the following changes to the original transcript.

PAGE LINE   CORRECTION/CHANGE AND REASON THEREFORE

| PAGE | LINE | CORRECTION/CHANGE AND REASON THEREFORE | |
|---|---|---|---|
| 8 | 3 | in should be "on" | typo |
| 8 | 17 | "unit" should be "units" | typo |
| 11 | 16 | "deference" should be "deficiency" | typo |
| 11 | 18 | should say the 1990 "letter". | clarification |
| 11 | 23 | should say "references to a" | 2 typos |
| 12 | 17 | deduction "until the tax year is closed". | clarification |
| 12 | 18 | should say deduction "of it in 1988". | clarification |
| 14 | 3 | "publish" should be "publishing" | typo |
| 14 | 4 | "to" should be "from" | typo |
| 14 | 12 | should say since "this was an agreed change" | typos |
| 18 | 9 | should refer to "a" tax | typo |
| 19 | 16 | should say would be "a" reference | typo |
| 22 | 19 | should be "A. They went to the IRS." | typo |
| 22 | 20 | should be "Q. Did they go to Mr.Saewitz directly?" | typo |
| 22 | 21 | "Q" should be "A" | typo |
| 25 | 15 | "backup" should be "carryback" | typo |
| 27 | 4 | "payment" should be "prepayment" | typo |
| 28 | 20 | "paid" should be "payments" | typo |
| 29 | 23 | "can" should be "could" | typo |
| 32 | 18 | "interest" should be "(interest)" | typo |
| 32 | 23 | "I've" should be "I'm" | typo |
| 35 | 18 | and "my discussions with Sid that" I | typo |
| 38 | 22 | "or Bert" should be "and Bobby" | typo |
| 40 | 1 | should say "If they gave us the money, it" | typo |
| 42 | 15 | "0" should be "$0" | typo |
| 42 | 18 | should not be a period after increased | typo |
| 42 | 19 | "By" should be "by" and be on line 18 | typo |
| 42 | 20 | "$3" should be "$33" | typo |

_(signature)_                    _Michael W. Carroll_
STANLEY C. FETTERS                (SIGNATURE OF DEPONENT)
NOTARY PUBLIC STATE OF OHIO
MY COMMISSION EXPIRES 5/8/2003

NEW CENTRAL TRUST TOWER
PO BOX 5380
CINCINNATI OHIO 45201
513 977-3982

PROVIDER OF CASS
CORPORATE TAX DEPARTMENT



## SCRIPPS HOWARD

December 22, 1988

Mr. Jack R. Elliott
Case Manager
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

              re: The E. W. Scripps Company & Subsidiaries
                  E.I.N. #34-0517805

Dear Jack:

As we have discussed previously, The E. W. Scripps Company
and subsidiaries' desire to post a cash bond with the Internal
Revenue Service to in effect prepay and thereby stop the
interest accumulation on the 1982-84 adjustments anticipated
as a result of our recent settlement with the Internal Revenue
Service, which changed our method of reporting from the cash
method to the accrual method as of 1980.

This cash bond is being hand-delivered with this authorization
letter by our Jerome P. Hackman to your Team Coordinator,
George B. Imwalle on Thursday, December 22, 1988, is in the
amount of $9,000,000, and covers the following years now under
audit:

|                  | 1982        | 1983  | 1984        | TOTAL       |
|------------------|-------------|-------|-------------|-------------|
| Tax adjustment   | $3,000,000  | $ 0   | $2,500,000  | $5,500,000  |
| Interest Thereon | 2,500,000   | 0     | 1,000,000   | 3,500,000   |
|                  | $5,500,000  | $ 0   | $3,500,000  | $9,000,000  |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue Ser-
vice's receipt of this cash bond.

Thank you for your cooperation in this matter.

Sincerely,

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc.  1 - Letter for receipt purposes

**SCRIPPS 00020**



GOVERNMENT'S
EXHIBIT
1

1100 CENTRAL TRUST TOWER
P.O. BOX 5380
CINCINNATI, OHIO 45201
513 977-3882

MICHAEL W. CARROLL
CORPORATE TAX DIRECTOR



# SCRIPPS HOWARD

December 31, 1990

Mr. Sidney S. Saewitz
Internal Revenue Agent
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

   re:  The E. W. Scripps Company & Subsidiaries
        E.I.N. 34-0517805

Dear Sid:

As we have discussed previously, The E. W. Scripps Company and
subsidiaries' desire to prepay and thereby stop the interest
accumulation on the 1985-86 adjustments anticipated as a result
of our previous settlement with the Internal Revenue Service,
which changed our publishing affiliates' method of reporting
from the cash method to the accrual method as of 1980.

Our check for $7,000,000 is being hand-delivered with this
authorization letter by our Jerome P. Hackman to you today.
It covers the following years now under audit:

|                  | 1985         | 1986         | TOTAL        |
|------------------|--------------|--------------|--------------|
| Tax Adjustment   | $2,000,000   | $2,000,000   | $4,000,000   |
| Interest Thereon | 1,500,000    | 1,500,000    | 3,000,000    |
|                  | $3,500,000   | $3,500,000   | $7,000,000   |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue
Service's receipt of this payment.

Thank you for your cooperation in this matter.

Sincerely,

*Michael W. Carroll*

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc. 1 - Letter for receipt purposes

RECEIVED
EXAMINATION DIVISION

DEC 3 1 1990

334

GOVERNMENT'S
EXHIBIT

4



**Carroll, Mike**

| | |
|---|---|
| **From:** | Carroll, Mike |
| **To:** | Routt, Robby; Lyons, Doug; Buckey, David; Holliday, Robbin; Hickok, Lori |
| **Cc:** | Castellini, Dan; Stafford, Rob; Hackman, Jerome; Zimmerman, Dennis; Green, William |
| **Subject:** | Status: (1) IRS Settlement/Overpayment,  (2) 1994 Tax estimate/overpayment,  (3) Sacramento Cable - Tax Refund/Tax planning,  (4) 1994 Tax Information - Packets/Ross Reports |
| **Date:** | Wednesday, March 08, 1995 6:00PM |

This E-mail addresses a number of important tax issues that we are currently dealing with.  I apologize for its length. I started out over a week ago intending to address each topic in separate awareness memos or e-mails but kept getting interrupted. Since the issues are interrelated, I've decided to put them together on one "status " report and get it out to you.

IRS 1983-1987 SETTLEMENT / EXPECTED REFUNDS ON OUR OVERPAYMENTS

Our auditors are back again and working on the few remaining corrections needed to close these audits and on finishing their reports. Progress has been slow due to their lengthy absences since our tentative settlement with them last November. While the foreign tax credit issue regarding UPI's foreign net operating loss carryovers remains in dispute, we agreed to close all other issues and to take this issue to Appeals if necessary. Unfortunately, both our IRS Engineer and Head Agent will be gone again on other assignments after this week until April 3rd. I've requested that they remain on our case once they are back, at least until their reports for these settlements are final so that these years can be officially closed and our overpayment of tax and interest refunded as soon as possible.

Progress is being made.  We now have the final reports for Telescripps Cable and affiliated entities. We previously reviewed and okayed their preliminary adjustments regarding the amortization of Telescripps' acquired intangibles and the Scriptel redemption, so I do not anticipate problems in our review of the final reports.  We also have obtained TCI's agreement to accept and sign the settlement with the IRS. Before the Corporate IRS Report can be finished, the IRS Engineer needs to finalize the adjustments required by our acceptance of the IRS National Office's Intangible Assets Settlement Offer on our acquired intangible assets at KNXV, WXYZ, WFTS and Naples, and the related Closing Agreement, which must be signed by both sides. I'm told that he should be able to finish his work soon after he returns. Sid Saewitz indicates that he will be able to devote at least some of the time while he's gone to completing his report as it relates to the other agreed adjustments. We intend to review the final Telescripps' reports, complete an additional analysis requested by the  Engineer to assist him in finalizing the WFTS film amortization adjustments, and to work with Sid as we can during this period of their absence to help expedite their completion of their reports as soon as possible upon their return. Sid currently anticipates having his report completed and to us for our review and signature in early May. Once we get the corporate report, it should not take us long to review it.

Regarding our overpayment of our expected liability under the settlement, we have confirmed from the IRS and from obtaining copies of our tax accounts for the years 1983 through 1993 that our $7,000,000 prepayment in December 1990 and our $45,000,000 prepayment in December 1994 were both recorded as Advance Payments on IRS Examination Tax Deficiencies, and not as deposits or cash bonds. While this prevents us from obtaining an expedited refund of our overpayment now and we must wait until the Corporate audit report is completed and signed, and perhaps until the IRS Joint Committee also approves it, it does assure us that when we are refunded this overpayment of tax and interest, which should be in the neighborhood of $12,000,000 to $15,000,000, we will receive interest from the IRS on it at the current rate of 6.5%, which I'm told exceeds our current borrowing rate. Furthermore, this also assures us that our $3,000,000 deduction in 1990 for that portion of the 1990 prepayment designated as interest was proper. It also assures us that we will be able to deduct on our 1994 return that portion of the $24,500,000 of the December 30, 1994 prepayment that we designated as a payment of interest that is actually assessed as interest in the IRS's final report. The $700,000 refund that we just received is a partial refund of our overpayment that apparently was sent to us now due to an IRS oversight, but we don't expect any additional refunds until the audits are officially closed.

1994 TAX ESTIMATE / EXPECTED OVERPAYMENT / TAX PLANNING

We are currently preparing our company by company estimates of 1994 taxable income and related tax liability for our Form 7004 filing which is due March 15th.  While it is too soon to tell yet, I am anticipating that we should be overpaid by several million dollars.  This is after the $4,000,000 "Quickie" refund that we requested in mid-February and which we should be receiving by wire transfer any day now. If it appears that we are overpaid by more than this, we will request another "Quickie" refund.

We decided to play it safe when we made our 4th quarter tax installment payment on December 15, 1994 and paid $13,600,000 based upon the annualization of September year-to-date estimates of taxable income. We expected a smaller actual tax liability, due to the significant deductions for the December 30th prepayment of interest on our tentative IRS settlement and for the donation of Turner Broadcasting stock worth about $10,000,000 to The Scripps Howard Foundation, and for taking advantage of the opportunity to defer the reporting of about $11,400,000 of taxable income until 1995 for Sacramento Cable's anticipated 1995 receipt of the refund of previously overassessed possessory interest property tax liabilities for the years 1988-1995, with interest .  We deducted these contested taxes in 1992-1994 when they were billed and paid. Under the annualization method we could not consider these fourth quarter events; however, there was too much uncertainty on December 15th as to the

Page 1

GOVERNMENT'S EXHIBIT 16

SCRIPPS 00195

INE E. W. SCRIPPS COMPANY
P.O. BOX 5380
CINCINNATI, OHIO 45201
312 WALNUT STREET, SUITE 2800
CINCINNATI, OHIO 45202

CORPORATE TAX DIRECTOR

FAX (513) 977-3090
E-MAIL carroll@scripps.com

 **SCRIPPS**

August 6, 1999

RECEIVED

AUG 1 1 1999

APPEALS OFFICE
CINCINNATI, OHIO
INTERNAL REVENUE SERVICE

Mr. Richard A. O'Connor
Appeals Officer
IRS Appeals Office
312 Elm Street
Room 2330
Cincinnati, OH 45202

                    RE:    The E. W. Scripps Company

Dear Rick:  -

        This letter, which supplements my letter dated March 31, 1999, includes Jerome P.

Hackman's affidavit and my affidavit. The affidavits evidence that The E. W. Scripps Company's

intent was to make a payment of a tax liability and interest thereon (not a cash bond) on

December 31, 1990. The affidavits support my letter dated December 31, 1990 which explicitly

stated the Company's intent to pay the "1986 adjustments anticipated as a result of our previous

settlement with the Internal Revenue Service, which changed our publishing affiliates' method of

reporting from the cash method to the accrual method as of 1980". The check hand delivered

with the letter (as stated in the letter) was intended to pay (among other things) $2,000,000

increased tax liability (plus $1,500,000 interest) for the Company's 1986 taxable year.

        It is clear under the authorities set forth in my letter dated March 31, 1999 and

herein that the December 31, 1990 remittance was a payment of tax (plus interest) and that the

GOVERNMENT'S
EXHIBIT

47

250

Company is entitled to interest in excess of $2,245,212 on the amount it paid to the Internal
Revenue Service on December 31, 1990 with respect to 1986.

My letter dated December 30, 1990 specifically designated the $3,500,000
remittance as a payment for 1986 of $2,000,000 tax adjustment plus $1,500,000 interest thereon,
not a cash bond. In Ameel v. Comm., 426 F.2d 1270 (6th Cir. 1970), the Sixth Circuit, the Court
which has jurisdiction over the Company, held that a remittance made "in response to a proposed
deficiency asserted by the Government. . . and made by Appellant [taxpayer] intended to satisfy a
proposed deficiency and discharge any further tax liability. . . " was a payment of tax. Like the
remittance in Ameel, the Company's remittance was made to carry out its agreement with the
Internal Revenue Service on Form 870-AD to switch its publishing affiliates from the cash to the
accrual method of accounting and, when paid, was paid with the intent to discharge the
Company's tax liability. The Sixth Circuit's decision in Ameel is unequivocal support for the
claim for refund (as more fully described in my letter dated March 31, 1999).

It is clear from Ewing v. U.S., 914 F2d 499 (4th Cir. 1990) and Moran v. U.S., 63
F.3d 663 (7th Cir. 1995) that formal assessment of tax is unnecessary. What is important is the
taxpayer's intent to discharge its tax liability. The Company remitted the tax (plus interest) with
the intent of discharging its tax liability. My letter dated December 31, 1990 explicitly states that
intent. Further, Jerry Hackman's affidavit and my affidavit both evidence the Company's intent.
The Company intended to pay the tax and, as reflected in Jerry Hackman's affidavit and my
affidavit, directly communicated that intent to Internal Revenue Service Agent Sidney S. Saewitz.
Agent Saewitz's checking a box on an Internal Revenue Service form which the taxpayer had

251

Mr. Richard A. O'Connor
August 6, 1999
Page 3

never seen before can only be viewed as inadvertent error. It was inconsistent with the taxpayer's intent.

In addition to Jerry Hackman's affidavit (which includes our calculation of the tax due for 1986) and my affidavit, I am enclosing a copy of my earlier letter dated March 31, 1999. I believe our affidavits and the authorities cited in my letter support the Company's position. I would be pleased to discuss this issue with you further if any questions remain as to your allowance of the Company's claim in full.

Very truly yours,

Michael W. Carroll

Michael W. Carroll

cc: Castellini, Hackman, Toomajian

**AFFIDAVIT**

I, Michael W. Carroll, am the Corporate Tax Director of The E. W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 11, 1979.

With the approval of the Company's Senior Vice President/Finance and Administration, Daniel J. Castellini, I authorized the Company's $7,000,000 remittance made on December 31, 1990 of the Company's additional 1985 and 1986 consolidated federal income taxes, and the related interest, that the Company believed it owed as the result of the Company's agreement with the Internal Revenue Service ("IRS") on the Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash method to the accrual method as of the tax year 1990. My transmittal letter, dated December 31, 1990 to IRS Agent Sidney S. Saewitz, the IRS Audit Team Coordinator of the ongoing audit of the Company's 1985-1987 consolidated income tax returns, clearly indicated to the IRS that the Company's intent was to pay $2,000,000 in additional 1985 tax, $2,000,000 in additional 1986 tax, $1,500,000 in interest on the additional 1985 tax, and $1,500,000 in interest on the additional 1986 tax.

The June 16, 1988 Form 870-AD agreement bound the Company to change its publishing affiliates' method of accounting from the cash method to the accrual method for tax reporting purposes. In conjunction with that agreement and the closing of the Company's tax years through 1984, the additional tax and interest owed through the Company's 1984 tax year was assessed and paid. Although the IRS audit of the Company's returns for the years 1985, 1986 and 1987 began in early 1990, the additional

253

tax and interest owed for 1985 and 1986 as a result of the Form 870-AD agreement had
not yet been calculated. The Company anticipated a significant additional tax liability for
1985 and 1986 due to this agreement, and wanted to pay what it owed as soon as
possible. I asked Agent Saewitz to calculate the amount of additional 1985 and 1986 tax
due as a result of this agreed method change so that the Company could pay the
additional tax plus interest thereon before the end of 1990. He told me that he would not
be able to complete this complex calculation by then. I then told him that the Company
wanted to pay most of what it would owe in 1990, in order to both stop the accruing of
interest on this known and agreed tax adjustment and also to deduct the payment of the
interest on its 1990 return. We undertook the task of determining the additional tax and
interest that the Company would owe and to pay it by year-end. Agent Saewitz offered to
help submit the payment to the IRS.

   The adjustments as a result of the July 16, 1988 Agreement through the
Company's 1984 tax year had already been determined, assessed and paid and the
Company had already filed its 1987 return using the accrual method of accounting. I
instructed Jerome P. Hackman of my staff to calculate the additional tax the Company
owed for 1985 and 1986 so that the Company could pay the additional tax and the related
interest that it owed. We also researched how to make this payment of tax deficiency and
related interest so that it would be treated by the IRS as a payment of tax and interest, and
not as a cash bond, so that the Company could properly deduct the interest paid on its
1990 tax return. My transmittal letter that accompanied the Company's payment clearly
identified it as a payment of additional tax and the related interest for the tax years 1985

254

and 1986. It did not request that this payment be treated as a deposit in the nature of a cash bond.

Because I was vacation on December 31, 1990, I asked Mr. Hackman to deliver the Company's $7,000,000 payment, along with my transmittal letter, to the IRS Collections Department. When I returned from vacation early in 1991, Mr. Hackman advised me of his concern that Agent Saewitz, who had accompanied Mr. Hackman to IRS Collections, may have processed the Company's payment incorrectly, despite knowing that the intent was for this payment to be an payment of additional tax and related interest and not a cash bond. He told me that he raised this concern with Agent Saewitz at the time the payment was processed, and that Agent Saewitz had assured him that the payment would be posted and treated by the IRS as the Company intended, as an payment of tax and interest, just as I had designated it to be treated in my transmittal letter. He also assured him that the prepaid interest would be allowed as a 1990 tax deduction.

This December 31, 1990 payment was, in fact, posted to the Company's account as an Advance Payment of Exam Deficiency. We were able to confirm this on Account Transcripts which we later obtained for both tax years. We were therefore confident that the Company's payment had been properly treated by the IRS as intended, as an advance payment of additional 1985 and 1986 taxes owed and the related interest, which was deductible in 1990 the year in which it was paid.

In early 1995, Agent Saewitz informed me that our December 31, 1990 payments were treated as payments of tax and interest, and not as cash bonds. He assured me that the Company would receive interest on any of the monies that were refunded. We were

255

satisfied with his conclusion. We later learned that he then asked to have an IRS attorney research the issue further and confirm his conclusion.

On October 5, 1995 an Information Document Request was issued asking the Company to provide support for it's 1990 deduction of the interest paid on December 31, 1990. Sometime after this and prior to the April 9, 1996 issuance of the proposed adjustment to disallow the Company's 1990 deduction of this interest, Agent Saewitz made it known to me that he had reversed his position on the December 31, 1990 payment of tax and interest and that it was now his opinion that it should be treated as a cash bond instead. He told me that the Company was not entitled to deduct the interest portion of it in 1990. He also told me that any amounts refunded to the Company would not be entitled to interest. I strongly objected to his recharacterization of the December 31, 1990 payment of tax and interest as a cash bond, especially as Agent Saewitz clearly knew that the Company's intent was for this payment to be an payment of tax and interest, and not to be a cash bond deposit. I reminded him that if the payment had been processed improperly that it was due to his handling of the payment voucher, which Mr. Hackman objected to when he prepared it, and that Agent Saewitz had assured him that the payment would be treated by the IRS as the Company had intended, as a payment of additional 1985 and 1986 tax and deductible interest.

On September 11, 1997 after the Company and the IRS had settled its tax years 1985, 1986 and 1987, the Company received a refund of the $3,500,000 for the 1986 tax year without interest. Subsequently, on January 22, 1998 the Company and the IRS reached an exam settlement of all proposed IRS adjustments for tax years 1988-1991. In

this agreement, the IRS allowed the Company's 1990 deduction of the interest that it had paid on December 31, 1990.

On September 28, 1998 the Company filed its claim, requesting the interest to which it is entitled on the $3,500,000 that was refunded to it, as this money was clearly intended to be a payment of tax and interest, just as the IRS posted it and treated it for years.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

*Michael W. Carroll*

Michael W. Carroll

257

**AFFIDAVIT**

I, Jerome P. Hackman, am Tax Manager-Federal Audits of The E.W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 16,1984.

On December 31, 1990, I hand delivered to the Internal Revenue Service Exam Division at its office on 550 Main Street, Cincinnati, Ohio, the Company's check dated December 31, 1990 in the amount of $7,000,000 to the Internal Revenue Service ("IRS"). The $7,000,000 check was attached to a letter dated December 31, 1990 from Michael W. Carroll, the Corporate Tax Director of the Company, to Internal Revenue Agent Sidney S. Saewitz, which letter specifically designated $3,500,000 of the $7,000,000 as payment of $2,000,000 of tax (plus $1,500,000 interest thereon) for 1986.

The $7,000,000 remittance was intended to pay additional tax (plus interest thereon) that the Company calculated it owed for its 1985 and 1986 taxable years as a result of the Company's agreement with the IRS on Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash to accrual method.

In December 1990 Michael W. Carroll made the decision to make the payment to the IRS to satisfy the additional tax (plus interest thereon) for 1985 and 1986 resulting from the June 16, 1988 agreement with the Internal Revenue Service to change the Company's publishing affiliates' method of accounting from the cash to accrual method. The payment was intended not only to stop future interest accumulation on the additional 1985 and 1986 tax, but also to be deductible in 1990, to the extent of the portion designated as interest.

I calculated the additional 1985 and 1986 "cash to accrual switch" tax (plus the interest thereon). To calculate the additional tax I prepared a schedule of "Cash to Accrual Adjustments" on a cumulative basis comparing the December 31, 1986 Cash to Accrual Balance Sheets. A net cumulative Section 481(a) adjustment was computed by subtracting the Section 481(a) liabilities from Section 481(a) assets. Attached as an example is a copy of Denver Publishing's "Cash to Accrual Adjustments" schedule. The cash to accrual adjustments for tax years 1981 through 1984 had been computed by the Internal Revenue Service and agreed to by the Company prior to December 31, 1990. Therefore, I calculated the amount of tax and interest liability as of December 31, 1990. The amount of $16,140,533 represented the total Section 481(a) adjustments for the two-year period of 1985 and 1986 for the newspaper affiliates. As the schedule labeled, "Cash to Accrual Adjustment For All Scripps Howard Newspapers & United Feature Syndicate From 1/1/82 to 1/1/87 By Year and Cumulative To 1/1/82" indicates, I multiplied the total 1985 and 1986 Section 481(a) adjustment by the 46% corporate tax rate to calculate an additional tax liability of $7,424,645 for 1985 and 1986. I allocated the additional tax liability equally between the two tax years. I then calculated interest that would be due on this tax liability and included tax liabilities resulting from years 1982 through 1984 less an earlier Company remittance of $5,500,000. Total tax of $6,475,637 remained and I calculated interest on this amount to be $3,306,363. The total tax and interest liability was $9,782,000. Since the Company did not want to overpay on its liability, and as my calculation of it relied on many complex calculations done by various people in the Tax Department and the IRS, the Company

decided to round the tax and interest numbers down to a total of $7,000,000 split equally between years 1985 and 1986.

Mr. Carroll was on vacation, so I was assigned the task of hand delivering the $7,000,000 payment of tax and interest along with his transmittal letter. On December 31, 1990 Agent Saewitz and I walked to the IRS office. When we arrived there, Agent Saewitz stamped Mr. Carroll's transmittal letter and the $7,000,000 check as received on December 31, 1990. At this point, while I waited, Agent Saewitz located a Form 3244- A "Payment Posting Voucher Examination" and had a secretary type various information on the Form 3244-A. Agent Saewitz explained to me that the IRS uses Form 3244-A internally to post payments to taxpayer accounts and Agent Saewitz then provided me with a copy of the document. Upon examination of Form 3244-A, I noticed that the "Cash Bond Box" had been erroneously checked. Immediately, I objected to the characterization of the payment as a cash bond. I explained to Agent Saewitz that the $7,000,000 represented an advance payment of additional tax and related interest. Agent Saewitz responded that it would eventually be posted as the taxpayer designated it in the transmittal letter, but that for purposes of processing by the IRS collections department he was required to check either the "cash bond" box or the "Section 316 (C)" box. Since Agent Saewitz believed that Section 316 definitely did not apply, he said that he checked the "cash bond" box by default. He explained that the remittance would be posted as a payment of tax on the Company's transcript and that the interest would be deductible in 1990 by doing it this way. Again, I vigorously protested the checking of the "cash bond" box, but Agent Saewitz replied again that it had to be checked or "Collections" would not be able to process and accept the payment. Agent Saewitz acknowledged that he could understand my uneasiness and said that since he was the IRS Audit Team Coordinator for the Company that he would allow the interest expense as a deduction upon audit of the 1990 tax year. Agent Saewitz then suggested that he could have his secretary type the words

| | |
|---|---|
| TAX ADJ | 2,000,000 |
| INTEREST | 1,500,000 |
| | 3,500,000 |

for each year on the Form 3244-A. Agent Saewitz said that by doing this the Company's intent to make a payment of tax and interest would be clearly evident. At this point having been told by Agent Saewitz that I had no other options, I delivered the payment as Agent Saewitz had arranged it.

On October 5, 1995 I received Information Document Request Number 12 regarding the 1988 through 1991 IRS Audit of the Company. This IDR requested workpapers on how the 1990 payment was handled on the Company's tax return. On April 9, 1996 I received "Form 5701 Number 2 Notice of Proposed Adjustment" regarding disallowance of the Company's 1990 interest deduction resulting from the December 31, 1990 payment. Sometime between October 5, 1995 and April 9, 1996 I realized that Agent Saewitz no longer considered the Company's December 31, 1990 payment to be a payment of tax and interest, but now considered the payment to be a deposit in the nature of a cash bond.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

Jerome P. Hackman

```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3                      _   _   _

 4    THE E.W. SCRIPPS COMPANY   :

 5    AND SUBSIDIARIES            :

 6           PLAINTIFF            : CASE NO. C-1-01-434

 7    VS                         :

 8    UNITED STATES OF AMERICA   :

 9           DEFENDANT            :

10                      _   _   _

11

12              Deposition of JEROME HACKMAN, a

13    witness herein, taken by the plaintiff as upon

14    cross-examination pursuant to the Federal Civil

15    Rules of Procedure and pursuant to agreement among

16    counsel as to time and place and stipulations

17    hereinafter set forth, at the offices of Baker &

18    Hostetler, 312 Walnut Street, Suite 3200,

19    Cincinnati, Ohio 45202, before Ross A. Giglio,

20    official Court Reporter within and for the State

21    of Ohio.

22                      _   _   _

23              GIGLIO REPORTING SERVICES
                    3 CYPRESS GARDEN
24              CINCINNATI.  OHIO 45220
                    (513( 861-2200
25
```



1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
2                  WESTERN DIVISION

3                    -   -   -

4   THE E.W. SCRIPPS COMPANY  :

5   AND SUBSIDIARIES          :

6        PLAINTIFF            : CASE NO. C-1-01-434

7   VS                        :

8   UNITED STATES OF AMERICA  :

9        DEFENDANT            :

10                   -   -   -

11

12          Deposition of JEROME HACKMAN, a

13   witness herein, taken by the plaintiff as upon

14   cross-examination pursuant to the Federal Civil

15   Rules of Procedure and pursuant to agreement among

16   counsel as to time and place and stipulations

17   hereinafter set forth, at the offices of Baker &

18   Hostetler, 312 Walnut Street, Suite 3200,

19   Cincinnati, Ohio 45202, before Ross A. Giglio,

20   official Court Reporter within and for the State

21   of Ohio.

22                   -   -   -

23              GIGLIO REPORTING SERVICES
                  3 CYPRESS GARDEN
24              CINCINNATI.  OHIO 45220
                   (513( 861-2200

25



1    have to look in my records.

2         Q.    That's fine.  Show you an exhibit

3    that was marked as Exhibit 47.  If you could take

4    a look at that document for me, please, and in

5    particular, starting with the page marked at the

6    bottom, page 258.  You could take a look at the

7    whole exhibit.

8              Are you ready?

9         A.    I guess.

10        Q.    I would like to refer you

11   specifically to pages 258 through 260.  Have you

12   seen this document before?

13        A.    Yes.

14        Q.    Does page 260 contain your signature?

15        A.    Yes.

16        Q.    Is this an affidavit that you signed?

17        A.    Yes.

18        Q.    You may have had a chance already,

19   let me know if you have not, to read the

20   affidavit.  Let me know if everything in the

21   affidavit that you believe to be true and correct

22   today.

23        A.    Yes, I believe it to be true.

24        Q.    Okay.  The second paragraph of the

25   affidavit states on "December 31, 1990, I

1    hand-delivered to the IRS examiner division at the

2    office at 555 Main Street, Cincinnati, Ohio,

3    company check dated December 31, 1990 in the

4    amount of $7 million to the Internal Revenue

5    Service.  $7 million check was attached to a

6    letter dated December 31, 1990 from Michael

7    Carroll."

8             I would like for you now to take a

9    look at Exhibit 4.  Tell me if you have seen that

10   document before.

11        A.    Yes, ma'am.

12        Q.    Is this a copy of the letter and

13   check that you referred to in your affidavit?

14        A.    Yes, it is.

15        Q.    Also like to show you, have you look

16   at Government Exhibit 5.  Take a look at this

17   document for me, please.  Let me know if you

18   recognize it.

19        A.    Yes, I do.

20        Q.    Could you tell me what it is?

21        A.    It is a Form 3244-A examination

22   posting voucher.

23        Q.    Okay.  How is it that you recognize

24   this document?

25        A.    when we made our payment of tax and

1    interest on December 31, 1990, since the Internal

2    Revenue agent that I was dealing with, Sidney

3    Saewitz, had a secretary type this up and then he

4    date-stamped it ∧ gave it to me.
                    and then

5         Q.    Okay.  Did he give you a photocopy of

6    this or did he give you the original document?

7         A.    I believe that he gave me a photocopy

8    of it.

9         Q.    Okay.  The Government Exhibit

10   Number 4, I think that it is, if you could refer

11   to that.  Did you draft that letter?

12        A.    No, I did not.

13        Q.    Okay.

14        A.    Mr. --

15             MR. EYRE:  You were not asked the

16             question who drafted it.

17        Q.    In your affidavit, Government

18   Exhibit 47, you referred to some calculations that

19   you made?

20        A.    Yes.

21        Q.    1985-1986 liability.  Are those

22   calculations reflected in Exhibit Number 4?

23        A.    Yes.  The outcome of those

24   calculations are.

25        Q.    Okay.  I will now show you Government

1    Exhibit 49.  Take look at that document for me,
2    please.
3            A.    Yes.
4            Q.    Have you seen this document before?
5            A.    Yes.
6            Q.    Did you prepare it?
7            A.    Yes, I did.
8            Q.    Okay.  Could you tell me what it is?
9            A.    This is a calculation of -- it's the
10   calculation that was intended to satisfy the
11   additional tax and interest liability that was· due
12   to -- due to our method change that was -- due to
13   the change of our method of accounting from cash
14   to accrual basis, that we had reached an agreement
15   with the IRS on June 16, 1988, to change our
16   method of accounting.  This is a calculation of
17   that.
18           Q.    Okay.  This calculation was prepared
19   by you?
20           A.    Yes.
21           Q.    Okay.  On December 31, 1990, when you
22   presented the letter, Exhibit 4, and the check to
23   Sidney Saewitz, did you give him a copy of that
24   calculation?
25           A.    No, I didn't.

1      Q.    Do you recall at any time giving

2   Mr. Saewitz a copy of that calculation?

3      A.    No, I do not.

4      Q.    Okay.  When you presented the letter

5   and the check to Mr. Saewitz, where were you?

6      A.    We were at his office at 550 Main

7   Street.

8      Q.    IRS?  Was anybody else present?

9      A.    Well, there were, the room from what

10  I remember, there were other people.  There is,

11  like, a big room and then there is another room

12  off to the side and I think that we were -- I had

13  greeted other agents that I had known from

14  previous audits, but I think that when we sat down

15  we were alone, yes.

16     Q.    You were sitting down when you

17  presented him with the letter and check?

18     A.    Yes.

19     Q.    Do you recall what you told

20  Mr. Saewitz?

21     A.    I told him that here is the letter

22  and here is our check.  We intend to pay the

23  additional tax and interest that we owe for years

24  1985 and 1986 as a result of the June 16th, 1988

25  agreement to -- that I guess it was done on Form

1   870 that we had signed, and this is a payment of
2   the tax and interest and that, you know, he knew
3   that our intent was to make this payment before we
4   had -- well, we had asked him to make the
5   calculation and he had said that he did not want
6   to because of the complexities of it.
7            Q.    Let me back up.  You asked him to
8   make which calculation?
9            A.    To do this calculation for us, since
10  the IRS was adjusting our method of accounting.
11           Q.    By that, do you mean the additional
12  liability for the '85 and '86 tax years?
13           A.    Yes.
14           Q.    Okay.  So do you recall when you
15  asked Mr. Saewitz to make the calculation?
16           A.    No, I did not.  My boss, Michael
17  Carroll, asked him and I don't remember if I was
18  present when Mike asked him to do that or not.
19           Q.    Okay.
20           A.    But he didn't want to do it and so we
21  decided that we would do it and we alerted him to
22  what we were trying to do, that we wanted to pay
23  the tax and interest that we owed for years 1985
24  and 1986.  Basically, that's what we did.  We
25  brought the check and Mike's transmittal letter

1    how you calculated the liability or about the

2    dollar amount of the liability at all?

3         A.    No.

4         Q.    Okay.  I would like to refer you to

5    Government Exhibit Number 5.  Now, in your

6    affidavit, I believe that you stated that

7    Mr. Saewitz had a secretary prepare this document;

8    is that correct?

9         A.    That's correct.

10        Q.    So to the best of your knowledge,

11   Mr. Saewitz did not prepare this document?

12        A.    No, he did not.

13        Q.    Now, you will notice this document,

14   the cash bond box is checked?

15        A.    Yes.

16        Q.    Did you notice that on

17   December 31, 1990?

18        A.    Yes, I did.  And I alerted

19   Mr. Saewitz that I thought that this was incorrect

20   to do this, that this box should not be checked

21   because we were not making a cash bond payment.

22   He knew that it was not our intent.  Our intent

23   was always to make a payment of tax and interest

24   for the amounts that we owed for the additional

25   tax liabilities that we knew and interest that we

1    owed for years 1985 and 1986.

2           Q.    Okay.  Now, you said that Mr. Saewitz

3    knew that it was your intent to make a payment and

4    not a cash bond.  How do you know that he knew

5    that was your intent?

6           A.    Well, if he didn't know up to that

7    time, I told him right at that moment what we were

8    trying to do.  We were trying to make a payment of

9    tax and interest.  But he, I mean, Mike Carroll

10   and I had discussed that we wanted to pay the tax

11   and interest that we expected to owe for years

12   1985 and 1986.  And we wanted to pay the tax and

13   we wanted to pay the interest associated with that

14   liability.  And, I mean, we told him that numerous

15   times.  I mean, he knew that.  And I told him that

16   day again that's what we were doing.

17          Q.    You specifically told him on December

18   31, 1990 that you wanted to make a payment and not

19   a cash bond or deposit?

20          A.    That's correct.

21          Q.    Okay.  Are you sure about that?

22          A.    Yes.

23          Q.    Did Mr. Saewitz say anything to you

24   about why the cash bond box was checked?

25          A.    Yes.  He said for processing purposes

1   for the collection department that they needed to
2   check either the Send 316(c) box or the cash bond
3   box to process it.  And at that point, I said,
4   well, it is incorrect to do this because we are
5   not making a cash bond payment.
6              Basically, we discussed it back and
7   forth and he kept telling me in order for the
8   collection department to process it, that for the
9   transcript to be posted, that one of these two
10  boxes had to be checked or he could not process
11  this payment and that he would not be able to
12  consummate the transaction.
13        Q.    Okay.
14        A.    So then he -- well, then I told him
15  again that I didn't feel that this was correct to
16  do and his response was well, you know, I'm going
17  to be your IRS team coordinator for the 1990 cycle
18  and I know what your intent is and that you want
19  to obtain an interest deduction for the amount
20  specified as interest, and he said that he would
21  allow that deduction in 1990.
22        Q.    Okay.
23        A.    And then he added, said what we could
24  do also is to have the secretary type the words
25  "tax adjustment and interest" for the $2 million

1    of tax adjustment and the million five of interest
2    on the form itself in the remarks box.  I said
3    well, I guess that would help, and he said that
4    will clearly show that your intent was to pay, to
5    make the payment, the payment of interest --
6    excuse me -- the payment of tax and interest and
7    not a bond payment.
8         Q.    Okay.
9              MR. EYRE:  I'm not sure that it was
10             clear.  Maybe you want to clarify the form
11             that he got originally did not have the·
12             remarks section.
13        A.    Right.  This was later.  He handed
                     form
14    this ᴧback to the secretary and had her type this
               and then
15    on there ᴧgave it back to me.
16        Q.    So it was Mr. Saewitz's idea to type·
17    the --
18        A.    Yes, it was.
19        Q.    Okay.
20        A.    Yes.
21        Q.    On December 31, 1990, during that
22    time period, in your mind, what was the difference
23    between a payment and a cash bond?
24        A.    Well, if it was a cash bond,
25    basically, you would not be able to deduct the

18

```
 1   interest.  It would stop the accumulation of
 2   interest on the -- whereas the payment of tax and
 3   interest, if you have a known liability and it is
 4   fixed and determinable, you could pay the tax and
 5   you could also pay the associated interest with
 6   that and you could obtain an interest deduction.
 7        Q.   Would it be correct to say that it
 8   was Scripps's main purpose was to get an interest
 9   deduction in making this payment?
10        A.   Two-fold.  Stop the accumulation of
11   the interest and also to obtain the interest ·
12   deduction in 1990.
13        Q.   Okay.  December 31, 1990, do you
14   recall your job title with Scripps?
15        A.   I was either tax supervisor or tax
16   manager at that point.
17        Q.   Okay.  What did your job duties
18   entail?
19        A.   Well, we prepared tax returns part of
20   the year.
21        Q.   That would be Scripps's tax return?
22        A.   Yes.
23        Q.   Federal return?
24        A.   Yes, for the Consolidated Group.
25        Q.   Okay.
```

1          Q.    December 31, 1990.

2          A.    I would say the most that we ever had

3    was ten.

4          Q.    Okay.

5          A.    And now we are down to five.  So I

6    would think back then we probably had six or

7    seven, I guess.

8          Q.    Okay.  Okay.  When you prepared this

9    calculation for the 1985 and 1986 tax year, did

10   you refer to the 1986 tax return, the Scripps 1986

11   tax return in making those calculations?

12         A.    No, I didn't.

13         Q.    Do you know what you referred to in

14   making the calculation?  Any other documents?

15         A.    Well, I mean, these, the numbers.  Do

16   you want to know where the numbers came from?

17         Q.    Yes.  Exactly.

18         A.    Is that what you are asking?

19         Q.    Yes.  Exactly.

20         A.    The total column, well, let's take

21   one step back.  We were mandated by the change in

22   the legislation to adopt the accrual method of

23   accounting as of 1/1/87.  With the 12/31/86 return

24   that we filed, we had done -- we had calculated

25   the amount of the Section 481 adjustment in total

1    that we would on a cumulative basis the difference

2    between the method that we had been on, the cash

3    basis, and the accrual basis.  And that difference

4    is represented in this number $38,653,757.

5         Q.    Okay.

6         A.    And so that it is the cumulative

7    affect of the accounting method change from cash

8    to accrual.  And the numbers that you see for

9    years '81, '82, '83 and '84, these were

10   adjustments that had been made due to that method

11   change by the IRS.

12        Q.    Okay.  So if I could stop you there.

13   The '82, '83, '84 numbers were numbers that the

14   IRS came up with?

15        A.    Yes, ma'am.

16        Q.    Were these numbers that Scripps

17   agreed with?

18        A.    Yes.

19        Q.    Okay.  Okay.

20        A.    And so --

21        Q.    Well, how was it that you determined

22   the '85 and '86 numbers?

23        A.    Okay.  What I knew was that we had,

24   cumulatively, we had a change totaling $38,653,757

25   and what I then had to do was to go back and

1   figure out what the amounts would be for 1985 and
2   1986.  In order to do that, I took the adjustments
3   that the IRS had already calculated for '81, '82,
4   '83 and '84, put them all into the spread sheet by
5   company.  In some cases, I had to -- they would do
6   a 446 adjustment, which is the yearly increment, and
7   then we had a 481 (a) calculation, which is a
8   four-year spread.  The way that they had done it,
9   I had to go back.  They had done it piecemeal, so
10  I had to go back and piece together, you know,
11  who, which company did the 481(a) adjustment
12  belong to.
13          Once I did that, I added that to the
14  446 increment for each year and then I knew
15  in total the total agreed to each of the
16  total IRS adjustments for each year, so I knew
17  that I had everything in the right category.
18          Because later on, we would use this
19  to, you know, to set up the tax liabilities owed
20  by each company, so we used it internally also.
21  So anyway, what I did then was to simply, the '85
22  and '86 amounts were simply squeezed out by
23  subtracting from the cumulative total the amounts
24  for 1981, '82, '83 and '84 from that.
25          Q.    Okay.

```
 1           A.    That gave me a number which
 2    represented '85 and '86.
 3           Q.    Okay.  That's what that is.  So this
 4    is -- this number represents, am I correct, the
 5    total in income for the '85 and '86 tax years?
 6           A.    That's correct.
 7           Q.    So the $16,140,533.50 adjustment is
 8    the increase of income from 1985 and 1986?
 9           A.    That's correct.
10           Q.    Is this based strictly on the change
11    from cash to the accrual method?
12           A.    Yes.
13           Q.    Okay.  Is there any way -- well, back
14    up.  Are those your initials on the top of this
15    form?
16           A.    Yes.
17           Q.    Dated 12/21/1990?
18           A.    Yes.
19           Q.    Is that the date that you prepared
20    this?
21           A.    That's the day that the final
22    calculation was done, but it took me more time
23    than one day to do it.
24           Q.    Okay.  Do you recall approximately
25    how much time that you spent doing it?
```

1       A.    Well, significant time.  I'm sure
2   that we worked on our 12/15 estimates, but I would
3   say Mike gave me this project in early December
4   and so I probably worked off and on probably from
5   roughly December, roughly speaking, from probably
6   around December 1st through December 21st on it.
7       Q.    Okay.  Did anyone review your
8   calculations for accuracy?
9       A.    Mike Carroll examined this.  He did
10  not do a thorough review.
11      Q.    Okay.
12      A.    These calculations were very complex
13  and with the amount of -- Mike was also going on
14  vacation.  Due to that and the complexity of these
15  calculations, I'm assuming that he did not feel
16  that he had time to do a thorough review of it.
17      Q.    Now, I see here that you have
18  multiplied the $16 million by 46 percent?
19      A.    That's correct.
20      Q.    Is that the effective tax rate for
21  Scripps for the year?
22      A.    That's the federal income tax rate at
23  that time.
24      Q.    And you came up with the $7 million
25  tax figure; is that correct?

1   column, if you go to tax by year --

2        Q.   Okay.

3        A.   That's a running total starting from

4   '82, a combination of the '82, '83, '84 and the

5   '85 and '86 amounts.

6        Q.   Okay.

7        A.   And that was the total amount of tax

8   that was owed for the switch from cash to the

9   accrual method of accounting.

10       Q.   Okay.

11       A.   And we had made a payment on

12  12/31/88.  I think that says 12/20.  Maybe we did

13  make.  I believe that we did make it earlier than

14  12/31.  But we paid $3 million of tax for 1982 and

15  we made a payment of $2.5 million of tax for '84,

16  so that totals $5.5 million.

17            So what I did was I took the total

18  tax, less the amount that we had already paid for

19  the preceding years, and that left us with a

20  liability of $6,475,633.

21       Q.   Okay.

22       A.   And then what I did, since we could

23  not at that point sit down and actually calculate

24  the yearly increments, 1985 and 1986 yearly

25  increments to the dollar, we could only make a

1    reasonable calculation that both years would be
2    roughly equal, so what I did was I just divided
3    the tax liability in two.  I took half of the tax
4    and assumed that it was owed for 1985 and I took
5    the other half and I assumed that it would be owed
6    for 1986.

7            Q.    Okay.

8            A.    So, roughly, what would that be?
9    $3,200,000 of tax for each year.  And I could not
10   speak for Mr. Carroll, but I assumed that because
11   of the complexities of the calculation and, you
12   know, we later agreed that we should round it down
13   some, but I don't know how he decided to round it
14   down to that exact number.

15           Q.    Okay.

16           A.    But we agreed that due to the
17   complexities of this that, you know, we didn't
18   want to overpay the liability to the IRS.

19           Q.    Okay.  Now, you stated that you could
20   not determine exactly the dollar amount for 1985
21   and the dollar amount for 1986.  Why is that?

22           A.    Because you would have to take all of
23   the balances for each year, compare the 12/31/84
24   numbers to the 12/31/85 numbers and make your
25   calculations on that, and then do the same thing

1  for the year-end balances for years, for 12/31/85
2  and 12/31/86.

3      Q.   Okay.

4      A.   And, I mean, you're talking hundreds
5  of calculations.

6      Q.   Okay.

7      A.   Maybe to explain more this
8  $38 million number.

9      Q.   The total?

10     A.   Yeah, on the total.  All these
11 calculations in the total column had been done
12 previously.

13     Q.   Who did these?

14     A.   Well, I did the Denver Publishing
15 Company myself.  I came up with the $13,730,994.

16     Q.   Okay.

17     A.   That's the only one that I did
18 myself. ⌃The Rest of these were done by other tax
19 accountants in our tax department.

20     Q.   Okay.

21     A.   So, I mean, these took quite a bit of
22 time to do each company, and that's what you would
23 need to do to actually calculate the 1985 amount
24 and the 1986 amount.  And that's what the IRS
25 actually did with the preceding years.  That's why

1    Sid Saewitz did not want to do this because he

2    didn't feel that he had enough time to do the

3    calculations.  And that was his feeling on it.

4        Q.    Okay.

5        A.    But I do want to add that, you know,

6    the liability was fixed and determinable.  We

7    could measure what the liability was.  I think

8    that this is a valid measure of it.

9        Q.    Okay.  I would like to refer you to

10   Government Exhibit 6.  Take a look at that and

11   tell me if you have ever seen that before or not.

12       A.    Yes, I recognize it.

13       Q.    Could you tell me what it is?

14       A.    This is a tax return for the year

15   1986 for the Scripps Company, U.S. Corporate

16   Income Tax Return, Form 1120.

17       Q.    Did you prepare this form?

18       A.    No, I didn't.

19       Q.    Do you know who did?

20       A.    Well, this is a consolidated form, so
                                    Geoff
21   it was either, I believe Xxxfxx Frazier, I believe,

22   in our tax department prepared it.  Or it could

23   have been Rob Stafford.  I don't know which

24   gentleman prepared it.  But it was one or the

25   other.

1    Q.    Okay.  So if I am correct about
2  Mr. Carroll's letter to Sid Saewitz, he has
3  proposed a $2 million dollar tax adjustment for
4  1986, and a $1.5 million interest payment for
5  1986; is that correct?
6    A.    That's correct.
7    Q.    Okay.  Now, based upon your
8  calculations that you did for the '85 and '86
9  year, if the tax adjustment was divided by two,
10  would it be correct then to divide the increase in
11  income by two, by the '85 and '86 years?
12    A.    I guess that you could say that, yes.
13    Q.    Okay.  So that would mean
14  approximately an $8 million increase in income for
15  '85 and an $8 million increase for '86?
16    A.    That would be correct.
17    Q.    Okay.  So if looking at the '86
18  return, if you increased the income by $8 million,
19  can you tell me if that would have any effect upon
20  the tax liability for 1986?
21    MR. EYRE:  Objection.  You can
22    answer.
23    A.    This tax return by itself, no, it
24  would not change.
25    Q.    Okay.  It would not change or it

```
 1   would not affect the tax liability?
 2         A.    Wouldn't affect the tax liability.
 3         Q.    Which numbers would it change?
 4         A.    Except for we did carry this loss
 5   back to 1983.
 6         Q.    Okay.  Which loss?  Can you refer to
 7   the line on the tax return so that I am with you?
 8         A.    The $62 million loss.
 9         Q.    That would be line 30?
10         A.    Yes.
11         Q.    Okay.  You know that the $62 million
12   was carried back to '83?
13         A.    Yes.
14         Q.    All $62 million was carried back?
15         A.    No, part of it went into, I believe,
16   1984.  I don't believe that it all was to be used
17   in '83.
18         Q.    Do you recall approximately how much
19   went to each year?
20         A.    Not off-hand, no.
21         Q.    Okay.  Okay.  Would an increase in
22   income for 1986 by $8 million change the amount of
23   the tax loss for the year?
24               MR. EYRE:  Objection.
25         A.    Well, the increase of $8 million was
```

1    our, again, was our calculation of what we would

2    owe, the additional tax and interest that we would

3    owe for years 1985 and '86 from, you know, from

4    the switch from the cash method to the accrual

5    method of accounting.

6         Q.    Right.  But my question is if you

7    increased income, gross income by $8 million for

8    the '86 year, would that change the amounts of the

9    net operating loss, the $62 million loss?

10        A.    Yes.

11        Q.    Would that change, then, 1983 or 1984

12   income tax liability?

13        A.    Yes, it would.

14        Q.    Okay.  Do you recall what the 1983

15   tax liability was?

16        A.    No.

17        Q.    How about '84?

18        A.    No, I do not.

19        Q.    Okay.  Okay.  I would show you what

20   was marked as Government Exhibit Number 48.  If

21   you could take a look at that document for me,

22   please.  Have you seen this document before?

23        A.    Yes.

24        Q.    Could you identify it?

25        A.    Yes.  I prepared it back, well, dated

```
 1   December 28, 1990.
 2        Q.   Okay.  Is this -- what is this?
 3        A.   Research.
 4        Q.   Okay.  Is it addressed to Mike?
 5        A.   Yes.  It says "Mike."
 6        Q.   Okay.  I hate to ask you to do this.
 7   I had a hard time reading this.  Could you -- this
 8   is in your handwriting?
 9        A.   Yes.
10        Q.   Could you just read it in the record?
11             MR. EYRE:  We hope that you could
12        read your own writing.
13        A.   I hope so.
14             MR. EYRE:  If not, I have trouble.
15        Q.   It was not that bad.
16        A.   Sure.  "DJC called 12/27 saying he
17   would like to delay the $7 million payment until
18   1/4/91 because banks would charge a higher
19   interest rate on a year-end loan than by waiting
20   until first week of 1991.  His question was could we
21   deduct $3 million of interest in 1990 if we waited
22   to make $7 million payment until 1991?  They will
23   set up a $3 million interest accrual for books.
24   Seems to me we would have to at least pay the $4
25   million in tax by year-end in order to set up the
```

1   liability for interest" -- and I think that this
2   word over here is fixed liability.

3        Q.    Okay.

4        A.    "Seems to me that we would have to at
5   least pay the $4 million in tax by year-end in
6   order to set up the liability for interest since
7   an RAR for 1985 and 1986 has not been delivered to
8   Scripps Howard by IRS. ~~Although xxinxparenthesex~~,
9   (Although under 461(f), all events have occurred to
10  fix the liability -- IRS switched us to accrual in
11  1980 -- the amount can be accurately determined,
12  $3 million for interest, economic performance
13  occurs since interest economically accrues for
14  accrual basis companies.)

15               Payment of$^{a}$tax, without calling it a
16  cash bond (call it tax owed for cash to accrual
17  switch from newspaper group) would have same
18  effect as filing an amended return by December 31,
19  1990 and paying the tax, which would establish an
20  interest deduction for 1990.  DJC says that he
21  would definitely like to deduct $3 million in
22  interest in 1990 and not just stop the
23  accumulation of further interest.

24               Therefore, if we need the $7 million~~x~~
25  ~~ixfxxwexxmadexxthatxxfxxwmixkixon~~ paid by 12/31/90 he

1   will authorize it, but he prefers to wait until
2   1/4/91 to make payment if possible and maintain a
3   $3 million dollar interest deduction.

4           Doug and I ironed out our differences
5   on cash to accrual numbers on Wednesday.  He had a
6   $700,000 mistake on Pittsburgh Press and I forgot
7   to back out, take pre-1954 adjustment of $3
8   million.  After we were done, our differences were was
9   within $500,000 of taxable income on the overall
10  adjustment.  We still had small individual company
11  differences.  Instead of $4.4 million of tax it
12  should be about $4.7 million of tax.

13          Mike, my main concern with DJC is do
14  we have an actual liability under 461(f) andxxwhen
15  since we have no RAR only 1980 settlement forcing
16  us to switch to accrual basis for which we can couldk
17  deduct $3 million of interest in 1990 or even in
18  1991, and should we word our letter differently.

19          A cash bond only serves to stop the
20  running of interest and does not give rise to an
21  interest deduction.  Whereas it appears that if we
22  do not designate the payment as a cash bond, but
23  call it "tax due for switch from cash to accrual
24  basis of accounting," then the interest appears to be
25  deductible in the year paid per Revenue Ruling

89-6

1    ~~Xux9xxfx.~~    I will discuss further with you on Monday.

2    We deducted interest on last cash bond payment in

3    1988, whether correct or not.  I doubt if an agent

4    would challenge a cash payment for interest.

5    Laskey will need to know by 11:00 Monday.  If we

6    make no payment until 1991, I don't believe that

7    we could deduct the $3 million of interest in 1990

8    since we have no RAR for years 1985 and 1986.

9    Jerry."

10         Q.    Okay.  Does Mike refer to Mike

11    Carroll?

12         A.    Yes.

13         Q.    Who is DJC?

14         A.    Dan ~~Castellini~~ Castellini

15         Q.    Who is the Doug referred to?

16         A.    Doug Lyons.

17         Q.    Who is Doug Lyons?

18         A.    Presently the director of accounting.

19         Q.    He is employed with Scripps?

20         A.    Yes, he is.

21         Q.    Okay.  Who is the Laskey that is

22    referred to in the letter?

23         A.    He was the assistant treasurer for

24    the Scripps Company.

25         Q.    Okay.  Like to show you what was

1   was in hearing distance because I would assume

2   that she was because she was only a few feet away

3   from us when she typed this.  So I would think

4   that she was still in the room, but, that part of

5   it, you know, I don't know if other people were

6   around.

7        Q.    Do you recall the name of the

8   secretary who typed the form?

9        A.    No, I don't.  All that I could tell

10  you is that she was a female and that's all that I

11  know --

12       Q.    Okay.

13       A.    -- at this point.

14       Q.    Okay.  After you had delivered the

15  check and the letter, had conversation with Sid,

16  when you left the IRS, how did you think that the

17  IRS was going to treat the $7 million check, as a

18  cash bond or as a payment?

19       A.    I thought that the IRS would treat it

20  as a payment because I had reiterated to Sid time

21  and time again that we were making a payment of

22  tax and interest and he understood what we were

23  doing.  And he said just for collection purposes,

24  this box had to be checked, and he assured me that

25  it was a payment of tax and interest.  I trusted

1   him.  I really, you know, took him to his word

2   that when we audited 1980, that he would allow it

3   as a deduction.  And I had no reason to doubt him

4   up to that point.  Our relationship was always

5   honest and I had respect for Sid and I think that

6   he respected me.  I just had no doubt that what he

7   said to me would hold true.

8        Q.    Okay.  Okay.

9        A.    So I did want to add, I mean, you

10  know, I did reiterate more than once at that point

11  in time and he understood that we were making a

12  payment of tax and interest and not a cash bond.

13  And you know, he assured me that it was to be

14  posted correctly and I guess that later on, we

15  never received any notices to the contrary to

16  indicate that it was, that the IRS was going to

17  say it was a cash bond, and we deducted that on

18  our December 31, 1990 return, and after the

19  examination of that year was over, it was allowed

20  as a deduction.

21       Q.    Okay.  At some point in time, did you

22  learn that perhaps the IRS was not treating this

23  $7 million check as a payment, but rather treated

24  it as a cash bond?

25            MR. EYRE:  Objection.  You asked him

1      does he know how it was treated internally?

2           MS. HALLETT:  No.  At some point in

3      time, did he learn.

4           MR. EYRE:  What they thought it was

5      and how it was treated?  That's two

6      different things.

7      A.    I learned how -- well, Mr. Saewitz

8   had led me to believe that the posting of it was

9   as posted as a payment of tax and interest and not

10  a cash bond.  Up until probably October of 1995, I

11  believe, and we had a discussion earlier in 1995

12  in February where we had made another payment and

13  we realized that we had made an over-payment. We Had

14  an incorrect calculation in our numbers and we had

15  made a payment of $45 million in December of '94.

16  And we asked if we could get some of that money

17  back and Mr. Saewitz responded no because that was

18  a payment of tax and interest and it was not a

19  cash bond.  He reiterated that you could only get

20  monies back on a cash bond.  You have to wait

21  until the actual tax years are closed when you

22  make a payment of tax and interest.

23           So even in February of '95, I

24  believed that our 1990 payment would still be

25  treated as a payment of tax and interest.  And I

1   guess that the first inkling that I had that it
2   may not be treated as such was we received an
3   information document request in October of 1995
4   requesting our work papers on how we handled the
5   1990 portion that we designated as interest on the
6   tax return and we did deduct that, and I gave -- I
7   responded to that IDR and gave him a copy of the
8   work paper which showed that we deducted that
9   interest.

10          Q.    Okay.

11          A.    And I did not hear much from him on
12  it until I guess that it was between that time and
13  April of '96.  In April, we received a Form 5701
14  which was disallowing the interest expense.  So I
15  guess that I knew from his information document
16  request that he had a problem with that or he was
17  wondering about it, or he was, you know, he was
18  investigating or examining the payment, but I
19  didn't know until April of '96 that he was going
20  to actually disallow it.

21          Q.    Okay.  Okay.  Now, you had said that
22  you had some discussion with Mr. Saewitz in
23  February of 1995 regarding a December 1994
24  payment?

25          A.    Right.

```
 1              A.    Sid was on our job the better part of
                                      Imwalle's
 2    ten years.  He started as George Ixwxxkdxxs -- he

 3    moved into the team coordinator position, so

 4    everything just sort of over a ten-year period, he

 5    knew from being the -- moved from being the

 6    assistant on the job to being the team coordinator

 7    so that, you know, we have a ten-year history with

 8    Sid.  Just to tell you some of the background --

 9              Q.    Okay.

10              A.    -- to the case.

11              Q.    Okay.

12              A.    I don't know if that helps you or

13    not.

14              Q.    Okay.  It does.  After you delivered

15    the $7 million check to the IRS and you saw the

16    cash bond box checked on the posting voucher form,

17    did you go back to your office and relay that fact

18    to anybody in your office?

19              A.    Not that day.  Mike was -- Michael

20    Carroll, the Corporate Tax Director, was on

21    vacation.  And I believed Dan Castelini to be on

22    vacation.  That was part of my dilemma was whether

23    to go through and finish the transaction with Sid

24    as to how we had arranged it, or to take my check

25    and go back to the office and then do, you know,
```

1   don't, you know, don't consummate the transaction.
2   I guess that at that point I knew -- I could not
3   ask for help at that point.  I think that -- well,
4   I think -- well, I don't know for sure that
5   Mr. Castelini was on vacation, but I believed him
6   to be.
7           So it was up to me to decide whether
8   to go through with it the way that we had arranged
9   it with Sid, then having the secretary type "tax
10  adjustment plus interest" on it, and I guess that
11  ultimately I relied upon Sid that he would be, you
12  know, he was trustworthy as far as I was concerned
13  up to that point, and I always felt, you know,
14  that we could trust each other and I trusted him
15  that when he said that it would be posted as a
16  payment of tax and interest, I took him, you know,
17  at his word.
18          MR. EYRE:  Hold on a second.  Could
19      you read the question back?  I'm not sure
20      that you answered the question.  I'm not
21      sure.  Could you ask the question again?
22      (The reporter read the question)
23          MR. EYRE:  Yeah.  That was the
24      question that you were asked.
25  A.    Not on that day.

1          Q.     At some point in time, did you?

2          A.     Yes.

3          Q.     When was that?

4          A.     Probably in January of 1991.

5          Q.     Okay.  Who did you speak to about

6     this?

7          A.     The Corporate Tax Director, Mike

8     Carroll.  I expressed my concerns with what had

9     happened with the checking of the cash bond box

10    and I told him that I told, you know, well,

11    basically told the whole story, that what happened

12    and I had emphasized with Mike that I reiterated

13    to Sid numerous times that, you know, we were

14    making a payment of -- our intent was to make a

15    payment of tax and interest for the 1985 and 1986

16    tax liabilities and the interest that accrued on

17    those liabilities and, you know, I told him the

18    whole story that Sid -- about the typing of the

19    tax adjustment and interest on there, that Sid

20    felt that our intent would clearly be shown that

21    it was payment of tax and interest, not a cash

22    bond.

23         Q.     What was Mr. Carroll's reaction?

24         A.     He was concerned.  Maybe a little

25    bit -- I don't know if he was mad, upset or

54

1  whatever, but he was concerned.  He wanted the
2  payment to represent, you know, our intention,
3  which was to be a payment of tax and interest, not
4  a cash bond.  And he could not understand why Sid
5  had to check that box.  Part of my dealings with
6  Sid is that I did say in part of our argument, I
7  said, "Why don't you just not check the box, just
8  leave it blank?"  And he said, "No, we can't do
9  that.  For collections to process it, one of these
10 two boxes needs to be checked."  I don't know
11 what -- outside of that, I explained to Mike what
12 had happened.  I don't think that he was happy
13 seeing the cash bond box checked, but he clearly
14 stated the IRS knew what our intention was, which
15 was to pay tax and interest for 1985 and '86.
16        Q.    Did you show Mr. Carroll a copy of
17 the posting voucher form?
18        A.    Yes.
19        Q.    Okay.  Did he give you at that time
20 any further instructions with regard to insuring
21 that the $7 million was posted as a payment and
22 not as a cash bond at that point in time?
23        A.    Not -- at some point we asked the IRS
24 to give us a copy of our transcript, I guess.  And
25 I don't even know if that was related to this

1    whole thing, but any payment that we had made was

2    marked the same way.  I think they called it an

3    advance payment of an exam, advance payment on

4    examination or something like that.  So there was

5    nothing to indicate that it was being treated as a

6    cash bond, and we assumed that it was still being

7    recognized, I guess, as a payment of tax and

8    interest for those years.

9              Q.    Okay.  Would it be correct to say

10    that you continued to think that until October of

11    1995?

12             A.    Yes.

13             Q.    Okay.  I would like to refer you to

14    your affidavit, I believe that's Exhibit 47, page

15    marked 259 at the bottom.

16             A.    Yes.

17             Q.    Okay.  In the first full paragraph

18    there, about three-quarters of the way down, you

19    talked about a cash bond box or the section 316(c)

20    box.  Do you see that?

21             A.    Yes.

22             Q.    Okay.  Does that section 316(c)

23    referenced in your affidavit refer to the

24    Government Exhibit 5 posting voucher that says

25    "send 316(c)"?

1          A.    Yes.  I guess that's a typo.  That
2    should be Send 316(c).
3          Q.    Okay.  Do you know what a 316(c) is?
4                MR. EYRE:  Objection to the extent
5          that your answer calls for any discussions
6          that you had with me, okay?
7                You can't tell or you can't testify
8          to something that you might have learned
9          from me.  Do you understand the difference?
10                If you learned independently of me,
11          you could answer the question.
12                MS. HALLETT:  He could testify if he
13          knows what a 316(c) is.
14          A.    I don't want to answer this on the
15    advice of my legal counsel.
16                MS. HALLETT:  Is the objection
17          attorney-client privilege?
18                MR. EYRE:  Based upon attorney-client
19          privilege, unless he had some prior
20          knowledge as to what a 316(c) is.
21                MS. HALLETT:  I disagree.
22                MR. EYRE:  Okay.
23          Q.    In December 31 of 1990, did you know
24    what a 316(c) was?
25          A.    No.

1          Q.    Did you ask Mr. Saewitz?

2          A.    No.  He told me that that definitely

3    did not apply, and I trusted him.  Well --

4               MR. EYRE:  You answered the question.

5          You answered the question.

6          Q.    Did Mr. Saewitz tell you at any time

7    that the cash bond box or the Send 316(c) box must

8    be checked?

9          A.    Yes.  He told me that a box had to be

10   checked in order for the collections department of

11   the Internal Revenue Service to accept the payment

12   and to post it to our transcript.  Without that,

13   he could not process this transaction.  He was

14   going to hand me the check back.

15              MS. HALLETT:  I don't have any

16         further questions.  I thank you for your

17         time.

18                   (Deposition concluded)

19

20         *Jerome Hackman* (signature)

21              Jerome Hackman

22   STATE OF OHIO           )
                            ) ss.
23   COUNTY OF HAMILTON      )

24   Subscribed and sworn to before me this 6th day of February, 2003.

25   _____        STANLEY C. FETTERS
     Notary Public                    NOTARY PUBLIC STATE OF OHIO
                                      MY COMMISSION EXPIRES 5/8/2003

TO THE REPORTER:  I have read the entire transcript of my deposition taken on this _6 IH_ day of _FEBRVARY_, 2002, or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the signature page and authorize you to attach the following changes to the original transcript.


PAGE LINE   CORRECTION/CHANGE AND REASON THEREFORE

| PAGE LINE | CORRECTION/CHANGE | REASON |
|---|---|---|
| 4-12 | "Highcrossing" change to "High Crossing" | two words |
| 5-9 | add the word "a" | clarity |
| 6-18 | add the word "would" | clarity |
| 9-4 | add the words "and then" | clarity |
| 13-5 | add the word "just" | clarity |
| 13-8 | "Castelini" change to "Castellini" | spelling |
| 16-8 | add the word "and" | clarity |
| 16-20 | change the word "I" to "he" | clarity and understanding |
| 16-21 | add the word "deduction" | clarity |
| 17-14 | add the word "form" | clarity |
| 17-15 | add the words "and then" | clarity |
| 19-25 | add the word "it" | clarity |
| 22-6 | change "year" to "yearly" | clarity |
| 22-7 | change "KLA" to "(a)" | clarity and understanding |
| 22-14 | delete "and I" | clarity |
| 22-15 | delete "knew" | clarity |
| 28-18 | add the word "the" | clarity |
| 28-22 | add the word "for" | clarity |
| 29-21 | "Jeff" change to "Geoff" | spelling |
| 31-2 | add the word "it" | clarity |
| 33-20 | add the word "we" | clarity |
| 33-23 | add the word "it" | clarity |
| 34-15 | add the word "a" | clarity |
| 34-8 | delete "although in parentheses," | clarity and understanding |
| 34-9 | open parentheses before the word "although" | clarity |
| 34-14 | close parentheses after the word "companies" | clarity |
| 34-24 | delete the comma | clarity |
| 34-25 | delete the words "if we made that $7 million" | clarity |
| 35-3 | add the word "1990" | clarity |

STANLEY C. FETTERS
NOTARY PUBLIC STATE OF OHIO
MY COMMISSION EXPIRES 5/6/2003

(SIGNATURE OF DEPONENT)

TO THE REPORTER:  I have read the entire
transcript of my deposition taken on this _6 TH_
day of _FEBRUARY_____, 2002, or the same has been
read to me.  I request that the following changes
be entered upon the record for the reasons
indicated.  I have signed my name to the signature
page and authorize you to attach the following
changes to the original transcript.


PAGE LINE  CORRECTION/CHANGE AND REASON THEREFORE

| PAGE LINE | CORRECTION/CHANGE | REASON |
|-----------|-------------------|--------|
| 35-8 | add the letter "s" behind the word difference | clarity |
| 35-8 | change the word "was" to "were" | clarity |
| 35-14 | delete "and then" | clarity |
| 35-16 | change the word "could" to "can" | clarity |
| 35-18 | add the word "and" | clarity |
| 35-24 | add the word "then" | clarity |
| 36-1 | change 8.9-6 to 89-6 | error |
| 36-14 | change "Castelini" to "Castellini" | spelling |
| 38-7 | change "Jeff" to "Geoff" | spelling |
| 38-13 | delete "and then the reviewer" | clarity |
| 38-15 | add the word "the" | clarity |
| 40-5 | change "Imwalde" to "Imwalle" | spelling |
| 43-2 | change 1980 to 1990 | error |
| 44-13 | add the word "we" | clarity |
| 51-2 | change "Imwalde" to "Imwalle" | spelling |
| 55-1 | add the word "made" | clarity |
| 19-9 | delete the "s" after cycle | clarity |
| 26-14 | change the word "in" to "for" | clarity |
| 26-15 | change the word "in" to "for" | clarity |
| 43-2 | change the word "we" to "they" | clarity |


_Stanley G. Fetters_
STANLEY G. FETTERS
NOTARY PUBLIC STATE OF OHIO
MY COMMISSION EXPIRES 5/8/2003

_Jerome Bachman_
(SIGNATURE OF DEPONENT)

1100 CENTRAL TRUST TOWER
P.O. BOX 5380
CINCINNATI, OHIO 45201
513 8773862

MICHAEL W. CARROLL
CORPORATE TAX DIRECTOR


**SCRIPPS
HOWARD**

December 31, 1990

Mr. Sidney S. Saewitz
Internal Revenue Agent
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

    re:  The E. W. Scripps Company & Subsidiaries
        E.I.N. 34-0517805

Dear Sid:

As we have discussed previously, The E. W. Scripps Company and
subsidiaries' desire to prepay and thereby stop the interest
accumulation on the 1985-86 adjustments anticipated as a result
of our previous settlement with the Internal Revenue Service,
which changed our publishing affiliates' method of reporting
from the cash method to the accrual method as of 1980.

Our check for $7,000,000 is being hand-delivered with this
authorization letter by our Jerome P. Hackman to you today.
It covers the following years now under audit:

|  | 1985 | 1986 | TOTAL |
|---|---|---|---|
| Tax Adjustment | $2,000,000 | $2,000,000 | $4,000,000 |
| Interest Thereon | 1,500,000 | 1,500,000 | 3,000,000 |
|  | $3,500,000 | $3,500,000 | $7,000,000 |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue
Service's receipt of this payment.

Thank you for your cooperation in this matter.

Sincerely,

*Michael W. Carroll*

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc. 1 - Letter for receipt purposes

RECEIVED
EXAMINATION DIVISION

DEC 3 1 1990


GOVERNMENT'S
EXHIBIT
4

334



0901062828

7,000,000.00

SCRIPPS HOWARD

DECEMBER 31, 1990

PAY TO THE ORDER OF

INTERNAL REVENUE SERVICE

RECEIVED EXAMINATION DIVISION DEC 31 1990 DIST. DIR. INT. REVENUE CINCINNATI, OHIO

P.O. BOX ... CINCINNATI, OHIO

## Payment Posting Voucher— Examination (Not a taxpayer receipt)

| N M F | U L C | DLN / Status | SSN/EIN 34-0517805 | Form number/ MFT 1120/02 | Tax period 8612 | Transaction date 12-31-90 |
|---|---|---|---|---|---|---|

Taxpayer name, address, and ZIP code

E. W. Scripps Co.
1100 Central Trust Tower Cincinnati, OH 45202

List, in the column below, payments to be posted to the taxpayer's account. A maximum of two *Credit* transactions may be shown.

Remarks

Tax Adj     2,000,000
Interest    1,500,000
            3,500,000

RECEIVED

DEC 3 1 1990

DIRECTOR INT REV
CINCINNATI

☒ Cash bond    ☐ Send 316(C)

Prepared by *(Name and unit symbol)*
S. SAEWITZ, RA 1104, DO 31 Room 4504 FOB X2356   X2356

List, in the column below, any Debit amount to be assessed. A maximum of one *Debit* transaction may be shown.

| Transaction Data | | | | Transaction Data | | |
|---|---|---|---|---|---|---|
| Amount | Code | Description | | Amount | Code | Description |
| | | | | | 670 | Subsequent payment |
| | 170 | ES penalty | | | 610 | Remittance with return |
| | 180 | FTD penalty | | | 620 | Payment for 7004 |
| | 360 | Fees and collection cost | | 3,500,000 | 640 | Advance payment on deficiency |
| | 570 | Additional liability pending | | | 430 | All other est. tax payments |
| | | Other debit | | | 660 | 706-ES |
| | | Other debit | | | 680 | Designated interest |
| | | | | | | Other credit |
| | | | | 3,500,000 | | Total payment |

Form 3244-A (Rev. 6-85)                    Part 2                    Department of the Treasury
Dispose of all prior issues              (Duplicate copy—do not process)        Internal Revenue Service

---

## Payment Posting Voucher— Examination (Not a taxpayer receipt)

| N M F | U L C | DLN / Status | SSN/EIN 34-0517805 | Form number/ MFT 1120/02 | Tax period 8512 | Transaction date 12-31-90 |
|---|---|---|---|---|---|---|

Taxpayer name, address, and ZIP code

E.W. Scripps Co
1100 Central Trust Tower, Cincinnati, OH 45202

List, in the column below, payments to be posted to the taxpayer's account. A maximum of two *Credit* transactions may be shown.

Remarks

Tax Adj.   2,000,000
Interest   1,500,000
           3,500,000

RECEIVED

DEC 3 1 1990

DIRECTOR INT REV
CINCINNATI

☒ Cash bond    ☐ Send 316(C)

Prepared by *(Name and unit symbol)*
S. Saewitz, RA1104 DO31 Room 4504FOB X2356

List, in the column below, any Debit amount to be assessed. A maximum of one *Debit* transaction may be shown.

| Transaction Data | | | | Transaction Data | | |
|---|---|---|---|---|---|---|
| Amount | Code | Description | | Amount | Code | Description |
| | | | | | 670 | Subsequent payment |
| | 170 | ES penalty | | | 610 | Remittance with return |
| | 180 | FTD penalty | | | 620 | Payment for 7004 |
| | 360 | Fees and collection cost | | 3,500,000 | 640 | Advance payment on deficiency |
| | 570 | Additional liability pending | | | 430 | All other est. tax payments |
| | | Other debit | | | 660 | 706-ES |
| | | Other debit | | | 680 | Designated interest |
| | | | | | | Other credit |
| | | | | 3,500,000 | | Total payment |

Form 3244-A (Rev. 6-85)                    Part 2                    Department of the Treasury

340

GOVERNMENT'S EXHIBIT
5

THE E. W. SCRIPPS COMPANY
P.O. BOX 5380
CINCINNATI, OHIO 45201
312 WALNUT STREET, SUITE 2800
CINCINNATI, OHIO 45202

CORPORATE TAX DIRECTOR

FAX (513) 977-3090
E-MAIL carroll@scripps.com

 **SCRIPPS**

August 6, 1999

**RECEIVED**

AUG 1 1 1999

APPEALS OFFICE
CINCINNATI, OHIO
INTERNAL REVENUE SERVICE

Mr. Richard A. O'Connor
Appeals Officer
IRS Appeals Office
312 Elm Street
Room 2330
Cincinnati, OH 45202

> RE:    The E. W. Scripps Company

Dear Rick:   -

       This letter, which supplements my letter dated March 31, 1999, includes Jerome P.

Hackman's affidavit and my affidavit. The affidavits evidence that The E. W. Scripps Company's

intent was to make a payment of a tax liability and interest thereon (not a cash bond) on

December 31, 1990. The affidavits support my letter dated December 31, 1990 which explicitly

stated the Company's intent to pay the "1986 adjustments anticipated as a result of our previous

settlement with the Internal Revenue Service, which changed our publishing affiliates' method of

reporting from the cash method to the accrual method as of 1980". The check hand delivered

with the letter (as stated in the letter) was intended to pay (among other things) $2,000,000

increased tax liability (plus $1,500,000 interest) for the Company's 1986 taxable year.

       It is clear under the authorities set forth in my letter dated March 31, 1999 and

herein that the December 31, 1990 remittance was a payment of tax (plus interest) and that the

PARENT OF THE SCRIPPS HOWARD MEDIA COMPANIES

GOVERNMENT'S
EXHIBIT
47

250

Mr. Richard A. O'Connor
August 6, 1999
Page 2

Company is entitled to interest in excess of $2,245,212 on the amount it paid to the Internal

Revenue Service on December 31, 1990 with respect to 1986.

My letter dated December 30, 1990 specifically designated the $3,500,000

remittance as a payment for 1986 of $2,000,000 tax adjustment plus $1,500,000 interest thereon,

not a cash bond. In Ameel v. Comm., 426 F.2d 1270 (6th Cir. 1970), the Sixth Circuit, the Court

which has jurisdiction over the Company, held that a remittance made "in response to a proposed

deficiency asserted by the Government. . . and made by Appellant [taxpayer] intended to satisfy a

proposed deficiency and discharge any further tax liability. . . " was a payment of tax. Like the

remittance in Ameel, the Company's remittance was made to carry out its agreement with the

Internal Revenue Service on Form 870-AD to switch its publishing affiliates from the cash to the

accrual method of accounting and, when paid, was paid with the intent to discharge the

Company's tax liability. The Sixth Circuit's decision in Ameel is unequivocal support for the

claim for refund (as more fully described in my letter dated March 31, 1999).

It is clear from Ewing v. U.S., 914 F2d 499 (4th Cir. 1990) and Moran v. U.S., 63

F.3d 663 (7th Cir. 1995) that formal assessment of tax is unnecessary. What is important is the

taxpayer's intent to discharge its tax liability. The Company remitted the tax (plus interest) with

the intent of discharging its tax liability. My letter dated December 31, 1990 explicitly states that

intent. Further, Jerry Hackman's affidavit and my affidavit both evidence the Company's intent.

The Company intended to pay the tax and, as reflected in Jerry Hackman's affidavit and my

affidavit, directly communicated that intent to Internal Revenue Service Agent Sidney S. Saewitz.

Agent Saewitz's checking a box on an Internal Revenue Service form which the taxpayer had

Mr. Richard A. O'Connor
August 6, 1999
Page 3

never seen before can only be viewed as inadvertent error. It was inconsistent with the taxpayer's intent.

In addition to Jerry Hackman's affidavit (which includes our calculation of the tax due for 1986) and my affidavit, I am enclosing a copy of my earlier letter dated March 31, 1999. I believe our affidavits and the authorities cited in my letter support the Company's position. I would be pleased to discuss this issue with you further if any questions remain as to your allowance of the Company's claim in full.

Very truly yours,

Michael W. Carroll

Michael W. Carroll

cc: Castellini, Hackman, Toomajian

# AFFIDAVIT

I, Michael W. Carroll, am the Corporate Tax Director of The E. W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 11, 1979.

With the approval of the Company's Senior Vice President/Finance and Administration, Daniel J. Castellini, I authorized the Company's $7,000,000 remittance made on December 31, 1990 of the Company's additional 1985 and 1986 consolidated federal income taxes, and the related interest, that the Company believed it owed as the result of the Company's agreement with the Internal Revenue Service ("IRS") on the Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash method to the accrual method as of the tax year 1990. My transmittal letter, dated December 31, 1990 to IRS Agent Sidney S. Saewitz, the IRS Audit Team Coordinator of the ongoing audit of the Company's 1985-1987 consolidated income tax returns, clearly indicated to the IRS that the Company's intent was to pay $2,000,000 in additional 1985 tax, $2,000,000 in additional 1986 tax, $1,500,000 in interest on the additional 1985 tax, and $1,500,000 in interest on the additional 1986 tax.

The June 16, 1988 Form 870-AD agreement bound the Company to change its publishing affiliates' method of accounting from the cash method to the accrual method for tax reporting purposes. In conjunction with that agreement and the closing of the Company's tax years through 1984, the additional tax and interest owed through the Company's 1984 tax year was assessed and paid. Although the IRS audit of the Company's returns for the years 1985, 1986 and 1987 began in early 1990, the additional

tax and interest owed for 1985 and 1986 as a result of the Form 870-AD agreement had
not yet been calculated. The Company anticipated a significant additional tax liability for
1985 and 1986 due to this agreement, and wanted to pay what it owed as soon as
possible. I asked Agent Saewitz to calculate the amount of additional 1985 and 1986 tax
due as a result of this agreed method change so that the Company could pay the
additional tax plus interest thereon before the end of 1990. He told me that he would not
be able to complete this complex calculation by then. I then told him that the Company
wanted to pay most of what it would owe in 1990, in order to both stop the accruing of
interest on this known and agreed tax adjustment and also to deduct the payment of the
interest on its 1990 return. We undertook the task of determining the additional tax and
interest that the Company would owe and to pay it by year-end. Agent Saewitz offered to
help submit the payment to the IRS.

   The adjustments as a result of the July 16, 1988 Agreement through the
Company's 1984 tax year had already been determined, assessed and paid and the
Company had already filed its 1987 return using the accrual method of accounting. I
instructed Jerome P. Hackman of my staff to calculate the additional tax the Company
owed for 1985 and 1986 so that the Company could pay the additional tax and the related
interest that it owed. We also researched how to make this payment of tax deficiency and
related interest so that it would be treated by the IRS as a payment of tax and interest, and
not as a cash bond, so that the Company could properly deduct the interest paid on its
1990 tax return. My transmittal letter that accompanied the Company's payment clearly
identified it as a payment of additional tax and the related interest for the tax years 1985

and 1986. It did not request that this payment be treated as a deposit in the nature of a cash bond.

Because I was vacation on December 31, 1990, I asked Mr. Hackman to deliver the Company's $7,000,000 payment, along with my transmittal letter, to the IRS Collections Department. When I returned from vacation early in 1991, Mr. Hackman advised me of his concern that Agent Saewitz, who had accompanied Mr. Hackman to IRS Collections, may have processed the Company's payment incorrectly, despite knowing that the intent was for this payment to be an payment of additional tax and related interest and not a cash bond. He told me that he raised this concern with Agent Saewitz at the time the payment was processed, and that Agent Saewitz had assured him that the payment would be posted and treated by the IRS as the Company intended, as an payment of tax and interest, just as I had designated it to be treated in my transmittal letter. He also assured him that the prepaid interest would be allowed as a 1990 tax deduction.

This December 31, 1990 payment was, in fact, posted to the Company's account as an Advance Payment of Exam Deficiency. We were able to confirm this on Account Transcripts which we later obtained for both tax years. We were therefore confident that the Company's payment had been properly treated by the IRS as intended, as an advance payment of additional 1985 and 1986 taxes owed and the related interest, which was deductible in 1990 the year in which it was paid.

In early 1995, Agent Saewitz informed me that our December 31, 1990 payments were treated as payments of tax and interest, and not as cash bonds. He assured me that the Company would receive interest on any of the monies that were refunded. We were

satisfied with his conclusion. We later learned that he then asked to have an IRS attorney research the issue further and confirm his conclusion.

On October 5, 1995 an Information Document Request was issued asking the Company to provide support for it's 1990 deduction of the interest paid on December 31, 1990. Sometime after this and prior to the April 9, 1996 issuance of the proposed adjustment to disallow the Company's 1990 deduction of this interest, Agent Saewitz made it known to me that he had reversed his position on the December 31, 1990 payment of tax and interest and that it was now his opinion that it should be treated as a cash bond instead. He told me that the Company was not entitled to deduct the interest portion of it in 1990. He also told me that any amounts refunded to the Company would not be entitled to interest. I strongly objected to his recharacterization of the December 31, 1990 payment of tax and interest as a cash bond, especially as Agent Saewitz clearly knew that the Company's intent was for this payment to be an payment of tax and interest, and not to be a cash bond deposit. I reminded him that if the payment had been processed improperly that it was due to his handling of the payment voucher, which Mr. Hackman objected to when he prepared it, and that Agent Saewitz had assured him that the payment would be treated by the IRS as the Company had intended, as a payment of additional 1985 and 1986 tax and deductible interest.

On September 11, 1997 after the Company and the IRS had settled its tax years 1985, 1986 and 1987, the Company received a refund of the $3,500,000 for the 1986 tax year without interest. Subsequently, on January 22, 1998 the Company and the IRS reached an exam settlement of all proposed IRS adjustments for tax years 1988-1991. In

this agreement, the IRS allowed the Company's 1990 deduction of the interest that it had paid on December 31, 1990.

On September 28, 1998 the Company filed its claim, requesting the interest to which it is entitled on the $3,500,000 that was refunded to it, as this money was clearly intended to be a payment of tax and interest, just as the IRS posted it and treated it for years.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

Michael W. Carroll

Michael W. Carroll

**AFFIDAVIT**

I, Jerome P. Hackman, am Tax Manager-Federal Audits of The E.W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 16, 1984.

On December 31, 1990, I hand delivered to the Internal Revenue Service Exam Division at its office on 550 Main Street, Cincinnati, Ohio, the Company's check dated December 31, 1990 in the amount of $7,000,000 to the Internal Revenue Service ("IRS"). The $7,000,000 check was attached to a letter dated December 31, 1990 from Michael W. Carroll, the Corporate Tax Director of the Company, to Internal Revenue Agent Sidney S. Saewitz, which letter specifically designated $3,500,000 of the $7,000,000 as payment of $2,000,000 of tax (plus $1,500,000 interest thereon) for 1986.

The $7,000,000 remittance was intended to pay additional tax (plus interest thereon) that the Company calculated it owed for its 1985 and 1986 taxable years as a result of the Company's agreement with the IRS on Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash to accrual method.

In December 1990 Michael W. Carroll made the decision to make the payment to the IRS to satisfy the additional tax (plus interest thereon) for 1985 and 1986 resulting from the June 16, 1988 agreement with the Internal Revenue Service to change the Company's publishing affiliates' method of accounting from the cash to accrual method. The payment was intended not only to stop future interest accumulation on the additional 1985 and 1986 tax, but also to be deductible in 1990, to the extent of the portion designated as interest.

I calculated the additional 1985 and 1986 "cash to accrual switch" tax (plus the interest thereon). To calculate the additional tax I prepared a schedule of "Cash to Accrual Adjustments" on a cumulative basis comparing the December 31, 1986 Cash to Accrual Balance Sheets. A net cumulative Section 481(a) adjustment was computed by subtracting the Section 481(a) liabilities from Section 481(a) assets. Attached as an example is a copy of Denver Publishing's "Cash to Accrual Adjustments" schedule. The cash to accrual adjustments for tax years 1981 through 1984 had been computed by the Internal Revenue Service and agreed to by the Company prior to December 31, 1990. Therefore, I calculated the amount of tax and interest liability as of December 31, 1990. The amount of $16,140,533 represented the total Section 481(a) adjustments for the two-year period of 1985 and 1986 for the newspaper affiliates. As the schedule labeled, "Cash to Accrual Adjustment For All Scripps Howard Newspapers & United Feature Syndicate From 1/1/82 to 1/1/87 By Year and Cumulative To 1/1/82" indicates, I multiplied the total 1985 and 1986 Section 481(a) adjustment by the 46% corporate tax rate to calculate an additional tax liability of $7,424,645 for 1985 and 1986. I allocated the additional tax liability equally between the two tax years. I then calculated interest that would be due on this tax liability and included tax liabilities resulting from years 1982 through 1984 less an earlier Company remittance of $5,500,000. Total tax of $6,475,637 remained and I calculated interest on this amount to be $3,306,363. The total tax and interest liability was $9,782,000. Since the Company did not want to overpay on its liability, and as my calculation of it relied on many complex calculations done by various people in the Tax Department and the IRS, the Company

decided to round the tax and interest numbers down to a total of $7,000,000 split equally between years 1985 and 1986.

Mr. Carroll was on vacation, so I was assigned the task of hand delivering the $7,000,000 payment of tax and interest along with his transmittal letter. On December 31, 1990 Agent Saewitz and I walked to the IRS office. When we arrived there, Agent Saewitz stamped Mr. Carroll's transmittal letter and the $7,000,000 check as received on December 31, 1990. At this point, while I waited, Agent Saewitz located a Form 3244- A "Payment Posting Voucher Examination" and had a secretary type various information on the Form 3244-A. Agent Saewitz explained to me that the IRS uses Form 3244-A internally to post payments to taxpayer accounts and Agent Saewitz then provided me with a copy of the document. Upon examination of Form 3244-A, I noticed that the "Cash Bond Box" had been erroneously checked. Immediately, I objected to the characterization of the payment as a cash bond. I explained to Agent Saewitz that the $7,000,000 represented an advance payment of additional tax and related interest. Agent Saewitz responded that it would eventually be posted as the taxpayer designated it in the transmittal letter, but that for purposes of processing by the IRS collections department he was required to check either the "cash bond" box or the "Section 316 (C)" box. Since Agent Saewitz believed that Section 316 definitely did not apply, he said that he checked the "cash bond" box by default. He explained that the remittance would be posted as a payment of tax on the Company's transcript and that the interest would be deductible in 1990 by doing it this way. Again, I vigorously protested the checking of the "cash bond" box, but Agent Saewitz replied again that it had to be checked or "Collections" would not be able to process and accept the payment. Agent Saewitz acknowledged that he could understand my uneasiness and said that since he was the IRS Audit Team Coordinator for the Company that he would allow the interest expense as a deduction upon audit of the 1990 tax year. Agent Saewitz then suggested that he could have his secretary type the words

| TAX ADJ | 2,000,000 |
| INTEREST | 1,500,000 |
| | 3,500,000 |

for each year on the Form 3244-A. Agent Saewitz said that by doing this the Company's intent to make a payment of tax and interest would be clearly evident. At this point having been told by Agent Saewitz that I had no other options, I delivered the payment as Agent Saewitz had arranged it.

On October 5, 1995 I received Information Document Request Number 12 regarding the 1988 through 1991 IRS Audit of the Company. This IDR requested workpapers on how the 1990 payment was handled on the Company's tax return. On April 9, 1996 I received "Form 5701 Number 2 Notice of Proposed Adjustment" regarding disallowance of the Company's 1990 interest deduction resulting from the December 31, 1990 payment. Sometime between October 5, 1995 and April 9, 1996 I realized that Agent Saewitz no longer considered the Company's December 31, 1990 payment to be a payment of tax and interest, but now considered the payment to be a deposit in the nature of a cash bond.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

Jerome P. Hackman

12/28/90

GOVERNMENT'S
EXHIBIT
48

SCRIPPS 00091

Mike

DJc called 12/27 saying he would like
to delay # 7M payment until 1/4/91
because banks would charge a higher
interest rate on a year end loan then by waiting
until 1st week of 1991.

His question was could we deduct # 3 M
of interest in 1990 if we waited to
make $1M payment until 1991? They will set
up a # 1M interest account for books.

— It seems to me we would have to at least
pay the # 4M in tax by year end in
order to set up the liability for interest
since an RAP for 1985 & 1986 has not
been delivered to Scripps Howard by IRS,
(although under 461(f) all events have occurred
to fix the liability — IRS switched us to
accrual in 1980. The amount can be accurately
determined — # 3M for interest
economic performance occurs since interest
economically accrues for accrual basis companies)

& payment of tax without calling it a cash loan
(call it tax owed for cash to accrual switch
for newspaper group) would have same
effect as I am an accrual return on 12/31/90

and paying the tax which would establish
an interest deduction for 1990.

DJC says he would definitely like to
deduct the $3M of interest in 1990
and not just stop the accumulation
of further interest, therefore if
we need the $7M paid by
12/31/90 he will authorize it
but he prefers to wait until
1/4/91 to make payment if possible
and maintain a $3M 1990
interest deduction.

Doug and I ironed out our differences
on cash to accrual it's on
Wednesday. He had a 700,000
mistake on Pittsburgh Press
and I forgot to back out
tobe pre - 1954 adjustment of
$3M.
    After we were done our differences
were within 500,000 of taxable
income on the overall adjustment. (We
still had small individual company differences.)
Instead of $4.4M of tax it should be
about $4.7M of tax.        **SCRIPPS 00092**

Mike my main concern with DJC is do we have
an actual liability under 461(4) [since we

3

have no RAR only 1980 settlement forcing us to switch to accrual basis & for which we can deduct $3M of interest in 1990 or even in 1991. And should we word our letter differently?

A cash bond only serves to stop the running of interest and does not give rise to an interest deduction whereas it appears if we do not designate the payment as a cash bond but call it "tax due for switch from cash to accrual basis of accounting" then the interest appears to be deductible in the year paid per Revenue Ruling 89-6,

I will discuss further with you on Monday. We deducted interest on last cash bond payment in 1988 whether correct or not. I doubt if an agent would challenge a 1991 payment for interest. Lackey will need to know by 11:00 Monday.

If we make no payment until 1991 I don't believe we can deduct the $7M of interest in 1990 since we have no RAR for years 1985 and 1986.    Jerry

SCRIPPS 00093

CASH TO ACCRUAL ADJUSTMENT FOR ALL
JYPS SCWARD NEWSPAPERS & UNITED FEATURE SYNDICATE
FROM 01/01/82 TO 01/01/87 BY YEAR
AND CUMULATIVE TO 01/01/82

*JMH 12/21/90*

| COMPANY | TOTAL 681 ADJ. TOTAL 666 ADJ. BY YEAR THRU 1981 | TOTAL 681 ADJ. TOTAL 666 ADJ. BY YEAR 1982 | TOTAL 681 ADJ. & TOTAL 666 ADJ. BY YEAR 1983 | TOTAL 666 ADJ. BY YEAR 1984 | ESTIMATE OF TOTAL 666 ADJ. BY YEAR 1985 & 1986 | TOTAL |
|---|---|---|---|---|---|---|
| NIAGARA POST | (125,703.50) | 275,921.00 | (238,896.00) | 112,503.00 | (6,026.50) | 20,518.00 |
| CINNATI POST | (758,687.00) | 1,189,512.00 | 16,627,887.00) | 593,556.00 | 5,990,801.00 | 387,375.00 |
| RKGS CITIZEN JOURNAL | 7,057,810.00 | 480,197.00 | 2,065,323.00 | 7,209,921.00 | (4,793,051.00) | 0.00 |
| TIER | 735,061.50 | 25,386.00 | 25,386.00 | 0.00 | (120,920.50) | 56,743.00 |
| 'ER PUBLISHING | 4,207,700.50 | 3,400,592.00 | 2,180,752.00 | 2,609,053.00 | 1,138,280.50 | 13,730,394.00 |
| ILD POST | 305,736.50 | 74,599.00 | 45,815.00 | 20,398.00 | 139,602.50 | 447,944.00 |
| 'BIS PUBLISHING | 7,826,116.00 | 816,309.00 | 1,116,600.00 | 253,105.00 | 3,546,537.00 | 7,550,307.00 |
| WILLE NEWS SENTINEL | 693,837.50 | 87,286.00 | 315,082.00 | (247,105.00) | 1,825,953.50 | 2,449,646.00 |
| MEXICO STATE TRIBUNE | 531,362.00 | 31,269.00 | (8,091.00) | (24,652.00) | (483,347.00) | 46,531.00 |
| 'SBORAU PRESS | 2,204,559.00 | (222,201.00) | (185,660.00) | 587,288.00 | 8,861,679.00 | 11,245,585.00 |
| ART NEWS | 261,462.50 | 120,955.00 | (166,065.00) | 411,148.00 | (155,217.50) | 631,273.00 |
| TATTLER | 702,146.00 | 163,852.00 | 86,441.00 | 30,419.00 | 1250,168.00) | 863,890.00 |
| 'ED | 50,211.50 | (110,706.00) | 133,600.00 | 12,537.00 | 126,068.00) | 50,688.50 |
| SCRIPPS-HOME OFFICE | 83,911.00 | (666,329.00) | 88,560.00 | 409,192.00 | 458,772.00 | 368,636.00 |
| | 389,778.50 | 191,775.00 | (31,376.00) | (184,426.00) | 52,508.50 | 498,858.00 |
| 'LY COMPANY | (8,442.00) | 30,846.00 | (134,537.00) | 22,510.00 | 18,803.00) | 766.00 |
| ER FEATURE SYNDICATE | 1,002,620.00 | 82,848.00 | (2,032,770.00) | 1,361,708.00 | 184,278.00 | 597,360.00 |
| ONE BY YEAR | 12,819,176.00 | 5,784,211.00 | (3,155,993.00) | 7,265,229.00 | 18,140,533.50 | 38,853,756.50 |

| ONE BY YEAR | | 5,784,211.00 | (3,155,993.00) | 7,265,229.00 | 18,140,533.00 | 26,033,584.50 |
|---|---|---|---|---|---|---|
| RATE | | 46% | 46% | 46% | 46% | 46% |
| BY YEAR | | 2,660,737.06 | (1,451,756.78) | 3,342,005.34 | 7,424,645.18 | 11,975,631.63 |
| S CASH TAX BOND PAYMENT ON 12/20/88 | | 3,000,000.00 | 0.00 | 2,500,000.00 | 0.00 | 5,500,000.00 |
| AL TAX DUE | | (339,262.94) | (1,451,756.78) | 842,005.34 | 7,424,645.18 | 6,475,631.63 |

GOVERNMENT'S EXHIBIT 49    SCRIPPS 00129

1          IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
2                     WESTERN DIVISION

3                       —   —   —

4   THE E.W. SCRIPPS COMPANY :

5   AND SUBSIDIARIES        :

6          PLAINTIFF       : CASE NO. C-1-01-434

7   VS                     :

8   UNITED STATES OF AMERICA :

9          DEFENDANT        :

10                      —   —   —

11

12          Deposition of DAVID HOLSCHER, a

13   witness herein, taken by the plaintiff as upon

14   cross-examination pursuant to the Federal Civil

15   Rules of Procedure and pursuant to agreement among

16   counsel as to time and place and stipulations

17   hereinafter set forth, at the offices of Baker &

18   Hostetler, 312 Walnut Street, Suite 3200,

19   Cincinnati, Ohio 45202, before Ross A. Giglio,

20   Official Court Reporter within and for the State

21   of Ohio.

22                      —   —   —

23                  GIGLIO REPORTING SERVICES
                       3 CYPRESS GARDEN
24                  CINCINNATI, OHIO 45220
                        (513) 861-2200
25                                         ORIGINAL

1    reviewer; is that correct?

2            A.    Yes.

3            Q.    So since 1988, say?

4            A.    Yes.

5            Q.    Who is it that is supposed to make

6    the decision whether something is a cash bond or

7    payment of tax, or -- strike that.  Who is it that

8    is supposed to decide when a taxpayer comes in

9    whether a remittance that the taxpayer made is the

10   -- strike that.  Sorry.  When the taxpayer makes a

11   remittance, comes in, you know, states their

12   intention how they want it treated, is it the

13   agent, then, that determines whether it should be

14   treated as a cash bond or a payment?

15           A.    No.  It should be the taxpayer who

16   will be  -- if they would like it as a cash bond

17   they should be stating to the agent that we want

18   this payment posted as a cash bond or we are

19   making a cash bond, they may say.

20           Q.    And the agent is just supposed to do

21   what the taxpayer conveys to the agent?

22           A.    Yes.

23           Q.    Okay.  Who is it that fills out the

24   3244-A form?

25                MS. HALLETT:  Objection.  Foundation.



```
 1   how many different examination groups that we
 2   would have.
 3        Q.    Okay.   That would be in a large case.
 4   For instance, there might be large groups in the
 5   large case division of a corporate exam section?
 6        A.    Right.
 7        Q.    Okay.   Show you what was previously
 8   marked as Plaintiffs 6.   Give you a chance to look
 9   at that.
10        A.    Okay.
11        Q.    Okay.   Will you agree with me that
12   nothing in that letter says that -- it says that
13   the taxpayer is requesting treatment of their
14   remittance as a cash bond; is that correct?
15        A.    I agree.
16        Q.    So under what you just said to me a
17   few minutes ago, this remittance should be treated
18   as a payment?
19             MS. HALLETT:   Objection.   Go ahead.
20        Answer.
21        A.    From what I can tell, yes.
22        Q.    Okay.   All right.   All right.   Great.
23   Thank you.   Regarding the guidance that you would
24   look to when an examiner calls in to ask a
25   question, is that all kept in a central location
```

```
 1                    CERTIFICATE
 2   E.W. SCRIPPS            :
                            :   SS:
 3   UNITED STATES OF AMERICA :
 4           I, Ross A. Giglio, notary public in
 5   and for the State of Ohio, do hereby certify that
 6   before the giving of his deposition, the said
 7   DAVID HOLSCHER was by me first duly sworn to
 8   testify the truth, the whole truth and nothing but
 9   the truth; that the foregoing deposition was given
10   at said time and place by DAVID HOLSCHER, to
11   counsel herein set forth; that said deposition was
12   taken in stenotypy by me, afterwards transcribed.
13           I do further certify that said
14   deposition was submitted to the witness for
15   examination and signature, and that I am not a
16   relative, counsel or attorney to any party herein,
17   or otherwise interested in the outcome of this
18   action.
19           IN WITNESS WHEREOF, I hereunto set my
20   Hand and seal of office at Cincinnati, Ohio this
21   ___ 16th day of ___ JAN ___, 2002.
22                        _____
                          Ross A. Giglio
23                        Notary Public - State of Ohio
24   My commission expires:
     April 29, 2004
25
```

1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF OHIO

3                     WESTERN DIVISION

4                        - - -

5    THE E.W. SCRIPPS COMPANY    :

6    AND SUBSIDIARIES            :

7          PLAINTIFF            :CASE NO.C-1-01-434

8    VS                          :

9    UNITED STATES OF AMERICA    :

10        DEFENDANT               :

11                        - - -

12

13         Deposition of GEORGE IMWALE, a witness

14    herein, taken by the plaintiff as upon

15    cross-examination pursuant to the Federal Civil

16    Rules of Procedure and pursuant to agreement among

17    counsel as to time and place and stipulations

18    hereinafter set forth, on December 6, 2002, at

19    10:07 a.m., at the offices of Baker & Hostetler,

20    312 Walnut Street, Cincinnati, Ohio 45202, before

21    Sharlene D. Hall, Official Court Reporter within

22    and for the State of Ohio.

23

24

25                                    ORIGINAL



1    logical.  You had other stuff you were doing,
2    obviously?
3            A.    Uh-huh.
4            Q.    You had other responsibilities.
5    The issue arose during your tenure with Scripps as
6    to whether Scripps should switch from a cash
7    method of accounting to an accrual method of
8    accounting; isn't that true?
9            A.    That's true.
10           Q.    And what do you remember about that?
11           A.    I remember a lot about that, because
12   I did that work.
13           Q.    Okay.  Tell me what, first of all,
14   how long Scripps was on a cash basis.
15           A.    Since 19 -- 1888.
16           Q.    Since the beginning of Scripps?
17           A.    That's before the inception of the
18   code even.
19           Q.    That is before the inception of the
20   code.  And Baker & Hostetler was with Scripps from
21   the very beginning, by the way.
22           A.    You don't look that old.
23           Q.    I was not Baker nor Hostetler.  So
24   they were on a cash basis audit at IRS, that first
25   raised an issue with Scripps?

1        A.    No, no, that was -- people raised it,
2   but for one reason or another it didn't -- it
3   wasn't sustained.  I don't know how far along it
4   went in the process.  And the cycle, before I had
5   the issue, they tried to take them halfway by
6   using the cash equivalent series by making them
7   prepaid expenses rather than let them deduct --
8   let us set up prepaid.  So we tried to get them to
9   go halfway.  And then I started the cycle.  And
10  then I was the one that said, hey, as far as
11  newspaper groups, you have inventory.  The Section
12  4467 clearly calls for you to be able to do the
13  accrual method.

14            I proposed the adjustment on both the
15  Broadcast group and the Newspaper group.  Went up
16  to the appeals division, appeals sustained the
17  E.W.  Scripps, which was the Paper group.  They
18  sent -- they conceded the Scripps Howard came back
19  for the next cycle, and I don't remember the case,
20  but a case came out, involved a credit card
21  company, where they forced them to go on the
22  accrual method.  And say we revisited that issue
23  on the second cycle, and then I believe that
24  Frank, he is the policy appeals officer on that,
25  he got an agreement on that.

1    Q.   Okay.  So, just so I'm clear.  During
2    the first cycle, well, when you first came on
3    board as the team coordinator for E.W. Scripps
4    Company for the IRS looking at E.W. Scripps,
5    Scripps was still on the cash method?
6    A.   This sounds bad, but they had two
7    sets of books.
8    Q.   Right.  And they were still on a cash
9    method?
10   A.   Right.  And then the examining agency
11   examined the cash books, and they contend that the
12   accrual books were internal management reports.
13   Q.   Okay.  And you -- then you
14   represented -- the IRS convinced or persuaded or
15   mandated that Scripps, the Broadcasting group,
16   during the first cycle switched to the accrual
17   method?
18   A.   I proposed it, the taxpayer didn't
19   agree with it.  I couldn't -- at least they had to
20   go through the administrative process before it
21   became final.  But the first cycle, the Paper
22   group went on the accrual method, the second
23   Broadcast group.
24   Q.   Right.  And they both ultimately went
25   on the accrual method during your tenure?

1          A.    That's my -- well, see, when they
2    went on it actually, I wouldn't have been around,
3    because I would have written the report.

4          Q.    Correct.

5          A.    By the time the second cycle that
6    would have been up in appeals, I was on another
7    case.  We got copies of the appeals reports, so I
8    was aware that they were on the accrual method.

9          Q.    And once they were on the accrual
10   method, that's a binding obligation on their part.
11   They can't next year go on cash, right?  I mean,
12   once on accrual, you are on accrual?

13         A.    Well, they can, I mean, you can do
14   anything you want.  But they ran into trouble with
15   446 the consistence standard, you can't change
16   your method of accounting without permission.

17         Q.    Right.

18         A.    If you wanted this -- if they wanted
19   to go to the cash method, they have to file under
20   the revenue procedures first, once the issue is
21   procedure for changing your method of accounting,
22   and if you are -- if you are denied, then you
23   can't change.

24         Q.    Right.  So when they changed to
25   accrual, it was a binding obligation on their

1  part, without going back to the IRS and submitting
2  some type of request?
3        A.    They shouldn't --
4        Q.    They shouldn't?
5        A.    -- they should not change.
6        Q.    I mean, it was binding on their part,
7  unless they got permission from the IRS to change?
8        A.    Oh, yeah.  It's binding in the sense
9  if they do they sustain the penalty, yeah.
10       Q.    So, they are under the obligation to
11 stick to the accrual method?
12       A.    Absolutely.
13       Q.    There's no question in your mind
14 about that?
15       A.    Overall method, yes.
16       Q.    Okay.  Overall accrual method?
17       A.    Yes.
18       Q.    And since they switched to the
19 accrual method, well, after your cycle was done,
20 the two cycles, did you have any contact with E.W.
21 Scripps Company?
22       A.    To today?
23       Q.    Yes.
24       A.    I called Dan Castellini and wished
25 him happy retirement when he retired.

35

1    C E R T I F I C A T E

2    STATE OF OHIO        :

3                         : SS

4    COUNTY OF HAMILTON   :

5         I, Sharlene D. Hall, RPR, the undersigned,

6    a duly qualified and commissioned notary public

7    within and for the State of Ohio, do hereby

8    certify that before the giving of his aforesaid

9    deposition, GEORGE IMWALE was by me first duly

10   sworn to depose the truth, the whole truth and

11   nothing but the truth; that the foregoing is the

12   deposition given at said time and place by GEORGE

13   IMWALE; that said deposition was taken in all

14   respects pursuant to stipulations of counsel

15   hereinbefore set forth; that I am neither a

16   relative of nor employee of any of their counsel,

17   and have no interest whatsoever in the result of

18   the action.

19        IN WITNESS WHEREOF, I hereunto set my hand

20   and official seal of office at Cincinnati, Ohio,

21   this 16th day of _January_, 2003.

22

23                         _Sharlene D. Hall_

24   My commission expires:   Sharlene D. Hall, RPR
     February 1, 2005         Notary public - State
25                            of Ohio
26

1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4                    - - -

5    THE E.W. SCRIPPS COMPANY      :

6    AND SUBSIDIARIES              :

7          PLAINTIFF              :CASE NO.C-1-01-434

8    VS                            :

9    UNITED STATES OF AMERICA      :

10         DEFENDANT               :

11                   - - -

12

13         Deposition of WILLIAM D. JACKSON, a witness

14    herein, taken by the plaintiff as upon

15    cross-examination pursuant to the Federal Civil

16    Rules of Procedure and pursuant to agreement among

17    counsel as to time and place and stipulations

18    hereinafter set forth, on December 10, 2002, at

19    10:00 a.m., at the offices of Baker & Hostetler,

20    312 Walnut Street, Cincinnati, Ohio 45202, before

21    Sharlene D. Hall, Official Court Reporter within

22    and for the State of Ohio.

23

24

25                                ORIGINAL



1    that payment.

2         Q.    Okay.  And when you say "deducted

3    interest," if they deducted interest, that would

4    indicate that it was a prepayment of tax, because a

5    cash bond you couldn't deduct interest?

6         A.    That's the way the company was

7    treating it.

8         Q.    Is that your understanding of

9    whether or not you can deduct interest?

10         A.    No.  It's still based on the tax

11    law.

12         Q.    Right, I understand that.  But it's

13    your understanding that if a company posts a cash

14    bond, they can deduct the interest portion?

15         A.    No.  No, they could not.

16         Q.    If they made a payment, they could

17    deduct the interest.  If they made a payment of tax

18    and interest, they could deduct the interest

19    portion?

20         A.    Right.

21         Q.    So at some point you learned that

22    there was some issue around that, right?

23         A.    Right.

24         Q.    Tell me what you learned.  Who you

25    learned it from.

```
1    went back to the code or not.
2              Q.    Okay.  But it's your understanding,
3    in any event, that at some point you allowed the
4    IRS -- you acting for the IRS -- allowed Scripps to
5    take a deduction for the interest payment they made
6    in 1990?
7              MS. HALLETT:  I'm going to object.
8         A.    Yes.
9              Q.    And you understand that if the
10   company paid a tax and interest in 1990, prepayment
11   of the tax in 1990, under the IRS rules and the
12   case law, the company would be entitled to interest
13   on the payment if they got any portion of the
14   payment back?
15        A.    If it was, in fact, a tax payment,
16   yes.
17             Q.    And when you mentioned the write-up
18   made by Sid, what write-up are you talking about?
19        A.    886-A.
20             Q.    When you settled the matter with
21   Scripps, by settled, when you agreed that Scripps
22   could deduct the interest payment in 1990, did you
23   have a discussion with Scripps as to whether or not
24   that meant Scripps would be entitled to receive
25   interest on the money if they got the money back at
```

1   some point?

2          A.    The issue was discussed between the

3   Scripps and audit team, and I can't remember

4   exactly what was said.  I did agree with Sid on

5   disallowances, but in order to get the case closed,

6   I allowed him to have the interest.

7          Q.    The interest deduction?

8          A.    The interest deduction.

9          Q.    Did you understand by allowing to

10  have the interest deduction that that would give --

11  that that would entitle Scripps, if they were to

12  get money back from that payment, that they would

13  get interest on that payment?

14         A.    That's something that never came up

15  at the time.

16         Q.    But you do understand in the normal

17  course if you make a payment and it's a payment of

18  tax and you overpay and you get it back, you do

19  collect interest?

20         A.    The IRS does pay interest, yes.

21         Q.    Okay.  But you are saying in this

22  particular instance you never focused on that issue

23  when you made the deal?

24         A.    That was not the consideration.

25         Q.    Okay.  But you do understand that in

1  the normal course that that's how this works?

2       A.    Right.

3       Q.    That the taxpayer gets interest on

4  it?

5       A.    Right.

6            MR. EYRE:  Okay.  I don't think I

7       have any other questions.

8

9            (Deposition concluded at 10:07 a.m.)

10

11

12
                        _____
                        William D. Jackson

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF OHIO          :

                       : SS

COUNTY OF HAMILTON     :

        I, Sharlene D. Hall, RPR, the undersigned,
a duly qualified and commissioned notary public
within and for the State of Ohio, do hereby certify
that before the giving of his aforesaid deposition,
WILLIAM D. JACKSON was by me first duly sworn to
depose the truth, the whole truth and nothing but
the truth; that the foregoing is the deposition
given at said time and place by WILLIAM D. JACKSON;
that said deposition was taken in all respects
pursuant to stipulations of counsel hereinbefore
set forth; that I am neither a relative of nor
employee of any of their counsel, and have no
interest whatsoever in the result of the action.

        IN WITNESS WHEREOF, I hereunto set my hand
and official seal of office at Cincinnati, Ohio,
this 16th day of ____January____, 2003.




_Sharlene D. Hall_

My commission expires:    Sharlene D. Hall, RPR
February 1, 2005          Notary public - State
                                of Ohio

```
1              UNITED STATES DISTRICT COURT
2            FOR THE SOUTHERN DISTRICT OF OHIO
3                   WESTERN DIVISION
4                      - - -
5   THE E.W. SCRIPPS COMPANY :
6   AND SUBSIDIARIES,        :
7     Plaintiffs,            :
8     vs.                    : CASE NO. C-1-01-434
9   UNITED STATES OF AMERICA,:
10    Defendant.             :
11                     - - -
12          Deposition of AMY RAVENSCRAFT, a
13   witness herein, taken by the plaintiff as upon
14   cross-examination, pursuant to the Federal
15   Rules of Civil Procedure and pursuant to
16   agreement and Notice as to the time and place
17   and stipulations hereinafter set forth, at the
18   offices of Baker & Hostetler, 312 Walnut
19   Street, Suite 3200, Cincinnati, Ohio, at 10:30
20   A.M. on Thursday, March 20, 2003, before
21   Darlene Anthony, RPR, a Registered Professional
22   Reporter and Notary Public within and for the
23   State of Ohio.
24                     - - -
25
```

1         A.    Yes, I have.

2              Q.    In what context have you seen that

3    document?

4         · A.    I saw this when I was given a

5    request to provide deposition.  This was faxed

6    to me as proof that my services were required.

7              Q.    Are you prepared to speak on or

8    give testimony on the topics one through seven

9    listed on Exhibit 12?

10             A.    Yes, I am.

11             Q.    Is there any of those topics that

12   you feel uncomfortable giving testimony about?

13             A.    No.

14             Q.    Let me ask you, on the form

15   3244-A, if you checked the cash bond box, are

16   you supposed to check the 316-C box?

17             A.    Yes, you are.

18             Q.    And the reason you're supposed to

19   check the 316-C box is so the taxpayer is

20   notified that the taxpayer's payment is being

21   treated as a cash bond?

22                  MS. HALLETT:  Objection, leading.

23             Q.    You can answer.

24             A.    Yes.

25             Q.    And you're aware of the fact that

1    in this particular case the 316-C box was not

2    checked on the form 3244-A.

3             A.    I was told that.  I haven't seen

4    the document.

5             Q.    But you would agree with me that

6    if it's not checked, that is not consistent

7    with the IRS rules and regulations.

8                 MS. HALLETT:  Objection, leading.

9    Go ahead.

10            A.    Correct.

11            Q.    Do you know what a blocking series

12   is?

13            A.    Yes, sir.

14            Q.    What's a blocking series?

15            A.    It's code designed to give

16   information regarding a transaction posted to

17   an account.

18            Q.    And you're aware of the fact that

19   there's a particular blocking series to be used

20   for a cash bond.

21            A.    That's correct, I am.

22            Q.    What is that blocking series?

23            A.    999.

24            Q.    And you're aware of the fact in

25   the taxpayer account in question here that

1   blocking series was not used.

2           A.   Yes, I am.

3           Q.   And you would agree with me that

4   not using the blocking series is inconsistent

5   with internally treating it as a cash bond.

6           A.   Yes.

7           Q.   So would you conclude from that,

8   since there was no -- the blocking series was

9   not used internally, that the IRS was indeed

10  treating the payment as a prepayment of tax?

11              MR. HALLETT:  Objection, leading.

12          A.   It would make that indication that

13  it was a prepayment of tax, yes.

14          Q.   So you're saying that internally

15  in the IRS, in their computer system, they were

16  treating the 12/31/90 payment by Scripps as a

17  prepayment of tax and not a cash bond?

18              MS. HALLETT:  Objection, leading.

19          A.   That's the way it was posted, yes.

20          Q.   You're aware of the fact that if

21  you make a cash bond payment, you don't get

22  credited with interest.

23          A.   That's correct.

24          Q.   You're aware of the fact that if

25  you make a prepayment of tax, you do get

MS. HALLETT: Do you have a document?

MR. EYRE: I'll show it later.

A. Yeah, I didn't see the document so I don't know how they computed the interest on it.

Q. Let me go back. When a taxpayer comes in -- let's say this instance, Scripps wants to make a payment. You can argue about what they wanted to do but, trust me, they wanted to make a prepayment of tax. Who is it who is responsible for filling out the 3244-A?

A. It varies. It can be either the person who receives the check or the secretary to whom they give it to.

Q. In Cincinnati in 1990, was there any guidance given to individuals as to how to treat money coming in as a prepayment? Allegedly as a prepayment?

A. Yes, there were.

Q. Was it up to the individual who got the money to decide whether to treat it as a cash bond or a prepayment of tax?

MR. HALLETT: Objection.

A. I'm not trying to be -- both

1          Q.    And it's also your understanding
2    that that's inconsistent with Rev. Proc. 8458,
3    isn't it?
4               MS. HALLETT:  Objection, leading.
5          A.    I don't see it as being
6    inconsistent, no.
7          Q.    And so you think they are
8    consistent?
9               MS. HALLETT:  Objection, no
10   relevance.
11         A.   Yes.
12      (Plaintiff's Exhibit 16 was marked for
13       identification.)
14         Q.    I'm showing you what has been
15   marked as Plaintiff's Exhibit 16.  Have you
16   ever seen that before?
17         A.    No, I have not.
18         Q.    If you look at interrogatory
19   number two, please, and you see the question,
20   it says, "Was it the policy or practice of the
21   Cincinnati District on December 31, 1990, to
22   treat all 'advance payments' or other
23   remittances made by a taxpayer prior to
24   assessment or notice of deficiency as cash
25   bonds, regardless of the taxpayer's intent in

1    the actual 3244-A to see if that box was
2    checked?
3            A.   No, I did not.
4                 MS. HALLETT:   You mean in this
5    particular case?
6                 MR. EYRE:   In this particular
7    case.
8            A.   I was unable to secure the doc.  I
9    tried.
10           Q.   Here, I'll help you.  This has
11   already been marked as Plaintiff's Exhibit 7,
12   and I think it's pretty clear, Mr. Saewitz
13   identified it as the 3244-A.
14                MS. HALLETT:   Are the exhibits
15   running from the prior depositions?
16                MR. EYRE:   Yes, all the way
17   through.
18                MS. HALLETT:   Okay.
19                MR. EYRE:   That's why I started
20   with 12.
21           Q.   Can you see on that that the 316-C
22   box is not checked?
23           A.   Yes, I can.
24           Q.   And you've given your knowledge of
25   the procedure.  You would infer from that that

1   through what happens to the physical check.
2             MR. HALLETT:  If you could just
3   tell her, where it comes in?  When?  Not if it
4   comes in the mail, but if you just start --
5        Q.   Alright.  In this instance, money
6   is hand delivered to the IRS office with
7   Mr. Saewitz accompanying the taxpayer.  What
8   actually happens to the physical check?
9        A.   The IRS employee that received the
10  money would -- he was an examiner employee?
11       Q.   Yes.
12       A.   Was this an agent?  Would accept
13  the payment.  He would either himself or
14  herself fill out the appropriate form or give
15  it to another party to fill out.  In this case,
16  and quite often, the secretary fills out the
17  3244-A.  If there are letters that need to be
18  sent to the taxpayer regarding that, the form
19  itself is photocopied so the letter can be sent
20  to another -- the form can be sent to another
21  area so that letter may be sent.
22       Q.   Let's just stop you there.  In
23  this particular instance, if the 316-C box was
24  checked, they would have made a copy of the
25  3244-A and sent it somewhere else so the

28

1     taxpayer could have been notified?

2          A.    That's correct.

3          Q.    Go ahead.

4          A.    Then the check and the

5     accompanying form are put with others that may

6     have been received that day and sent over to

7     the Cincinnati Service Center for actual

8     deposit.  There's a form 3210 that's filled out

9     that has the taxpayer's name and money amount

10    so we can make sure that nothing gets lost or

11    detached from point A to point B.

12              When it gets to the Service

13    Center, they take that information, again

14    comparing the checks or the cash, if that were

15    the fact, along with the forms that were filled

16    out, again to make sure that the two balance

17    with each other.  It goes through like a

18    clearing and deposit where we'll encode the

19    check and make initial transactions to an

20    account.  Comes out on, again, a balance type

21    sheet so we can make sure that our deposit

22    matches what we're going to post on the

23    computer.

24         Q.    Let me stop you for a sec.  In

25    this particular instance, up until the check

1   going to the person to fill out the 3210 -- is
2   that what it's called --
3            A.   Yes, sir.
4            Q.   -- in this particular instance,
5   the only difference between whether the payment
6   is to be treated as a cash bond or prepayment
7   of tax is that in the cash bond situation the
8   3244-A would have been photocopied so a 316-C
9   letter could have been sent out.
10           A.   If the box for 316-C had been
11  checked, that's correct.
12           Q.   But in a cash bond situation,
13  that's what should have happened.
14           A.   Yes, sir.
15           Q.   And in a prepayment of tax
16  situation, that is not done.
17           A.   That's correct.
18           Q.   And in this instance, as far as
19  you know, the 316-C process, procedure, box or
20  form was not done.
21           A.   That's correct; no, sir.
22           Q.   So now it comes to the person
23  filling out the 3210.  Is there any difference
24  between anything they fill out if it's a cash
25  bond or a prepayment of tax?

1        A.    No, it's merely a tracking device.
2        Q.    So tell me when the first
3   difference would occur if it's treated as a
4   cash bond versus a payment in the process.
5        A.    Once it goes into the receipt and
6   control area, we have to assign payments
7   individual numbers.  They're called document
8   locator numbers.  When that number is assigned
9   on a cash bond, it will be assigned a number
10  that contains a blocking series of 99.
11       Q.    Is the only difference in the
12  document locator number -- it's a series of
13  numbers, it's not just one number.
14       A.    I believe it's 13 digits.
15       Q.    Correct.  Is the only way you can
16  look at that number and determine whether it
17  was intended to be a cash bond or a prepayment
18  of tax is to look at the blocking series?
19       A.    Currently?
20       Q.    In 1990.
21       A.    In 1990, it would be the blocking
22  series, yes.  That would indicate if it was a
23  cash bond.  If it wasn't the distinct 99, you
24  would assume that it was not a cash bond.
25       Q.    Is that different today?

1          A.    The numbering system is not
2    different but now we put another code on with
3    your payment to identify that it's a cash bond.
4    A designated payment code goes on it now.
5          Q.    And is there also -- at some point
6    you also have to say or list cash bond.  Don't
7    you have to have an actual entry that says
8    that?
9          A.    Not to the best of my knowledge.
10         Q.    There's no literal cash bond that
11   is now entered?
12         A.    There are certain -- there's more
13   than one way to view an account, and there are
14   certain ways to view an account that, when you
15   bring it up and you're looking at it, you will
16   see the literal cash bond today if you have
17   that designated payment code, 12, and the 99 in
18   the block.  It's called corporate files on
19   line.  It give us a different type of
20   information.  You'll see the literal.
21         Q.    Let me ask this.  In your looking
22   at the -- and I'll show you the computer
23   sheets.  In your looking at the computer
24   generated sheets regarding this payment of
25   12/31/90, did you see anything in there that

1    helped you or told you that it was treated as a
2    cash bond?
3              A.    No.
4              Q.    Anything you saw indicated that
5    the Internal Revenue Service was treating it as
6    a prepayment of tax?
7              A.    That's correct.
8         (Plaintiff's Exhibit 17 was marked for
9         identification.)
10             Q.    I'm handing you what has been
11   marked as Exhibit 17.  This is another
12   Cincinnati Review Release.  Do you see that?
13             A.    Yes, sir.
14             Q.    Have you seen this document
15   before, this particular document?
16             A.    Yes, I have.
17             Q.    And you saw it in preparation for
18   getting ready to testify, right?
19             A.    Yes, I did.
20             Q.    I just don't want to be showing
21   you stuff you haven't had a chance to look at,
22   so if you need time, feel free to look at this
23   stuff.
24             A.    Okay.
25             Q.    If you answer my questions, I'll

```
1    not treated as a cash bond.  The document that
2    you showed me previous, the exhibit did
3    indicate it was to be treated as a cash bond.
4            Q.   Okay.  Other than the form 3244-A
5    where the cash bond is checked, in all the
6    records of the IRS, any other records,
7    including computer records, the payment was
8    treated as a prepayment of tax and not a cash
9    bond.
10           A.   The records that I viewed, yes,
11   that's exactly correct.
12           Q.   And you, I assume, reviewed the
13   appropriate records in the entire group of
14   records you could to ascertain how the payment
15   was being treated internally.
16           A.   Yes, but there were documents I
17   was unable to obtain.
18           Q.   Which documents are those?
19           A.   The payment posting voucher.  I
20   wanted to -- there was a refund issued.  I was
21   unable to secure the information related to
22   that refund.  Those two things.
23           Q.   You have no reason to believe that
24   anything you would have seen, other than what
25   you already saw, would have changed your view
```

```
1    that this was treated as a prepayment of tax?
2              MR. HALLETT:  Objection, leading.
3         A.   I can't agree or disagree.  I
4    would have to see what they had to say.
5         Q.   But you're here today to testify
6    that, based on your getting ready for this
7    deposition and the records you reviewed, the
8    IRS internally treated the 12/31/90 payment as
9    a prepayment of tax.
10        A.   I'm here to explain our processes
11   and our procedures regarding a cash payment.
12        Q.   And you would agree with me,
13   that's how it was treated in this instance.
14        A.   Yes, with the information I have.
15        Q.   Now we're up to the point where
16   the 3210 is filled out, okay?  Is a cash bond
17   posted to the account -- a payment that's to be
18   a cash bond, is it posted to the taxpayer's
19   account just like a prepayment of tax is posted
20   to the taxpayer's account?
21        A.   It takes the same steps, yes.
22        Q.   So it would show up in the
23   computer print-out for the taxpayer even if it
24   was a cash bond.
25        A.   Yes.
```

1       Q.   Other than Stacy, because she
2   obviously has her own opinion.  Other than
3   Stacy, did you ask anybody at the IRS, "What
4   the heck is this?  You're claiming this is a
5   cash bond and your internal system is
6   considering it prepayment"?
7       A.   No, it's nobody else's business.
8       Q.   Let me show you what has already
9   been marked as Exhibit 9.  Have you seen
10  Exhibit 9 before?
11      A.   No, I have not.
12      Q.   Do you know what Exhibit 9 is?
13      A.   Yes, I do.
14      Q.   What is it?
15      A.   It's what's commonly referred to
16  as a tax mod print.  It is a computerized
17  version of your account as far as the IRS is
18  concerned.  Of the taxpayer's account.
19      Q.   And does this particular Exhibit 9
20  refer to any -- well, you can tell it refers to
21  E.W. Scripps Company by the reference in the
22  right-hand side; can you not?
23      A.   It's got what we call the name
24  control, and if I knew what your employer
25  identification number was, it would also be

1    indicated by that.
2            Q.   So the fact that it says EWSC on
3    the right-hand side upper corner would be, as
4    far as you know, the E.W. Scripps Company;
5    would it not?
6            A.   In this case, yes, it would be.
7            Q.   What information do you glean from
8    this sheet? You being an expert in this area.
9    What do you see there?
10           A.   I see on this particular account
11   that we have a credit balance for over $3.5
12   million. It looks like this account was -- may
13   I ask --
14           Q.   Sure.
15               THE WITNESS: Am I supposed to
16   tell him everything I know from this?
17               MR. HALLETT: Anything you know.
18           A.   It appears there was some audit
19   activity going on, an internal agent, an
20   auditor, was looking at or working on this
21   account. That's indicated by that minus LK
22   freeze. That tells me there's exam activity
23   going on. Gives me the receive date of the
24   return. It gives me what the tax on the
25   original return was claimed by the taxpayer.

1          A.    Uh-huh, that's right.

2          Q.    And the transaction amount shows

3    you this is the amount of money actually owed?

4          A.    That was the amount of tax shown

5    on the return, not necessarily what was owed

6    but shown.

7          Q.    Okay.  If you turn to the second

8    page, can you tell me what is that first entry?

9    Do you know what that is, the T/C 660?

10         A.    Six sixty is an estimated tax

11   payment.  Again, a prepayment of a tax

12   liability.

13         Q.    And that shows a million five

14   hundred was paid; does it not?

15         A.    That's correct.

16         Q.    When there's a minus after the

17   number in the transaction amount, that tells

18   you that the taxpayer paid that in; is that

19   right?

20               MS. HALLETT:  Objection, leading.

21         Q.    What does that tell you?

22         A.    That it's a credit.

23         Q.    If you go to the one, two, three,

24   fourth page, can you identify on there the

25   $3,500,000 payment made by Scripps at the end

1   of 1990?
2           A.   Yes, I can.
3           Q.   And that's down towards the
4   bottom; is it not?
5           A.   Yes, it is.
6           Q.   And the first number in that is a
7   640.  Do you see that?
8           A.   Yes, sir.
9           Q.   What is that number called?
10          A.   That's a transaction code.  It's
11  commonly referred to as advanced deficiency
12  payment.
13          Q.   And the next series of numbers,
14  12/31/90, what does that tell you?
15          A.   That's the date that the payment
16  was received by IRS.
17          Q.   And the next number, the 3,500,000
18  with a minus after, what does that tell you?
19          A.   That tells me that we received a
20  payment of 3.5 million on 12/31.
21          Q.   What does the 9103 mean?
22          A.   That's a cycle date.  The first
23  two digits are indicative of the year that it
24  was made and the last two digits are indicative
25  of the week that the payment posted.  Sometimes

1    the receive date and the posting date aren't
2    the same.
3              Q.    The next series of numbers, 1, 2,
4    3 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, what is
5    that?
6              A.    That's the document locator
7    number.
8              Q.    And the document locator number,
9    each of those numbers or most of them have some
10   meaning, don't they?
11             A.    They all do.
12             Q.    The first two numbers, what is the
13   17?
14             A.    Seventeen is a number that was
15   assigned to the Cincinnati Service Center, so
16   it's our Service Center code.
17             Q.    What is the next number?
18             A.    It's the tax class.
19             Q.    And in this case the tax class is
20   3?
21             A.    Three.
22             Q.    What does that tell you?
23             A.    Without my ADP, I couldn't tell
24   you.  There is a book that breaks down tax
25   codes.  I'm sure in this case it means it's a

1   business account.
2           Q.   Would that tell you anything about
3   whether -- the tax code three is actually
4   commercial taxpayer, what you just said.  Does
5   it tell you anything about whether this is
6   treated as a cash bond or a prepayment of tax?
7           A.   Nothing at all.
8           Q.   The next number is 18.  That's the
9   document code; is it not?
10          A.   That is.
11          Q.   Does the fact that it's 18 as
12  opposed to 17 tell you anything about whether
13  it's treated as a cash bond or a prepayment of
14  tax?
15          A.   No, it doesn't.
16          Q.   The next number 403, what does
17  that mean?
18          A.   That's the Julian date.  That is
19  the day of the year that the payment was posted
20  on, and in certain instances such as this, they
21  add 400 to that date.  So if it was the 15th
22  day of the year, it would be 415.
23          Q.   The next three numbers here,
24  they're 000.  That is the blocking number; is
25  it not?

1           A.    That's correct.

2           Q.    And that's the one that you said

3    in 1990, if it were to be a cash bond, would

4    have registered 999.

5           A.    Yes, it would.

6           Q.    And that's what told you that they

7    were not treating it internally as a cash bond.

8           A.    Yes.

9           Q.    If you go to the next page, can

10   you tell what the last entry is there, the

11   Notice CP210?  Do you know what that is?

12          A.    It's a notice that goes out to the

13   taxpayer informing them there's a credit on the

14   account.

15          Q.    When does this tell you it was

16   sent out?

17          A.    It's cycle 9711, so I'd have to

18   look at the chart and see when the 11th week of

19   '97 was.

20          Q.    If you look on the last page, do

21   you see in the middle there it's got the 3.5

22   million sitting there?

23          A.    Service Center Status, yes.

24          Q.    What does Service Center Status

25   mean?

46

1   bond.

2           Q.   Right, but that was not in place

3   in 1990.

4           A.   That's correct, it was not.

5       (Plaintiff's Exhibit 18 was marked for

6       identification.)

7           Q.   I'm showing you what has been

8   marked as Plaintiff's Exhibit 18, and this is

9   where -- well, can you tell me what this is?

10          A.   Yeah, a portion of the Internal

11  Revenue manual regarding how to compute or

12  credit interest on a payment.  Specifically,

13  cash bonds.

14          Q.   And this is what confirmed what

15  you earlier said, that if it's a cash bond

16  posted after January 1, 1990, a blocking series

17  must be 990 to 999?

18               MR. HALLETT:  Objection, leading.

19          A.   Yes, it is.

20          Q.   Did you know that ahead of time or

21  did you have to look this up to get to

22  understand the blocking series?

23          A.   I knew it ahead of time.

24          Q.   But this confirmed what you told

25  me, doesn't it?

A. Yes, it does.

Q. Is there any -- maybe you've answered this but I don't want to go through a lot of documents. There's nothing else internally that you have that can show that this payment was treated as a cash bond, right? I mean the only thing you've ever referred to is the original 3244-A.

A. Right. Computer-wise, there's no indication it was a cash bond.

Q. Right, so anything else you looked at internally, everything you looked at, whatever you looked at confirmed for you that it was treated as a prepayment of tax, internally.

A. Yes, it was.

(Plaintiff's Exhibit 19 was marked for identification.)

Q. Showing you what is marked as Plaintiff's Exhibit 19. Can you tell me what this is?

A. This is another Review Release for Cincinnati.

Q. And this also tells you, does it not, that if it's a cash bond, you must check

```
1    the 316-C box?
2                 MS. HALLETT:  Objection, leading.
3          A.    Yes, it does.
4          Q.    And under paragraph C in
5    Exhibit 19, it goes through the procedure you
6    already told me about, which is photocopying
7    the form so you can send it to somebody to send
8    out the 316-C notice.
9          A.    That's correct.
10         Q.    Why is it important to send out a
11   316-C notice to a taxpayer?
12                MR. HALLETT:  Objection,
13   governmental deliberative process privilege.
14   You can answer.
15         A.    To notify the taxpayer that we
16   have, in fact, treated a payment like a cash
17   bond and what happens to that payment.
18         Q.    Why is that important to the
19   taxpayer?
20         A.    The taxpayer needs to be aware
21   that they may not be allowed credit interest,
22   as we discussed before, and that the refund
23   statute expiration is different.
24         Q.    So it's important for the taxpayer
25   to get that 316-C notice if it's being treated
```

Case 1:01-cv-00434-SJD   Document 22   Filed 04/01/2003   Page 163 of 223

Page 49

1    as a cash bond.

2           A.   Yes.

3     (Plaintiff's Exhibit 20 was marked for

4     identification.)

5           Q.   Showing you what has been marked

6     as Exhibit 20.  Can you identify that for me,

7     please?

8           A.   Yes, this is what we call a BMFOL

9     (phonetically pronounced bimfol) print-out.  It

10    is the corporate file on line that I explained

11    a little bit.  It's another way to view an

12    account.

13          Q.   One of the questions I have, and

14    maybe you can clear it up for me, does -- what

15    do you call it?  Bimfol?

16          A.   Yeah.

17          Q.   Is there a BMFOL for each

18    particular year or just one BMFOL for the

19    taxpayer?

20          A.   For each particular year.

21          Q.   So each tax year.  Is that right?

22          A.   For an 1120, each tax year.  If

23    you file 941, there would be one for each 941

24    that you filed, each tax form.

25          Q.   But this particular BMFOL, does it

LITIGATION SUPPORT SERVICES, INC.
Cincinnati, Ohio (513) 241-5605 / Dayton, Ohio (937) 224-1990

1    the documents?
2              A.    Didn't surprise me.
3              Q.    Do you think it's wrong to treat
4    it as a cash bond?
5                    MS. HALLETT:  Objection,
6    relevance.
7              A.    Do I have to answer that?
8              Q.    Yeah.   What do you think?
9                    MS. HALLETT:  You can give your
10   opinion.  It doesn't matter.
11             Q.    What is your opinion?
12             A.    On whether I think we processed it
13   correctly?
14             Q.    Yeah.
15             A.    I don't think we processed it
16   correctly.
17             Q.    You, being the IRS, processed it
18   as a prepayment of tax.
19             A.    Yes, we did.
20                   MR. EYRE:  I have no further
21   questions.  Thank you very much.  I appreciate
22   it.
23
24

25                        AMY RAVENSCRAFT

56

1       C E R T I F I C A T E
        STATE  OF   OHIO    :
2                          :  SS
        COUNTY OF HAMILTON :
3               I, Darlene Anthony, RPR, the under-
4       signed, a duly qualified notary public within
5       and for the State of Ohio, do hereby certify
6       that AMY RAVENSCRAFT was first duly sworn to
7       depose the truth, the whole truth, and nothing
8       but the truth; the foregoing is the deposition
9       given at said time and place by said witness;
10      that said deposition was taken pursuant to
11      stipulations hereinbefore set forth; that said
12      deposition was taken by me in stenotypy and
13      transcribed by means of computer; that said
14      deposition was submitted to the witness for
15      examination and signature; that I am neither a
16      relative of any of the parties or any of their
17      counsel; and I am not, nor is the court
18      reporting firm with which I am affiliated,
19      under a contract as defined in Civil Rule
20      28(D), and have no interest in the result of
21      this action.
22              IN WITNESS WHEREOF, I hereunto set my
        hand and official seal of office at Cincinnati,
23      Ohio, this 25th day of March, 2003. _Darlene Anthony_

24      My Commission expires: Darlene Anthony
        May 10, 2006              Notary Public-State of Ohio
25

```
Wed, 30 Jul 1997,  7:49 am


TXMODA34-0517805           MFT>02  TX-PRD>8612                    NM-CTRL:EWSC
17311-136-40600-7<DLN
                                           MF-XTRCT-CYC>9724   SC-REASON-CD 33
SC-STS>12  MOD-BAL>      3,508,054.00-  CYC>9103
MF-STS>10  MOD-BAL>      3,508,054.00-  CYC>8724        TODAYS-DT>07/30/97
                   LAST-NOTICE>210                     PRIMARY-LOC>3101
---------------------------               FIDO-CD>31
ASED 033198   FRZ>   -LK   |         AIMS-CD>1         COLLECTION-ASGMT>31010000
CSED>062997   INTL>        |         CAF>1
RSED>091590                |         PIA>6749
---------------------------                                              GATT
                                                                DELQ-MOD-FR>C
CASE-CTRL-INFO>ALL CASE CTRLS CLSD  CLSD-CTRL-CYC>9716  LST-CS-CTRL-ACTY>041797
-------------------------POSTED RETURN INFORMATION--------------------------
RET-RCVD-DT>051987                      CRD>051987  TX/TPR>    1,477,277.00
                                              NET-CR-CLMD>  1,500,000.00-
 NET-TXBL-INCOME>      2,493,094.00-
  CR-ELECT-TXPYR>        22,723.00-
----------------------------RETURN TRANSACTION---------------------------
    T/C   POSTED   TRANS-AMOUNT  CYC  T     DLN
    150  062987    1,477,277.00  8724   17311-136-40600-7

Employee #3160019463 Page 001 of 006 PAGE  002
```



PLAINTIFF'S
EXHIBIT
9

Wed, 30 Jul 1997,  7:49 am

```
TXMODA34-0517805         MFT>02  TX-PRD>8612                NM-CTRL>EWSC
------------------------POSTED TRANSACTIONS SECTION------------------------
      T/C   POSTED    TRANS-AMOUNT  CYC  T     DLN
      660   121586    1,500,000.00- 8653 T 17397-352-00014-6
                                    MICRO-SER-NUM>17010000000014670
      620   031587           0.00   8716   17304-094-16346-7
                                                  TENT-LIAB-TAX>      1,500,000.00
      460   050487           0.00   8716   17304-094-16346-7
                                                  EXT-DT>091587
      599   051987           0.00   8721   17949-539-00156-7        CLS-CD>17
      836   031587      22,723.00   8724   17311-136-40600-7
      420R  061687           0.00   8725   31977-167-00000-7 AIMS-NUM>0101000031
      960   011888           0.00   8801   17977-000-00000-0
      421   041189           0.00   8916   31977-167-00000-7  DISP-CD>99
      424R  041189           0.00   8916   31377-101-20000-9        SOURCE-CD>64
                                           SPCL-PROJ>010              ORG-CD>5800
                                           PTR-DO>31  PTR-TIN>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
                                           PTR-MFT>32  PTR-TX-PRD 8612
      421   041789           0.00   8917   31377-101-20000-9  DISP-CD>99
      424R  041789           0.00   8917   31377-107-20000-9        SOURCE-CD>64
                                           SPCL-PROJ>010              ORG-CD>5800
                                           PTR-DO>31  PTR-TIN>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
                                           PTR-MFT>32  PTR-TX-PRD>8612
Employee #3160019463 Page 002 of 006 PAGE   003
```

Wed, 30 Jul 1997,  7:50 am

```
TXMODA34-0517805         MFT`02   TX-PRD>8612                 NM-CTRL`EWSC
    421   041789              0.00   8917   31377-107-20000-9  DISP-CD`99
    424R 041789              0.00   8917   31377-107-20000-9      SOURCE-CD`64
                                          SPCL-PROJ>010              ORG-CD`580
                                            PTR-DO>31   PTR-TIN>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
                                               PTR-MFT`32   PTR-TX-PRD>861
    421   041989              0.00   8917   31377-107-20000-9  DISP-CD>99
    424R 041989              0.00   8917   31377-109-20000-9      SOURCE-CD>64
                                          SPCL-PROJ>010              ORG-CD>580
                                            PTR-DO>31   PTR-TIN>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
                                               PTR-MFT>32   PTR-TX-PRD>861
    962   110489              0.00   8946   17977-710-05908-9
    560R 112189              0.00   8948   31377-325-77500-9          ASED>123190
    421   040390              0.00   9015   31377-107-20000-9  DISP-CD>99
    424R 040390              0.00   9015   31377-093-20000-0      SOURCE-CD>64
                                          SPCL-PROJ>010              ORG-CD>580
                                            PTR-DO>31   PTR-TIN>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
                                               PTR-MFT>06   PTR-TX-PRD>861
    421   050190              0.00   9019   31377-093-20000-0  DISP-CD>99
    424R 050190              0.00   9019   31377-121-20000-0      SOURCE-CD`64
                                          SPCL-PROJ>010              ORG-CD>580
                                            PTR-DO>31   PTR-TIN>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
                                               PTR-MFT>06   PTR-TX-PRD.861
Employee #3160019463 Page 003 of 006 PAGE   004
```

1482

Wed, 30 Jul 1997,  7:50 am

```
TXMODA34-0517805         MFT>02  TX-PRD>8612                  NM-CTRL`EWSC
      421  050290            0.00  9019   31377-121-20000-0  DISP-CD`99
      424R 050290            0.00  9019   31377-122-20000-0       SOURCE-CD`64
                                          SPCL-PROJ>010              ORG-CD>580(
                                          PTR-DO>31  PTR-TIN>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)
                                                 PTR-MFT>06  PTR-TX-PRD>861)
      421  050290            0.00  9019   31377-122-20000-0  DISP-CD>99
      424R 050290            0.00  9019   31377-122-20000-0       SOURCE-CD>64
                                          SPCL-PROJ>010             ORG-CD>580(
                                          PTR-DO>31  PTR-TIN>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
                                                 PTR-MFT>06  PTR-TX-PRD>861)
      421  051190            0.00  9021   31377-122-20000-0  DISP-CD>99
      424R 051190            0.00  9021   31377-131-20000-0    ·  SOURCE-CD>64
                                          SPCL-PROJ>010             ORG-CD>580(
                                          PTR-DO>31  PTR-TIN>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
                                                 PTR-MFT>06  PTR-TX-PRD>861
      560R 072690            0.00  9032   31377-207-77500-0         ASED:123191
      640  123190    3,500,000.00- 9103   17318-403-00037-1
      560R 090991            0.00  9138   31377-252-77500-1        ASED>123192
      560R 052192            0.00  9223   31377-142-77500-2        ASED>123193
      560R 051993            0.00  9321   31377-139-77500-3        ASED`123194
      421  112993            0.00  9349   31377-131-20000-0  DISP-CD>99
```

Employee #3160019463 Page 004 of 006 PAGE  005

Wed, 30 Jul 1997, 7:51 am

```
TXMODA34-0517805          MFT>02  TX-PRD>8612                NM-CTRL>EWSC
       424  112993          0.00  9349    31377-333-20000-3         SOURCE-CD:64
                                          SPCL-PROJ>010               ORG-CD>580
                                             PTR-DO>84  PTR-TIN>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
                                                 PTR-MFT>06  PTR-TX-PRD>861
       560R 030494          0.00  9411    31377-063-77500-4         ASED>123195
       560R 051095          0.00  9520    31377-130-77500-5         ASED>123196
       560R 120495          0.00  9547    17347-718-77502-5         ASED>120495
       300  120495          0.00  9547    17347-718-10002-5 HOLD-CD>2 DISP-CD>0
                                          ASED>123196               APPL-CD>14
       300  020596          0.00  9604    17347-412-10005-6 HOLD-CD>2 DISP-CD>0
                                          ASED>123196               APPL-CD>14
       301  052096        66.00- 9619    17347-516-10003-6 HOLD-CD>2
                                          ASED>103196
       300  052796          0.00  9620    17347-522-10002-6 HOLD-CD>2 DISP-CD>0
                                          ASED>123196               APPL-CD>14
       560R 103196          0.00  9646    31377-305-77500-6         ASED:063097
       301  032497      7,988.00- 9711    17347-130-77500-7 HOLD-CD:1
       560  060297          0.00  9724    31377-153-77500-7         ASED>033198
--------------------------NOTICE HISTORY SECTION-------------------------
  NOTICE          AMOUNT    CYC  S  DO
  CP210      3,508,054.00- 9711  M  17    SUPPRESS-CD>0
```

Employee #3160019463 Page 005 of 006 PAGE 006

Wed, 30 Jul 1997,  7:51 am

```
TXMODA34-0517805          MFT:02  TX-PRD>8612              NM-CTRL>EWSC
---------------------CONTROL BASE AND HISTORY INFORMATION------------------
C#  STATUS  ACT-DT   ACTION-EMP   ACTIVITY    RCVD-DT   ASSIGN-TO   CAT  ORG  F  S
01    A     071691   0000000000   1194200185  070191   1756909999  ST11          1
      C     071891   1753004695   TRTODO31EX  070191   1756909999  ST11          G
02    A     070896   0000000000   6194200024  070196   1756909999  ST05          1
      C     071796   1756921979   TRTODO31EX  070196   1756909999  ST05          G
03    A     093096   0000000000   6285240008  093096   1756909999  ST05       1  1
      C     101096   1756904783   TR80A141EX  093096   1756905999  ST05       1  G
04    A     011597   0000000000   7011200134  123096   1756909999  ST05          1
      C     011797   1756904783   TR80AP141   123096   1756909999  ST05          G
05    A     040497   0000000000   7102200064  033197   1756909999  ST05          1
      C     041797   1751904055   7102200064  033197   1756909999 ,ST05          G
---------------------------SERVICE CENTER HISTORY SECTION-------------------
SC-STS   DATE      STATUS-AMOUNT   CYC
  12    012891    3,500,000.00- 9103
---------------------------MASTER FILE HISTORY SECTION----------------------
MF-STS   DATE      STATUS-AMOUNT   CYC
  04    050487    EXT-DT>870915  8716
  06    060887           0.00   8721
  10    062987           0.00   8724
```

Employee #3160019463 Page 006 of 006 PAGE  001

PLAINTIFF'S
EXHIBIT NO. 12
FOR IDENTIFICATION
DATE: 3-20-03    RPTR: da

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| THE E.W. SCRIPPS COMPANY AND SUBSIDIARIES, ) | |
| ) | CASE NO. C-1-01-434 |
| Plaintiff, ) | |
| ) | JUDGE SUSAN J. DLOTT |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | **NOTICE OF 30(b)(6) DEPOSITION** |
| ) | |
| Defendant. ) | |

PLEASE TAKE NOTICE THAT pursuant to Rule 30(b)(6) of the Federal Rules

of Civil Procedure, on February 25, 2003, at 10:30 a.m., Plaintiff will take the deposition of

defendant United States of America, at the offices of Baker & Hostetler, 312 Walnut Street, Suite

2650, Cincinnati, Ohio 45202. The deposition will cover the following areas:

1.     the completion and posting of the Form 3244-A prepared in connection

with the December 31, 1990, remittance by Scripps to Defendant;

2.     Defendant's internal treatment of or accounting for the remittance made

on December 31, 1990, by Scripps;

3.     the policies and practices of the Cincinnati District in place on December

31, 1990, for the treatment or characterization of "advance payments" or other remittances made

prior to an assessment or the issuance of a notice of deficiency;

4.    the current policies and practices of the Cincinnati District for the treatment or characterization of "advance payments" or other remittances made prior to an assessment or the issuance of a notice of deficiency.

5.    the policies, practices, and procedures for completing a Form 3244-A;

6.    the policies, practices, and procedures for posting an "advance payment" or other remittance made prior to an assessment or the issuance of a notice of deficiency; and

7.    the policies, practices, and procedures for coding and processing of an "advance payments" or other remittance made prior to an assessment or the issuance of a notice of deficiency;

Defendant will further take notice that said depositions will be conducted pursuant to the Federal Rules of Civil Procedure and Federal Rules of Evidence before a notary public or other officer authorized to take depositions, will be recorded by stenographic means, and will be continued from day to day until completed.

Respectfully submitted,

Paul Eyre /RCℒ

Paul P. Eyre (0025756) *Trial Counsel*
William M. Toomajian (0025740)
Thomas R. Lucchesi (0025790) *Trial Counsel*
Rebecca C. Lutzko (0069288)
BAKER & HOSTETLER LLP
3200 National City Center
Cleveland, Ohio 44114-3485
(216) 621-0200

Attorneys for Plaintiff

2

## CERTIFICATE OF SERVICE

A copy of the foregoing Notice of 30(b)(6) Deposition was served by facsimile

and by first-class U.S. Mail, postage prepaid, upon Stacy S. Hallett, attorney for the defendant, at

Tax Division, Department of Justice, P.O. Box 55, Ben Franklin Station, Washington, D.C.

20044, on this 31st day of January 2003.

Rebecca C Lutolis

One of the Attorneys for Plaintiff

G:\CLdata\RJ3825\95070\00020\Pleadings\Deposition Notice-2.doc

Internal Revenue Service
Appeals Office
312 Elm Street
Suite 2330
Cincinnati, OH 45202

Date: **NOV** 0 6 **2000**

The E W Scripps Co
P O Box 5380
Cincinnati, OH 45201

Department of The Treasury
Small Business / Self Employed

**Person to Contact:**
  Richard A. O'Connor
  Employee ID Number: 31-03632
  Tel:  513-684-3396
  Fax: 513-684-2214
**Refer Reply to:**
  SB:OH:CI:AP:RAO
**In Re:**
  Income
**Tax Period(s) Ended:**
  12/1986
**Amount of Claim:**
  $2,245,412.00

**Certified Mail**

Dear Taxpayer:

We are sorry, but we cannot allow the above claim for an adjustment to your tax.

Our decision is based on provisions of the Internal Revenue laws and regulations. This letter is
your legal notice that your claim is fully disallowed.

If you wish to bring suit or proceedings for the recovery of any tax, penalties or other moneys for
which this disallowance notice is issued, you may do so by filing such a suit with the United
States District Court having jurisdiction, or with the United States Court of Federal Claims. The
law permits you to do this within 2 years from the mailing date of this letter. However, if you
signed a waiver of the notice of claim disallowance (Form 2297), the period for bringing suit
began to run on the date you filed the waiver.

If you have any questions, please contact the person whose name and telephone number are
shown above.

Sincerely,

James A. Gutzwiller
Appeals Team Manager

cc:
  William M. Toomajian

**SCRIPPS 00053**



- 2 -

Specific written instructions should be obtained from the taxpayer relative
to whether he/she desires the advance payment to be held as a cash bond or
desires it to be assessed as payment of the proposed deficiency. However,
regardless of the taxpayer's instructions, no advance payment should be
designated for assessment until the Service is in a position to ascertain the
amount of the deficiency. This would normally occur when the 30-day letter
is issued. During the audit and until the issuance of the 30-day letter,
advance payments should be designated as cash bonds. This will prevent the
taxpayer from receiving interest on any portion of the advance payment later
determined to be an overpayment. Otherwise, taxpayers may use the advance
payment procedures for the purpose of securing a 20 percent return on their
money while pursuing their case through the administrative process.

If the advance payment is to be assessed, the taxpayer should be asked to
designate the amount of the payment to be applied to tax and the amount to be
applied to interest. The assessment of an advance payment of interest only
will not affect the running of interest on the deficiency.

If the taxpayer has made a payment which is to be treated as a cash bond, the
box next to "Form 316C" should be checked as well as the box next to "cash
bond." The Service Center will then notify the taxpayer by certified mail as
to the disposition of the payment. (Also, see Rev. Proc. 64-13, 1964-1 C.B.,
674.)

```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF OHIO
 2                     WESTERN DIVISION

 3                       _   _   _

 4    THE E.W. SCRIPPS COMPANY  :

 5    AND SUBSIDIARIES           :

 6          PLAINTIFF            :  CASE NO. C-1-01-434

 7    VS                         :

 8    UNITED STATES OF AMERICA   :

 9          DEFENDANT            :

10                       _   _   _

11

12                  Deposition of SIDNEY SAEWITZ, a

13    witness herein, taken by the plaintiff as upon

14    cross-examination pursuant to the Federal Civil

15    Rules of Procedure and pursuant to agreement among

16    counsel as to time and place and stipulations

17    hereinafter set forth, at the offices of Baker &

18    Hostetler, 312 Walnut Street, Suite 3200,

19    Cincinnati, Ohio 45202, before Ross A. Giglio,

20    Official Court Reporter within and for the State

21    of Ohio.

22                       _   _   _

23
                      GIGLIO REPORTING SERVICES
24                       3 CYPRESS GARDEN
                      CINCINNATI, OHIO 45220
25                       (513) 861-2200            ORIGINAL

26
```



1  Proceedings, December 5, 2002
2                    SIDNEY SAEWITZ
3  A witness herein, being duly sworn, was examined
4  and deposed as follows:
5                    CROSS-EXAMINATION
6  BY MR. EYRE:
7         Q.    State your name.
8         A.    Sidney Saewitz.
9         Q.    Where do you live, Mr. Saewitz?
10        A.    Sharonville, Ohio.
11        Q.    We have met before the deposition.
12  I'm Paul Eyre.  I represent the E.W. Scripps
13  Company.  I will be asking you questions today.
14  Do you understand that?
15        A.    Yes.
16        Q.    If I ask a question that's stupid or
17  you do not understand, would you say that?
18        A.    Would I say that it's stupid?
19        Q.    No.  Say that you don't understand
20  it.
21        A.    Yes.
22        Q.    If you answer the question, we agree
23  that you do understand it and you are answering it
24  in that vein, right?
25        A.    I hope, to the best of my knowledge,

```
 1              A.    Or, yeah, I guess that would be it.
 2              Q.    Well, how long did you in your IRS
 3   position, how long did you have some
 4   responsibility for the audit of the Scripps
 5   Company?
 6              A.    When you say "responsibility," what
 7   does that mean?
 8              Q.    Anything to do with it.
 9              A.    In rough figures, ten years.
10              Q.    For those ten years, did you spend
11   any time at the offices of the Scripps Company?
12              A.    I lived here.
13              Q.    Did you have an office here?
14              A.    At times.
15              Q.    When you say that you lived here,
16   what does that mean?
17              A.    I was here everyday for periods.
18              Q.    When you were here everyday, you
19   periodically would talk to the people at the E.W.
20   Scripps Company?
21              A.    Yes.
22              Q.    And, in fact, you became either
23   acquainted or friends with some of them?
24              A.    We had a working relationship.  What
25   do you mean by "friends"?
```

```
 1          Q.    They liked you.  You liked them?
 2          A.    Yeah, okay,
 3          Q.    Is it fair to say that they, through
 4    the dealings and you being here for that ten
 5    years, for living with the Scripps Company for ten
 6    years, is it fair to say that the people at the
 7    E.W. Scripps Company relied upon you as a
 8    trustworthy and honest individual?
 9          A.    I can't comment for them.  I don't
10    know.
11          Q.    Did you rely upon them for being
12    honest and trustworthy?
13          A.    I would have to evaluate the
14    credibility of the information when it came in.
15    Do I feel they always told me the truth?  No.
16          Q.    Okay
17          A.    Did I think that they did it
18    intentionally?  Sometimes.  I don't know.
19          Q.    Was the working relationship a good
20    working relationship?
21          A.    Could have been better.
22          Q.    In what way could it have been
23    better?
24          A.    Responses to requests were very slow.
25    It was not the best audit.
```

1          Q.    Okay.  In addition to you, was there
2    anyone else from the IRS here other than you
3    living here?
4          A.    Well, don't use the term "living"
5    here.  Other people were assigned to the audit
6    while I was here.
7          Q.    I didn't use the term "living."  You
8    did.
9          A.    I was being -- okay.  I went home at
10   night.  I didn't live here.  I was here eight
11   hours a day.
12         Q.    When you mean "live here," we will
13   agree that you do not mean that you slept here.
14   You went home?
15         A.    Right.
16         Q.    I'm comfortable with that.  Did
17   anyone -- under your definition of "live here" --
18   did anyone else from the IRS live there except
19   you?
20         A.    Would you like the history of who was
21   assigned?  George Imwalde was first.  He was the
22   first person here.  And then he was the first team
23   coordinator.  And then Bob Pohlcamp was the second
24   team coordinator.  He is deceased.
25         Q.    Okay.

```
 1    coordinator.  I was both.
 2            Q.     Okay.  So team coordinator for
 3    E.W. Scripps Company.  That was your title?
 4            A.     No.  I was team coordinator for the
 5    IRS.
 6            Q.     Okay.  Assigned to the E.W. Scripps
 7    Company?
 8            A.     Right.
 9            Q.     At that time, did you have any other
10    audit responsibilities with other companies or
11    just E.W. Scripps?
12            A.     I don't know for sure.
13            Q.     Well, let me see if I could ask if
14    there is something else.  At the time that you
15    worked for the ten years on the audit of the
16    E.W. Scripps Company, did you work on any other
17    audits of other companies?
18            A.     Somewhere in there I did.
19            Q.     Okay.
20            A.     I could think of what it was.  We
21    used to do the old TCMP --
22                   MS. HALLETT:  Objection.
23            A.     I just helped out on a couple smaller
24    cases.  I was not going to give the names.
25            Q.     Okay.  When you were the team
```

1    coordinator and you worked on the Scripps audit,
2    what did you view your job to be?
3            A.    I'm not really sure.  Run the audit.
4    What else could I say about that?
5            Q.    I don't know.  I'm asking the
6    questions.
7            A.    Repeat the question.
8            Q.    I don't know your job.
9            A.    Okay.  Make sure that the audit is
10   done.  Run the audit.
11           Q.    When you were here on a daily basis,
12   what types of things were you doing while you were
13   here?
14           A.    What types of things was I doing?
15           Q.    Yeah.
16           A.    From start to finish?  Had an opening
17   conference.  I set up the agenda for that opening
18   conference.  I actually did not -- the audit that
19   I took over, I didn't start the audit.  Bob
20   Pohlcamp was the team coordinator.
21           Q.    Which audit was this?
22           A.    I might be off on the years, but I'm
23   guessing that it is five, six, seven maybe.  You
24   know, I may be off a year.  I think five, six and
25   seven.

```
1              Q.    Okay.
2              A.    Bob was the team coordinator.  I was
3    a team member to begin with.
4              Q.    Okay.  Did you have much contact with
5    Mike Carroll during that period of time?
6              A.    Some.  Not on a weekly basis.
7              Q.    How about contact with Jerry Hackman?
8              A.    More than with Mike.
9              Q.    How much would you have with Jerry?
10             A.    It went in spurts.
11             Q.    From what to what?
12             A.    From if we had to work on something
13   and he was there working on it, we would do it,
14   you know.  But we could go weeks without.  Would I
15   talk to him daily sometimes?  Maybe.  Sometimes we
16   did stock reports, call, he knew the market, give
17   me what the market is doing that day.  Was that
18   business?  No.
19             Q.    Okay.  Other than talking to your
20   lawyer, did you talk to anyone about being deposed
21   here today?
22             A.    About being deposed?  Just other
23   parties.  We had to get releases from work, so we
24   all did it together with Linda.
25             Q.    Okay.  Did you discuss with any other
```

```
1    IRS manuals that tell you when you send out a
2    316(c)?
3              A.    No.
4              Q.    Did you look at Rev. 84-85?
5              A.    No.
6              Q.    Are you aware of the fact that the
7    IRS has a website that people like me, who are not
8    literate on a computer, could look at?
9              A.    Yes.
10             Q.    Are you aware of the fact that on
11   that website you could find out instructions as to
12   how to fill out any form, including 3244-A?
13             A.    No.  I'm not about filling out that
14   form, no.
15             Q.    So you were not aware of the fact
16   that you could actually look up samples and see
17   how the IRS tells you to fill it out?
18             A.    I have never seen a sample form
19   filled out.
20             Q.    Okay.  Have you ever looked at what a
21   316(c) is?
22             A.    No.
23             Q.    Have you ever looked at any IRS
24   regulations that tell you when you check the box
25   marked "cash bond," that you have to send out a
```

1    316(c) letter unless there is some fraud

2    implications?  Ever seen that?

3         A.    NO.

4         Q.    Do you know what I'm talking about?

5         A.    NO.

6         Q.    You're aware of the fact that

7    E.W. Scripps made a payment in 1990, call it a

8    remittance, dealing with the 1986 tax year?

9         A.    Yes.

10        Q.    And you're aware of the fact that at

11   some point in time, the IRS gave Scripps that

12   money back?

13        A.    I was told that yesterday.

14        Q.    Are you aware of the fact that

15   Scripps is suing because they believe that they

16   are entitled to interest on that money?

17        A.    Okay.  Yes.

18        Q.    Do you know that?

19        A.    When I got my release, that's what I

20   understood that it was about.

21        Q.    And you're aware of the fact that

22   Scripps is claiming that when they made the

23   remittance in 1990, they considered it a payment

24   of tax?

25        A.    Okay.

1    could be no tax liability.  In order to make that

2    statement, did you look and examine the carryback

3    rules?

4        A.    Did I look at the carryback rules?  I

5    did the audit the '86 year.

6        Q.    Yes.  The question is that you just

7    made a statement.  Are you sure about no tax

8    liability?

9        A.    1986?

10       Q.    Yes.  They made a payment.  There was

11   no tax liability?  Was there any tax liability,

12   when they made the payment in 1990?

13       A.    Not that I know of.

14       Q.    That's your testimony under oath?

15       A.    I was not aware of any tax liability.

16       Q.    Now, my question to you wasn't were

17   you aware of any tax liability.  Question is, in

18   1990, when the remittance was made, was it your

19   position that it was a cash bond?

20       A.    I had no position.  I took the money

21   and Jerry brought it over and I didn't know where

22   he wanted it.  We had -- they actually -- it

23   actually became a discussion.  I was told that was

24   the only way to post it.  I didn't fill out that

25   form.  I don't fill out forms.  I saw my name.  I

1    was surprised. And I was told, basically, that's

2    the only way that we could do it. Did I

3    understand it at the time? Not precisely.

4         Q.    I could appreciate that. So you're

5    testimony under oath is that in 1990, when the

6    remittance was made, that you didn't know and have

7    any position as to whether or not it was a cash

8    bond or a payment of tax?

9         A.    It was money that they wanted put on

10   that year.

11        Q.    Okay. Let me just go back.

12              MR. EYRE:  Have the question read

13        back.

14         (The reporter read the question)

15        A.    I didn't know what it was. I don't

16   remember anyway.

17        Q.    Okay. Just so I'm clear, your

18   position is that -- the only reason that I'm

19   asking these questions is to make sure at trial

20   I'm not surprised. Same reason they asked Jerry

21   questions.

22        A.    That's okay.

23        Q.    Just understand your position. Your

24   position is that you didn't conclude one way or

25   the other whether or not it was a cash bond or

```
 1    payment in 1990.
 2                MS. HALLETT:  Is this Sid's personal
 3                position, and not the position of the
 4    IRS?   What are you asking?
 5                MR. EYRE:  Both.
 6         Q.    When the payment was made in 1990,
 7    was it your personal position that you didn't know
 8    whether it was a cash bond or a payment of tax?
 9    You were taking no position one way or the other?
10         A.    I'm not exactly sure it was what it
11    was.  It was a long time ago.  Talking twelve
12    years ago.
13         Q.    Okay.  You did say that you were told
14    the cash bond box had to be checked?
15         A.    Yeah.  I mean, that's what I'm trying
16    to remember.  Best of my ability, that's the only
17    way that we could do it.  I don't know why.
18         Q.    Who told you that the cash bond box
19    must be checked?
20         A.    Secretary who -- had to be.  I don't
21    know.  I guess that I don't know because I didn't
22    fill out the form.  I assume that a secretary did.
23    I should not even assume that, so I don't know.
24         Q.    Are you telling us that a secretary
25    in the IRS fills out the form, checks "cash bond,"
```

1      Q.    So is it your testimony under oath
2   that you never discussed the remittance that
3   Scripps is going to make in 1990 for the 1986 tax
4   year before the time that Jerry Hackman walked
5   over to your office?
6      A.    That's not true, no.  I believe that
7   he told me that they were bringing money.  It was
8   not like he was unexpected.  Okay?
9      Q.    Let me be clear.  If I have people at
10  Scripps, more than one, who say that they
11  discussed with you personally this issue about
12  making a remittance well in advance of Jerry
13  Hackman bringing it over to your office, those
14  people are mistaken, in your opinion?
15     A.    I don't know who discussed that with
16  me that Jerry is alluding to.
17     Q.    Okay.  So is it possible that you
18  just don't remember discussions that you had with
19  employees in the tax Department of E.W. Scripps
20  Company about the 1990 payment --
21     A.    Who?
22     Q.    -- prior to Jerry Hackman coming
23  over?
24     A.    I remember having a discussion that
25  they were bringing money over.

1           Q.    That day?

2           A.    I was waiting for them, yes.

3           Q.    Okay.  Do you remember having a

4     discussion with anyone at E.W. Scripps about

5     attempting to calculate the tax owed in 1986

6     because of the change in the cash to accrual

7     method?

8           A.    No.

9           Q.    Do you recall having told someone at

10    the E.W. Scripps Company that that was too

11    complicated and you could not make that

12    calculation in time for the close of 1990?

13          A.    I don't remember that, no.

14          Q.    All right.  Do you remember someone

15    at E.W. Scripps Company telling you that, given

16    that, they would go ahead, make the calculation

17    themselves?

18          A.    I have no memory of this.

19          Q.    Okay.  After the payment was accepted

20    and the cash bond box was checked, the secretary

21    decided that was the appropriate thing to do and

22    you relied upon that?  Did you go check with

23    anyone else to see if this was the right thing to

24    do?

25               MS. HALLETT:  Objection to the form

```
1              of the question.  Go ahead.
2         A.    No.  You know the time that it was
3    that he brought it over?
4         Q.    I don't know the time.
5         A.    Neither do I.  No, I don't have any
6    memory of anything else going on that day.
7         Q.    How about later on, after the fact?
8    Not that day.
9         A.    Could you give me a period?  In the
10   next year?
11        Q.    The next month did you go back and
12   say, gee --
13        A.    I don't remember that, no.
14        Q.    When Jerry brought the money over to
15   you, he made it clear that he wanted a payment of
16   tax, did he not?
17        A.    I don't remember what he wanted at
18   the time.
19        Q.    Did you read the letter that
20   accompanied the payment?
21        A.    Then or now?
22        Q.    Then.
23        A.    I don't remember.  Did I read it
24   yesterday?  Yes.
25        Q.    You do recall the word "payment" is
```

```
1    used, do you not?
2         A.    Not now I don't, no.
3         Q.    Okay.  Just so we are clear.  I want
4    to make sure that we are clear.  You have no
5    memory of any discussions that you had with anyone
6    at E.W. Scripps about the desire of Scripps to
7    prepay a liability in 1990 before somebody called
8    you saying they were coming over with a check?
9         A.    Prepay a liability?  No.
10        Q.    Okay.  I mean, I don't want to ask
11   you about a conversation if you have no memory, so
12   what memory do you have of what Jerry Hackman said
13   to you on the date that he brought the check?
14        A.    It was a discussion on -- the date
15   that he brought the check, it was a discussion on
16   how he posted that money, how the money was
17   posted.  Jerry had concerns about it.
18        Q.    What were his concerns?
19        A.    How we were posting it.
20        Q.    Well, what did he want it?
21        A.    Prepayment, cash bond.
22        Q.    What did he express?
23        A.    I don't remember what he wanted.  He
24   was not happy with the cash bond, so all that
25   leaves is a prepayment.
```

```
 1          Q.    Do you remember $62 million?
 2          A.    I looked at the front page of the
 3   return.  I remember that 62 popped up.
 4          Q.    Question is that you said that Jerry
 5   and you had a debate about the cash bond box.  It
 6   is clear, is it not, that he did not want you to
 7   check the cash bond box?
 8                MS. HALLETT:  Objection.  Go ahead.
 9          A.    Did not have a debate.
10          Q.    Okay.  What did you have?
11          A.    Had a discussion.  I really didn't
12   have a say in the matter.
13          Q.    Who had the say?
14          A.    It was the way that I was told this
15   is the way that you have to post it.
16          Q.    Who told you that?
17                MS. HALLETT:  Objection.  Asked and
18          answered.
19          Q.    You didn't have a say because a
20   secretary checked the box?
21          A.    I was told procedurally that this is
22   how -- I believe -- I don't know for sure.  I
23   mean, I don't know.  My best memory, I was told
24   that this is the way that you had to do it.
25          Q.    Only person who could have told you
```

```
 1    that is the person who filled out the form; is
 2    that right?
 3              A.    I don't know.
 4                    MS. HALLETT:   Objection.
 5              Q.    Did you call someone else?
 6              A.    Nope.
 7              Q.    You did ask someone to do the typing
 8    on the form, did you not?
 9                    MS. HALLETT:   Objection.
10              A.    I don't know.
11              Q.    So you don't know how the form got
12    filled out?
13              A.    No.
14              Q.    Now, have you read the notes where
15    someone else -- is it your testimony under oath
16    today that you did not ask somebody to type that
17    form and it is a secretary.  Is that your
18    testimony?
19              A.    Repeat that.
20              Q.    Yeah.  I'm trying to understand what
21    the truth is here.  Under oath, you are telling me
22    today that you do not remember you asking a
23    secretary to fill out the form or to type that
24    form.
25              A.    That was twelve years ago.  I don't
```

1   remember that.

2          Q.    Okay.  So you're not denying that you

3   did that.  You just do not remember?

4          A.    Right.

5          Q.    That's fair.

6          A.    That's what I said.

7                MR. EYRE:  Let's have that read back.

8          (The reporter read the last question)

9          Q.    Right.  Question asked is, do you

10  know how the form got filled out?  Is your answer

11  to that question under oath the same answer that

12  you just gave, which is no, you don't know?

13                MS. HALLETT:  Objection.  Go ahead.

14         A.    To me, I don't remember.  I guess

15  that's what you want to hear.

16         Q.    I don't want to hear anything, just

17  the truth.

18         A.    My definition of "no" is that I don't

19  remember.

20         Q.    If you do not remember, please say

21  that because I don't want to put words in your

22  mouth.

23         A.    I'm trying to.

24         Q.    If you want me to rephrase a

25  question, please ask me that.

```
1              Q.    Okay.  Who is Eileen J. O'Connor?
2              A.    I don't know.
3              Q.    And do you know H. Broge?
4              A.    Yeah.  Hank Broge.  He's retired.  He
5     was a branch chief.
6              Q.    What branch was he the chief of?
7              A.    Exam Branch 1, I think.
8              Q.    Okay.  Is that here in Cincinnati or
9     somewhere else?
10             A.    It was here.  And then he was chief
11    of review.  Last job was chief of review.
12             Q.    Chief of review for what?
13             A.    For exam division.
14             Q.    Okay.  And we'll wait until page 2.
15    Why don't we go on.  Did you work anywhere between
16    college and the IRS, or did you come right to the
17    IRS?
18             A.    I was starting grad school for two --
19    no jobs.  I was off that summer.  I had surgery
20    two days after I graduated.
21             Q.    Okay.  If I go through some of the
22    sample forms, 3244 forms with you, do you have any
23    knowledge as to how those forms are supposed to be
24    filled out?
25             A.    No.
```

```
 1              Q.    So you're not able to say, well, this
 2      goes here, that goes there?
 3              A.    No.
 4              Q.    As you sit here today, you do not
 5      even know what a 316(c) is?
 6              A.    I have no idea.
 7              Q.    Okay.  When, going back to your
 8      meeting with Mr. Hackman, when he was making the
 9      payment in December, were you aware of the fact
10      that millions of dollars could have been at stake,
11      right?
12              A.    No.
13              Q.    All right.
14                    MS. HALLETT:  This is to be inserted
15              inside of Exhibit 1?
16                    MR. EYRE:  Yes.  Just making sure
17              that it was.
18              Q.    Who is Dave Cook?
19              A.    Dave Cook is an appeals officer.
20              Q.    Who is Dave Holscher?
21              A.    Dave Holscher.  Do you want to know
22      what he does now or at the time?
23              Q.    What does he do now?
24              A.    He works in taxpayer education.  I'm
25      not being totally precise, not totally precise.
```

1    Something like that.
2            Q.    Let me show you what I will mark as
3    Exhibit 2.
4                  MS. HALLETT:  Do I have a copy of
5            that?
6                  MR. EYRE:  Yes.
7                  MS. HALLETT:  Thank you.
8            Q.    Do you recognize what Plaintiffs
9    Number 2 is?
10           A.    Yeah.
11           Q.    What is it?
12           A.    This is a payment posting voucher
13   examination.
14           Q.    Now, whose responsibility is it to
15   fill out Exhibit 2?
16           A.    I don't know.
17           Q.    Is it the taxpayer's responsibility?
18           A.    I would assume no.
19           Q.    So you assume that it was someone at
20   the IRS's responsibility?
21           A.    Yes.
22           Q.    But you do not know whose
23   responsibility?
24           A.    No.  I don't know.  I don't know what
25   the manual says.

1    Q.    Okay.  You know that it is not your

2    responsibility because you didn't fill it out?

3    A.    That's not true.  It could be mine,

4    and I don't know how to do it.

5    Q.    Okay.  Is it fair to say that in

6    December of 1990, you didn't try to find out how

7    to do it either?

8    A.    Did not try to find out how to do it?

9    I don't remember.

10   Q.    You did mention earlier that you were

11   told that the cash bond box had to be checked.  Do

12   you remember saying that?

13   A.    I remember saying something like

14   that.  To the best of my recollection, that's all

15   that this is.  I was told that this was the way

16   that it had to be done.  Did I question it?  No.

17   Q.    And you don't know the reason why it

18   had to be done?

19   A.    No.

20   Q.    And you really do not know whether

21   that's a true statement, that it had to be done,

22   do you?

23   MS. HALLETT:  Objection.

24   A.    No.

25   Q.    Have you looked at, in the last

```
1    month, at any internal IRS manuals to see how they
2    might treat cash bond or payment?
3         A.    NO.
4         Q.    When you want to know -- maybe I just
5    assumed this.  Do you ever have reason to look at
6    an Internal Revenue manual?
7         A.    Manual, yes.
8         Q.    For what purposes?
9         A.    Sometimes when an issue that I feel
10   that I need to look up.
11        Q.    Let me ask it this way.  From the day
12   that the 3244-A was filed and the cash bond box
13   was checked, up until today, did you ever review
14   an IRS manual to see, gee, did we do it right?
15        A.    I don't know.
16        Q.    Well, do you remember having done
17   that?
18        A.    I don't know.
19        Q.    You don't know if you remember having
20   done that?
21        A.    No, I don't know if I ever did it.  I
22   don't remember.  If I did, I don't remember it.
23   If I didn't, I don't remember it.
24        Q.    So you can't say today whether or not
25   the way that the form was filled out was
```

```
 1   consistent with any IRS manual or inconsistent
 2   with the manual?
 3          A.   I have no idea.
 4          Q.   Okay.  Do you know how the remarks --
 5   we'll get to that later.  You know that there was
 6   some remarks put on the form in November -- I'm
 7   sorry -- December of 1990?  Do you know what I'm
 8   talking about?
 9               MS. HALLETT:  Objection.
10          A.   Only because I saw it yesterday, a
11   couple days ago.
12          Q.   Okay.  Do you recall a discussion
13   with Mr. Hackman as to putting on the form a
14   description of interest and tax?
15          A.   I don't remember.
16          Q.   Are you aware of the fact that the
17   sample IRS forms show that that entry is made only
18   when it is a payment of tax?
19          A.   I have never seen a sample form.
20          Q.   Are you aware of the fact that the
21   IRS sample form on the website shows that entry is
22   not made when it is a cash bond?  Are you aware of
23   that?
24          A.   No.
25          Q.   Okay.
```

1    whatever it took, try to do my best to come up

2    with an opinion.

3         Q.    As to which word should have been

4    used rather than "payment"?

5         A.    No.  What it would take to be an

6    interest payment, if that's what you wanted.  Are

7    you telling me that you want an interest payment?

8         Q.    I'm telling you what the company,

9    well, go back.  You got this letter.  I didn't get

10   this letter.  You got this in 1990?

11        A.    Yes.

12        Q.    It was addressed to you in 1990?

13        A.    Yes, addressed to me.

14        Q.    Clearly substituted the word

15   "payment" for "cash bond," does it not?

16             MS. HALLETT:  Objection.

17        A.    Yeah.

18        Q.    It does, right?

19        A.    Yes.

20        Q.    My question is, when you got this

21   letter, did you form any opinion as to whether or

22   not this company intended to make a payment of a

23   tax or they intended to post a cash bond?

24        A.    I don't remember.

25        Q.    So you don't know one way or the

```
 1    other?
 2         A.    I don't remember.
 3         Q.    Okay.  Is there any documents you
 4    could look at that might jog your memory as to
 5    what this company intended to pay?
 6         A.    I don't know.
 7         Q.    Okay.  Would you, maybe I should ask
 8    you this way.
 9              MR. EYRE:  If Mr. Saewitz remembers
10         this key part of the case before trial, I
11         hope that we have opportunity to         .
12         supplement.
13              I don't want to be surprised, you
14         know.
15              Do you understand what I'm asking?
16              MS. HALLETT:  No, I don't understand
17              what you're asking.
18              MR. EYRE:  If he suddenly recollects,
19         I would like to know.
20              MS. HALLETT:  I would be happy to let
21         you know if he suddenly remembers.  You
22         could mark that specific question.  If he
23         has a sudden memory recall, fine.
24              MR. EYRE:  Okay.
25    BY MR. EYRE:
```

58

1      Q.    You do not remember any conversation
2  that you had with any Scripps personnel prior to
3  the date of you receiving the check in 1990
4  regarding the remittance, right?
5           MS. HALLETT:  Objection.  Asked and
6       answered.
7      Q.    You may have said that you don't
8  remember, right?
9      A.    I believe that I said that I don't
10 remember a specific conversation, but I remember I
11 knew that Jerry was coming over.
12     Q.    Did you know that Scripps was
13 intending to make a prepayment of tax?
14     A.    I don't remember.
15     Q.    After December 31, 1990, do you
16 remember any conversation that you had with anyone
17 at Scripps regarding the 1990 remittance?
18     A.    Do I remember a specific
19 conversation?
20     Q.    Yes.
21     A.    No.
22     Q.    Do you remember any general
23 conversation?
24     A.    Yes.
25     Q.    Generally, what did you remember?

1          A.     Some of this started coming out.  I

2    remember asking Jerry, well, how could you owe tax

3    on it, and he told me that he assumed that we

4    would carry it back.

5          Q.     Carry what back?

6          A.     The payments to another year.

7          Q.     Okay.  Did you have any discussions

8    with Mr. Hackman or anyone else as to whether or

9    not they intended the remittance in 1990 to be a

10   prepayment of tax?

11         A.     I don't remember any conversation to

12   that effect.

13         Q.     Okay.  Did you at some point come to

14   any conclusion yourself as to whether the

15   remittance made in 1990 was a prepayment of tax or

16   a cash bond?

17         A.     We raised the issue in the year it

18   was deducted.  It was an audit team.  I don't know

19   whose name was on it, but the audit team raised

20   that issue.

21         Q.     And do you recall whether or not --

22   well, go back.  You would agree that if it was a

23   prepayment of tax, the interest would be

24   deductible?

25         A.     I'm not agreeing with that.  I'm not

1    familiar with this point to comment on aspects of
2    the tax law.
3           Q.    So you don't know whether or not a
4    prepayment of tax, interest portion of prepayment
5    of tax, is deductible?
6           A.    I'm not -- right now, I'm not
7    prepared to answer those questions.
8           Q.    I know that you're not prepared to
9    answer them.
10          A.    I don't know, is my answer.  I'm not
11   going to, unless I have it in front of me, to do
12   the research.  I don't know.
13          Q.    Do you know if a payment of interest
14   in 1990 is deductible on the 1990 tax return by
15   the company?
16          A.    Could you repeat that again?  I'm not
17   sure.
18          Q.    I don't want --
19          A.    I heard 1990 and 1990, so --
20          Q.    Just asking, do you know if a payment
21   of the interest portion of a tax liability in 1990
22   is deductible by the E.W. Scripps Company for the
23   year 1990?
24          A.    Paid in 1990?
25          Q.    Yeah.

```
1            A.    By the E.W. Scripps Company?

2            Q.    Right.  Could they deduct that on the

3     1990 tax return?

4            A.    Is that all of the facts?

5            Q.    Yeah.

6            A.    If it's interest, I would assume so.

7            Q.    If it is a cash bond, can they deduct

8     any portion of the cash bond?

9            A.    Common sense tells me no.

10           Q.    Okay.  Do you know if Scripps was

11    allowed to -- deductions that Scripps took in '90

12    for the interest that it paid, if that deduction

13    was allowed by the IRS ultimately?

14           A.    Ultimately --

15                 MS. HALLETT:  Objection, if it goes

16    to     the settlement.  That's not admissible or

17           relevant.

18    BY MR. EYRE:

19           Q.    You may answer.

20           A.    Ultimately, it was allowed.

21           Q.    Okay.

22           A.    I do remember that.

23           Q.    How do you remember that?

24           A.    I was there in the settlement.

25           Q.    Who was there with you?
```

 1    have told Scripps about the remittance would have
 2    been without the knowledge that the 1986 year had
 3    a large loss with no tax potential?
 4              A.    I read that.
 5              Q.    Is that a true statement?
 6              A.    At the time I wrote it, I believed
 7    it.
 8              Q.    So in 1998 when you wrote that, you
 9    believed that in 1990 that you didn't have the
10    knowledge that the 1986 year had a large loss with
11    no tax potential?
12              A.    Appears to say.
13              Q.    Is that what you believe to be true?
14              A.    That's a long time ago.  At this
15    point, I don't remember.
16              Q.    You see here where you state right
17    before that, that you do not know what was
18    actually said, but you do know that they never
19    stated they wanted to agree to any adjustments
20    because you would have executed Form 870.  You see
21    that?
22              A.    Yes.
23              Q.    Did you ever tell Scripps, discuss
24    with Scripps the execution of a Form 870 regarding
25    this remittance?

```
 1              A.    Did I discuss that with them?
 2              Q.    Yes.
 3              A.    I don't remember.
 4              Q.    Is it your testimony under oath that
 5      nobody at Scripps asked you to do a tax
 6      computation for the 1985-1986 years in the Fall of
 7      1980?
 8              A.    1980?
 9              Q.    1990.  I apologize.
10              A.    I don't remember.
11                    MS. HALLETT:  Objection.
12              Q.    If you turn to the last paragraph
13      there where you say, "This is a sophisticated
14      taxpayer."  You see that?
15              A.    I read it.
16              Q.    Third sentence says, "The problem not
17      only this year and of the prior years was caused
18      not by our errors but rather his errors."  Do you
19      see that?
20              A.    Yes.
21              Q.    So the "his" is who that you were
22      referring to?
23              A.    Mike Carroll.
24              Q.    So it is your testimony that the IRS
25      made no errors in this whole situation, and any
```

1          Q.   Do you know when -- have you examined

2    any posting to the Scripps accounts?   You know

3    what I'm asking?   I'm asking the thing where it

4    showed the taxpayer account.

5          A.   Transcripts?

6          Q.   Yeah.

7          A.   Looked at when?

8          Q.   Transcripts for Scripps in the last

9    month?

10         A.   No.

11         Q.   Do you have an opinion as to what it

12   means if the advance payment of deficiency is

13   noted on a transcript?

14         A.   I have no opinion.

15         Q.   So you don't know what that means?

16         A.   I have no opinion.

17         Q.   Okay.   I asked that wrong, perhaps.

18   I'm sorry.   Do you know what it means?

19         A.   No.

20         Q.   If you wanted to find out what it

21   means, where would you look?

22         A.   There is a book.

23         Q.   What's the name of the book?

24         A.   I don't know.   It's a big red book.

25   I hate to say that.

1    remittance made in 1990?

2            A.    I don't remember.

3            Q.    Do you remember anybody interviewing

4    you at any time after Scripps had filed an appeal

5    to get the interest?

6            A.    I was never interviewed.

7            Q.    So nobody asked you to recite what

8    occurred when you and Mr. Hackman went over to

9    pay the money?

10           A.    Nothing that I remember.

11           Q.    Do you recall if you were asked to

12   submit any statements?

13           A.    Statements to who?

14           Q.    To anybody.  Other than the one memo

15   that we looked at that I just showed you that

16   could or could not be you or might be another Sid,

17   are you aware of any other memos that you did on

18   this particular subject?

19           A.    No, I'm not.

20           Q.    Okay.  Do you recall any IRS lawyers

21   ever inquiring of you the circumstances

22   surrounding the Scripps payment in 1990?

23           A.    I don't understand what you are

24   asking.

25           Q.    I'm asking you if anybody came to you

```
1    saying, "Hey, Sid, come on, what happened?"  Did
2    anybody ask you that?
3              A.    No.  Not that I remember.
4              Q.    Okay.  You were aware of the fact
5    that Scripps had filed to get interest back?  Were
6    you aware of that fact?
7              A.    No.
8              Q.    Are you aware that there is a lawsuit
9    pending now presently in District Court here in
10   Cincinnati?
11             A.    Have I seen a copy of it?  No.
12             Q.    I guess that was not the question.
13   The question was, are you aware of the fact --
14             A.    My attorney told me that.
15             Q.    Forget that.  I'm sure that it is
16   true.  Other than what the attorney told you, were
17   you aware of it?
18             A.    Not that I could remember.
19             Q.    Okay.  Hand you Plaintiffs Exhibit 9.
20   This is a series of things.  That's all that I
21   could tell you.  This is marked as Number 9.
22             A.    Okay.
23             Q.    Do you know what Exhibit 9 is?
24             A.    This is a document, one of our
25   documents.
```

CERTIFICATE

E.W. SCRIPPS                    :
                               :  SS:
UNITED STATES                   :

            I, Ross A. Giglio, notary public in

and for the State of Ohio, do hereby certify that

before the giving of his deposition, the said

SIDNEY SAEWITZ was by me first duly sworn to

testify the truth, the whole truth and nothing but

the truth; that the foregoing deposition was given

at said time and place by SIDNEY SAEWITZ, to

counsel herein set forth; that said deposition was

taken in stenotypy by me, afterwards transcribed.

            I do further certify that said

deposition was submitted to the witness for

examination and signature, and that I am not a

relative, counsel or attorney to any party herein,

or otherwise interested in the outcome of this

action.

            IN WITNESS WHEREOF, I hereunto set my

Hand and seal of office at Cincinnati, Ohio this

15th day of ___JANUARY___, 2002.

                        _____
                        Ross A. Giglio
                        Notary Public - State of Ohio

My commission expires:
April 29, 2004

1100 CENTRAL TRUST TOWER          MICHAEL W. CARROLL
P.O. BOX 5380                     CORPORATE TAX DIRECTOR
CINCINNATI, OHIO    ▮
513 977-3862


## SCRIPPS
## HOWARD

December 31, 1990

Mr. Sidney S. Saewitz
Internal Revenue Agent
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

   re:  The E. W. Scripps Company & Subsidiaries
      E.I.N. 34-0517805

Dear Sid:

As we have discussed previously, The E. W. Scripps Company and
subsidiaries' desire to prepay and thereby stop the interest
accumulation on the 1985-86 adjustments anticipated as a result
of our previous settlement with the Internal Revenue Service,
which changed our publishing affiliates' method of reporting
from the cash method to the accrual method as of 1980.

Our check for $7,000,000 is being hand-delivered with this
authorization letter by our Jerome P. Hackman to you today.
It covers the following years now under audit:

|                  | 1985       | 1986       | TOTAL      |
|------------------|------------|------------|------------|
| Tax Adjustment   | $2,000,000 | $2,000,000 | $4,000,000 |
| Interest Thereon | 1,500,000  | 1,500,000  | 3,000,000  |
|                  | $3,500,000 | $3,500,000 | $7,000,000 |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue
Service's receipt of this payment.

Thank you for your cooperation in this matter.

Sincerely,

*Michael W. Carroll*

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc. 1 - Letter for receipt purposes

**R E C E I V E D**
**EXAMINATION DIVISION**

**DEC 3 1 1990**





SCRIPPS HOWARD

P.O. BOX 5380
CINCINNATI, OHIO 45201
513 977-3000

DECEMBER 31,1990

PAY TO THE ORDER OF

INTERNAL REVENUE SERVICE

7,000,000.00    0901062828

Mellon Bank (East) N.A., Philadelphia, PA
Payable through Mellon Bank (PA) N.A., Pittsburgh PA

RECEIVED
EXAMINATION DIVISION

DEC 31 1990

DIST. DIR. INT. REVENUE
CINCINNATI, OHIO

⑊090106 28 28⑊  ⑊O 3 L L0004 7⑊  2⑊9 2 5  58 4⑊

## Payment Posting Voucher— Examination
### (Not a taxpayer receipt)

| N U / M L / F C | DLN | SSN/EIN | Form number/ MFT | Tax period | Transaction data |
|---|---|---|---|---|---|
| Status | | 34-0517805 | 1120/02 | 8612 | 12-31-90 |

Taxpayer name, address, and ZIP code

E. W. Scripps Co.
1100 Central Trust Tower Cincinnati, OH 45202

List, in the column below, payments to be posted to the taxpayer's account. A maximum of two Credit transactions may be shown.

**Remarks**

Tax Adj    1,000,000
Interest    1,500,000
          3,500,000

R E C E I V E D

DEC 3 1 1990

DIRECTOR IN'T REV
CINCINNATI

☒ Cash bond    ☐ Send 316(C)

List, in the column below, any Debit amount to be assessed. A maximum of one Debit transaction may be shown.

| Amount | Code | Description |
|---|---|---|
| | 170 | ES penalty |
| | 180 | FTD penalty |
| | 360 | Fees and collection cost |
| | 570 | Additional liability pending |
| | | Other debit |
| | | Other debit |

| Amount | Code | Description |
|---|---|---|
| | 670 | Subsequent payment |
| | 610 | Remittance with return |
| | 620 | Payment for 7004 |
| 3,500,000 | 640 | Advance payment on deficiency |
| | 430 | All other est. tax payments |
| | 660 | 706-ES |
| | 680 | Designated interest |
| | | Other credit |
| 3,500,000 | | Total payment |

Prepared by (Name and unit symbol)
S. SAEWITZ, RA 1104, DO 31 Room 4504 FOB X2356

Form **3244-A** (Rev. 6-85)
Dispose of all prior issues

Part 2
(Duplicate copy—do not process)

Department of the Treasury
Internal Revenue Service

---

## Payment Posting Voucher— Examination
### (Not a taxpayer receipt)

| N U / M L / F C | DLN | SSN/EIN | Form number/ MFT | Tax period | Transaction data |
|---|---|---|---|---|---|
| Status | | 34-0517805 | 1120/02 | 8512 | 12-31-90 |

Taxpayer name, address, and ZIP code

E.W. Scripps Co
1100 Central Trust Tower, Cincinnati, OH 45202

List, in the column below, payments to be posted to the taxpayer's account. A maximum of two Credit transactions may be shown.

**Remarks**

Tax Adj.   2,000,000
Interest   1,500,000
        3,500,000

R E C E I V E D

DEC 3 1 1990

DIRECTOR IN'T REV
CINCINNATI

☒ Cash bond    ☐ Send 316(C)

List, in the column below, any Debit amount to be assessed. A maximum of one Debit transaction may be shown.

| Amount | Code | Description |
|---|---|---|
| | 170 | ES penalty |
| | 180 | FTD penalty |
| | 360 | Fees and collection cost |
| | 570 | Additional liability pending |
| | | Other debit |
| | | Other debit |

| Amount | Code | Description |
|---|---|---|
| | 670 | Subsequent payment |
| | 610 | Remittance with return |
| | 620 | Payment for 7004 |
| 3,500,000 | 640 | Advance payment on deficiency |
| | 430 | All other est. tax payments |
| | 660 | 706-ES |
| | 680 | Designated interest |
| | | Other credit |
| 3,500,000 | | Total payment |

Prepared by (Name and unit symbol)
S. Saewitz, RA 1104 DO31 Room 4504 FOB X2356

Form **3244-A** (Rev. 6-85)

Part 2

Department of the Treasury

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE E.W. SCRIPPS COMPANY            )
AND SUBSIDIARIES,                   )            Case No. C-1-01-434
                                    )
            Plaintiff,              )            Judge Dlott
                                    )
vs.                                 )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Defendant.              )
_____ )

## UNITED STATES' RESPONSES TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

INTERROGATORY NO. 1:

Identify all persons who have provided the substance of any response given to these interrogatories and state the interrogatory for which each such person identified has provided information.

ANSWER:

      Stacy Hallett                     Sid Saewitz
      Trial Attorney, Tax Division    Internal Revenue Service
      U.S. Department of Justice      Revenue Agent
      All                           No. 6, 7, 8



Linda Averback
Attorney
Internal Revenue Service
No. 6, 8

INTERROGATORY NO. 2:

Set forth in detail all facts supporting your contention that Plaintiff's claims are barred by the statute of limitations, as alleged in the First Affirmative Defense of your Answers to the First Amended Complaint.

ANSWER:

The United States withdraws its first affirmative defense and therefore it objects to this interrogatory as it is not relevant.

INTERROGATORY NO. 3:

Set forth in detail all facts supporting your contention that Plaintiff is not entitled to recover under the doctrine of equitable recoupment, as alleged in Second Affirmative Defense of your Answer to the First Amended Complaint.

ANSWER:

The United States withdraws its second affirmative defense and therefore it objects to this interrogatory as it is not relevant.

INTERROGATORY NO. 4:

Set forth in detail all facts supporting your contention that Plaintiff's December 31, 1990 Payment was a cash bond.

ANSWER:    The United States objects to this request as it improperly assumes facts not admitted by the United States or otherwise properly established, namely that the December 31, 1990 remittance was a payment. The United States also objects to this request as it is overly broad and unduly burdensome. See Hiskett v. Wal-Mart Stores, Inc.., 180 F.R.D. 403 (D. Kan. 1998). The United States further objects to this request as it is premature. See Leksi, Inc. v. Federal Insurance Co., 129 F.R.D. 99 (D. N.J. 1989). The plaintiff and its employees were unavailable for depositions until the first two weeks of December. As such, the United States has not yet completed its

-2-

discovery. Without waiving the above objection, answers will be set forth by the United States after discovery has proceeded in this matter.

## INTERROGATORY NO. 5:

Set forth in detail all facts supporting your contention that Plaintiff's December 31, 1990 Payment was not a payment of tax.

ANSWER:    The United States objects to this request as it improperly assumes facts not admitted by the United States or otherwise properly established, namely that the December 31, 1990 remittance was a payment. The United States also objects to this request as it is overly broad and unduly burdensome. See Hiskett v. Wal-Mart Stores, Inc.., 180 F.R.D. 403 (D. Kan. 1998). The United States further objects to this request as it is premature. See Leksi, Inc. v. Federal Insurance Co., 129 F.R.D. 99 (D. N.J. 1989). The plaintiff and its employees were unavailable for depositions until the first two weeks of December. As such, the United States has not yet completed its discovery. Without waiving the above objection, answers will be set forth by the United States after discovery has proceeded in this matter.

## INTERROGATORY NO. 6:

Identify any and all Forms 316(C) notices that you sent to Plaintiff in relation to the December 31, 1990 Payment.

ANSWER:

The United States objects to this request as it improperly assumes facts not admitted by the United States or otherwise properly established, namely that the December 31, 1990 remittance was a payment. Without waiving this objection, no such Form 316(C) notices have been located.

## INTERROGATORY NO. 7:

Identify all persons involved in the decision to treat the December 31, 1990 Payment as a cash bond.

ANSWER:

The United States objects to this request as it improperly assumes facts not admitted by the United States or otherwise properly established, namely that the December 31, 1990 remittance was a payment. Without waiving this objection, the following individuals contributed to the treatment of the December 31, 1990 remittance as a cash bond:

Michael W. Carroll, Jerome P. Hackman, and Sid Saewitz

-3-

INTERROGATORY NO. 8:

State the basis of your refusal in 1995 or at any other time to refund any portion of the December 31, 1990 Payment to Plaintiff.

ANSWER:    The United States objects to this request as it improperly assumes facts not admitted by the United States or otherwise properly established, namely that the December 31, 1990 remittance was a payment and that the United States refused to refund the remittance to the plaintiff. Without waiving this objection, the United States asserts that it treated the remittance as a deposit and it refunded the deposit to the plaintiff.

INTERROGATORY NO. 9:

Identify all persons involved in your decision to permit Plaintiff to deduct on its 1990 tax return $ 1,500,000 interest paid for the 1986 tax year as part of the December 31, 1990 payment.

ANSWER:    The United States objects to this request as it improperly assumes facts not admitted by the United States or otherwise properly established, namely that the December 31, 1990 remittance was a payment. In addition, the United States objects to this interrogatory as it seeks information that is not relevant to the claim or defense of any party, and it is not reasonably calculated to lead to the discovery of admissible evidence.

GREGORY G. LOCKHART
United States Attorney


STACY HALLETT
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6499

-4-

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' RESPONSES TO THE PLAINTIFF'S FIRST SET OF INTERROGATORIES has been made upon the following by depositing a copy in the United States mail, postage prepaid, this 27th day of November 2002:

> David G. Holcombe
> Baker & Hostetler LLP
> 312 Walnut Street, Suite 2650
> Cincinnati, Ohio 45292
>
> Paul P. Eyre
> William M. Toomajian
> Thomas R. Lucchesi
> Baker & Hostetler LLP
> 3200 National City Center
> Cleveland, Ohio 44114-3485

STACY HALLETT
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6499

-5-