IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE E.W. SCRIPPS COMPANY AND SUBSIDIARIES, | ) ) | Case No. C-1-01-434 |
| Plaintiff, | ) ) ) | Judge Dlott |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

## UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The United States of America, under Fed. R. Civ. P. 56, moves for summary

judgment against The E.W. Scripps Company and subsidiaries, on the grounds that there is

no genuine issue of material fact and the United States is entitled to judgment as a matter of

law. In support of this motion, the United States is simultaneously filing a memorandum in

support of this motion.

GREGORY G. LOCKHART
United States Attorney

STACY HALLETT
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6499

23

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE E.W. SCRIPPS COMPANY          )
AND SUBSIDIARIES,                 )          Case No. C-1-01-434
                                  )
            Plaintiff,            )          Judge Dlott
                                  )
vs.                               )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
            Defendant.            )
_____)

## UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In 1988, during the course of an audit of Scripps 1984 tax year, Scripps and the IRS agreed that Scripps would change its accounting method from a cash to an accrual basis. As of December 31, 1990, neither Scripps nor the IRS had calculated the amount, if any, that this change would increase Scripps's 1986 tax liability. Had Scripps made such a calculation, it would have found no additional tax was due for its 1986 taxable year. However, in December 1990, Scripps wanted to both take a tax deduction for interest paid during the year and stop the running of any interest that might have been due. On December 31, 1990, Scripps remitted $ 3,500,000 to the IRS for its 1986 year and claims that this remittance should have been treated as a tax payment, rather than a deposit, despite the fact that a remittance that does not satisfy an asserted tax liability should not be treated as the 'payment' of a tax. Ameel v. United States, 426 F.2d 1270, 1273 (6th Cir. 1970). The United States contends that because there was no asserted or proposed tax liability for the 1986 taxable

year, the remittance cannot be classified as a payment of a tax liability.

The distinction between a deposit and payment can be important for several reasons. See generally, Philip M. Jones, The Supreme Court Clarifies the Role of Assessments in Tax Controversies, 92 J. Tax'n 275 (May 2000). For example, the remittance of a payment allows the IRS to retain the funds remitted. However, a taxpayer is generally allowed to receive a return of a deposit at any time, unless or until a deposit converts to a payment upon assessment of a liability. See New York Life Insurance Company v. United States, 118 F.3d 1553, 1560 (Fed. Cir. 1997) ("The essence of a deposit is that the taxpayer is entitled to recover it without regard to the merits of the underlying tax claim.") However, for purposes of stopping the accrual of interest on a tax liability, either a deposit or a payment will suffice. Fortugno v. Commissioner, 353 F.2d 429, 434 (3d Cir. 1965). For purposes of the present action, if the December 31, 1990 remittance was a payment, Scripps is entitled to statutory interest on the amount for the entire time period it was held by the United States as a payment. If the remittance was a deposit, Scripps is not entitled to statutory interest for the time period it was held by the United States.

Although the term "payment" frequently appears in the Internal Revenue Code, the concept of a "deposit" does not.[1] See New York Life Insurance Company v. United States, 118 F.3d 1553, 1556 (Fed. Cir. 1997). Rather the concept of the "deposit of taxes" stems from the Supreme Court's decision of Rosenman v. United States, 323 U.S. 658 (1945). See New York Life Insurance Company v. United States, 118 F.3d 1553 (Fed. Cir. 1997). In Rosenman the executors of an estate sent a check to the Internal Revenue Service stating that payment was made under "protest and

---

[1]     The term "deposit" is found in the Internal Revenue Code in a remittance sense only in reference to: (1) excise taxes on gasoline, liquor, and air or sea tickets ( see § 6302(f)); (2) amounts withhold at the source and required to be deposited at certain financial institutions (see § 6302(g) and § 6656); (3) certain partnership items (see § 6226); (4) to certain bonding requirements (see § 7101 and § 7485); (5) retirement provisions for Tax Court judged (see § 7447 & § 7448); (6) amounts seized in criminal investigations (see § 7608); (7) the process for banking collected taxes, sales proceeds, et (see § 7809).

duress" and solely for the purposes of avoiding penalties and interest. 330 U.S. at 660. The Supreme

Court, in holding that the remittance was not a payment of a tax liability, rather it was a "deposit in

the nature of a cash bond for the payment of taxes thereafter found to be due," (Id. at 662), stated:

> the taxpayer did not discharge what he deemed a liability nor pay one
> that was asserted. There was merely an interim arrangement to cover
> whatever contingencies the future might define....by allowing such a
> deposit arrangement, the Government safeguards collection of the
> assessment of whatever amount tax officials may eventually find owing
> from a taxpayer, while the taxpayer in turn is saved the danger of
> penalties on an assessment made, as in this case, years after a fairly
> estimated return has been filed.

Rosenman, 323 U.S. at 662 & 663.

## FACTS

1.      In 1988, in closing the audit of its 1984 taxable year, Scripps and the IRS agreed that

Scripps would change its accounting method from a cash basis to an accrual basis. Exhibit 47 at p.

253 to the Carroll Deposition..

2.      On or about December 10, 1990, Michael Carroll asked Jerry Hackman to prepare a

calculation of additional taxes and interest Scripps would owe for its 1986 year due to the change in

accounting method. Carroll Dep. at p. 9 lines 5-16 & p. 15 - 17; Exhibit 7 to Carroll Deposition.

3.      Carroll is the corporate tax director for Scripps and has been head of the tax

department at Scripps since 1982. Carroll Dep. at p. 4 - 5. Hackman is the tax manager of federal

audits for the Scripps Corporation. Hackman Dep. at p. 4.

4.      Carroll states that Scripps wanted to make a payment with respect to any increased

liability due to the change in accounting method because Scripps wanted to stop the running of any

interest and to deduct the payment of interest on its 1990 tax return. Carroll Dep. at p. 11 lines8 -

11.

5.      Before asking Hackman to make this calculation, Carroll had asked the IRS agent to

-3-

calculate the amount of additional taxable income, if any, that would be due for the 1985 and 1986 tax years due to the change in accounting method.  Carroll Dep. at p. 13 lines19-22.  In response, the Revenue Agent stated that he would not be able to make any such calculations before the 1990 year-end.  Carroll Dep. at p. 13 lines 22-24.

6.      When Hackman prepared his calculation, he did not refer to Scripps's 1986 tax return that had been previously filed with the IRS.  Hackman Dep. at p. 20 lines8-12.

7.      Scripps had previously filed a 1986 income tax return reflected a net operating loss of $ 62 million.  Carroll Dep. at p. 24 line7.  Scripps carried back the 1986 net operating loss to its 1983 & 1984  taxable years.  Carroll Dep. at p. 26 lines 6-9; Hackman Dep. at p. 31 lines 6-13.

8.      Hackman's calculation consisted of estimating the increase in income created by the change in accounting method for the 1985 and 1986 tax years and dividing by two to allocate the increased income between the 1985 and 1986 tax years. Hackman Dep. at p. 23 lines7-9; Exhibit 49 to Hackman Deposition..  Hackman then multiplied the increase in income by the applicable federal income tax rate for each tax year.  Hackman Dep. at p. 24 lines17-25; Exhibit 49 to Hackman Deposition.

9.      Based upon Hackman's estimates, Scripps's total income for 1986 would have been increased by $ 8 million. Hackman Dep. at p. 30 lines7-17.

10.      Based upon the tax return filed by Scripps for its 1986 taxable year, the increase in $ 8 million in income for 1986 would not increase Scripps's tax liability for the 1986 taxable year, (Hackman Dep. at p. 30 lines17 - 25 & p. 31 lines 1-2), since the 1986 tax return filed by Scripps reported a $62 million loss.  Hackman Dep. at p. 31 lines 6-10; Exhibit 6 to Hackman Deposition. An $ 8 million increase in income for the 1986 taxable year would have still left Scripps with a $ 56 million income loss for the year.  As such, Hackman's calculation bore no resemblance to the actual

-4-

effect the change in accounting method would have on Scripps's 1986 tax liability.

11.    Since the 1986 operating loss was carried back to Scripps's 1983 and 1984 taxable years, (Hackman Dep. at p. 31 lines 11-20), a change in the net operating loss by $ 8 million for 1986 could only change Scripps's tax liability for the 1983 and 1984 taxable years. Hackman Dep. at p. 31 lines 6-13.

12.    Carroll looked at the summary Hackman prepared, but did not look at the details behind the summary. Carroll Dep. at p. 9 lines 14-16.

13.    On December 31, 1990, E.W. Scripps, Inc. delivered a check in the amount of $ 7,000,000.00 to the Internal Revenue Service stating that the funds were to "prepay and thereby stop the interest accumulation on the 1985-86 adjustments anticipated..." The letter accompanying the remittance designated how the funds should be applied to the 1985 and 1986 tax accounts of E.W. Scripps. Exhibit 4 to Carroll Deposition; Carroll Dep. at p. 7 - 8.

14.    The letter and check in the amount of $ 7,000,000 were hand-delivered to the IRS by Hackman. Exhibit 47 to Hackman Deposition; Hackman Dep. at p. 7 - 8.

15.    Scripps had previously sent remittances to the IRS with the intent of halting the running of interest and obtaining interest deductions. On December 22, 1988, E.W. Scripps, Inc. delivered a check in the amount of $ 9,000,000.00 to the Internal Revenue Service stating that the funds were to "prepay and thereby stop the interest accumulation on the 1982 - 1984 adjustments anticipated..." The letter accompanying the remittance stated that the funds were to be treated as a cash bond and designated how the funds should be applied to the 1982, 1983, and 1984 tax accounts of E.W. Scripps. Exhibit 1 to Carroll Deposition; Carroll Dep. at p. 7 - 8. E.W. Scripps was allowed an interest deduction for the amount of designated interest that it paid with respect to the 1988 payment. Hackman Dep. at p. 37 lines 12-24.

16.    When Hackman delivered the December 31, 1990 remittance to the IRS, he was

given a photocopy of a Form 3244-A, IRS Payment Posting Voucher, that indicated the remittance

was being treated as a cash bond by the IRS.  Hackman Dep. at p. 8 lines 15-25 & p. 9 line 8.

## ARGUMENT

The December 31, 1990 remittance to the IRS by Scripps could not have been a payment on

Scripps's 1986 tax liability because neither Scripps nor the IRS had asserted, proposed, or calculated

a tax liability for the 1986 tax year.  If such a calculation had been made, Scripps would have

determined that it had no increased tax liability for its 1986 taxable year.  An essential factor in

determining whether a remittance is to be treated as a payment or a deposit is whether the

remittance satisfies an asserted tax liability.  Courts have consistently held that a remittance that

satisfies an asserted tax liability is a payment and that a remittance that does not satisfy an asserted

liability is a deposit.  See Consolidated Edison Company of New York, Inc. v. United States, 941 F.

Supp. 398, 401 (S.D. N.Y. 1996); see also Ameel v. United States, stating "[t]his much is clear: (1) a

remittance is not per se 'payment' of the tax; (2) a remittance that does not satisfy an asserted tax

liability should not be treated as the 'payment' of a tax; and (3) an essential factor in 'payment'

before assessment is the satisfaction or discharge of what the taxpayer deems a liability. 426 F.2d

1270, 1273 (6th Cir. 1970)(citing Mertens, Law of Federal Taxation, vol. 10, § 58.27 at 79 (1964 ed.)).

That essential factor, an asserted tax liability, is missing in the present case.

In Ameel, the executrix of an estate filed the estate tax return and paid the tax shown due on

the return.  The return was audited and the IRS computed an additional tax due.  The executrix

agreed to the additional tax and made payment.  A new administrator of the estate was appointed

and decided that the additional assessment against the estate was incorrect and filed a claim for

-6-

refund beyond the two year period from payment for filing a claim for refund. The estate argued

that it had not made a payment of the taxes, but rather submitted a deposit as defined in Rosenman.

The Sixth Circuit, in holding that the estate had made a payment, not a deposit, stated:

> In general, a tax is considered 'paid' for purposes of the running of the
> period of limitations when a taxpayer files his return accompanied by his payment. . .
> On the other hand, where this is no tax liability computed and proposed, a
> remittance is to be treated as a cash bond to stop the running of interest on the
> amount 'dumped,' Busser v. United States, 130 F.2d 537 (3d Cir. 1942), or
> deposited until a more definite determination of the tax liability is asserted
> by the Government. Rosenman v. United States, 323 U.S. 658 (1945). In
> such cases, 'payment' occurs when the indefinite tax liability is further defined;
> such as by a formal assessment of a definite amount.

Ameel, 426 F.2d 1270 at 1272.

Here, there was no tax liability defined by either Scripps or the IRS. Scripps's 1986 return

for the year, as filed, reflected a $ 62 million operating loss. Scripps's accountant estimated that for

the 1986 taxable year, the change in accounting method would have increased Scripps's income by

$ 8 million. Adding this $ 8 million of additional income to the $ 62 million loss reflected on

Scripps's previously filed return would have led to a $ 56 million loss for the year and no potential

tax liability. Even a glance at the first page of Scripps's filed return for the year would have born out

this conclusion.

Scripps, however, did not consult its previously filed tax return and did not compute

whether any additional tax liability would be due for its 1986 taxable year. Rather, Scripps, in pursuit

of an interest deduction for its 1990 tax year, multiplied its increased income figure by the tax rate

and guessed that interest would be $ 1.5 million. It then "dumped" the $ 3.5 million with the IRS.

This in no way was an attempt to calculate whether it had an increased liability and was not possibly

an attempt to satisfy a determined or proposed deficiency or liability. Since there was no asserted or

proposed liability, the remittance cannot be considered a payment as there was no proposed liability

-7-

to discharge.

While under Ameel, there is no requirement that a final determination of the tax liability for a payment to be made, it is clear that some specific liability be asserted. The court recognized that in cases of "dumping" of funds with the IRS until "a more definite determination of tax liability is asserted ..., 'payment' occurs when the liability is further defined..." Id. at 1272. Similarly, the Holtvogt court, in dealing with a remittance made with an application for extension of time, noted "[m]ost of the cases where courts have found deposits rather than estimated payments have involved round figures ($ 120,000 in Rosenman; $ 25,000 in Risman), and it is certainly more likely that one would deposit a round amount than a precise figure like $ 9,006." Holtvogt v. United States, 887 F. Supp. 994, 1000 (S.D. Ohio 1995).

The "dumped" language in Ameel, which is particularly fitting in the present case, comes from a line of cases finding that a remittance that is "dumped" on the IRS where there is no indication on a return, or from a proposed liability from the IRS, can only be considered a deposit. See Wiltgen v. United States, 813 F. Supp. 1387, 1391 (N.D. Iowa 1992) citing Budd v. United States, 252 F.2d 456 (3rd Cir. 1957), Binder V. United States, 590 F.2d 68 (3d Cir. 1978), Charles Leich & Co. v. United States, 329 F.2d 649 (Ct. Cl. 1964); see also, Busser v. United States, 130 F.2d 537 (3rd Cir. 1942)(finding that a taxpayer cannot deposit its money with the Internal Revenue Service to collect an attractive interest rate, considerably higher than could be secured elsewhere). Dumping is precisely what Scripps did in this case. Without regard to whether it even had a tax liability, Scripps in pursuit of a $1.5 million interest deduction for its 1990 tax year, dumped its remittance on the IRS. Under any analysis, Scripps's remittance can only be characterized as a cash bond.

There are a host of cases discussing whether a particular remittance by a taxpayer is a

-8-

payment or a deposit. The Circuit Courts are not unanimous in the standards they apply in making such a determination.[2] However, the one common factor in every case is that there must be at least some proposed or determined liability before a remittance will be considered a payment. See Ameel v. United States, 426 F.2d 1270 (6th Cir. 1970), New York Life Insurance Company, 118 F.3d 1553 (Fed. Cir. 1997); Ewing v. United States, 914 F.2d 499 (4th Cir 1990) ("a payment results from the remittance by a taxpayer concomitant with the recognition of a tax obligation whether by filing with a return, resolution of a dispute by an agreement . . . or otherwise."); Fortugno v. Commissioner, 353 F.2d 429 (3rd Cir. 1965)(holding there must be acquiescence of a proposed deficiency or assessment before a remittance is a payment); Moran v. United States, 63 F.3d 663 (7th Cir. 1995) (because notice of deficiency issued, the remittance was a payment as the taxpayers remittance was made in response to the notice of deficiency) overruled on different grounds Malachinksi v. Commissioner, 268 F.3d 497 (7th Cir. 2001); Dubuque Packing v. United States, 233 F.2d 453 (8th Cir. 1956); Thomas v. Mercantile Nat. Bank, 204 F.2d 943 (5th Cir. 1953); Lewyt Corp. v. Commissioner, 215 F.2d 518 (2d Cir. 1954) affirmed in part and reversed in part on other grounds, 349 U.S. 237 (1955). In those cases where the liability was proposed or determined, the remittance is generally held to be a payment. In those cases where there is no determined liability, the remittance is held to be a deposit.

For example, in Malachinski v. Commissioner, 268 F.3d 497 (7th Cir. 2001), a remittance was

---

[2]      The fact-intensive inquiry sometimes pursued in the so-called "facts and circumstances" tests of some courts is often wasteful of judicial and taxpayer resources and should almost never be necessary. See, e.g., Ewing v. United States, 914 F.2d 499 (4th Cir 1990), stating that some of the factors that may be considered include the date the tax liability it defined, formal assessment, the taxpayer's intent, how the government treated the funds, and whether there was a dispute over the amount of the liability at the time funds were remitted. It should, in particular, be unnecessary where, as here, there is no tax liability computed or proposed and the remittance is 'dumped' until a more definite determination for tax liability, if any, is asserted. In such a situation, it is unnecessary to look further to determine the intent of the parties or the other facts and circumstances used by some courts.

made during the course of an audit, but before a report proposing a deficiency was prepared. The Seventh Circuit found that because the remittance was made well before any liability was defined, it was a deposit. Id. at 508. However, in Ewing v. United States, 914 F.2d 499 (4th Cir. 1990), the taxpayers and the IRS had reached an agreement as to the amount of their deficiency. The next day, the taxpayers forwarded their remittance to the IRS. The Fourth Circuit held that because the remittance was "concomitant" with the recognition of a tax liability, it had to be a payment. Id. at 504. In factually similar case to the present, Consolidated Edison Company of New York, Inc. v. United States, 941 F. Supp. 398 (S.D. N.Y. 1996), Con Edison had already satisfied its tax obligations and incurred no tax deficiency for the years at issue. As such, the court held that Con Edison had no liability to be discharged and therefore there could be no payment of a tax for the years in which there was no additional tax liability. Id. at 401. Each of these cases is consistent with the Sixth Circuit's Ameel decision in that without, at a minimum, a proposed or ascertained tax deficiency or liability, there can be no payment as there is no known liability to be extinguished.

As shown, the present case presents the fact pattern of a "dumping" of funds with the intent to receive a tax deduction and to stop the running of any interest. The IRS told Scripps that it did not have time to calculate its additional tax liability, if any, by year end. The tax liability was undefined, and if Scripps had bothered to look at its previously filed tax return, it would have determined that no liability was possible based upon its own calculations. Under no theory can Scripps's December 31, 1990 remittance be considered a payment of a tax liability.

## CONCLUSION

Scripps, in pursuit of an interest deduction for its 1990 taxable year, made a $ 3.5 million remittance to the IRS without regard to whether it had a tax liability for the 1986 taxable year. It is not entitled to interest on the return of those funds. The United States is entitled to summary

-10-

judgment on this issue as there is no dispute that a calculation of Scripps's 1986 tax liability was not

made, either by Scripps or by the IRS. Without at least a proposed liability, there can be no

payment. The United States is entitled to judgment as a matter of law.

GREGORY G. LOCKHART
United States Attorney

STACY HALLETT
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6499

-11-

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES'

MEMORANDUM IN SUPPORT OF ITS FOR SUMMARY JUDGMENT has been made upon

the following by depositing a copy in the United States mail, postage prepaid, this __31st__ day of

March 2003:

> Paul P. Eyre
> Thomas R. Lucchesi
> Rebecca C. Lutzko
> Baker & Hostetler LLP
> 3200 National City Center
> Cleveland, Ohio 44114-3485

STACY HALLETT
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-6499

1                IN THE UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF OHIO

3                        WESTERN DIVISION

4                           -  -  -

5     THE E.W. SCRIPPS COMPANY    :

6     AND SUBSIDIARIES            :

7          PLAINTIFF           :CASE NO.C-1-01-434

8     VS                         :

9     UNITED STATES OF AMERICA    :

10         DEFENDANT             :

11                          -  -  -

12

13         Deposition of MICHAEL W. CARROLL, a witness

14    herein, taken by the defendant as upon

15    cross-examination pursuant to the Federal Civil

16    Rules of Procedure and pursuant to agreement among

17    counsel as to time and place and stipulations

18    hereinafter set forth, on December 6, 2002, at

19    9:35 a.m., at the offices of Baker & Hostetler,

20    312 Walnut Street, Cincinnati, Ohio 45202, before

21    Sharlene D. Hall, Official Court Reporter within

22    and for the State of Ohio.

23

24

25                                    ORIGINAL

1

2    APPEARANCES:

3

4        ON BEHALF OF THE PLAINTIFF:

5            PAUL EYRE, ESQ.
             BECKY LUTZKO, ESQ.
6            BAKER & HOSTETLER
             3200 NATIONAL CITY CENTER
7            CLEVELAND, OHIO 44114-3485

8

9        ON BEHALF OF THE DEFENDANT:

10           STACY SUZANNE HALLETT
             TAX DIVISION
11           P.O. BOX 55
             WASHINGTON, DC 20044-0055
12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBITS
For Government:
1       12/22/88 Letter
 Received                                    8

4       12/31/90 Letter
 Received                                    8

7       12/10/90 Handwritten notes
 Identified                                 17
8       12/12/90 Handwritten notes
 Identified                                 19

9       12/14/90 Handwritten notes
 Identified                                 22

11      12/31/90 Handwritten notes
 Received                                   23

12      12/30/94 Letter
 Received                                   23

16      3/8/95 Memo
 Identified                                 28

21      6/19/96 Handwritten notes
 Identified                                 33

22      7/8/96 Handwritten notes
 Identified                                 37

23      7/9/96 Letter
 Identified                                 40

33      1/30/98 Handwritten notes
 Identified                                 38

34      Scripps memo
 Identified                                 38

46      4/13/99 Handwritten notes
 Identified                                 43

47      8/6/99 Letter
 Identified                                 46

50      Tax Summary
 Identified                                 11

```
 1                    MICHAEL W. CARROLL
 2    being first duly sworn, was examined and testified
 3    as follows:
 4                    CROSS-EXAMINATION
 5    BY MS. HALLETT:
 6         Q.   Can you state your name, please?
 7         A.   My name is Michael W. Carroll.
 8         Q.   And your address?
 9         A.   My home address or my business
10    address?
11         Q.   Home address.
12         A.   8385 Greenleaf -- that's one word --
13    Drive, Cincinnati, Ohio 45255.
14         Q.   And are you presently employed?
15         A.   Yes.
16         Q.   Whose your employer?
17         A.   E.W. Scripps Company.
18         Q.   What is your position?
19         A.   I'm the corporate tax director.
20         Q.   How long have you been the corporate
21    tax director?
22         A.   Been -- well, I started with the
23    company in 1979, and I became the head of the tax
24    department in 1982.
25         Q.   Okay.  And by "head of the tax
```

1    department," is that also the corporate tax

2    director, the same position?

3        A.    Initially, my title was a corporate

4    tax manager, and at some point in time it became

5    corporate tax director.

6        Q.    Then what are your job duties as

7    corporate tax director?

8        A.    I'm the head of the tax department,

9    that is, responsible for the preparation and

10   filing of all of the federal and state and local

11   income tax returns, the majority of the personal

12   property returns.  We also handle the various

13   federal and state audits, and do planning and

14   research, typical functions of a corporate tax

15   department.

16       Q.    Okay.  And what about your educational

17   background?  Can you just briefly summarize your

18   educational background?

19       A    Sure.  I have a bachelor's from Ohio

20   State University, with a major in accounting.

21   Then I have a MBA in finance from the University

22   of Cincinnati.

23       Q.    And when did you graduate with your

24   bachelor's degree?

25       A.    That would be June of 1972.

```
 1              Q.    Okay.  And what about the MBA?  What
 2     year did you --
 3              A.    That following year, June of '73.
 4              Q.    Okay.  I'm going to show you two
 5     exhibits, Mr. Carroll.  One is marked Exhibit 1,
 6     and one is marked Exhibit 4.  If you could take a
 7     look at those for me please, and tell me if you've
 8     seen those before.
 9              A.    Yes, I have.
10              Q.    Both of them?
11              A.    Yes.
12              Q.    Okay.  Is that your signature on both
13     of the documents?
14              A.    That is my signature.
15              Q.    Okay.  Now, on Government Exhibit
16     Number 1, can you describe in your own words what
17     that document is?
18                    MS. LUTZKO:  Go ahead and read it,
19              just to make sure.
20                    THE WITNESS:  Before?  Okay.
21                    MS. LUTZKO:  Yeah.
22              Q.    Take as much time as you need to read
23     them.
24              A.    This letter I prepared.
25              Q.    This is Exhibit 1 you are referring
```

1    to?

2         A.    Yes.

3         Q.    Okay.

4         A.    Exhibit 1, the letter dated December

5    22nd, 1988.  I prepared this letter as a

6    transmittal letter to go with our payment to the

7    IRS in 1988, because we had recently settled with

8    the IRS and agreed to switch our newspaper

9    divisions from the cash method to the accrual

10   method of accounting, as of 1980.  And we -- even

11   though the audit was not finished yet, we wanted

12   to prepay the majority of what we owed on the

13   conversion from cash to accrual, and to stop the

14   running of the interest on that portion.

15        Q.    Okay.  Now, with this transmittal

16   letter, did you also submit a check to the

17   Internal Revenue Service?

18        A.    Yes.

19        Q.    And what was the amount of that check?

20        A.    Would have been for the amount here on

21   the letter, which is $9 million.

22        Q.    Okay.  Now, there are some

23   calculations on the letter that show tax

24   adjustment and interest.

25        A.    Yes.

| | |
|---|---|
| 1 | Q. Did you make those calculations? |
| 2 | A. I don't know if I made them. I |
| 3 | probably had someone in my staff make them. |
| 4 | Q. Okay. |
| 5 | A. But approved them, yes. |
| 6 | Q. Okay. Would you have reviewed the |
| 7 | calculations? |
| 8 | A. Yes. |
| 9 | Q. Okay. Now, as to the second letter, |
| 10 | Exhibit Number 4, can you tell me what that is? |
| 11 | A. This letter, Exhibit 4, which is dated |
| 12 | December 31st, 1990, was also a transmittal that I |
| 13 | had prepared and I signed, which went with our |
| 14 | prepayment of tax and interest for the years 1985 |
| 15 | and '86. Again, on the agreement that we had with |
| 16 | the IRS to change the reporting for our publishing |
| 17 | subsidiary unit from the cash method to the |
| 18 | accrual method of accounting. |
| 19 | Q. Okay. Now there's -- with this |
| 20 | letter, was there also submitted a check to the |
| 21 | Internal Revenue Service? |
| 22 | A. Yes, there was. |
| 23 | Q. In the amount of $7 million? |
| 24 | A. That is correct. |
| 25 | Q. Now, this letter also indicates a |

```
 1    break out of taxes and interest; is that correct?
 2          A.    That is correct.
 3          Q.    Did you make that calculation for
 4    those dollar amounts?
 5          A.    I asked Jerry Hackman on my staff to
 6    make the calculation.  I looked it over and agreed
 7    that that's the proper amount of money that we
 8    should pay.
 9          Q.    When you say you looked it over, do
10    you recall what documents you looked over?
11          A.    He, Jerry, prepared a summary of
12    showing, by newspaper subsidiary unit, the
13    calculations of what additional tax and related
14    interest that we would owe for these years.  And I
15    looked over that summary.  I did not look over all
16    the details that went into preparing that summary.
17          Q.    Showing you what's been marked as
18    Exhibit Number 50.  Does that appear to be the
19    summary Mr. Hackman prepared?
20                MS. HALLETT:  I think you have it.
21          It's the same as 49.
22                MS. LUTZKO:  Okay.
23                MS. HALLETT:  I don't know why there's
24          two.
25                MS. LUTZKO:  Okay.
```

```
 1            MS. HALLETT:  Solves my problem.  Took
 2       49 yesterday.
 3            MS. LUTZKO:  Forty-nine and 50 are
 4       equivalent, as far as we know.  Yeah.
 5       Okay.
 6       A.   Yes.  I believe this is the summary
 7   that Mr. Hackman prepared.  Looks like the left
 8   edge is missing a little bit, but I can make out
 9   those, that those are the names of our newspaper
10   subsidiary companies.
11       Q.   Okay.  Great.  Now, I notice in the
12   letter dated December 22nd, 1988, Government
13   Exhibit 1, you referred to the remittance to the
14   Internal Revenue Service as a cash deposit, I
15   believe is the word you used.
16       A.   I referred to it as a cash bond.
17       Q.   Cash bond.  I'm sorry.  As a cash
18   bond.  Now, do you know why you used that word in
19   that letter?
20       A.   I believe before we made this payment
21   we did some research on how such a payment should
22   be made.  And at that time we felt that it should
23   be referred to as a cash bond.
24       Q.   Okay.  And the second letter,
25   Government Exhibit Number 4, you do not refer to
```

1   the remittance as a cash bond. Is that your

2   intent?

3        A.    That is correct. That was definitely

4   our intent, because between the time that we made

5   the prepayment for 1988 and as we were researching

6   the proper way to make the payment for 1990, we, I

7   guess, we better understood the government's

8   guidance, and we definitely wanted not only to

9   stop the running of the interest, but also to be

10  able to deduct the interest portion of the

11  prepayment on our 1990 return.

12            So upon further educating ourselves on

13  the best way to do that, we purposely did not

14  refer to this as a cash bond, because we did not

15  want it to be a cash bond. We wanted it to be a

16  prepayment of tax deference and related interest,

17  so I, specifically -- in fact, I used this letter

18  as a reference in preparing the 1990.

19        Q.    You mean the letter dated December

20  22nd, 1988?

21        A.    Yes. I took the -- yes, ma'am. I

22  took the 1988 letter as a reference, specifically

23  removed reference to cash bond because we did not

24  want it to be a cash bond.

25        Q.    Okay.

1          A.    We wanted it to be an advance payment

2    of tax and interest.

3          Q.    Okay.  With respect to the December

4    22nd, 1988 remittance, I believe there was an

5    amount of $9 million.  Do you know whether the

6    Internal Revenue Service treated that as a cash

7    bond?

8          A.    I -- I'm not sure how they treated it

9    on their records.

10         Q.    At any time did you become aware of

11   how the IRS treated it on their records?

12         A.    We may have after the fact.  I don't

13   know.  I do know that when the 1988 audit was

14   closed, that they allowed us to take the interest

15   as a deduction in 1988, although normally, as we

16   found out later, if a payment is a cash bond, you

17   can't take the deduction.  But they did allow a

18   deduction.

19         Q.    Okay.  Then that was for the 1988

20   payment?

21         A.    Yes.

22         Q.    Okay.  Now, with respect to the

23   December 31st, 1990 remittance, do you know

24   whether the -- how the IRS treated that?  Did they

25   treat that as a cash bond?

1          A.     That's why we are here today.  By this

2     letter and by verbally telling our team

3     coordinator, Sid Saewitz, we told the IRS, and Sid

4     Saewitz knew that we wanted this payment to be a

5     prepayment of tax and interest and not a cash

6     bond.  That's why I, specifically, removed any

7     reference to cash bond on this letter.  And it was

8     our intent to be a payment of tax.  That's the way

9     we thought that it was processed.  That's the way

10    Sid told us it was processed, until years later.

11         Q.     When you say "we," who are you

12    referring to?

13         A.     "We" would be Scripps, in general,

14    specifically myself and Mr. Hackman.

15         Q.     Okay.  Do you recall, specifically,

16    telling Mr. Saewitz that you want the remittance

17    treated as a payment for the remittance that was

18    made December 31st, 1990?

19         A.     Before we made this payment, I went to

20    Mr. Saewitz and asked him if he would do the

21    calculation of what the additional taxable income

22    would be for these two years, 1985 and '86.  He

23    told me that he would not be able to do that for

24    me before year-end.  I then told him that we

25    wanted to pay roughly what we owed on that agreed

1    adjustment, because we had agreed with the signing

2    of the Form 870-AD, back in 1988 I believe, that

3    we would switch all of our published subsidiaries

4    to the cash method to the accrual method of

5    accounting.  And, in fact, on the previous two

6    audit cycles, all of those calculations through

7    the year 1984 had already been made and agreed to

8    and paid.  So the only thing left was these two

9    years, because in 1985 and 1986, when we filed our

10   returns, we had filed them under the cash method.

11              So I had told him that, you know,

12   since then, and this was an agreed case, it was

13   just a matter of calculating the additional tax,

14   that we wanted to go ahead -- and no later than

15   the end of 1990 -- make that payment, to not only

16   stop the running of the interest, but also to get

17   a deduction for the interest on our 1990 return.

18   So Sid knew that that's what we wanted to do.

19        Q.   Did you have more than one

20   conversation with Mr. Saewitz about this before

21   you actually made the remittance?

22        A.   I can't give you dates or numbers of

23   times, but I would say I probably had more than

24   one discussion with him about that, yes.

25        Q.   Okay.  Okay.  And I don't believe you

```
 1      answered my question, but my question was:  Do you
 2      know how the IRS treated the December 31st, 1990
 3      remittance?  Did they treat it as a cash bond?
 4                  MS. LUTZKO:  Objection, to the extent
 5            you know.
 6            A.   I'm sorry.  Repeat the question.
 7            Q.   Do you know how the IRS treated the
 8      December 31st, 1990 remittance?
 9            A.   When -- sometime after this we asked
10      for and received a transcript of our account.  And
11      on the transcript it said Advance Payment of Tax
12      Deficiency.  To me -- that clearly indicated to me
13      that the IRS was treating it as a prepayment of
14      tax and interest and not as a cash bond.
15            Q.   Okay.  And when you say "sometime
16      after this," you mean sometime after December
17      31st, 1990?
18            A.   Yes.
19            Q.   Okay.  And who showed you the IRS
20      transcript, do you recall?
21            A.   I believe Mr. Saewitz gave it to Jerry
22      Hackman, and Jerry Hackman showed it to me.
23            Q.   Okay.  Mr. Carroll, I'm going to show
24      you what's been marked as Government's Exhibit
25      Number 7.  If you can take a look at that exhibit,
```

1    please, and tell me if you recognize it?

2         A.    Yes, I do recognize the document.

3         Q.    Okay.  Is this in your handwriting?

4         A.    Yes, ma'am.

5         Q.    Okay.  And can you tell me what that

6    document is?

7         A.    It is my notes of a conversation that

8    I had with the gentleman that was the controller

9    of the company at the time.  And it refers to a

10   conversation I also had with Jerry Hackman.

11        Q.    Okay.  Who's the gentleman that was

12   the controller of the corporation?

13        A.    His name was Robert Routt.

14        Q.    Is that R-O-U --

15        A.    R-O-U-T-T.

16        Q.    About -- I guess about halfway down

17   the document, I believe it starts with "I asked."

18        A.    Yes.

19        Q.    Is that correct?  Could you read that

20   for me?  Just to make sure I -- I'm not making any

21   comment about your handwriting.

22        A.    I'm left-handed.  I think that's

23   pretty good.

24              How much of it do you want me to read?

25        Q.    Just to the end of page.

1          A.    Okay.  "I asked JPH" -- which is the

2    reference to Jerry Hackman -- "to give me a rough

3    idea of tax still due for 1985 and 1986.  Per JPH

4    neither we nor IRS have made the tax calculation

5    for 1985 & 1986, but we know the accumulative

6    1980-1986 amount, so we can back out amounts paid

7    for 1980-81 & assessed & (mostly prepaid) for

8    1982-84 to arrive at roughly what we owe for

9    1985-86.  Once I have it, will consider prepayment

10   with DJC" -- who is Dan Castellini, who was the

11   vice president and CFO of the company.

12         Q.    Okay.  Now, that document is dated

13   December 10th, 1990; is that correct?

14         A.    That is correct.

15         Q.    Now, does that give you any indication

16   of about when you asked Mr. Hackman to make the

17   calculation for the '85 and '86 liability?

18         A.    That would seem to be correct, yes.

19         Q.    Okay.  And that sounds about right,

20   December 10th?

21         A.    Yes, I would think so.

22         Q.    Okay.  Great.

23               (Mr. Eyre left room.)

24         Q.    Mr. Carroll, I'd like to show you

25   what's been marked as Government Exhibit Number 8.

| | |
|---|---|
| 1 | A.   Sure. |
| 2 | Q.   If you can take a look at that |
| 3 | document please.  Tell me if you recognize it. |
| 4 | A.   Yes, I recognize this document. |
| 5 | Q.   Okay.  Is this in your handwriting? |
| 6 | A.   Yes, it is. |
| 7 | Q.   Okay.  At the very top like it has |
| 8 | initials "TSO." |
| 9 | A.   That's how I refer to tax saving |
| 10 | opportunity. |
| 11 | Q.   Okay.  At the very bottom of this |
| 12 | document it's -- I believe, it starts with "DFL." |
| 13 | A.   Yes. |
| 14 | Q.   Is that correct? |
| 15 | A.   Yes. |
| 16 | Q.   Can you read from the point where it |
| 17 | says "DFL" to the end?  It looks like it's cut off |
| 18 | a little bit, but... |
| 19 | (Mr. Eyre entered room.) |
| 20 | A.   Yes.  "DFL" -- and that's a reference |
| 21 | to a gentleman named Doug Lyons who worked for |
| 22 | Mr. Routt. |
| 23 | Q.   Okay. |
| 24 | A.   He offered his rough overall estimate |
| 25 | to JPH -- again the reference to Jerry Hackman -- |

```
 1   which he believes is close & suggests we still owe
 2   approximately -- what, there's no approximately --
 3   that we still owe $4 million in tax plus interest,
 4   but perhaps his number is too high.  It did not
 5   consider IRS allowances for self insurance,
 6   workmen's compensation, et cetera.
 7            And then, like you say, the last line
 8   is somewhat cut off.  It refers to Scripps Howard
 9   borrowing cost.
10        Q.   Okay.  Now, in this document, when it
11   talks about we still owe 4 million in tax, can you
12   tell from this document what year or years that
13   refers to?
14        A.   Well, the earlier part of the document
15   refers to the years 1985 and '86, so I would think
16   that that would be the reference to 1985 and '86.
17        Q.   Okay.  And what was Mr. Lyons'
18   position with Scripps?
19        A.   He was the -- I'm not sure what his
20   title was at the time, but currently he's the
21   director of -- director of financial accounting, I
22   believe is his title.  I'm not sure about that.
23        Q.   Was he in the tax department at the
24   time?
25        A.   No, he was not in and never has been
```

1   in the tax department.

2         Q.   Okay.  Thank you.  Okay.  I'm going to

3   show you what's been marked as Government Exhibit

4   Number 9.  If you can take a look at that document

5   for me please, and tell me if you recognize it?

6         A.   Yes, I do recognize this document.

7         Q.   Okay.  Is this document in your

8   handwriting?

9         A.   Yes, it is.

10        Q.   And it's dated December 14th, 1990?

11        A.   Yes, ma'am.

12        Q.   And did you -- can you tell me what

13   that document represents?

14        A.   This is more discussions of our

15   attempts to calculate the amount of tax we owed on

16   this cash to accrual issue for the years 1985 and

17   '86.

18        Q.   Okay.  Now, was this recording your

19   conversation with somebody or just these -- just

20   your notes?

21        A.   Well, these look like -- well, at the

22   very top of the page it says with "w/JPH," which

23   would be with Jerry Hackman, so I would guess that

24   these are my notes after I had a conversation with

25   Mr. Hackman.

```
1                      (Mr. Eyre left room.)
2           Q.   Okay.  Great.  Okay.  I'm now going to
3      show you what's marked Government Exhibit Number
4      11.
5           A.   Okay.
6           Q.   If you can take a look at that
7      document for me please, and tell me if you
8      recognize it?
9           A.   Okay.  Yes, I recognize this document.
10          Q.   Is this document in your handwriting?
11          A.   Yes, ma'am.
12                    (Mr. Eyre entered room.)
13          Q.   Can you tell me what it represents?
14          A.   It represents conclusions that we made
15     as to researching whether or not our prepayment
16     would entitle us to a 1990 tax deduction for the
17     prepaid interest.
18          Q.   Okay.  When you say "we," who are you
19     referring to?
20          A.   Okay.  Well, I guess "we" again would
21     be myself, Mr. Hackman, and the document states it
22     also references Dan Castellini and Mr. John Kron
23     from Deloitte & Touche.
24          Q.   Okay.  Great.  Thank you.  I'm now
25     going to show you what's been marked as Exhibit
```

```
 1  │  Number 12.  If you can take a look at that
 2  │  document for me, please?
 3  │       A.   Okay.  Yes, I also recognize this
 4  │  document.
 5  │       Q.   Okay.  Is that your signature on the
 6  │  second page?
 7  │       A.   Yes, it is.
 8  │       Q.   Did you direct this -- draft this
 9  │  letter?
10  │       A.   Yes, ma'am.
11  │       Q.   And it's dated December 30th, 1994; is
12  │  that correct?
13  │       A.   That is correct.
14  │       Q.   Okay.  I'd like to refer you to the
15  │  second paragraph on page 1, about a quarter of the
16  │  way down -- well, before I do that, the letter
17  │  indicates that checks totaling $45 million are
18  │  being delivered to Mr. Saewitz; is that correct?
19  │       A.   They went to the IRS.  Did they go to
20  │  Mr. Saewitz directly?
21  │       Q.   I don't know.  The letter is addressed
22  │  to Mr. Saewitz, but --
23  │       A.   They either went directly to him or
24  │  they were delivered to the Cincinnati Federal
25  │  Building.
```

1        Q.   Okay.

2        A.   And it's possible that Mr. Saewitz

3   went with Jerry.  Again, I don't remember.

4        Q.   Okay.  But a check totaling or checks

5   totaling 45 million did accompany this letter?

6        A.   Yes, ma'am.

7        Q.   Okay.  And then about a quarter of the

8   way down, the second paragraph, the letter states

9   "This partial payment is in addition to the

10   December 31, 1990 partial payment of proposed 1985

11   tax adjustments of $2,000,000 and related interest

12   of $1,500,000, and proposed 1986 tax adjustments

13   of $2,000,000 and related interest of $1,500,000."

14   Is that correct?

15        A.   Yeah.

16        Q.   And then it continues, "This partial

17   payment also considers amended returns previously

18   filed by the taxpayer, but not yet acted upon the

19   by the Service, as well as several additional tax

20   corrections, for tax years through 1993."  Is that

21   correct?

22        A.   That's what it says, yes.

23        Q.   And then it goes on to say, "Finally,

24   it reports and partially pays the proposed 1986

25   tax assessment as additional 1983 tax, due to our

| | |
|---|---|
| 1 | 1986 net operating loss." Is that correct? |
| 2 | A.   Yes, ma'am. |
| 3 | Q.   Now, can you explain that to me how -- |
| 4 | I don't understand what you mean by "It reports |
| 5 | and partially pays the proposed 1986 tax |
| 6 | assessment as additional 1983 tax." |
| 7 | A.   Our 1986 tax return showed a net loss. |
| 8 | Q.   Okay. |
| 9 | A.   Under tax law we can carryback that |
| 10 | tax loss to the third preceding year, which would |
| 11 | have been 1983.  And, in fact, that is what we |
| 12 | did.  When we filed our 1986 return.  We also |
| 13 | filed a Form 1139, which is a carryback form where |
| 14 | we ask the Service to carryback that 1986 tax loss |
| 15 | to reduce the taxable income that we had in 1983, |
| 16 | and to give us a refund for tax related to that |
| 17 | adjustment. |
| 18 | Q.   Okay.  Can you tell from this letter |
| 19 | how much of the 45 million went to this additional |
| 20 | 1983 tax? |
| 21 | A.   On page 2, the $45 million payment is |
| 22 | broken down by year.  So to state how much of the |
| 23 | 45 million related to the 1983 year, per the top |
| 24 | of the second page, that would be $33.5 million. |
| 25 | Q.   Okay.  And that is -- oh, I see.  So |

```
 1.    it would be 13.8 million in tax and 19.7 million
 2    in interest?
 3            A.    That is correct, yes.
 4            Q.    Okay. Does that mean that the 1983 tax
 5    liability was increased by 13.8 million?
 6            A.    From where it was at this point in
 7    time, it went up $33 million tax and interest.
 8            Q.    Tax and interest.  So from December
 9    30th, 1994?
10            A.    Right.  That would be after we had
11    carried back the 1986 loss to the 1983 year.
12            Q.    Okay.
13            A.    Reducing its taxable income to a
14    smaller amount, and now we were adjusting this to
15    that backup for these adjustments.
16            Q.    Does that mean the 1986 net operating
17    loss was reduced?
18            A.    Well, during the course of the audit
19    for 1986 there were several adjustments that
20    affected that 1986 tax return, and issues that
21    were related to it.  And as the 1986 adjustments
22    reduced the 1986 tax loss, since we had already
23    carried back the full amount of the loss on the
24    original return to 1983, we also had to take those
25    net adjustments and adjust the adjustment to the
```

```
 1    1983 year --
 2         Q.   Okay.
 3         A.   -- accordingly.
 4         Q.   Okay.
 5         A.   Everything has an impact.
 6         Q.   Okay.  So, then, any impact on the '86
 7    return would have affected the '83 return because
 8    that's where it was carried back; is that correct?
 9         A.   Right, right.
10         Q.   Okay.  Okay.  I'd like to show you
11    what's been marked as Exhibit 16, if you could
12    take a look at that document for me, please.
13         A.   Okay.  I also recognize this document.
14         Q.   Okay.  Can you tell me what that
15    document is?
16         A.   This is my report to various people in
17    the accounting areas of corporate office of the
18    status of where we were in reaching an IRS
19    settlement in the tax years 1983 through '87, and
20    also a status on the expected overpayments that we
21    had made as a result of the prepayments in both
22    1990 and 1994.
23         Q.   Okay.  I'd like to refer you to the
24    fourth paragraph, where it states "Regarding our
25    overpayment of our expected liability under the
```

| | |
|---|---|
| 1 | settlement, we have confirmed from the IRS and |
| 2 | from obtaining copies of our tax accounts for |
| 3 | years 1983 through 1993, that our $7,000,000 |
| 4 | payment in December 1990 and our $45,000,000 |
| 5 | prepayment in December 1994 were both recorded as |
| 6 | Advance Payments on IRS Examination Tax |
| 7 | Deficiencies, and not as deposits or cash bonds." |
| 8 | Is that what it states? |
| 9 | A.   Yes. |
| 10 | Q.   Okay.   Now, with respect to the |
| 11 | December of 1990 and $7 million figure, you state |
| 12 | you "Have confirmed from the IRS from obtaining |
| 13 | copies of our tax accounts."   When you state "We |
| 14 | have confirmed from the IRS," how did you confirm |
| 15 | from the IRS? |
| 16 | A.   That would be with discussions that I |
| 17 | had with Mr. Saewitz. |
| 18 | Q.   Okay.   You had specific discussions |
| 19 | with Mr. Saewitz? |
| 20 | A.   Yes. |
| 21 | Q.   Do you recall when those discussions |
| 22 | took place? |
| 23 | A.   I would assume it would be shortly |
| 24 | before the date of this memo, which was March 8th, |
| 25 | 1995. |

1          Q.   Okay.  And do you recall the substance

2    of those discussions?

3          A.   Well, when we made the 1994 payment of

4    $45 million, we anticipated that was what we owed

5    in additional tax and interest for all of the

6    agreed issues.

7          Q.   Okay.

8          A.   We, in the process of closing those

9    tax years, and then shortly thereafter, we

10   realized that we had made a calculation error, we

11   didn't really owe $45 million.  So I asked

12   Mr. Saewitz if it was possible, now that we

13   realized we made an error, to get back the

14   overpayment portion of that $45 million, and he

15   said that no, that was not possible because that

16   payment was a payment of tax and interest and not

17   a cash bond and that you can only get back

18   overpayments to the IRS prior to the closing of a

19   tax year, if it was a cash bond.  And since both

20   our 1990 and our 1994 payments were paid of tax

21   and interest and were not payments in the nature

22   of a cash bond, we could not get back those moneys

23   now.  But when we finally did close those years

24   and we finally did get the refund for the

25   overpayments, we would also get interest on those

1  refunds.

2       Q.   Okay.  Did Mr. Saewitz, specifically,

3  refer to the December 1990 $7 million remittance?

4       A.   There were several conversations.  The

5  very first conversation was brought about because

6  we discovered we had overpaid in 1994.  But in

7  subsequent conversations both prepayments were

8  discussed.

9       Q.   Okay.  And you, specifically, remember

10  that today?

11       A.   I cannot tell you dates or numbers of

12  times, but I know we discussed both prepayments as

13  reflected in this memo.

14       Q.   Okay.  And did you discuss it with

15  anyone else from the IRS, other than Mr. Saewitz?

16       A.   I would doubt it, probably just with

17  Mr. Saewitz.

18       Q.   Okay.  Do you recall how much of the

19  $45 million was over paid?

20       A.   I don't believe it refers to it in

21  this memo, but it was -- it was millions.  I don't

22  remember how many millions.  It was enough that we

23  asked if there was any way we can get it back.

24       Q.   Do you recall which tax years it

25  related to?

1           A.    No, I don't.  It was -- as you can see

2       on the previous exhibit, there were 10 or 12 years

3       involved.

4           Q.    Okay.  You also state in this memo

5       that you confirmed from the IRS and from obtaining

6       copies of our tax accounts for the years 1983

7       through years 1993.  Is that referring to the

8       transcript you talked about earlier?

9           A.    As I understand it, there's different

10      types of transcripts, and over the course of time

11      we have obtained different types of transcripts

12      through Mr. Saewitz getting them and then showing

13      them to us.  So I don't know if these sets of

14      transcripts are the same as the previous

15      transcripts, but on the transcript it refers to

16      our prepayments as Advance Payment of Tax

17      Deficiency.

18          Q.    But this does specify what you are

19      speaking of here are IRS transcripts?

20          A.    Yes.  We obtained them from the IRS,

21      yes.

22          Q.    Okay.

23                THE WITNESS:  Can we take a short

24          break?

25                MS. HALLETT:  Absolutely.

1          THE WITNESS:   Thanks.

2          (A short recess was had from

3      10:25-10:32.)

4      Q.   Mr. Carroll, I'm going to show you

5  what's been marked as Exhibit Number 21.   If you

6  can take a look at that document for me, please?

7      A.   Yes, I recognize this document.

8      Q.   Okay.   Is this in your handwriting?

9      A.   Yes, it is.

10     Q.   Can you tell me what that reflects?

11     A.   This also refers to the prepayment of

12 tax and interest.

13     Q.   Okay.   And it is dated June 19th,

14 1996; is that correct?

15     A.   That is the date, yes.

16     Q.   With respect to the number 2, about a

17 quarter of the way down the page, can you read

18 what that says?

19     A.   You can't read my writing?

20     Q.   An occasional word.

21     A.   Regarding 1988 and 1990 prepayments,

22 Rick -- and I'm trying to determine which Rick I'm

23 referring to, because I think it must have been

24 Rick O'Connor, who is an IRS appeals' officer.

25     Q.   Okay.

      A.    Because there was one issue for that
year that we took to appeals, and it was on our
foreign tax credits, which is what number 1 refers
to.

      Q.    Okay.

      A.    So I'm not a hundred percent sure, but
I believe when I'm referring to Rick, it is Rick
O'Connor, IRS appeals' officer.

      Q.    Okay.

      A.    Rick has been advised, and may bring
it up, that Sid & IRS attorney now feel, unlike
they have said for over one year now, that, one,
we should be entitled to get our money back now as
a cash bond, only problem, it is a joint committee
case.

            Two, with interest.

            Three, but we can't deduct the
interest in the years paid as no tax interest
liability to tie it to yet.  And then I have in
parenthesis "then" -- I'm not sure what that
refers to -- as per the 5701s we now have from Sid
on this, which JPH -- again, reference to Jerry
Hackman -- argued with Sid on, but I've not yet
done with Sid, since Sid helped us do the 1990 and
1994 prepayments as payments of tax not cash

1    bonds, they should be deductible when paid.  I

2    need to point this out.  And I guess that last one

3    is ASAP, as soon as possible.

4         Q.   Okay.  Now, was this the first time

5    you learned that they you should be entitled to

6    get the money back now, referring to June 19th of

7    1996, I assume?

8              MS. LUTZKO:  Objection.  You can

9         answer the question.

10        A.   I don't -- I don't know exactly when

11   the IRS informed us that they were no longer

12   treating the 1990 payment as a payment of tax and

13   interest and not as a cash bond.  But at some

14   point in time, after early 1995, we found out that

15   they were now treating our prepayment as if it was

16   a cash bond.

17        Q.   How did you find out?

18        A.   I believe Mr. Saewitz told Jerry

19   Hackman and myself that.

20        Q.   Okay.

21        A.   To which we strongly objected because

22   they had been telling us all along that it was a

23   payment of tax and not a cash bond.

24        Q.   Before this date of June of 1996, had

25   you asked for the money back?

| 1 | MS. LUTZKO: Objection. |
|---|---|

1          MS. LUTZKO: Objection.

2     A.   which?

3     Q.   Any.

4     A.   No.

5     Q.   Have you -- you hadn't asked?

6     A.   I don't know about as far as before

7 June 1996. well, let's backup here a minute.

8 Shortly after we overpaid the 1994 payment, yes,

9 we went to Sid and we said: We paid you too much

10 money; 45 million was too much money at the end of

11 '94. Is there any way we can get it back?

12          And at that point in time he told us

13 no. Because it was a payment of tax and not a

14 cash bond, we could not get any of the money back

15 until these years were closed. But, again, once

16 we got the money back, we would get it with

17 interest. The only way you can get the money back

18 before the years are closed is if it was a payment

19 of a cash bond, and he told us that these were not

20 payments of cash bonds. Therefore, we can't get

21 the money back until the years are closed, but,

22 again, we would get it with interest.

23     Q.   At any point in time did you ask for

24 the December 31st, 1990 money back?

25          MS. LUTZKO: Objection.

1          A.    I don't think we have asked for it

2     back.  But in the context of discussing both of

3     the prepayments with Mr. Saewitz, he continued for

4     a period of time to tell us that, no, we cannot

5     get the money back because they were not cash bond

6     payments, they were prepayments of tax.

7          Q.    Okay.  Okay.  I'll just show you what's

8     been marked as Exhibit Number 22.  If you can take

9     a look at that document for me, please, tell me if

10    you recognize it?

11         A.    Okay.  I recognize this document.

12         Q.    Is this in your handwriting?

13         A.    Yes, it is.

14         Q.    Can you tell me what that document

15    represents?

16         A.    It represents my rather lengthy

17    writing of notes relating to the IRS change in

18    position on our prepayments, and discusses with --

19    I believe that it is wrong.

20         Q.    Okay.  Which prepayments does this

21    refer to?

22         A.    Looks like it refers to the 1988, the

23    1990 and the 1994 prepayments.

24         Q.    Okay.  I'd like to refer you to, I

25    guess it's page 394, is marked at the bottom of

```
 1    the document.
 2          A.    Okay.
 3          Q.    Starting at the top of the page, I
 4    believe it says "We will not agree to."
 5          A.    Yes.
 6          Q.    Is that correct?
 7          A.    Yes.
 8          Q.    Could you read from there down and
 9    tell me where it ends with the letter "B"?
10          A.    "We will not agree to:  (1), no
11    interest paid to us on refunds.  (A) especially
12    for the past 1 1/2 years when we (DJC)" -- with
13    references to Dan Castellini -- "requested our
14    overpayments to be refunded to us" -- that would
15    be with regard to the 1994 overpayment, even
16    though it doesn't say that there.
17          Q.    That was going to be my question.
18    That reference is to the 1994?
19          A.    Do you want me to continue?
20          Q.    No, that's fine.  But is that correct,
21    that only references the 1994?
22          A.    Right.
23          Q.    Okay.  Answer my question.  Okay.
24    I'm going to hand you two exhibits, Exhibits 33
25    and 34, and I'm not going to ask you to read
```

```
 1    anything from them.  I just want to know if you
 2    can identify these, and tell me if they are in
 3    your handwriting.
 4              MS. LUTZKO:  I'm sorry.  Number?
 5         A.   Thirty-three and 34.
 6              MS. LUTZKO:  Thanks.
 7              MR. EYRE:  I thought you said you were
 8         going to ask him about the notes.
 9              MS. HALLETT:  He just identified --
10              MR. EYRE:  A handwriting.
11              MS. HALLETT:  If that is his
12         handwriting.  He can read.
13              THE WITNESS:  I took very long notes.
14              MS. LUTZKO:  That is all you want to
15         know?
16              MS. HALLETT:  That's all I want to
17         know.
18              MS. LUTZKO:  If you are comfortable
19         looking at the pages.
20              THE WITNESS:  I can definitely say
21         that they are my notes.
22              MS. LUTZKO:  All pages of them?
23              THE WITNESS:  They are rather
24         voluminous notes. They are all in my
25         handwriting.
```

1   BY MS.HALLETT:

2          Q.   Okay.  That's what?  Exhibits 33 and

3   34?

4          A.   That is correct.

5          Q.   Okay.  Great.  Do you want to continue

6   reading them or --

7          A.   If you are not going to ask any

8   questions, I guess I don't need to.

9          Q.   Okay.  Okay.  This one I do, I'm going

10  to have a couple of questions on.  But I will tell

11  you it's only really the first portion of it.  So

12  you can read the entire thing if you want, but I

13  only have a question on really actually the second

14  full paragraph.  It's Exhibit 23.  Again, if you

15  want to read that full thing.

16              MS. LUTZkO:  Thanks.

17          A.   Okay.

18          Q.   Okay.  Can you identify this document?

19          A.   Yes.

20          Q.   Okay.  What is it?

21          A.   This is a memorandum that I issued to

22  Dan Castellini or Bert Routt and Doug Lyons.

23          Q.   Okay.  The second paragraph on page 1,

24  about two thirds the way down.  It says, "After

25  telling us since 1995."

1                    MS. LUTZKO:   You see where she is?

2                    THE WITNESS:   Yes.

3           Q.   "That we cannot get a current refund

4    for any portion of about $7,000,000 in tax and

5    about $7,000,000 in interest that we overpaid.

6    When we prepaid our expected liability in December

7    1994 until the case is officially closed, the IRS

8    is now suggesting we may be able to get some of it

9    back now.   While this sounds good, it is actually

10   quite disturbing, as they are not changing their

11   position with regard to the December 1994

12   prepayment, which caused the overpayment

13   situation, but they may reclassify our December

14   1988 and December 1990 prepayments of tax and

15   interest as cash bond deposits, for which we would

16   likely receive no interest on if they were to be

17   refunded.   Even more importantly, if we have these

18   payments refunded to us, we would undo our primary

19   purpose in making them, to stop accruing of

20   interest on the additional tax liability that we

21   knew we owed."

22                    Can you explain to me what you mean by

23   that, if the payments were refunded they would

24   undo the primary purpose of stopping the accruing

25   of interest?

GIGLIO REPORTING SERVICES
3 CYPRESS GARDEN
CINCINNATI, OHIO 45220
(513) 861-2200

1          A.   I'm thinking give us the money.  It

2    would be as if we never ever made the payments.

3          Q.   Are you referring to all of the

4    payments in that sentence, the December '94, the

5    December 1988 and December 1990 payments?

6               MS. LUTZKO:  Objection, but answer the

7          question.

8          A.   In going back and rereading that

9    portion of this paragraph.  I believe I was

10   referring to both the 1990 and the 1994

11   prepayments, because if they gave us some money

12   back it would be as if we had never made the

13   payment, and if it was taken off the record, then

14   we would not be stopping the running of interest

15   on taxes that we knew that we owed.

16         Q.   Okay.  And okay.  So that referred to

17   the December 1988 and December 1990?

18         A.   No.

19              MS. LUTZKO:  Objection.  That's not

20         what he said.

21         A.   No.  I said 1990 and 1994.

22         Q.   1990 and 1994.  Okay.

23         A.   I believe that's what I'm referring

24   to.

25         Q.   Okay.  Okay.  Thank you.  The second

1   to last exhibit is Exhibit Number 46.  If you can

2   take a look at that for me, please.

3               MS. LUTZKO:  Thanks.

4         A.    Okay.  I do recognize this document.

5         Q.    Okay.  Is this in your handwriting?

6         A.    Yes, it is.

7         Q.    Can you tell me what that document

8   represents?

9         A.    This is notes, again, per a

10  conversation that I had with Jerry Hackman with

11  regard to developments in our appeal case on the

12  interest claim.  Mr. Rick O'Connor, the IRS

13  appeals' officer, was reviewing our claim as to

14  whether or not we were entitled to interest on the

15  refund of our 1990 prepayment of tax and interest.

16        Q.    Okay.  The second page, marked 250 at

17  the bottom.  There are two stars that appear in

18  the left.

19        A.    Yes.

20        Q.    Can you read that portion, starting

21  from there down the page?

22        A.    Okay.  It says, "I like Rick's point"

23  -- again, referring to Rick O'Connor, IRS appeals'

24  officer.

25        Q.    Okay.

```
 1              A.    Regarding our filing of a Form 1139 to
 2    carryback the 1986 net operating loss when
 3    originally filed.
 4              Q.    Can I stop you?  That "C/B" means
 5    carryback?
 6              A.    C/B means carryback.
 7              Q.    I'm sorry.  Go ahead.
 8              A.    Not only do you have to read my
 9    handwriting, you have to understand my shorthand,
10    yes.
11              To carryback the 1986 net operating
12    loss when originally filed to earlier tax years,
13    as Rick indicated this carryback, done prior to
14    this audit or prepayment, put our 1986 account at
15    taxable income of 0.  So the 1986 RAR, which
16    stands for revenue agent report, gave our 1986 tax
17    year a tax liability as 1986 taxable income was
18    increased.
19              By this issue, by $5-6 million and by
20    all issues by $3 million, as opposed to IRS's
21    chief argument that we never had a 1986 tax
22    liability and we should have known that we would
23    never have one.  Subsequently, this 1986 tax
24    liability was also carried back to prior tax
25    years, with the 1986 tax year liability ultimately
```

1  being 0 after this carryback, but we did have a

2  1986 tax liability.  These revenue agent report

3  adjustments increased 1986 taxable income.  As JPH

4  -- again reference to Jerry Hackman -- as JPH

5  points out, the 1986 revenue agent report ends up

6  with additional taxable income on this accrual

7  issue of about $5-6 million, which resulted in a

8  tax liability of $2.5 to $3 million, which is

9  close to what we decided to prepay in December of

10  1990.

11          At least in theory, and Rick seems to

12  agree with us, and with the support of the cases

13  cited by the IRS, we should be entitled to treat

14  our December 1990 remittance as a payment of tax

15  and interest and not as a cash bond.  And,

16  therefore, we should be entitled to interest on

17  the $3 million returned to us.

18          While reconciling our number to the

19  revenue agent report number is problematic, many

20  revisions/agreements on the various facets of this

21  accrual method change occurred from December 1990

22  to the revenue agent report in 1996, it should not

23  matter if the numbers can be reconciled.  It is

24  only relevant that we had a tax liability, and we

25  paid a portion of it, and we did not designate it

1    to be a cash bond.

2         Q.   Great.  Thank you.  And, finally, the

3    very last, I'm going to show you what's been

4    marked as Government Exhibit 47.

5              MS. LUTZKO:  That was an affidavit.

6              MS. HALLETT:  That's the affidavit.

7         Starting at pages marked 253 to 257.  If

8         you could take a look at that document and

9         identify it for me, please.

10        Q.   I'm not going to ask you --

11        A.   Are you going to ask me questions

12   about this?

13        Q    No.

14        A.   That's fine.

15        Q.   Can you identify that document?

16        A.   Yes, I can.

17        Q.   What is it?

18        A.   This is my letter to Rick O'Connor,

19   the appeals' officer, in 1999, with regard to our

20   position that the prepayment in 1990 of tax and

21   interest was a payment of tax and interest and not

22   a cash bond, and, therefore, we were entitled to

23   interest when they refunded the money to us.

24             Mr. O'Connor had asked Mr. Hackman and

25   I to prepare and sign written affidavits attesting

1   to that. And that is what these are.

2           Q.   Okay. And that is your signature on

3   the affidavit?

4           A.   Yes. Yes, it is.

5           Q.   Okay. And sitting here today, is

6   everything in that affidavit true and correct to

7   the best of your knowledge?

8                MS. LUTZKO: Objection. Answer the

9           question.

10          A.   Yes, it is.

11               MS. HALLETT: Okay. Thank you. I

12          have no further questions. I appreciate

13          your time.

14               THE WITNESS: Sure.

15               MS. LUTZKO: We are not going to waive

16          signature.

17               (Deposition concluded at 11:21)

18

19          _____
                Michael W. Carroll
20

21

22

23

24

25

1          C E R T I F I C A T E

2    STATE OF OHIO            :

3                            : SS

4    COUNTY OF HAMILTON      :

5          I, Sharlene D. Hall, RPR, the undersigned,

6    a duly qualified and commissioned notary public

7    within and for the State of Ohio, do hereby

8    certify that before the giving of his aforesaid

9    deposition, MICHAEL W. CARROLL was by me first

10   duly sworn to depose the truth, the whole truth

11   and nothing but the truth; that the foregoing is

12   the deposition given at said time and place by

13   MICHAEL W. CARROLL; that said deposition was taken

14   in all respects pursuant to stipulations of

15   counsel hereinbefore set forth; that I am neither

16   a relative of nor employee of any of their

17   counsel, and have no interest whatsoever in the

18   result of the action.

19         IN WITNESS WHEREOF, I hereunto set my hand

20   and official seal of office at Cincinnati, Ohio,

21   this _16+h_ day of ___January__, 2003.

22

23   ___Sharlene D. Hall___

24   My commission expires:      Sharlene D. Hall, RPR
     February 1, 2005            Notary public - State
25                               of Ohio
26

                 GIGLIO REPORTING SERVICES
                    3 CYPRESS GARDEN
                 CINCINNATI, OHIO 45220
                    (513) 861-2200

TO THE REPORTER:  I have read the entire
transcript of my deposition taken on this _____
day of _____, 2002, or the same has been
read to me.  I request that the following changes
be entered upon the record for the reasons
indicated.  I have signed my name to the signature
page and authorize you to attach the following
changes to the original transcript.


PAGE LINE  CORRECTION/CHANGE AND REASON THEREFORE

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____


_____
(SIGNATURE OF DEPONENT)

- ' -

'73 [1] 6:3
'83 [1] 26:7
'85 [1] 17:17
'86 [7] 8:15;
13:22; 17:17;
19:15, 16; 20:17;
26:6
'87 [1] 26:19
'94 [2] 34:11;
40:4

- 0 -

0 [2] 42:15; 43:1

- 1 -

1 [6] 6:5, 16, 25;
7:4; 10:13;
22:15
1,500,000 [2]
23:12, 13
1 [6] 32:3;
36:10, 12; 38:23;
46:24
10 [3] 3:5; 30:2;
31:3
10th [2] 17:13,
20
11 [3] 3:24;
21:4; 45:17
1112 [1] 3:9
112 [1] 3:2
1139 [2] 24:13;
42:1
12 [3] 3:6; 22:1;
30:2
1212 [1] 3:10
13 [1] 3:21
13.8 [2] 25:1, 5
14 [1] 3:7
14th [1] 20:10
16 [1] 26:11
163 [1] 3:12
17 [1] 3:5
19 [2] 3:6, 13
19.7 [1] 25:1
1972 [1] 5:25
1979 [1] 4:23
1980 [1] 7:10
1980-1986 [1]
17:6
1980-81 [1] 17:7
1982 [1] 4:24
1982-84 [1] 17:8
1983 [13] 23:25;
24:6, 11, 15, 20,
23; 25:4, 11, 24;
26:1, 19: 27:3;
30:6

1984 [1] 14:7
1985 [9] 8:14;
13:22; 14:9;
17:3, 5; 19:15,
16; 20:16; 23:10
1985-86 [1] 17:9
1986 [28] 14:9;
17:3, 5; 23:12,
24; 24:1, 5, 7,
12, 14; 25:11,
16, 19, 20, 21,
22; 42:2, 11, 14,
15, 16, 17, 21,
23, 25; 43:2, 3, 5
1988 [16] 7:5, 7;
10:12; 11:5, 20,
22; 12:4, 13, 15,
19; 14:2; 31:21;
35:22; 39:14;
40:5, 17
1990 [36] 8:12;
11:6, 11, 18;
12:23; 13:18;
14:15, 17; 15:2,
8, 17; 17:13;
20:10; 21:16;
23:10; 26:22;
27:4, 11; 28:20;
29:3; 31:21;
32:24; 33:12;
34:24; 35:23;
39:14; 40:5, 10,
17, 21, 22;
41:15; 43:10, 14,
21; 44:20
1993 [3] 23:20;
27:3; 30:7
1994 [18] 22:11;
25:9; 26:22;
27:5; 28:3, 20;
29:6; 32:25;
34:8; 35:23;
36:15, 18, 21;
39:7, 11; 40:10,
21, 22
1995 [3] 27:25;
33:14; 38:25
1996 [5] 31:14;
33:7, 24; 34:7;
43:22
1999 [1] 44:19
19th [2] 31:13;
33:6

- 2 -

2,000,000 [2]
23:11, 13
2 [3] 24:21;
31:16; 36:12
2.5 [1] 43:8
2002 [1] 1:18

2003 [1] 46:21
20044-0055 [1]
2:11
2005 [1] 46:24
21 [2] 31:5;
45:17
216 [1] 3:13
22 [3] 3:2, 8;
35:8
227 [1] 3:15
22nd [4] 7:5;
10:12; 11:20;
12:4
23 [3] 3:9, 11;
38:14
237 [1] 3:16
25-10 [1] 31:3
250 [1] 41:16
253 [1] 44:7
257 [1] 44:7
28 [1] 3:12

- 3 -

3 [3] 42:20;
43:8, 17
30 [2] 3:10, 18
30th [2] 22:11;
25:9
31 [3] 3:3, 9;
23:10
312 [1] 1:20
31st [7] 8:12;
12:23; 13:18;
15:2, 8, 17;
34:24
32 [1] 31:3
3200 [1] 2:6
33 [4] 3:14;
25:7; 36:24;
38:2
33.5 [1] 24:24
331 [1] 3:18
34 [3] 36:25;
37:5; 38:3
34scripps [1]
3:19
35 [1] 1:19
37 [1] 3:15
38 [2] 3:18, 20
394 [1] 35:25

- 4 -

4 [6] 6:6; 8:10,
11; 10:25; 19:3,
11
40 [1] 3:17
412 [1] 3:3
43 [1] 3:21
44114-3485 [1]
2:7

45 [5] 22:17;
23:5; 24:19, 21,
23
45,000,000 [1]
27:4
45 [5] 28:4, 11,
14; 29:19; 34:10
45202 [1] 1:20
45255 [1] 4:13
46 [2] 3:23; 41:1
464 [1] 3:21
47 [1] 44:4
478 [1] 3:22
49 [2] 9:21; 10:2

- 5 -

5-6 [2] 42:19;
43:7
50 [2] 9:18; 10:3
50tax [1] 3:24
55 [1] 2:11
5701s [1] 32:21

- 6 -

6 [2] 1:18; 3:22

- 7 -

7 [2] 8:23; 15:25
7,000,000 [1]
27:3
7 [2] 27:11; 29:3
7,000,000 [2]
39:4, 5
712 [1] 3:5

- 8 -

8 [5] 3:2, 4, 12,
15; 17:25
812 [1] 3:6
8385 [1] 4:12
870-ad [1] 14:2
88 [1] 3:2
8th [1] 27:24

- 9 -

9 [5] 1:19; 3:16;
7:21; 12:5; 20:4
90 [5] 3:3, 5, 6,
7, 9
912 [1] 3:7
94 [1] 3:10
95 [1] 3:12
96 [3] 3:13, 15,
16
98 [1] 3:18
99 [2] 3:21, 22

- A -

able [3] 11:10;
13:23; 39:8
about [23] 5:16;
6:1;  14:20, 24;
16:16, 21;  17:16,
19;  19:11,  22;
22:15;      23:7;
29:5;      30:8;
31:16;     34:6;
37:8;    38:24;
39:4,  5;    43:7;
44:12
absolutely  [1]
30:25
accompany  [1]
23:5
accordingly  [1]
26:3
account    [2]
15:10; 42:14
accounting  [6]
5:20; 7:10; 8:18;
14:5;    19:21;
26:17
accounts   [3]
27:2, 13; 30:6
accrual [7]  7:9,
13;  8:18;  14:4;
20:16; 43:6, 21
accruing    [2]
39:19, 24
accumulative [1]
17:5
acted [1] 23:18
action [1] 46:18
actually    [3]
14:21;    38:13;
39:9
addition [1] 23:9
additional [10]
9:13;    13:21;
14:13; 23:19, 25;
24:6, 19;  28:5;
39:20; 43:6
address [4]  4:8,
9, 10, 11
addressed   [1]
22:21
adjust [1] 25:25
adjusting   [1]
25:14
adjustment  [4]
7:24;    14:1;
24:17; 25:25
adjustments  [7]
23:11, 12;  25:15,
19, 21, 25;  43:3
advance    [4]
12:1;    15:11;
27:6; 30:16

advised    [1]
32:10
affected    [2]
25:20; 26:7
affidavit    [4]
44:5, 6;  45:3, 6
affidavits   [1]
44:25
aforesaid   [1]
46:8
after [10]  12:12;
15:9, 16;  20:24;
25:10;    33:14;
34:8;    38:24;
43:1
again [11]  8:15;
18:25;    21:20;
23:3;    32:22;
34:15, 22;  38:14;
41:9, 23;  43:4
agent [5]  42:16;
43:2, 5, 19, 22
agree [3]    36:4,
10;  43:12
agreed [7]   7:8;
9:6;  13:25;  14:1,
7, 12;  28:6
agreement   [2]
1:16;  8:15
agreements   [1]
43:20
ahead [3]   6:18;
14:14;  42:7
all  [13]    5:10;
9:15;    14:3,  6;
28:5;     33:22;
37:14, 16, 22, 24;
40:3;      42:20;
46:14
allow [1]  12:17
allowances   [1]
19:5
allowed    [1]
12:14
along [1]  33:22
already [2]  14:7;
25:22
also  [20]    5:1,
12;  7:16;  8:12,
20,  25;    11:9;
14:16;    16:10;
21:22;    22:3;
23:17;    24:12;
25:24,  26:13, 20,
28:25;     2.3 v,
31:11;  42:24
although    [1]
12:15
am [1]  46:15
amended    [1]
23:17
america [1]  1:9

among [1]  1:16
amount [9]  7:19,
20;   8:23;   9:7;
12:5;     17:6;
20:15;  25:14, 23
amounts [2]  9:4;
17:6
answer [4]  33:9;
36:23;     40:6;
45:8
answered   [1]
15:1
anticipated  [1]
28:4
anyone [1]  29:15
anything    [1]
37:1
appeal [1]  41:11
appeals    [6]
31:24;   32:2, 8;
41:13, 23;  44:19
appear [2]  9:18;
41:17
appearances  [1]
2:2
appreciate   [1]
45:12
approved [1]  8:5
approximately [2]
19:2
are  [28]    4:14;
5:6;  6:25;  7:22;
10:3, 9;  13:1, 11;
20:24;     21:18;
22:17;  30:14, 18,
19;    34:18,  21;
37:2,  18,  21,  23,
24;  38:7;  39:10;
40:3;      41:17;
44:11;  45:1,  15
areas [1]  26:17
argued [1]  32:23
argument    [1]
42:21
arrive [1]  17:8
asap [1]  33:3
ask  [7]    24:14;
34:23;     36:25;
37:8;      38:7;
44:10, 11
asked  [12]   9:5;
13:20;     15:9;
16:17;   17:1, 16;
23.: 1      29:23;
33:25      34:5;
30.1,  44:24
assessed    [1]
17:7
assessment   [2]
23:25;  24:6
assume     [2]
27:23;  33:7

attempts    [1]
20:15
attesting    [1]
44:25
attorney    [1]
32:11
audit [5]    7:11;
12:13;     14:6;
25:18;  42:14
audits [1]  5:13
aware [1]  12:10

- B -

b [3]  36:9;  42:4,
6
bachelor's   [2]
5:19, 24
back [24]   14:2;
17:6;   25:11, 23;
26:8;   28:13,  17,
22;      29:23;
32:13;   33:6, 25;
34:11, 14, 16, 17,
21,  24;   35:2,  5;
39:9;   40:8,  12;
42:24
background  [2]
5:17, 18
backup     [2]
25:15; 34:7
baker [2]   1:19;
2:6
be  [38]    5:25;
9:18;  10:22, 23;
11:9,   15,   24;
12:1;  13:4, 8, 13,
22,  23;    17:18;
19:16;     20:23;
21:21;     24:24;
25:1,  10;   27:16,
23;  32:13;  33:1,
5;  36:14, 15, 17;
39:8,  16;    40:2,
12,   14;    43:13,
16, 23;  44:1
became [2]  4:23;
5:4
because    [15]
7:7;  11:4, 14, 23;
14:1,  9;    26:7;
28:15;     29:5;
31:23;     32:1;
33:21;     34:13;
35:5; 40:11
becky [1]  2:5
become     [1]
12:10
been  [18]    4:20,
22;   7:20;   9:17;
14:7;     15:24;
17:25;     19:25;

20:3;    21:25;
24:11;    26:11;
31:5, 23;  32:10;
33:22;    35:8;
44:3
**before** [13]  1:20;
6:8,  20;  10:20;
13:19, 24;  14:20;
22:16;    27:24;
33:24;  34:6, 18;
46:8
**behalf** [2]  2:4, 9
**being**  [3]   4:2;
22:18;  43:1
**believe**    [17]
10:6,   15,   20;
12:4;   14:2, 25;
15:21;    16:17;
18:12;    19:22;
29:20;    32:7;
33:18;    35:19;
36:4; 40:9, 23
**believes** [1]  19:1
**bert** [1]  38:22
**best**  [2]   11:13;
45:7
**better** [1]  11:7
**between** [1]  11:4
**bit**   [2]    10:8;
18:18
**bond** [30]  10:16,
17, 18, 23;  11:1,
14,  15,  23,  24;
12:7,   16,    25;
13:6, 7;  15:3, 14;
28:17,  19,   22;
32:14;  33:13, 16,
23;   34:14, 19;
35:5;    39:15;
43:15; 44:1, 22
**bonds** [3]   27:7;
33:1; 34:20
**borrowing**    [1]
19:9
**both** [9]   6:10,
12;  26:21;  27:5;
28:19;  29:7, 12;
35:2; 40:10
**bottom**    [3]
18:11;    35:25;
41:17
**box** [1]  2:11
**break**  [2]   9:1;
30:24
**briefly** [1]  5:17
**bring** [1]  32:10
**broken** [1]  24:22
**brought** [1]  29:5
**building**    [1]
22:25
**business** [1]  4:9
**by**  [20]   1:14;

4:5,  25;   9:12;
13:1,  2;   23:18,
19;    24:4,  22;
25:5;     38:1;
39:22;  42:19, 20;
43:13;  46:9, 12

**- C -**

**c**  [4]   42:4,  6;
46:1
**c-1-01-434**   [1]
1:7
**calculate**    [1]
20:15
**calculating**   [1]
14:13
**calculation**    [6]
9:3,  6;   13:21;
17:4, 17; 28:10
**calculations**  [5]
7:23;   8:1,   7;
9:13;  14:6
**can**  [45]    4:6;
5:17;  6:16;  8:10;
10:8;    15:25;
16:5;  17:6;  18:2,
16;  19:11;  20:4,
12;   21:6,  13;
22:1;  24:3, 9, 18;
26:14;    28:17;
29:23;  30:1, 23;
31:6,  10,  17;
33:8;  34:11, 17;
35:8,  14;   37:2,
12,  20;   38:12,
18;  39:22;  41:1,
7,  20;   42:4;
43:23;  44:15, 16
**can't** [5]   12:17;
14:22;    31:19;
32:17;  34:20
**cannot**    [3]
29:11;    35:4;
39:3
**carried**    [4]
25:11, 23;  26:8;
42:24
**carroll** [10]  1:13;
4:1,   7;   6:5;
15:23;    17:24;
31:4;    45:19;
46:9, 13
**carryback**    [9]
24:9,  13,   14;
42:2, 5, 6, 11, 13;
43:1
**case**  [5]    1:7;
14:12;    32:15;
39:7;  41:11
**cases** [1]  43:12
**cash**  [40]    7:9,

13;  8:17;  10:14,
16, 17, 23;  11:1,
14,  15,  23,  24;
12:6,  16,   25;
13:5, 7;  14:4, 10;
15:3, 14;  20:16;
27:7;  28:17, 19,
22;    32:14, 25;
33:13,  16,   23;
34:14,  19,  20;
35:5;    39:15;
43:15; 44:1, 22
**castellini**   [4]
17:10;    21:22;
36:13; 38:22
**caused** [1]  39:12
**center** [1]  2:6
**certify** [1]  46:8
**cetera** [1]  19:6
**cfo** [1]  17:11
**change** [3]  8:16;
35:17; 43:21
**changing**    [1]
39:10
**check**  [4]   7:16,
19; 8:20;  23:4
**checks**    [2]
22:17; 23:4
**chief** [1]  42:21
**cincinnati**    [5]
1:20;  4:13;  5:22;
22:24; 46:20
**cited** [1]  43:13
**city** [1]  2:6
**civil** [1]  1:15
**claim**  [2]   41:12,
13
**clearly** [1]  15:12
**cleveland** [1]  2:7
**close**  [3]   19:1;
28:23; 43:9
**closed** [5]  12:14;
34:15,  18,  21;
39:7
**closing** [2]  28:8,
18
**comfortable**   [1]
37:18
**comment**    [1]
16:21
**commission**   [1]
46:24
**commissioned**
[1]  46:6
**committee**    [1]
32:14
**companies**   [1]
10:10
**company** [5]  1:5;
4:17,  23;   16:9;
17:11
**compensation** [1]

19:6
**concluded**    [1]
45:17
**conclusions**  [1]
21:14
**confirm**    [1]
27:14
**confirmed**    [4]
27:1,   12,   14;
30:5
**consider**    [2]
17:9;  19:5
**considers**    [1]
23:17
**context** [1]  35:2
**continue**    [2]
36:19; 38:5
**continued**    [1]
35:3
**continues**    [1]
23:16
**controller**    [2]
16:8, 12
**conversation**  [7]
14:20;  16:7, 10;
20:19, 24;  29:5;
41:10
**conversations** [2]
29:4, 7
**conversion**   [1]
7:13
**coordinator**   [1]
13:3
**copies**  [3]   27:2,
13;  30:6
**corporate**    [8]
4:19, 20;  5:1, 3,
5, 7, 14;  26:17
**corporation**   [1]
16:12
**correct**    [22]
8:24;    9:1,  2;
11:3;    16:19;
17:13,  14,  18;
18:14;  22:12, 13,
18;   23:14,  21;
24:1;  25:3;  26:8;
31:14;  36:6, 20;
38:4;  45:6
**corrections**   [1]
23:20
**cost** [1]  19:9
**could**  [7]    6:6;
16:19;    26:11;
28:22;    34:14;
36:8;  44:8
**counsel** [3]  1:17;
46:15, 17
**county** [1]  46:4
**couple** [1]  38:10
**course**    [2]
25:18;  30:10

**court** [2]  1:1, 21
**credits** [1]  32:3
**cross-examinatio**
**n** [2]  1:15;  4:4
**current** [1]  39:3
**currently**  [1]
19:20
**cut** [2]    18:17;
19:8
**cycles** [1]  14:6

**- D -**

**d** [3]  1:21;  46:5,
24
**dan** [4]    17:10;
21:22;    36:13;
38:22
**date** [3]    27:24;
31:15;  33:24
**dated** [8]    7:4;
8:11;      10:12;
11:19;    17:12;
20:10;    22:11;
31:13
**dates** [2]  14:22;
29:11
**day** [1] 46:21
**dc** [1] 2:11
**december**    [34]
1:18;  7:4;  8:12;
10:12;    11:19;
12:3, 23;  13:18;
15:2,  8,  16;
17:13, 20;  20:10;
22:11;    23:10;
25:8;  27:4, 5, 11;
29:3;      34:24;
39:6, 11, 13, 14;
40:4, 5, 17;  43:9,
14, 21
**decided** [1] 43:9
**deduct**      [2]
11:10;  32:17
**deductible**   [1]
33:1
**deduction**    [5]
12:15,  17,  18;
14:17;  21:16
**defendant**    [2]
1:10;  2:9
**deference**   [1]
11:16
**deficiencies**  [1]
27:7
**deficiency**   [2]
15:12;  30:17
**definitely** . [3]
11:3, 8;  37:20
**degree** [1]  5:24
**delivered**    [2]
22:18, 24

**deloitte**    [1]
21:23
**department**   [6]
4:24;  5:1, 8, 15;
19:23;  20:1
**depose** [1] 46:10
**deposit**     [1]
10:14
**deposition**   [5]
1:13;      45:17;
46:9, 12, 13
**deposits**    [2]
27:7;  39:15
**describe**    [1]
6:16
**designate**   [1]
43:25
**details** [1] 9:16
**determine**   [1]
31:22
**developments** [1]
41:11
**dfl** [3]  18:12, 17,
20
**didn't** [1] 28:11
**different**    [2]
30:9, 11
**direct** [1] 22:8
**directly**    [2]
22:20, 23
**director**    [7]
4:19, 21;  5:2, 5,
7; 19:21
**discovered**  [1]
29:6
**discuss**     [1]
29:14
**discussed**   [2]
29:8, 12
**discusses**   [1]
35:18
**discussing**  [1]
35:2
**discussion**  [1]
14:24
**discussions**  [5]
20:14; 27:16, 18,
21; 28:2
**district** [2]  1:1,
2
**disturbing**  [1]
39:10
**division** [2]  1:3;
2:10
**divisions** [1] 7:9
**djc** [2]    17:10;
36:12
**document**    [35]
6:17;  16:2, 6, 17;
17:12;    18:3,  4,
12;    19:10,  12,
14;    20:4,  6,  7,

13;   21:7, 9, 10,
21;      22:2,  4;
26:12,  13,  15;
31:6, 7;  35:9, 11,
14;  36:1;  38:18;
41:4, 7;  44:8, 15
**documents**   [2]
6:13;  9:10
**does** [6]    9:18;
17:15;  25:4, 16;
30:18;  35:20
**doesn't** [1] 36:16
**dollar** [1]  9:4
**done** [2]    32:24;
42:13
**doubt** [1] 29:16
**doug** [2]    18:21;
38:22
**down** [8]    16:16;
22:16;      23:8;
24:22;    31:17;
36:8;      38:24;
41:21
**draft** [1]  22:8
**drive** [1]  4:13
**due** [2]      17:3;
23:25
**duly** [3]      4:2;
46:6, 10
**during** [1]  25:18
**duties** [1]  5:6

**- E -**

**e** [4]   1:5;  4:17;
46:1
**earlier** [3]  19:14;
30:8;  42:12
**early** [1]  33:14
**edge** [1]  10:8
**educating**   [1]
11:12
**educational**  [2]
5:16, 18
**either** [1]  22:23
**else** [1]  29:15
**employed**    [1]
4:14
**employee**    [1]
46:16
**employer**    [1]
4:16
**end** [4]    14:15;
16:25;    18:17;
34:10
**ends** [2]    36:9;
43:5
**enough** [1]  29:22
**entered**     [2]
18:19;  21:12
**entire** [1]  38:12
**entitle** [1]  21:16

**entitled**    [6]
32:13;      33:5;
41:14;  43:13, 16;
44:22
**equivalent**   [1]
10:4
**error** [2]    28:10,
13
**especially**   [1]
36:11
**esq** [2]  2:5
**estimate**    [1]
18:24
**et** [1]  19:6
**even** [3]    7:10;
36:15;  39:17
**ever** [1]  40:2
**everything**   [2]
26:5;  45:6
**exactly** [1]  33:10
**examination**   [1]
27:6
**examined** [1]  4:2
**exhibit** [24]    6:5,
6,  15,  25;   7:4;
8:10,  11;    9:18;
10:13, 25;  15:24,
25;  17:25;  20:3;
21:3, 25;  26:11;
30:2;  31:5;  35:8;
38:14;      41:1;
44:4
**exhibits** [5]  3:1;
6:5;  36:24;  38:2
**expected**    [3]
26:20, 25;  39:6
**expires** [1]  46:24
**explain** [2]  24:3;
39:22
**extent** [1]  15:4
**eyre** [7]      2:5;
17:23;    18:19;
21:1,  12;    37:7,
10

**- F -**

**f** [1]  46:1
**facets** [1]  43:20
**fact** [4]    11:17;
12:12;      14:5;
24:11
**far** [2]      10:4;
34:6
**february**    [1]
46:24
**federal** [4]  1:15;
5:10, 13;  22:24
**feel** [1]  32:11
**felt** [1]  10:22
**figure** [1]  27:11
**filed** [7]    14:9,

10;      23:18;
24:12, 13;   42:3,
12
**filing** [2]   5:10;
42:1
**finally** [4]  23:23;
28:23, 24;  44:2
**finance** [1]  5:21
**financial**   [1]
19:21
**find** [1]  33:17
**fine** [2]   36:20;
44:14
**finished** [1]  7:11
**first** [5]    4:2;
29:5;     33:4;
38:11;  46:9
**following** [1]  6:3
**follows** [1]  4:3
**foregoing**   [1]
46:11
**foreign** [1]  32:3
**form** [4]    14:2;
24:13;  42:1
**forth** [2]   1:18;
46:15
**forty-nine**   [1]
10:3
**found** [2]  12:16;
33:14
**fourth** [1]  26:24
**from** [27]   5:19,
21;    7:9,  13;
8:17;     18:16;
19:12;    21:23;
24:18;   25:6, 8;
27:1, 2, 12, 14,
15;  29:15;  30:5,
20;  31:2;  32:21;
36:8;      37:1;
41:21; 43:21
**full** [3]    25:23;
38:14, 15
**functions**   [1]
5:14
**further**    [2]
11:12;  45:12

**- G -**

**gave** [3]  15:21;
40:11;  42:16
**general**    [1]
13:13
**gentleman**  [3]
16:8, 11;   39:21
**get** [18]   14:16;
28:13, 17, 22, 24,
25;     29:23;
32:13;    33:6;
34:11, 14, 16, 17,
20,  22;   35:5;

39:3, 8
**getting** [1]  30:12
**give** [5]   14:22;
17:2, 15;   24:16;
40:1
**given** [1]  46:12
**giving** [1]  46:8
**go** [5]  6:18;  7:6;
14:14;    22:19;
42:7
**goes** [1]  23:23
**going** [17]   6:4;
15:23;    20:2;
21:2, 25;   31:4;
36:17, 24,  25;
37:8;    38:7,  9;
40:8;    44:3,  10,
11;  45:15
**good** [2]   16:23;
39:9
**got** [1]  34:16
**government**   [8]
3:1; 6:15;  10:12,
25;  17:25;  20:3;
21:3;  44:4
**government's** [2]
11:7;  15:24
**graduate**    [1]
5:23
**great** [6]  10:11;
17:22;  21:2, 24;
38:5;  44:2
**greenleaf**    [1]
4:12
**guess** [7]   11:7;
16:16;    20:23;
21:20;     33:2;
35:25;  38:8
**guidance**    [1]
11:8

**- H -**

**hackman**    [18]
9:5,  19;    10:7;
13:14;    15:22;
16:10;  17:2, 16;
18:25;  20:23, 25;
21:21;    32:23;
33:19;    41:10;
43:4; 44:24
**had** [29]    7:7;
8:3, 13, 15;  14:1,
7,  10,  24,  23;
13:8, 18;   20:24;
14:15; 25:10, 22,
24,     26:21;
27:17, 18;  28:10;
29:6;     31:2;
33:22, 24;  40:12;
41:10;    42:21;
43:24;  44:24

**hadn't** [1]  34:5
**halfway**    [1]
16:16
**hall** [3]    1:21;
46:5, 24
**hallett** [12]  2:10;
4:5;   9:20,  23;
10:1;     30:25;
37:9,  11,  16;
38:1;     44:6;
45:11
**hamilton**    [1]
46:4
**hand** [2]   36:24;
46:19
**handle** [1]  5:12
**handwriting** [13]
16:3, 21;   18:5;
20:8;     21:10;
31:8;     35:12;
37:3, 10, 12, 25;
41:5; 42:9
**handwritten**  [8]
3:5, 6, 7, 9, 13,
15, 18, 21
**he** [16]    9:11;
13:20, 22,   23;
18:24;  19:1, 19,
23, 25;   28:14;
34:12, 19;   35:3;
37:9, 12; 40:20
**he's** [1]  19:20
**head** [3]   4:23,
25;  5:8
**helped** [1]  32:24
**here** [5]    7:20;
13:1;     30:19;
34:7; 45:5
**hereby** [1]  46:7
**herein** [1]  1:14
**hereinafter**   [1]
1:18
**hereinbefore** [1]
46:15
**hereunto**    [1]
46:19
**high** [1]  19:4
**him** [6]    13:20,
24;    14:11,  24;
22:23; 37:8
**his** [7]    16:13;
18:24;  19:4, 19,
22;  37:11;  46:8
**home** [2]  4:9, 11
**hostetler**    [2]
1:19;  2:6
**how** [16]    4:20;
10:21;    12:8, 11,
24;    15:2,   7;
16:24;     18:9;
24:3,  19,   22;
27:14;  29:18, 22;

33:17
**howard** [1]  19:8
**hundred** [1]  32:6

**- I -**

**i'd** [5]    17:24;
22:14;  26:10, 23;
35:24
**i'll** [1]  35:7
**i'm** [29]    4:19;
5:8;   6:4;  10:17;
12:8;   15:6, 23;
16:20, 22;  19:19,
22;    20:2;  21:2,
24;    31:4,  22;
32:6,    7,    20;
36:24, 25;   37:4;
38:9;   40:1, 23;
42:7;  44:3, 10
**i've** [1]  32:23
**idea** [1]  17:3
**identified**   [13]
3:5, 6, 8, 12, 14,
15,  17, 18,  20,
21, 23, 24;  37:9
**identify** [4]  37:2;
38:18;  44:9, 15
**impact** [2]   26:5,
6
**importantly**   [1]
39:17
**income** [8]  5:11;
13:21;    24:15;
25:13;  42:15, 17;
43:3, 6
**increased**   [3]
25:5;     42:18;
43:3
**indicated**   [2]
15:12;  42:13
**indicates**   [2]
8:25; 22:17
**indication**   [1]
17:15
**informed**   [1]
33:11
**initially** [1]  5:3
**initials** [1]  18:8
**insurance**   [1]
19:5
**intent** [3]   11:2,
4;  13:8
**interest**    [48]
7:14, 24;    8:14;
9:1, 14;  11:9, 10,
16;    12:2,  14;
13:5;   14:16, 17;
15:14;     19:3;
21:17;  23:11, 13;
25:2, 7, 8;   28:5,
16,    21,    25;

31:12; 32:16, 18;
33:13; 34:17, 22;
36:11; 39:5, 15,
16, 20, 25;
40:14; 41:12, 14,
15; 43:15, 16;
44:21, 23; 46:17
**internal** [4] 7:17;
8:21; 10:14;
12:6
**into** [1] 9:16
**involved** [1] 30:3
**irs** [33] 7:7, 8;
8:16; 12:11, 24;
13:3; 15:2, 7, 13,
19; 17:4; 19:5;
22:19; 26:18;
27:1, 6, 12, 14,
15; 28:18;
29:15; 30:5, 19,
20; 31:24; 32:8,
11; 33:11;
35:17; 39:7;
41:12, 23; 43:13
**irs's** [1] 42:20
**issue** [4] 20:16;
32:1; 42:19;
43:7
**issued** [1] 38:21
**issues** [3] 25:20;
28:6; 42:20
**it's** [9] 9:21;
18:12, 17; 20:10;
22:11; 23:2;
35:25; 38:11, 14
**its** [1] 25:13

- J -

**jerry** [13] 9:5,
11; 15:21, 22;
16:10; 17:2;
18:25; 20:23;
23:3; 32:22;
33:18; 41:10;
43:4
**job** [1] 5:6
**john** [1] 21:22
**joint** [1] 32:14
**jph** [7] 17:1, 3;
18:25; 20:22;
32:22; 43:3, 4
**june** [6] 5:25;
6:3; 31:13; 33:6,
24; 34:7

- K -

**knew** [4] 13:4;
14:18; 39:21;
40:15
**know** [21] 8:2;

9:23; 10:4, 18;
12:5, 13, 23;
14:11; 15:2, 5, 7;
17:5; 22:21;
29:12; 30:13;
33:10; 34:6;
37:1, 15, 17
**knowledge** [1]
45:7
**known** [1] 42:22
**kron** [1] 21:22

- L -

**last** [4] 19:7;
33:2; 41:1; 44:3
**later** [3] 12:16;
13:10; 14:14
**law** [1] 24:9
**learned** [1] 33:5
**least** [1] 43:11
**left** [5] 10:7;
14:8; 17:23;
21:1; 41:18
**left-handed** [1]
16:22
**lengthy** [1] 35:16
**let's** [1] 34:7
**letter** [32] 3:2,
3, 10, 16, 22;
6:24; 7:4, 5, 6,
16, 21, 23; 8:9,
11, 20, 25;
10:12, 19, 24;
11:17, 19, 22;
13:2; 22:9, 16,
21; 23:5, 8;
24:18; 36:9;
44:18
**liability** [13]
17:17; 25:5;
26:25; 32:19;
39:6, 20; 42:17,
22, 24, 25; 43:2,
8, 24
**like** [12] 10:7;
17:24; 18:7, 17;
19:7; 20:21;
22:14; 26:10, 23;
35:22, 24; 41:22
**likely** [1] 39:16
**line** [1] 19:7
**little** [2] 10:8;
18:18
**local** [1] 5:10
**long** [2] 4:20;
37:13
**longer** [1] 33:11
**look** [13] 6:7;
9:15; 15:25;
18:2; 20:4, 21;
21:6; 22:1;

26:12; 31:6;
35:9; 41:2; 44:8
**looked** [4] 9:6,
9, 10, 15
**looking** [1]
37:19
**looks** [3] 10:7;
18:17; 35:22
**loss** [10] 24:1,
7, 10, 14; 25:11,
17, 22, 23; 42:2,
12
**lutzko** [23] 2:5;
6:18, 21; 9:22,
25; 10:3; 15:4;
33:8; 34:1, 25;
37:4, 6, 14, 18,
22; 38:16; 39:1;
40:6, 19; 41:3;
44:5; 45:8, 15
**lyons** [3] 18:21;
19:17; 38:22

- M -

**m** [1] 1:19
**ma'am** [7] 11:21;
16:4; 20:11;
21:11; 22:10;
23:6; 24:2
**made** [16] 8:2;
10:20, 22; 11:4;
13:18, 19; 14:7,
21; 17:4; 21:14;
26:21; 28:3, 10,
13; 40:2, 12
**major** [1] 5:20
**majority** [2]
5:11; 7:12
**make** [10] 6:19;
8:1, 3; 9:3, 6;
10:8; 11:6;
14:15; 16:20;
17:16
**making** [2]
16:20; 39:19
**manager** [1] 5:4
**many** [2] 29:22;
43:19
**march** [1] 27:24
**marked** [15] 6:5,
6; 9:17; 15:24;
17:25; 20:3;
21:3, 25; 26:11;
31:5; 35:8, 25;
41:16; 44:4, 7
**matter** [2] 14:13;
43:23
**may** [4] 12:12;
32:10; 39:8, 13
**mba** [2] 5:21;
6:1

**me** [38] 6:7;
8:10; 13:23, 24;
15:12, 22; 16:1,
5, 20, 24; 17:2;
18:3; 20:5, 12;
21:7, 13; 22:2;
24:3; 26:12, 14;
31:6, 10; 35:9,
14; 36:9, 19;
37:2; 39:22;
41:2, 7; 44:9, 11;
46:9
**mean** [6] 11:19;
15:16; 24:4;
25:4, 16; 39:22
**means** [2] 42:4,
6
**memo** [6] 3:12,
19; 27:24;
29:13, 21; 30:4
**memorandum** [1]
38:21
**method** [8] 7:9,
10; 8:17, 18;
14:4, 10; 43:21
**michael** [6] 1:13;
4:1, 7; 45:19;
46:9, 13
**million** [27]
7:21; 8:23; 12:5;
19:3, 11; 22:17;
23:5; 24:19, 21,
23, 24; 25:1, 7;
27:11; 28:4, 11,
14; 29:3, 19;
34:10; 42:19, 20;
43:7, 8, 17
**millions** [2]
29:21, 22
**minute** [1] 34:7
**missing** [1] 10:8
**money** [15] 9:7;
32:13; 33:6, 25;
34:10, 14, 16, 17,
21, 24; 35:5;
40:1, 11; 44:23
**moneys** [1]
28:22
**more** [4] 14:19,
23; 20:14; 39:17
**mostly** [1] 17:7
**mr** [39] 6:5;
9:19; 10:7;
13:14, 16, 20;
14:20; 15:21, 23,
17:16, 23, 24;
18:19, 22; 19:17;
20:25; 21:1, 12,
21, 22; 22:18,
20, 22; 23:2;
27:17, 19; 28:12;
29:2, 15, 17;

30:12;    31:4;
33:18;    35:3;
37:7, 10;    41:12;
44:24
ms [33]    4:5;
6:18, 21;    9:20,
22, 23, 25;    10:1,
3;   15:4;   30:25;
33:8;    34:1, 25;
37:4, 6, 9, 11, 14,
16, 18, 22;   38:1,
16;   39:1;   40:6,
19;   41:3;   44:5,
6; 45:8, 11, 15
much [7]   6:22;
16:24; 24:19, 22;
29:18; 34:9, 10
must [1] 31:23
my [24]   4:7, 9;
5:3;  6:14;   8:3;
9:5;  10:1;  15:1;
16:7;    20:24;
26:16;    31:19;
35:16; 36:17, 23;
37:21, 24;   42:8,
9;  44:18;  46:19,
24
myself [3] 13:14;
21:21; 33:19

- N -

name [3]  4:6, 7;
16:13
named [1] 18:21
names [1] 10:9
national [1] 2:6
nature [1] 28:21
need [3]   6:22;
33:2; 38:8
neither [2]   17:4;
46:15
net [6]  24:1, 7;
25:16, 25;  42:2,
11
never [5]  19:25;
40:2, 12;   42:21,
23
newspaper  [3]
7:8; 9:12;  10:9
nor [2]    17:4;
46:16
normally    [1]
12:15
notary [2]   46:6,
24
notes [17]   3:5,
6,  7,  9,  13,  15,
18,  21;   16:7;
20:20, 24; 35:17;
37:8, 13, 21, 24;
41:9

nothing    [1]
46:11
notice [1] 10:11
now [29]   6:15;
7:15, 22; 8:9, 19,
25;   10:11,  18;
12:22;  17:12, 15;
19:10;    20:18;
21:2, 24;   24:3;
25:14;    27:10;
28:12, 23; 32:11,
12, 13, 21; 33:4,
6, 15; 39:8, 9
number    [18]
6:16; 8:10; 9:18;
10:25;    15:25;
17:25;    19:4;
20:4; 21:3; 22:1;
31:5, 16;  32:3;
35:8; 37:4; 41:1;
43:18, 19
numbers    [3]
14:22;    29:11;
43:23

- O -

o [1] 2:11
o'connor    [6]
31:24;    32:8;
41:12, 23;  44:18,
24
objected    [1]
33:21
objection    [7]
15:4; 33:8; 34:1,
25;   40:6,  19;
45:8
obtained    [2]
30:11, 20
obtaining    [3]
27:2, 12; 30:5
occasional   [1]
31:20
occurred    [1]
43:21
offered [1] 18:24
office [2]  26:17;
46:20
officer [5] 31:24;
32:8;  41:13, 24;
44:19
offices [1] 1:19
official [2]  1:21;
46:20
officially    [1]
39:7
oh [1] 24:25
ohio [10]    1:2,
20,  22;    2:7;
4:13; 5:19;  46:2,
7, 20, 25

okay [118]  4:25;
5:16;  6:1, 4, 12,
15, 20;   7:3, 15,
22;  8:4, 6, 9, 19;
9:22,  25;   10:5,
11,  24;    11:25;
12:3,  19,  22;
13:15;    14:25;
15:15,  19,  23;
16:3, 5, 11;  17:1,
12, 19, 22;   18:5,
7, 11, 23;  19:10,
17;   20:2, 7, 18;
21:2, 5, 9, 18, 20,
24;   22:3, 5, 14;
23:1, 4, 7;  24:8,
18, 25;  25:4, 12;
26:2, 4, 6, 10, 13,
14,  23;    27:10,
18;    28:1,  7;
29:2, 9, 14,  18;
30:4,  22;   31:8,
13, 25;  32:5, 9;
33:4,  20;   35:7,
11, 20, 24;  36:2,
23;   38:2, 5, 9,
17, 18, 20, 23;
40:16,  22,  25;
41:4, 5,  16,  22,
25; 45:2, 5, 11
once [2]   17:9;
34:15
one [11]   4:12;
6:5, 6; 14:19, 24;
32:1, 12;   33:2;
38:9; 42:23
only [11]  11:8;
14:8, 15;  28:17;
32:14;    34:17;
36:21; 38:11, 13;
42:8; 43:24
operating   [4]
24:1;    25:16;
42:2, 11
opportunity  [1]
18:10
opposed    [1]
42:20
original    [1]
25:24
originally   [2]
42:3, 12
other [1] 29:15
our [45]  7:6, 8;
8:13, 16;   10:9;
11:4, 11;  13:2, 8;
14:3,   9,   17;
15:10;    20:14;
21:15;    23:25;
24:7;   26:24, 25;
27:2,  3,  4,  13;
28:20;  30:6, 16;

32:2, 13;  33:15;
35:18;    36:13;
39:6,  13,  18;
41:11,  13,  15;
42:1,  14,  16;
43:14, 18;  44:19
ourselves   [1]
11:12
over [8]   9:6, 9,
10, 15;   29:19;
30:10; 32:12
overall [1] 18:24
overpaid    [3]
29:6; 34:8;  39:5
overpayment  [4]
26:25;    28:14;
36:15; 39:12
overpayments [4]
26:20; 28:18, 25;
36:14
owe [6]   9:14;
17:8; 19:1, 3, 11;
28:11
owed [6]   7:12;
13:25;    20:15;
28:4;    39:21;
40:15
own [1] 6:16

- P -

p [1] 2:11
page [12] 16:25;
20:22;  22:6, 15;
24:21, 24;  31:17;
35:25;    36:3;
38:23; 41:16, 21
pages [3]  37:19,
22; 44:7
paid [9]    14:8;
17:6;    28:20;
29:19;    32:18;
33:1;    34:9;
36:11; 43:25
paragraph   [6]
22:15;    23:8;
26:24; 38:14, 23;
40:9
parenthesis  [1]
32:20
part [1] 19:14
partial [3]  23:9,
10, 16
partially    [2]
23:24; 24:5
past [1] 36:12
paul [1] 2:5
pay [2]    9:8;
13:25
payment    [31]
7:6;  10:20, 21;
11:6;  12:1,  16,

20;   13:4, 8, 17,
19;        14:15;
15:11;   23:9, 10,
17;   24:21;   27:4;
28:3, 16;   30:16;
33:12, 23;   34:8,
13, 18;   40:13;
43:14;   44:21
**payments**   [11]
27:6;   28:20, 21;
32:25;      34:20;
35:6;   39:18, 23;
40:2, 5
**pays** [2]   23:24;
24:5
**people** [1]  26:16
**per** [4]     17:3;
24:23;      32:21;
41:9
**percent** [1]  32:6
**perhaps** [1]  19:4
**period** [1]  35:4
**personal**    [1]
5:11
**place** [3]    1:17;
27:22;  46:12
**plaintiff** [3]   1:7,
14;  2:4
**planning**    [1]
5:13
**please** [12]   4:6;
6:7;  16:1;   18:3;
20:5;  21:7;  22:2;
26:12;      31:6;
35:9;  41:2;  44:9
**plus** [1]  19:3
**point** [8]      5:4;
18:16;      25:6;
33:2, 14;   34:12,
23;  41:22
**points** [1]  43:5
**portion** [8]  7:14;
11:10;      28:14;
38:11;      39:4;
40:9;      41:20;
43:25
**position**     [6]
4:18;  5:2;  19:18;
35:18;      39:11;
44:20
**possible**    [4]
23:2;  28:12, 15;
33:3
proceeding   (1)
34:13
x...;...l t t  17:7;
21.1:; 30.6
**preparation**  [1]
5:9
**prepare**     [1]
44:25
**prepared**    [6]

**6:24;   7:5;   8:13;
9:11, 19;  10:7
**preparing**   [2]
9:16;  11:18
**prepay** [2]   7:12;
43:9
**prepayment** [15]
8:14;   11:5, 11,
16;  13:5;  15:13;
17:9;      21:15;
27:5;      31:11;
33:15;      39:12;
41:15;      42:14;
44:20
**prepayments** [13]
26:21;   29:7, 12;
30:16;      31:21;
32:25;   35:3, 6,
18,   20,    23;
39:14;  40:11
**presently**   [1]
4:14
**president**   [1]
17:11
**pretty** [1]  16:23
**previous**    [3]
14:5;  30:2, 14
**previously**  [1]
23:17
**primary**    [2]
39:18, 24
**prior** [3]   28:18;
42:13, 24
**probably** [3]  8:3;
14:23;  29:16
**problem**    [2]
10:1;  32:14
**problematic**  [1]
43:19
**procedure**   [1]
1:16
**process** [1]  28:8
**processed**   [2]
13:9, 10
**proper** [2]   9:7;
11:6
**property** [1]  5:12
**proposed**    [4]
23:10,  12,   24;
24:5
**public** [2]   46:6,
24
**published**   [1]
14:3
**publishing**   [1]
8:16
**purpose**    [2]
39:19, 24
**purposely**   [1]
11:13
**pursuant**    [3]
1:15, 16;  46:14

**put** [1]  42:14

**- Q -**

**qualified**    [1]
46:6
**quarter**     [3]
22:15;      23:7;
31:17
**question**     [9]
15:1,  6;    33:9;
36:17, 23;  38:13;
40:7;  45:9
**questions**    [4]
38:8, 10;   44:11;
45:12
**quite** [1]  39:10

**- R -**

**r** [1]  46:1
**r-o-u** [1]  16:14
**r-o-u-t-t**    [1]
16:15
**rar** [1]  42:15
**rather** [2]  35:16;
37:23
**reaching**    [1]
26:18
**read** [14]    6:18,
22;    16:19, 24;
18:16;  31:17, 19;
36:8, 25;   37:12;
38.12, 15;  41:20;
42:8
**reading** [1]  38:6
**realized**    [2]
28:10, 13
**really** [3]   28:11;
38:11, 13
**recall** [7]   9:10;
13:15;      15:20;
27:21;      28:1;
29:18, 24
**receive** [1]  39:16
**received** [5]   3:2,
4, 9, 11;  15:10
**recently** [1]   7:7
**recess** [1]   31:2
**reclassify**   [1]
39:13
**recognize**   [14]
16:1, 2;   18:3, 4;
20:5, 6;   21:8, 9;
22:3;      26:13;
31:7;   35:10, 11;
41:4
**reconciled**   [1]
43:23
**reconciling**  [1]
43:18
**record** [1]  40:13

**recorded**    [1]
27:5
**recording**    [1]
20:18
**records** [2]  12:9,
11
**reduce** [1]  24:15
**reduced**     [2]
25:17, 22
**reducing**    [1]
25:13
**refer** [8]   10:25;
11:14;      18:9;
22:14;      26:23;
29:3;  35:21, 24
**reference**   [11]
11:18,  22,   23;
13:7;      17:2;
18:20, 25;  19:16;
32:22;      36:18;
43:4
**references**   [3]
21:22;  36:13, 21
**referred**    [4]
10:13,  16,   23;
40:16
**referring**    [11]
6:25;      13:12;
21:19;      30:7;
31:23;      32:7;
33:6;   40:3, 10,
23;  41:23
**refers** [10]  16:9;
19:8,   13,    15;
29:20;      30:15;
31:11;   32:3, 21;
35:22
**reflected**    [1]
29:13
**reflects**     [1]
31:10
**refund** [4]  24:16;
28:24;      39:3;
41:15
**refunded**    [5]
36:14;  39:17, 18,
23;  44:23
**refunds** [2]  29:1;
36:11
**regard** [4]  36:15;
39:11;      41:11;
44:19
**regarding**    [3]
26:24;      31:21;
42:1
**related** [8]  9:13;
11:16;  23:11, 13;
24:16, 23;  25:21;
29:25
**relating**     [1]
35:17
**relative**     [1]

46:16
**relevant** [1]
43:24
**remember** [3]
23:3; 29:9, 22
**remittance** [11]
10:13;    11:1;
12:4, 23;   13:16,
17;  14:21;  15:3,
8;  29:3;  43:14
**removed** [2]
11:23;  13:6
**repeat** [1]  15:6
**report** [6]  26:16;
42:16;    43:2,  5,
19, 22
**reporter** [1]  1:21
**reporting** [1]
8:16
**reports** [2]
23:24;  24:4
**represents** [6]
20:13;  21:13, 14;
35:15, 16;  41:8
**requested** [1]
36:13
**rereading** [1]
40:8
**research** [2]
5:14;  10:21
**researching** [2]
11:5;  21:15
**respect** [4]  12:3,
22;  27:10;  31:16
**respects** [1]
46:14
**responsible** [1]
5:9
**result** [2]  26:21;
46:18
**resulted** [1]  43:7
**return** [8]  11:11;
14:17;  24:7, 12;
25:20, 24;  26:7
**returned** [1]
43:17
**returns** [4]  5:11,
12;  14:10;  23:17
**revenue** [9]  7:17;
8:21;    10:14;
12:6;    42:16;
43:2, 5, 19, 22
**reviewed** [1]  8:6
**reviewing** [1]
41:13
**revisions** [1]
43:20
**rick** [11]  31:22,
24;    32:7,  10;
41:12, 23;  42:13;
43:11;  44:18
**rick's** [1]  41:22

**right** [5]   17:19;
25:10;    26:9;
36:22
**robert** [1]  16:13
**room** [4]  17:23;
18:19;  21:1, 12
**rough** [2]   17:2;
18:24
**roughly** [2]
13:25;  17:8
**routt** [3]  16:13;
18:22;  38:22
**rpr** [2]  46:5, 24
**rules** [1]  1:16
**running** [4]  7:14;
11:9;    14:16;
40:14

**- S -**

**saewitz** [19]
13:3, 4, 16, 20;
14:20;    15:21;
22:18,  20,  22;
23:2;  27:17, 19;
28:12;  29:2, 15,
17;    30:12;
33:18; 35:3
**said** [9]  15:11;
28:15;    32:12;
34:9;    37:7;
40:20, 21;  46:12,
13
**same** [3]   5:2;
9:21; 30:14
**saving** [1]  18:9
**say** [9]    9:9;
13:11;    14:23;
15:15;    19:7;
21:18;    23:23;
36:16; 37:20
**says** [7]  18:17;
20:22;    23:22;
31:18;    36:4;
38:24; 41:22
**scripps** [5]  1:5;
4:17;    13:13;
19:8, 18
**seal** [1]  46:20
**second** [10]  8:9;
10:24;  22:6, 15;
23:8;    24:24;
38:13, 23;  40:25;
41:16
**see** [3]   24:25;
30:1; 39:1
**seem** [1]  17:18
**seems** [1]  43:11
**seen** [1]  6:8
**self** [1]  19:5
**sentence** [1]
40:4

**service** [6]  7:17;
8:21;    10:14;
12:6;    23:19;
24:14
**set** [3]    1:18;
46:15, 19
**sets** [1]  30:13
**settled** [1]  7:7
**settlement** [2]
26:19; 27:1
**several** [3]
23:19;    25:19;
29:4
**sharlene** [3]
1:21;  46:5, 24
**she** [1]  39:1
**short** [2]  30:23;
31:2
**shorthand** [1]
42:9
**shortly** [3]
27:23;    28:9;
34:8
**should** [10]  9:8;
10:21, 22; 32:13;
33:1,  5;   42:22;
43:13, 16, 22
**show** [11]   6:4;
7:23;    15:23;
17:24;    20:3;
21:3, 25;   26:10;
31:4;  35:7;  44:3
**showed** [3]
15:19, 22;  24:7
**showing** [3]
9:12, 17;  30:12
**sid** [10]    13:3,
10;    15:23;
32:11, 21, 23, 24;
34:9
**sign** [1]  44:25
**signature** [5]
6:12,  14;   22:5;
45:2, 16
**signed** [1]  8:13
**signing** [1]  14:1
**since** [5]  14:12;
25:22;    28:19;
32:24; 38:25
**sitting** [1]  45:5
**situation** [1]
39:13
**smaller** [1]  25:14
**solves** [1]  10:1
**some** [6]   5:4;
7:22;    10:21;
33:13;    39:8;
40:11
**somebody** [1]
20:19
**someone** [1]  8:3
**sometime** [3]

15:9, 15, 16
**somewhat** [1]
19:8
**soon** [1]  33:3
**sorry** [4]  10:17;
15:6;  37:4;  42:7
**sounds** [2]
17:19; 39:9
**southern** [1]  1:2
**speaking** [1]
30:19
**specific** [1]
27:18
**specifically** [7]
11:17, 22;  13:6,
14, 15;  29:2, 9
**specify** [1]  30:18
**ss** [1]  46:3
**stacy** [1]  2:10
**staff** [2]   8:3;
9:5
**stands** [1]  42:16
**stars** [1]  41:17
**started** [1]  4:22
**starting** [3]
36:3;    41:20;
44:7
**starts** [2]  16:17;
18:12
**state** [12]  1:22;
4:6;  5:10, 13, 20;
24:22;  27:11, 13;
30:4;  46:2, 7, 24
**states** [6]  1:1, 9;
21:21;    23:8;
26:24; 27:8
**status** [2]  26:18,
20
**still** [4]   17:3;
19:1, 3, 11
**stipulations** [2]
1:17;  46:14
**stop** [5]   7:13;
11:9;    14:16;
39:19; 42:4
**stopping** [2]
39:24; 40:14
**street** [1]  1:20
**strongly** [1]
33:21
**submit** [1]  7:16
**submitted** [1]
8:20
**subsequent** [1]
34:7
**subsequently** [1]
42:23
**subsidiaries** [2]
1:6;  14:3
**subsidiary** [3]
8:17;    9:12;
10:10

**substance** [1]
28:1
**such** [1] 10:21
**suggesting** [1]
39:8
**suggests** [1]
19:1
**summarize** [1]
5:17
**summary** [6]
3:24; 9:11, 15,
16, 19; 10:6
**support** [1]
43:12
**sure** [10] 5:19;
6:19; 12:8;
16:20; 18:1;
19:19, 22; 32:6,
20; 45:14
**suzanne** [1] 2:10
**switch** [2] 7:8;
14:3
**sworn** [2] 4:2;
46:10

- T -

**t** [2] 46:1
**take** [16] 6:6,
22; 12:14, 17;
15:25; 18:2;
20:4; 21:6; 22:1;
25:24; 26:12;
30:23; 31:6;
35:8; 41:2; 44:8
**taken** [3] 1:14;
40:13; 46:13
**talked** [1] 30:8
**talks** [1] 19:11
**tax** [88] 2:10;
4:19, 21, 23, 25;
5:1, 4, 5, 7, 8,
11, 14; 7:23;
8:14; 9:13;
11:16; 12:2;
13:5, 8; 14:13;
15:11, 14; 17:3,
4; 18:9; 19:3,
11, 23; 20:1, 15;
21:16; 23:11, 12,
19, 20, 25; 24:5,
6, 7, 9, 10, 14,
16, 20; 25:1, 7,
8, 20, 22; 26:19;
27:2, 6, 13; 28:5,
9, 16, 19, 20;
29:24; 30:6, 16;
31:12; 32:3, 18,
25; 33:12, 23;
34:13; 35:6;
39:4, 14, 20;
41:15; 42:12, 16,

17, 21, 23, 24,
25; 43:2, 8, 14,
24; 44:20, 21
**taxable** [7]
13:21; 24:15;
25:13; 42:15, 17;
43:3, 6
**taxes** [2] 9:1;
40:15
**taxpayer** [1]
23:18
**team** [1] 13:2
**tell** [21] 6:7;
8:10; 16:1, 5;
18:3; 19:12;
20:5, 12; 21:7,
13; 24:18;
26:14; 29:11;
31:10; 35:4, 9,
14; 36:9; 37:2;
38:10; 41:7
**telling** [4] 13:2,
16; 33:22; 38:25
**testified** [1] 4:2
**than** [4] 14:14,
19, 23; 29:15
**thank** [5] 20:2;
21:24; 40:25;
44:2; 45:11
**thanks** [4] 31:1;
37:6; 38:16;
41:3
**that's** [19] 4:12;
9:7; 13:1, 8, 9;
14:18; 16:22;
18:9, 20; 23:22;
26:8; 36:20;
37:16; 38:2;
40:19, 23; 44:6,
14
**their** [4] 12:9,
11; 39:10; 46:16
**them** [13] 6:10,
23; 8:2, 3, 5;
14:10; 30:12, 13,
20; 37:1, 22;
38:6; 39:19
**then** [15] 5:6,
21; 12:19;
13:24; 14:12;
19:7; 23:7, 16,
23; 26:6; 28:9;
30:12; 32:19, 20;
40:13
**theory** [1] 43:11
**there** [14] 7:22;
8:20, 22; 12:4;
25:19; 29:4, 23;
30:2; 32:1;
34:11; 36:8, 16;
41:17, 21
**there's** [4] 8:19;

9:23; 19:2; 30:9
25
**thereafter** [1]
28:9
**therefore** [3]
34:20; 43:16;
44:22
**these** [14] 9:14;
13:22; 14:8;
20:19, 21, 24;
25:15; 30:13;
34:15, 19; 37:2;
39:17; 43:2;
45:1
**they** [27] 12:8,
14, 17, 24; 15:3;
22:19, 23, 24;
32:12; 33:1, 5,
11, 15, 22; 35:5,
6; 37:2, 21, 23,
24; 39:10, 13,
16, 23; 40:11;
44:23
**thing** [3] 14:8;
38:12, 15
**think** [6] 9:20;
16:22; 17:21;
19:15; 31:23;
35:1
**thinking** [1] 40:1
**third** [1] 24:10
**thirds** [1] 38:24
**thirty-three** [1]
37:5
**this** [77] 6:24,
25; 7:5, 15;
8:11, 19, 25;
10:6, 20; 11:14,
17; 13:1, 4, 7,
19; 14:12, 20;
15:9, 16; 16:3;
18:4, 5, 11;
19:10, 12; 20:6,
7, 14, 16, 18;
21:9, 10; 22:3, 8;
23:5, 9, 16;
24:18, 19; 25:6,
14; 26:13, 16;
27:24; 29:13, 21;
30:4, 18; 31:7, 8,
11; 32:22; 33:2,
4, 24; 35:11, 12,
20; 38:9, 18, 21;
39:9; 40:9; 41:4,
5, 9; 42:13, 14,
19, 23; 43:1, 6,
20; 44:12, 18;
46:21
**those** [14] 6:7,
8; 8:1; 9:4;
10:9; 14:6;
25:24; 27:21;
28:2, 8, 22, 23,

25
**though** [2] 7:11;
36:16
**thought** [2] 13:9;
37:7
**three** [1] 32:17
**through** [6] 14:6;
23:20; 26:19;
27:3; 30:7, 12
**tie** [1] 32:19
**time** [18] 1:17;
5:4; 6:22; 10:22;
11:4; 12:10;
16:9; 19:20, 24;
25:7; 30:10;
33:4, 14; 34:12,
23; 35:4; 45:13;
46:12
**times** [2] 14:23;
29:12
**title** [3] 5:3;
19:20, 22
**today** [3] 13:1;
29:10; 45:5
**told** [8] 13:3, 10,
23, 24; 14:11;
33:18; 34:12, 19
**too** [3] 19:4;
34:9, 10
**took** [6] 10:1;
11:21, 22; 27:22;
32:2; 37:13
**top** [4] 18:7;
20:22; 24:23;
36:3
**totaling** [3]
22:17; 23:4, 5
**touche** [1] 21:23
**transcript** [5]
15:10, 11, 20;
30:8, 15
**transcripts** [5]
30:10, 11, 14, 15,
19
**transmittal** [3]
7:6, 15; 8:12
**treat** [3] 12:25;
15:3; 43:13
**treated** [7] 12:6,
8, 11, 24; 13:17;
15:2, 7
**treating** [3]
15:13; 33:12, 15
**true** [1] 45:6
**truth** [3] 46:10,
11
**trying** [1] 31:22
**tso** [1] 18:8
**two** [9] 6:4;
9:24; 13:22;
14:5, 8; 32:16;
36:24; 38:24;

41:17
types [2]   30:10,
11
typical [1]   5:14

- U -

ultimately   [1]
42:25
under [3]   14:10;
24:9; 26:25
undersigned   [1]
46:5
understand   [3]
24:4; 30:9;  42:9
understood   [1]
11:7
undo [2]    39:18,
24
unit [2]    8:17;
9:12
united [2]  1:1, 9
university    [2]
5:20, 21
unlike [1]  32:11
until [4]    13:10;
34:15, 21;  39:7
up [3]       25:7;
32:11; 43:5
upon [3]    1:14;
11:12; 23:18
us [20]     12:14;
13:10;     21:16;
24:16;     30:13;
32:24;  33:11, 22;
34:12, 19;   35:4;
36:11, 14;  38:25;
39:18;  40:1, 11;
43:12, 17;  44:23
used [3]    10:15,
18;  11:17

- V -

various [3]  5:12;
26:16; 43:20
verbally [1]  13:2
very [6]      18:7,
11;  20:22;  29:5;
37:13;  44:3
vice [1]   17:11
voluminous    [1]
37:24
·  з [1]  1:8

- W -

w [9]     1:5, 13;
4:1, 7, 17;  20:22;
45:19;  46:9, 13
waive [1]  45:15
walnut [1]  1:20

want [11]   11:15,
24;       13:16;
16:24;     36:19;
37:1,  14,   16;
38:5, 12, 15
wanted [8]   7:11;
11:8,  15;   12:1;
13:4, 25;   14:14,
18
washington   [1]
2:11
way [11]    11:6,
13;     13:8,  9;
22:16;     23:8;
29:23;    31:17;
34:11, 17;  38:24
we [134]    5:12;
7:7, 10, 11,  12;
8:15;   9:7,  14;
10:4, 20, 21, 22;
11:4, 5, 6, 7, 8,
13, 14, 15, 23;
12:1,  12,  15;
13:1, 3, 4, 9, 11,
13, 19, 24, 25;
14:1, 3, 9, 10, 14,
18;   15:9;  17:4,
5, 6, 8;  19:1, 3,
11;      20:15;
21:14, 18,  20;
24:9, 11, 12, 14,
15;    25:10,  14,
22, 24;   26:18,
20;   27:1, 13;
28:3, 4, 8, 9, 10,
12, 13, 22, 23,
24, 25;  29:6, 12,
22, 23;    30:11,
20, 23;  32:2, 13,
17, 21;   33:14,
21;   34:8, 9, 11,
14, 16, 20, 22;
35:1, 4; 36:4, 10,
12;  39:3, 5, 6, 8,
15, 17, 18, 20,
21;  40:2, 12, 14,
15;      41:14;
42:21, 22;  43:1,
9, 13, 16, 24, 25;
44:22; 45:15
well [10]    4:22;
19:14;     20:21;
21:20;     22:16;
23:19;     25:18;
28:3;  34:7
went [9]    8:13;
9:16;     13:19;
22:19, 23;  23:3;
24:19;     25:7;
34:9
were [23]    11:5;
22:24;  25:14, 19,

21;  26:18;  27:5;
28:20, 21;   29:4,
7;  30:2;  33:11,
15;   34:15, 19;
35:5,  6;   37:7;
39:16, 23; 41:14;
44:22
western [1]  1:3
what's [10]  9:17;
15:24;     17:25;
20:3;   21:3, 25;
26:11;     31:5;
35:7; 44:3
whatsoever   [1]
46:17
where [8]  18:16;
24:13;     25:6;
26:8,  18,   24;
36:9; 39:1
whereof      [1]
46:19
whether     [4]
12:5, 24;   21:15;
41:14
which [21]  7:21;
8:11,  13;   17:1;
19:1;     20:22;
24:10, 13; 27:24;
29:24;    31:22;
32:3, 22;  33:21;
34:2;     35:20;
39:12, 15; 42:15;
43:7, 8
who [7]    13:11;
15:19;     17:10;
18:21;     21:18;
31:24
who's [1]  16:11
whole [1]  46:10
whose [1]  4:16
why [4]     9:23;
10:18; 13:1, 6
will [4]     17:9;
36:4, 10;  38:10
within [2]   1:21;
46:7
witness      [10]
1:13;       6:20;
30:23;     31:1;
37:13,  20,  23;
39:2;      45:14;
46:19
word [4]    4:12;
10:15, 18;  31:20
words [1]  6:16
worked [1]  18:21
workmen's    [1]
19:6
would [38]   5:25;
7:20;  8:6;  9:14;
13:13, 20, 22, 23;
14:3, 23;   17:18,

21;   19:15,  16;
20:23;  21:16, 20,
24:10, 24;   25:1,
10;  26:7;  27:16,
23;       28:25;
29:16;  34:16, 22;
36:14;  39:15, 18,
23;  40:2, 12, 14;
42:22
writing      [2]
31:19;  35:17
written [1]  44:25
wrong [1]  35:19

- Y -

year [14]   6:2, 3;
14:7;      19:12;
24:10,  22,  23;
25:11;     26:1;
28:19;  32:2, 12;
42:17, 25
year-end     [1]
13:24
years [24]  8:14;
9:14;   13:10, 22;
14:9;  19:12, 15;
20:16;     23:20;
26:19;     27:3;
28:9, 23;  29:24;
30:2, 6, 7; 32:18;
34:15,  18,  21;
36:12; 42:12, 25
yesterday    [1]
10:2
yet [4]     7:11;
23:18; 32:19, 23
you've [1]  6:7
your [26]   4:6, 8,
16, 18;  5:6, 16,
17, 23;  6:12, 16;
11:1;   16:3,  21;
18:5;   20:7,  18,
20;  21:10;  22:5;
31:8;      35:12;
37:3;  41:5;  45:2,
7, 13

HOW CENTRAL TRUST    WFP
PO BOX 1560
CINCINNATI OHIO 45201
513 977 3962

LAW OFFICE DEPT
CORPORATE TAX DIRECTOR



**SCRIPPS**
**HOWARD**

December 22, 1988

Mr. Jack R. Elliott
Case Manager
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

          re: The E. W. Scripps Company & Subsidiaries
              E.I.N. #34-0517805

Dear Jack:

As we have discussed previously, The E. W. Scripps Company
and subsidiaries' desire to post a cash bond with the Internal
Revenue Service to in effect prepay and thereby stop the
interest accumulation on the 1982-84 adjustments anticipated
as a result of our recent settlement with the Internal Revenue
Service, which changed our method of reporting from the cash
method to the accrual method as of 1980.

This cash bond is being hand-delivered with this authorization
letter by our Jerome P. Hackman to your Team Coordinator,
George B. Imwalle on Thursday, December 22, 1988, is in the
amount of $9,000,000, and covers the following years now under
audit:

|  | 1982 | 1983 | 1984 | TOTAL |
|---|---|---|---|---|
| Tax adjustment | $3,000,000 | $ 0 | $2,500,000 | $5,500,000 |
| Interest Thereon | 2,500,000 | 0 | 1,000,000 | 3,500,000 |
|  | $5,500,000 | $ 0 | $3,500,000 | $9,000,000 |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue Ser-
vice's receipt of this cash bond.

Thank you for your cooperation in this matter.

Sincerely,

*Michael W. Carroll*

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc.  1 - Letter for receipt purposes

**SCRIPPS 00020**



GOVERNMENT'S
EXHIBIT

1

110C  TRAL TRUST TOWER
P.O. Box 5380
CINCINNATI, OHIO 45201
513 977-3862

MICHAEL W. CARROLL
CORPORATE TAX DIRECTOR

 **SCRIPPS HOWARD**

December 31, 1990

Mr. Sidney S. Saewitz
Internal Revenue Agent
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

> re:  The E. W. Scripps Company & Subsidiaries
>      E.I.N. 34-0517805

Dear Sid:

As we have discussed previously, The E. W. Scripps Company and
subsidiaries' desire to prepay and thereby stop the interest
accumulation on the 1985-86 adjustments anticipated as a result
of our previous settlement with the Internal Revenue Service,
which changed our publishing affiliates' method of reporting
from the cash method to the accrual method as of 1980.

Our check for $7,000,000 is being hand-delivered with this
authorization letter by our Jerome P. Hackman to you today.
It covers the following years now under audit:

|                  | 1985        | 1986        | TOTAL       |
|------------------|-------------|-------------|-------------|
| Tax Adjustment   | $2,000,000  | $2,000,000  | $4,000,000  |
| Interest Thereon | 1,500,000   | 1,500,000   | 3,000,000   |
|                  | $3,500,000  | $3,500,000  | $7,000,000  |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue
Service's receipt of this payment.

Thank you for your cooperation in this matter.

Sincerely,

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc. 1 - Letter for receipt purposes

**RECEIVED**
**EXAMINATION DIVISION**

**DEC 3 1 1990**

334

GOVERNMENT'S
EXHIBIT
4
PENGAD 800-631-6989

12/10/90

Newspapers Cash to Accrual — 1985-86 Increments

JRR asked if we intended to pay them now since interest rate is going up 5%?

I corrected his understanding re: interest rates. The rate remains at 11% thru 1st qtr 1991 but due to the 1990 Tax Bill while interest remains fully deductible the rate is increased 2% after a Notice of Deficiency is issued

Since the 11% rate is higher than we can earn now we will consider prepaying 1985-86 tax now

I asked JIH to give me a rough idea of tax still due from 1985 & 86

Per JIH neither we nor IRS have made the tax calculation for 1985 + 1986 but we know the accumulation 1980-86 amount so he can back out amounts paid for 1980-81 + assessed (mostly prepaid) for 1982-84 to arrive at roughly what we owe for 1985-86.

Once I have it, will consider prepayment with DJC

GOVERNMENT'S EXHIBIT 7

PENGAD 800-631-6989

SCRIPPS 00233

<u>TSO</u>

12/12/90    Prepay Newspapers 1985-86 Accrual Increments

DFL asked if we were planning to do so
since interest jumps up in 1991

I told ~~the~~ DFL:
1) JPH is currently working on the approximate
   1985-86 incremental amounts (total less 1980-84 and

2) Once we have it, I'll get DJC OK to

{ TSO
prepay 1985-86
get 1990 tax
deduction
+ stop interest }

prepay in 1990 so
a) we get 1990 tax deduction on the interest
b) we stop the interest
   + rate differential of 11% vs our cost of funds
     which I'm told is less than 11%.

3) JRR has also asked (so JRR + DFL must work to prepay

4) As I informed JRR, interest in 1991
   remains at 11%.
   only on tax deferences when notified
      does the rate go up 2%. ~~went~~ to 13%.

5) we had been waiting for the IRS calculation
   since we didn't do one specifically for
   1985 + 1986, but since the IRS has not
   given us one yet, good time to consider prepaying

SCRIPPS 00232

GOVERNMENT'S
EXHIBIT
8

✗✗ TSO
120X - Did we deduct
a 7 of self ins accrual
their claims was

DFL offered his rough overall estimate to JPH, which
he believes was close + suggests we still owe 4M tax
plus interest, but perhaps his # is too high. He did not
consider IRS allowances for self ins, W/C, etc.
Re: SH _____ cost = the a... curr. # ~ 8½% vs IRS's 11%

12/14/90    IRS Audits
                w/ JPH

Pension 1985-87 audit — the auditor says he's finished
              + told Sid he had no adjustments to propose

Connecticut Summary Reports
        He has completed his review
            + is going over corrections with Sid
                who has agreed to make them
                    + resume corrected reports

1985-86 Newspaper - Cash to Accrual Prepayment
          He's not been able to complete his calculation
              of the estimated 1985-86 newspaper increments
              due to work on the above this week

        For many units a 1-1-87 calculation was not done
            (it was for some) so it must 1st be done so we
            can get 1985-86 by subtracting 1980-81 +1982-84
            amounts from the 1-1-87 amount        **SCRIPPS 00231**

        I told JPH that DOC also wants to do so by year-end
            after my discussion of it with him too lengthy
            (since we can get the adjustment deduction in 1990
            + stop 11% interest so our 8½% borrowing rate)
        I suggested that he get DFC's calculation (x'y'm dude
            still per DFC recall) + see if it looks reasonable & if so,
            we'll use it for those units without 1-1-87 calculations

GOVERNMENT'S
EXHIBIT
9
PENGAD 800-631-6989

2/31/90   Prepayment of 1985 & 1986 Accrual Income Increments for
EWS Cash to Accrual Issue

1980-81 -   June 1988 agreed to Accrual + pd amt due
deducted interest paid

1982-84 -   December 1988   pd $9 M Cash bond (5.5 mte
(3.5 men
to stop interest, deducted in 35M

July 1989 -   Received RAR - Did not protest
this issue, but RAR is still
at Appeal on other issues

1988 + 1989 SHI 1120 - Aid not deduct accrued interest

1985-86   -   how under audit but no 5701 on 40 issue
yet, but we will Agree on issue
+ just make sure the amt is correct.

-   If Prepaid on 12/31/90 can we deduct $3 M interest or not

To meet All Events Test:
1) fixed liab - while no RAR or 5701
we agreed for 1980-81 + 1982-84 ??
2) can determine amt - Yes
3) economic performance 461(h)
El occurs as interest economically accrues

SCRIPPS 00234

JPH + I reviewed SHI 1120's
1987 - Sch M'd Accrued Interest of $2.6 M as Still in appeals
1988 - Reversed Sch M's on units books since settled 1988
-   Deducted $3.5 M of prepaid interest but did not
deduct this year end accrual of interest remaining,
since it relates to contested liabilities
1989 - Did not deduct this increase in the accrual, not settled

GOVERNMENT'S
EXHIBIT
11
PENGAD 800-631-6989

We called John Kron for his interpretation + conclusion of the following:

Question - Does the Accrual of Interest on this
To Be Agreed to Issue pass the All Events
Test under Sec. 461, allowing us to
deduct it yearly, whether paid or not,
even though we don't have a Notice of
Deficiency from the IRS for 1985-86 yet?

Conclusion - Which John Kron suggests also
is its better to pay the $3M of interest
today to ensure its 1990 Tax deductibility
rather than assuming its deductible since
we are an accrual basis taxpayer (the answer is
not clear to
JK either.

The uncertainty surrounds the 1st test
to there an event which fixes our liability?
We have previously agreed to switch our
publishing Co. to Accrual as of 1980 and
1985-86 adjustments are needed to complete
this transition + once we have the 5701 +
have verified the amount we will agree to the
issue + pay the amount due
However, as of today we have no 1985-86 Notice
of Deficiency.

We will follow Rev Rul 89-6 + not call our
payment a cash bond to ensure its 1990
deductibility.

**SCRIPPS 00235**

12/31/90

Prepayment of 1985-86 Tax + Interest on EWS' Cash to Accrual Increments

To verify our conclusion (although it's not clear) that we can't deduct accrued interest on these increments unless we have a <u>Deficiency Notice</u> + pay the interest

I called John Kwon

He seemed unclear, also as to whether we'd pass the 1st prong (a fixed event establishing the tax + interest liability) since we've not yet received a Notice of Deficiency + researched the issue + called us back

To be certain, we should pay it today + follow Rev Rul 89-6 in not calling it a cash bond (even though we did call our 1988 prepayment a cash bond with IRS OK☒. (This was paid before RR 89-6 was issued)

Per RR 70-580 - Accrued Interest on an agreed <u>proposed tax deficiency is deductible</u>, but not if it's being contested.    **SCRIPPS 00236**

He feels we can't partialize the issues + must wait to deduct accrued interest until all are settled.

JPH + P then gave our conclusion (+JJK's similar
conclusion) to DJC.
DJC agreed to pay the full $7M today
especially since the expected ~20% short term
bank borrowing rate for today did not materialize
+ in fact is likely to be as low as 7½%.

We gave DPL + JRR the conclusion
By paying by check (SHI check which Sid
told JPH was fine) DPL does not have to
borrow the money today anyway as he
would if it was a wire transfer (so we get
2 days float until holiday plus low st rates)
JRR prepared the check request, & - DJC
signed it, + he carried it to MMC to
prepare.

JPH will hand deliver $7,000,000 check + our
Authorization letter to Sid this afternoon +
Sid is expecting it.

**SCRIPPS 00237**

⟶ * Clearly doing it this way, per Rev Rul 89-6, our
$3M prepayment of interest is deductible in 1990.

Sid said to JPH that if we pay this interest in 1990
he would allow a 1990 tax deduction for it w/o question

CINCINNATI, OHIO 45
513 977-3862


SCRIPPS
HOWARD

December 30, 1994

Mr. Sidney S. Saewitz
Internal Revenue Agent
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio 45201

        re:  The E. W. Scripps Company and Subsidiaries
             (current E.I.N. 51-0304972; E.I.N. during
              1983-1987 audit period was 34-0517805)

Dear Sid:

As we have discussed and recently set up with you, The E. W.
Scripps Company desires to partially pay the Internal Revenue
Service's proposed audit adjustments, as partially agreed to
by the taxpayer, for the examinations of The E. W. Scripps
Company and Subsidiaries for tax years 1985-1987 and of
Telescripps Cable Company (E.I.N. 84-0917187) for partnership
tax years 1983-1987.

Our checks totaling $45,000,000.00 are being hand-delivered
today, by our Jerome P. Hackman, to you or your designate at
your office, with this letter and completed and signed Forms
870 for years 1983-1990 and Forms 1120-X for years 1991-1993.
This is to be considered a partial payment of the proposed
tax assessments, and related interest (deductible in 1994),
for the audit years and all subsequent tax years through 1993,
as a result of this proposed tax assessment. This partial
payment is in addition to the December 31, 1990 partial payment
of proposed 1985 tax adjustments of $2,000,000.00 and related
interest of $1,500,000.00, and proposed 1986 tax adjustments of
$2,000,000.00 and related interest of $1,500,000.00.  This
partial payment also considers amended returns previously filed
by the taxpayer, but not yet acted upon by the Service, as well
as several additional tax corrections, for tax years through
1993. Finally, it reports and partially pays the proposed 1986
tax assessment as additional 1983 tax, due to our 1986 net
operating loss. Since we received our 1983 tax refund in May
1987 due to the carryback of our 1986 net operating loss, as
filed, the proposed 1983 tax adjustment, while increasing our
1983 tax liability, does not incur interest until May 1987.

GOVERNMENT'S
EXHIBIT
12
PENGAD 800-631-6989

**SCRIPPS 00214**

This partial payment of the proposed tax assessments and related interest (deductible in 1994), is as follows:

| Tax Year | Tax Payment | Interest | Total |
|----------|-------------|----------|-------|
| 1983 | $13,800,000.00 | $19,700,000.00 | $33,500,000.00 |
| 1984 | 0.00 | 0.00 | 0.00 |
| 1985 | 800,000.00 | 1,800,000.00 | 2,600,000.00 |
| 1986 | 0.00 | 0.00 | 0.00 |
| 1987 | 0.00 | 0.00 | 0.00 |
| 1988 | 600,000.00 | 600,000.00 | 1,200,000.00 |
| 1989 | 0.00 | 0.00 | 0.00 |
| 1990 | 2,300,000.00 | 1,500,000.00 | 3,800,000.00 |
| sub-total | $17,500,000.00 | $23,600,000.00 | $41,100,000.00 |
| 1991 | 1,300,000.00 | 600,000.00 | 1,900,000.00 |
| 1992 | 900,000.00 | 200,000.00 | 1,100,000.00 |
| 1993 | 800,000.00 | 100,000.00 | 900,000.00 |
| totals | $20,500,000.00 | $24,500,000.00 | $45,000,000.00 |

Please have the duplicate copy of this letter date-stamped and given to Mr. Hackman as our evidence of the Internal Revenue Service's receipt of this payment and related documents.

Thank you for your cooperation in helping us to make this partial payment in 1994 of the proposed tax assessment and the related interest.

Sincerely,

Michael W. Carroll

Michael W. Carroll

encls. Forms 870 (1983-1990), Forms 1120-X (1991-1993)
       Duplicate copy of letter for receipt

cc: Castellini, Hackman, Stafford, Toomajian
bcc: JRR, EJW, DPL, DFL, Audit files, 1994 1120 files

SCRIPPS 00215

## Carroll, Mike

| | |
|---|---|
| **From:** | Carroll, Mike |
| **To:** | Routt, Robby; Lyons, Doug; Buckey, David; Holliday, Robbin; Hickok, Lori |
| **Cc:** | Castellini, Dan; Stafford, Rob; Hackman, Jerome; Zimmerman, Dennis; Green, William |
| **Subject:** | Status: (1) IRS Settlement/Overpayment,  (2) 1994 Tax estimate/overpayment,  (3) Sacramento Cable - Tax Refund/Tax planning,  (4) 1994 Tax Information - Packets/Ross Reports |
| **Date:** | Wednesday, March 08, 1995 6:00PM |

This E-mail addresses a number of important tax issues that we are currently dealing with. I apologize for its length. I started out over a week ago intending to address each topic in separate awareness memos or e-mails but kept getting interrupted. Since the issues are interrelated, I've decided to put them together on one "status " report and get it out to you.

### IRS 1983-1987 SETTLEMENT / EXPECTED REFUNDS ON OUR OVERPAYMENTS

Our auditors are back again and working on the few remaining corrections needed to close these audits and on finishing their reports. Progress has been slow due to their lengthy absences since our tentative settlement with them last November. While the foreign tax credit issue regarding UPI's foreign net operating loss carryovers remains in dispute, we agreed to close all other issues and to take this issue to Appeals if necessary. Unfortunately, both our IRS Engineer and Head Agent will be gone again on other assignments after this week until April 3rd. I've requested that they remain on our case once they are back, at least until their reports for these settlements are final so that these years can be officially closed and our overpayment of tax and interest refunded as soon as possible.

Progress is being made. We now have the final reports for Telescripps Cable and affiliated entities. We previously reviewed and okayed their preliminary adjustments regarding the amortization of Telescripps' acquired intangibles and the Scriptel redemption, so I do not anticipate problems in our review of the final reports. We also have obtained TCI's agreement to accept and sign the settlement with the IRS. Before the Corporate IRS Report can be finished, the IRS Engineer needs to finalize the adjustments required by our acceptance of the IRS National Office's Intangible Assets Settlement Offer on our acquired intangible assets at KNXV, WXYZ, WFTS and Naples, and the related Closing Agreement, which must be signed by both sides. I'm told that he should be able to finish his work soon after he returns. Sid Saewitz indicates that he will be able to devote at least some of the time while he's gone to completing his report as it relates to the other agreed adjustments. We intend to review the final Telescripps' reports, complete an additional analysis requested by the Engineer to assist him in finalizing the WFTS film amortization adjustments, and to work with Sid as we can during this period of their absence to help expedite their completion of their reports as soon as possible upon their return. Sid currently anticipates having his report completed and to us for our review and signature in early May. Once we get the corporate report, it should not take us long to review it.

Regarding our overpayment of our expected liability under the settlement, we have confirmed from the IRS and from obtaining copies of our tax accounts for the years 1983 through 1993 that our $7,000,000 prepayment in December 1990 and our $45,000,000 prepayment in December 1994 were both recorded as Advance Payments on IRS Examination Tax Deficiencies, and not as deposits or cash bonds. While this prevents us from obtaining an expedited refund of our overpayment now and we must wait until the Corporate audit report is completed and signed, and perhaps until the IRS Joint Committee also approves it, it does assure us that when we are refunded this overpayment of tax and interest, which should be in the neighborhood of $12,000,000 to $15,000,000, we will receive interest from the IRS on it at the current rate of 6.5%, which I'm told exceeds our current borrowing rate. Furthermore, this also assures us that our $3,000,000 deduction in 1990 for that portion of the 1990 prepayment designated as interest was proper. It also assures us that we will be able to deduct on our 1994 return that portion of the $24,500,000 of the December 30, 1994 prepayment that we designated as a payment of interest that is actually assessed as interest in the IRS's final report. The $700,000 refund that we just received is a partial refund of our overpayment that apparently was sent to us now due to an IRS oversight, but we don't expect any additional refunds until the audits are officially closed.

### 1994 TAX ESTIMATE / EXPECTED OVERPAYMENT / TAX PLANNING

We are currently preparing our company by company estimates of 1994 taxable income and related tax liability for our Form 7004 filing which is due March 15th. While it is too soon to tell yet, I am anticipating that we should be overpaid by several million dollars. This is after the $4,000,000 "Quickie" refund that we requested in mid-February and which we should be receiving by wire transfer any day now. If it appears that we are overpaid by more than this, we will request another "Quickie" refund.

We decided to play it safe when we made our 4th quarter tax installment payment on December 15, 1994 and paid $13,600,000 based upon the annualization of September year-to-date estimates of taxable income. We expected a smaller actual tax liability, due to the significant deductions for the December 30th prepayment of interest on our tentative IRS settlement and for the donation of Turner Broadcasting stock worth about $10,000,000 to The Scripps Howard Foundation, and for taking advantage of the opportunity to defer the reporting of about $11,400,000 of taxable income until 1995 for Sacramento Cable's anticipated 1995 receipt of the refund of previously overassessed possessory interest property tax liabilities for the years 1988-1995, with interest . We deducted these contested taxes in 1992-1994 when they were billed and paid. Under the annualization method we could not consider these fourth quarter events; however, there was too much uncertainty on December 15th as to the

Page 1

GOVERNMENT'S
EXHIBIT
16
PENGAD 800-631-6989

SCRIPPS 00195

6/19/96
2:45

per Sid to JPH

① He's reviewed Jim's Convictions w/Ron
+ now feels as we do
— we will get all Fgn tax Credit
so its just a timing issue

② Ko: 1988 + 1990 Prepayments
Rick has been advised (+ may bring it up)
that Sid + IRS Attorney
now feel (unlike they have said for over 1yr now)
1) we S/B entitled to get our
money back now (as a cash bond)
(only problem — it is a Joint
Committee case)
2) with interest
3) but we can't deduct the
interest in the years paid
as no tax (interest) liability
to tie it to yet (ibes)
* as per the 5701's we now have
from Sid on this
(which JPH argued w/ Sid on)
(but I've not yet done w/ Sid)
since Sid helped us do the 1990 +
1994 Prepaymts as pymt of tax
not cash bonds, they S/B deductible
when paid — I need to point this out × SA1

GOVERNMENT'S EXHIBIT 21

SCRIPPS 00396

7/8/96

IRS 1983-87, '88 + fwd prepayments / Overpayment
w/ Srd               - 1988-91 IRS Audit 5701

Srd provided me with a copy of Rev Proc 84-58
which he indicated that the IRS Attorney
will cite in his written conclusion to us soon
that:

1) our 12/88 and 12/90 prepayments (of
   tax deficiency and interest)

2) are refundable upon our request
   (a total reversal of their position until
   recently that as pymts of tax and
   interest we could not get refunds
   until the Joint Committee approved our
   settlements after the other appeals were
   closed + these years are closed)

3) but they are cash bonds
   not pymts of tax + interest
   since:

   A) our 12/88 transmittal says it was a cash
      bond ?? (even though we indicated
      it as specific payments of tax + interest
      + we intended it as such as I recall)

   B) our 12/90 prepayment was mostly for
      1986 when with the NOL we had
      no tax deficiency, nor a 5701 regarding
      the cash to accrual adjustments, which
      is what we were prepaying as the
      IRS + we had resolved the expected

SCRIPPS 00389

GOVERNMENT'S
EXHIBIT
22
ENGAD 800-631-6989

amount of adjustments + we wanted to
stop the interest + get a deduction for it
+ we even had Sid take our payment
to the Fed'l Bldg + Sid filled out the
forms so that it would be a payment
of a tax deficiency + related deductible
interest + not of a cash bond, even
though Sid indicated that he had to check
the cash bond box on the form)
Per Sid today → since we had no tax
deficiency for 1986 + we also had no
5701 yet for the add'l cash to accrual
adjustments (+ in fact per Sid they will
favorable 5701 adjustments ??)
we had no tax deficiency to prepay
so our prepayments can't be for a tax
deficiency + deductible interest, but are
only bonds that were never applied
to a specific tax deficiency, in 12/94
of ever + they are still sitting unapplied
in our accounts (UNFORTUNATELY per Sid)
(as I reminded Sid when we determined
the amount of our 12/94 prepayment, we
considered the 12/88 + 12/90 prepayments as
already applied to the specific tax years
they were indicated for + then paid the
additional amount of tax + deductible interest
(altho we eved and overpaid)

**SCRIPPS 00390**

4) and we will not get interest on these cash bonds when refunded to us (although JPH just told me that Sid had told him that we will get interest on these refunds" — Sid ignored this point & referred back to the fact that we did not have a tax deficiency, when paid or even now, so our prepayments could not be payments of tax and interest, even if intended to be so, & must be cash bonds, which don't accrue interest (as I know, but since we intended them to be pymts of tax & interest & specified them as such & Sid helped us to make sure the 12/90 & 12/94 pymts were pymts of tax & interest & he knew our intent → therefore, we overpaid our tax & now it S/B refunded to us w/ interest → & not as a cash bond without interest!)

5) and per his recent 570)    **SCRIPPS 00391**
as cash bonds
we can't deduct the prepaid interest when paid, but only when applied & these prepayments are still sitting on our accounts unapplied (Sid suggests that we need to correct this unfortunate situation ASAP)

Srd also indicated that the IRS Attorney's
conclusion will state that our
~~12/94 prepayments~~, since they ~~are payments~~
~~of tax deficiency and interest~~
~~can't be refunded~~ now
not until the Joint Committee approves our
settlement (after all appeals are settled + closed
first) + our case can finally be closed

Finally, ~~Srd~~ did indicate that he now has
the Tax Court decisions on our 2 ~~Bridgeport~~
appeals
but not yet for the Fairfield appeal (& it
was apparently slowed by the many limited
parties it had to notify)

SCRIPPS 00392

+ as we know + agreed
he'd like to wait + calculate the adjustments
for all 3 partnership appeal settlements
at once
but he does have a statutory deadline to write
up the 2 Bridgeport settlements (of 3/31/97)
so he may have to write them up anyway
~~but the Fairfield settlement~~ unless he
gets it soon (as the statute can't be extended)
also — for 1 of the Bridgeport partnerships
he was given the wrong 1987 adjustment
+ he needs it (its a favorable adjustment
in our sale year for prior IRS adjustments

(ted had not yet reversed themselves on it)
Srd asked if WMT had the Tax Court
decision & if he does, Srd would like to
get a copy as he could get the correct
1987 SW adjustment quicker from us than
from the IRS
I told Srd I'd check w/ WMT:
1) on the Budgepwt decision
2) on the status of the Fairfield final
Tax Court decision
(which S/B soon if not done already)

Re: VEI of L Appeal
We hope (I Srd hopes) that we are able to
settle it soon with Rick O'Conn

IN CONCLUSION
We will review - Rev Proc 84-58
- our 12/88 & 12/90 prepayment
- transmittals
- research supporting as pymts of
tax deficiency & related
deductible interest
& not as cash bonds
- the facts re actual tax deficiencies
& prepayments by tax year

BUT

SCRIPPS 00393

We will <u>not</u> <u>agree to</u>:

① No Interest Paid to Us on Refunds

Ⓐ - especially for the past 1½ years
when we (DJC) requested our
overpayments to be refunded to us
and the IRS refused to do so stating
that they were payments of tax deficiency
and interest, and as such, we could
not get our overpayments back until all
appeals were settled + closed + the Joint
Committee approved our settlement and our
1983-87 case could be closed
+ now they say we can get them refunded
as they are cash bonds, but without interest
THIS IS NOT RIGHT NOR FAIR!

Ⓑ or for the many years that they have been
holding our money, which was specified
as payments of tax and interest, and
not as cash bond (altho the 12/88 payment
has some exposure on this point)
+ we thought applied to the tax years as we specified
Per Syd we may be able to specify (in writing)
the use of this still unallocated money,
to other years (check this) now, but he's
not sure how it works (probably not to our benefit!)

② Denial of our 1988 and 1990 interest
deductions (as they were pymts & deductible

SCRIPPS 00394

interest (at least in 12/90 if not 12/88), not cash bonds.

Srd did not expect us to be happy with these developments
+ we aren't

I will F/U w/ WMT (+ then ATC) on all of this
It keeps getting worse
1st - no deduction when paid
now - no interest on the refunds
- + still we can't get the 12/94 overpayments
back until the years can be closed

**SCRIPPS 00395**

(15- Per Srd — originally it was the opinion of
Dave _____ the Appeals/Exam Reviewer
that we could not get any of our overpayments
refunded in early 1995 when we caught our
12/31/94 overpayment err
+ its only now that the IRS Attorney, after
waiting over a year for his conclusions, is
taking the position that our 12/88 and 12/90
prepayments were not payments of tax and
interest, but were cash bonds, which can be
refunded upon our written request, but they
bear no interest + our interest paid is not
deductible. He does conclude as prepayments of tax
we can't get any of our O/P 12/94 pymts back yet!)

# SCRIPPS HOWARD

## INTER OFFICE MEMO

| TO: | D. J. Castellini, J. R. Routt, D. F. Lyons | FROM: | M. W. Carroll |
|-----|---------|-------|---------------|
| DATE: | July 9, 1996 | SUBJECT: | Mid-year update on the status of significant Federal, State and Local Tax Reporting Issues, Audits, Appeals, Settlements, and Planning Ideas |

During the first six months of 1996 our major federal, state and local tax audits and appeals have been proceeding forward. Several matters have been successfully closed while most remain ongoing. Here is where we stand today:

## FEDERAL TAX MATTERS

1983-1987 Corporate, Telescripps, Tele-Media Settlement - This very favorable overall settlement at the audit-level of all but one of the many disagreed, big-dollar tax issues, including the tax amortization of acquired intangible assets at KNXV, WXYZ, WFTS, Naples and at all Telescripps and Tele-Media cable systems, the tax deduction related to the redemption of TCI from Telescripps, and the incremental cash to accrual adjustments, remains open. Our settlement with the IRS still requires the official approval of the Congressional Joint Committee. While tentative approval has been given, all of our other appeal cases in these years must first be settled, officially closed and then consolidated into our corporate case settlement report before the Joint Committee will give its official approval and the case can be officially closed. We are getting closer, but it has been a slow process. Our case is officially out of Exam now and into Appeals. After some technical difficulties, the Telescripps portion of the overall settlement is now officially closed, as is our Sacramento settlement. The three Connecticut appeal cases are also settled now and are in the process of being closed, which leaves our appeal of the consolidated foreign tax credit limitation adjustments as the one remaining unresolved case. After telling us since early 1995 that we cannot get a current refund for any portion of about $7,000,000 in tax and about $7,000,000 in interest that we overpaid when we prepaid our expected liability in December 1994 until the case is officially closed, the IRS is now suggesting that we may be able to get some of it back now. While this sounds good, it actually is quite disturbing as they are not changing their position with regard to the December 1994 prepayment, which caused the overpayment situation, but they may reclassify our December 1988 and December 1990 prepayments of tax and interest as cash bond deposits, for which we would likely receive no interest on if they were to be refunded. Even more importantly, if we have these payments refunded to us, we would undo our primary purpose in making them, to stop the accruing of interest on the additional tax liability that we knew we owed. We will not request that these prepayments



GOVERNMENT'S
EXHIBIT
23
PENGAD 800-631-6989

SCRIPPS 00382

be refunded. I am reviewing the facts and hope to convince the IRS that their new position is wrong.

1985-1987 Sacramento Appeal - Our very favorable settlement last fall of all four appealed issues, including the Make Ready cost tax issues, wherein the IRS conceded 87.5% of both the depreciation and investment tax credit portions of this issue to us, is now officially closed and incorporated into our Corporate 1985-1987 RAR. This is so even though River City has never signed off on the settlement, at least to my knowledge.

1984-1987 Bridgeport and Fairfield, Connecticut Cable Partnerships Appeals - All three of these cases are now settled. The Bridgeport adjustments should be incorporated into our Corporate RAR soon, and hopefully the Fairfield adjustments will be available soon also. The net result of all three settlements is a refund of about $200,000.

1983-1987 Foreign Tax Credit Limitation (UPI's OFL) Appeal - After waiting nine months just to be assigned an Appeals Officer, and another two months to meet with him, we had our first meeting on June 20th. While he indicated that he will not concede the issue, I am optimistic that we will reach a favorable settlement of the issue soon. When combined with corrections to our consolidated foreign source income for years 1988-1993 which will significantly increase our yearly credit limitations, even a 50-50 settlement of the issue makes it just a timing (interest) issue. We have analyzed various settlement options, and project our pre-tax cost to settle will be between $100,000-700,000, with all foreign tax credits fully utilized. Our next Appeals meeting is July 23rd.

1988-1991 Audit - This audit has gone relatively smooth so far. We are keeping current with their IDR's and only a handful of their 80 requests are outstanding. We hope to hold them to their targeted April 1997 completion date. There are few proposed adjustments so far, including a favorable allowance of an additional $245,000 of accrued bonuses being deductible in 1991 instead of 1992, and carryforward adjustments for the Sacramento partnership settlement and a small adjustment to our 1989 gain on the sale of our Mile Hi Partnership interest. They are also proposing to defer our deductions in 1988 and 1990 for the prepaid interest that we paid then. As mentioned above, I hope to get these dropped by convincing them that these prepayments were not deposits of the nature of cash bonds, but rather payments of tax and related interest as we intended and designated when we paid them. Sid even helped us make the 1990 payment in this manner. They are also considering a one-time permanent capitalization of the supplies kept on our Cable division trucks. We also expect adjustments related to the intangible assets acquired at WMAR-TV and for several smaller 1988-1991 acquisitions, and they may revisit the Evansville intangible assets again but only as of 1988. They are reviewing the several large settlement payments made in Sacramento and also Knoxville's JOA termination payments, but  oelieve that our current deductions for each of these payments are well supported. We expect them to once again look closely at the transitional investment tax credits claimed through 1990 for the Sacramento additions, but I do not anticipate a big adjustment, if any. We expect them to focus more on specific accrued liabilities and general tax issues this cycle than they have previously. The Computer Audit Specialist

reviewed and approved our conversion of the transaction tapes into our current format and is performing audit procedures using them. A financial products agent was brought in and he agrees with how we reported our investments. He will come back, but just to review the Yen loan loss with the International Tax Auditor. The International agent has been reviewing the corrections to our 1988-1991 foreign source income calculations and is generally in agreement with them and with our foreign tax credit limitation calculations, although he may propose some minor adjustments regarding indirect foreign expense allocations. He is also awaiting the outcome of our appeal regarding whether UPI's foreign NOL carryover stays in our group or not. I expect him to follow how it is settled for these years also and hopefully our settlement will not even carryover to this period. So far they have not followed through on the supposedly IRS national office mandated Newspaper Carrier Compliance Check that they indicated would be done to make sure that we were consistently filing Form 1099's for all of our independent contractors. Since we also prepaid the anticipated 1988-1991 impact of our 1983-1987 overall IRS settlement in December 1994, and also included several necessary corrections to the returns as filed, there should be little additional tax due when this audit is completed.

1992-1995 Tax Return issues - Our December 1994 prepayment on the 1983-1987 settlement also prepaid most of the settlement's impact on these years and it considered several corrections to these returns as filed. As mentioned in my January 19, 1996 status memo there are a number of issues in these years that we expect the IRS will review closely, including our gain on the sale of The Pittsburgh Press, UFS's 1992 artwork donation deduction, the Section 1071 deferred gain from the sale of WMC, the timing of our deductions for the overassessed Sacramento possessory interest property taxes, our tax treatment of Scripps Howard Productions and HGTV "start-up" costs, deductions for donations of appreciated stock to Scripps Howard Foundation, our 1994 deduction of prepaid IRS interest (in excess of the amount owed), our foreign tax credit calculations, and more.

Independent Contractor vs. Employee Classification cases - Both our San Luis Obispo buy-sell carrier case and our Cincinnati Post stringer cases are awaiting rulings regarding their eligibility for Section 530 safe harbor protection. We will vigorously fight the San Luis Obispo adverse ruling if we are not granted relief as the IRS Ruling ignored the true facts, the buy-sell carriers' financial risk, and even more importantly the specific statutory exemptions that exclude buy-sell carriers from treatment as employees. Ours is the first adverse buy-sell case although several others are now progressing. We still have no opinion from Colorado on their review of our carriers and drivers there. The NAA Taxation Committee's Task Force on Independent Contractor Issues has been considering the best solution to the more frequent challenges now coming from the IRS. What may be the best solution to our problem is the "Direct Seller's" provision included in the Small Business Protection Act passed today by the Senate, which will now go to a Conference Committee to iron out its differences with a similar previously passed bill in the House. This provision puts specific language directly into the statutes that qualifying newspaper distributors are to be treated as independent contractors.

Tax Planning - Other than the tax provisions attached to the Small Business Protection Act, which if passed as is and signed into law, could "cure" our independent contractor problems with the IRS, and it would also extend the tax benefits from Employer Provided Educational Assistance Programs and the tax credits for research costs and new hiring costs, I do not expect any significant tax changes this year due to the upcoming Presidential elections. Any capital gains tax rate reduction will not likely be seriously reconsidered until next year, when Tax Reform will be debated once again. We still need a fix to the UMKK royalty problem in order to permanently solve our foreign tax credit limitation problems. While a favorable IRS Appeals settlement on the UPI foreign NOL carryover issue and the corrections to the 1988-1993 foreign source income calculations should solve our tax credit problems through 1994, they do not cure the basic problem of leaving too much of the profits in UMKK to be taxed at the high Japanese tax rates.

## STATE TAX MATTERS

Lake County Property Taxes - Our Fifth District Court of Appeals victory in our 1989-1992 case has been appealed as expected by the County and Gaylord Wood. A rehearing has been refused by the Court of Appeals but there is a reasonably good chance that it will be heard by the Florida Supreme Court. Recently we filed our Answer Brief and the Florida Cable Association filed an Amicus Brief on our behalf. We expect to win an affirmation if the case is heard, which would set judicial precedent on this issue in the State of Florida and possibly throughout the county on the proper valuation method that must be used when assessing cable assets for personal property tax purposes. Our 1993-1995 cases remain on-hold pending the outcome of this case.

New York City UFS/UPI 1981-1982 Combined Return Appeal - We were shocked when the Administrative Law Judge rendered an unfavorable decision in this very old case. We have now hired prominent, New York City tax attorneys to help us win or favorably settle this case. We have filed our Appeal Exception and Legal Brief. While our attorneys tell us that we should win this case, since there is no certainty of victory especially as we are trying to get a reversal decision they have recommended that we try once more to achieve a pre-trial settlement with the City, which is where we now stand. We have authorized our attorney to offer a 50-50 settlement, but no more, to resolve this case or we will go to Court. With 15 years of interest, the dollars involved are now about $2,800,000.

Sacramento Property Taxes - We decided not to pursue the biforcated Possessory Interest valuation cases, since our chances to get our annual $400,000 possessory interest tax reduced further were not strong, and to properly prepare the cases for trial would be costly. Doug Mo agreed with our decision, and he is currently trying to wrap up getting the erroneously assessed 1993 personal property tax penalty of $90,000 refunded to us. While we successfully appealed and overturned the County's 1988 revaluation of our possessory interest and received all of the $10,400,000 in overassessed taxes back with $950,000 of interest, when the system is transferred to Comcast it will be subjected to a proper revaluation of its possessory interest due to the change in ownership following the

Proposition 13 statute in California. Howver Doug Mo has commented that the increased tax should not be anywhere near what the County tried to force on us. Regardless, it is Comcast's tax problem, not ours.

Ohio Franchise Tax Appeals, Audits, Issues - Our 1990-1991 Appeal remains open. The primary issue is whether Ohio can tax, through apportionment, our 1989 gain on the sale of our Mile Hi partnership interest, which is an intangible asset. This is a controversial issue in Ohio and our aim is to achieve a fair settlement on this $1,000,000 issue, as the statute is against us but we know the state is settling these issues with other taxpayers. We have a similar issue on the 1994 return regarding the 1993 sales of WVRT, KUPL and Pharos/World Almanac. The 1992-1993 audit has proceeding slowly but the auditor appears to be allowing us to exclude 90% of all foreign source revenues under the new rules that became effective in 1992 despite our prior audit battles on this issue and despite the fact thatUFS's directly related expenses to generate these foreign revenues are close to 50% due to the royalty payments to authors/creators. If the 90% exclusion is allowed, we will continue to enjoy a huge annual tax savings as it shelters much of our Ohio combined income.

Pennsylvania Franchise tax - We have now received a check for about $54,000 from the state, which represents the interest owed to Scripps Howard, Inc. on the 1988-1989 franchise tax refunds totaling $435,000 that we won last year. This case is now closed.

Florida - Following through on our success last year in settling WPTV's sales factor to only include 50% of its national and network advertising revenues instead of 100%, we have also settled the 1988-1993 tax years also using the same 50% national and network advertising sales factor. This is saving us $190,000 in additional tax for these audit years plus the related interest on this assessment. This case should be closed in July.

Ohio Sales and Use Tax Appeals - Our Scripps Howard, Inc. case has now been closed with the State allowing Cincinnati Post the printer's exemption and dropping a $6,000 penalty from our assessment. Scripps Howard Broadcasting's case remains open, although with the recent Ohio Supreme Court decision that upheld the favorable WBNS decision that Nielsen and Arbitron rating services are exempt from the Ohio sales tax, our only open issue, our case should be successfully closed very soon.

Indiana - The auditor returned to wrap up his audit of Evansville's 1990-1992 returns. He is allowing our sizable enterprise zone tax credits, with just minor adjustments. This case should be closed soon.

Arizona - Dennis assisted Robby in successfully reducing the proposed assessment on the ᴜes tax audit of Hall Systems.

Upcoming Unitary Reporting Audits - Both California and Colorado have scheduled audits this year. While California is auditing John P. Scripps Newspapers returns for 1992-1994, we expect the auditor to look closely at trying to force us onto a unitary filing.

Dennis and I have prepared for this and we hope to be able to convince him that the State will not benefit from such an effort. This audit begins next Monday, July 15th. Colorado has been very vocal the past few years, sending us Unitary Reporting Questionnaires, and now telling us upfront that when they come here in October to do their 1988-1994 audit of Denver, their intention is to try to put us on a unitary filing there. My concern is that they have nothing to lose by assessing us on a unitary basis since Denver has not been paying Colorado income taxes since prior to 1988 due to its losses. Since Denver is our biggest newspaper as has high amounts of property, payroll and sales in comparison to our other newspapers, if it is combined with the other newspapers in a Colorado unitary return, we could owe as much as $2,000,000 a year in Colorado tax on the combined taxable income with a relatively high Colorado apportionment factor. While we have been successful in past years in avoiding unitary reporting threats in California, Arizona, Illinois and elsewhere, this remains a serious and a growing concern, especially now that the units do less of their own administrative work with the start-up of the Shared Financial Services Department here in Corporate Office. Our argument that the units handle their own day to day activities and decision-making with only limited oversight from Corporate Office is not as strong as it once was. We intentionally postponed the Colorado audit from May until October so that we can deal with the California audit first, as we have a stronger set of facts in California to defend our position that our units should file separate returns there. Hopefully a successful defense against California will help us to overcome the expected Colorado attack. We are also concerned that our exposure to unitary reporting challenges is being increased as several of our new businesses (HGTV, UFS contracts, Scripps Howard Productions, etc.) are expanding their activities into more states, creating state income tax nexus and new state filing requirements. Also the use of Scripps Howard Publishing, Inc. as a catch-all for special payrolls and investments gives us concern.

State Tax Saving Opportunities - We have analyzed the best way to handle intercompany notes receivable from non-cable subsidiaries after the Cable Division is sold. Although it is desired to no longer maintain a parent Delaware holding company, there are several more beneficial ways to deal with this intercompany debt than putting it into our new parent, Scripps Howard, Inc. and letting Ohio tax a portion of it. If we put the non-cable notes into WXYZ, since the Michigan Single Business Tax would not tax the interest income, just as Delaware does not, we could save perhaps $300,000 annually. Another possibility would be to set up a Delaware financing subsidiary (this would not be a parent holding company like we have now) or perhaps a Nevada subsidiary as Nevada has no corporate income tax. While the state income tax savings from having a Delaware passive holding company will be much less after the cable division is gone, there still is significant tax savings potential available. Several restructuring recommendations also remain available for implementation, such as combining the three New Mexico entities into just one entity, but over several years so as not to lose any NOL carryovers, while achieving the tax benefit of a lower current New Mexico Income Tax on the combined taxable incomes of these entities by being able to currently utilize the NOL's of CH and BCH to offset New Mexico State Tribune's taxable income. In the fall we will again analyze the benefits of these and other state tax savings opportunities if we were to restructure our legal entities in different configurations. Previously we analyzed merging the

SCRIPPS 00387

Entertainment Division entities together, but for now the HGTV start-up losses provide the greatest tax savings to us by keeping them as a division of Scripps Howard Broadcasting Company, where they shelter its taxable income and reduce its state taxes by a sizable amount.  If we are unable to overcome the Colorado unitary reporting threat, we will want look very closely as to if a restructuring of our entities can reduce our overall state tax liability in such a taxing environment.  We may even have to reconsider our position on state unitary reporting.  We continue to look for and to consider other ways to minimize state taxes for all entities.

cc: Stafford, Hackman, Zimmerman, Green

**SCRIPPS 00388**

1/30/98

Re: 1988-1991 IRS Audit Settlement
& Possible Snafu due to our Intended 1983-87
Claim for Interest on 'Cash Bond' monies refunded to us

I've waited since talking to Pete on Tuesday pm (1/27/98)
to hear from Will Jackson (altho he was at a 2 day
Managers mtg until today.

12:44 VM - from Will Jackson - Call him  684-2328
(I was out at lunch)
1:30 VM to Will — Returning his call. I'm back from lunch
2:07 VM - from Will- Call him at 684-2462
2:30 I called 684-2462 Bob w/ Estate tax answered
He tried to connect me to Will at 684-2328
then put me into his VM         **SCRIPPS 00399**
So I left Will another VM.
3:10 VM - from Will. Call him at 684-2462
(while on another call)
(3:25 Bob met w/ me & also w/ DEZ until 4:10 re: a)
call from FOOD NETWORK VP of finance)
4:20 I called 684-2462 & this time a lady in but I
answered. She also transferred me to 684-2328
When Will did not answer (per JPH he usually
leaves at 3:45) I left him another VM
When he called back I was in a mtg & just got
out of it 5 minutes ago. If he's still there, call
me as I'll be in awhile. Otherwise call me next week
4:45 Called to advise DJC that Will & I played phone tag
all afternoon so I have not yet discussed it w/ him (CMB int
(put him
th message

GOVERNMENT'S
EXHIBIT
33
PBCAO 800-631-6989

2/2/98

10AM    w/ DJC — Will has not called me yet this morning. We played phone tag Friday afternoon.

11:48    VM from Will. Call him at 684-2462

1:45    I returned his call + was told he was not available. I told receptionist that I was returning his call + that he could call me when he is available.

2:32    VM from Will. Call him at 684-2328

3:35    I was ready to call Will again (but if he's getting ready to go home at 3:45 this is not a good time to call him. I'll call him later + leave him a VM so its again up to him to call me on it tomorrow.

4:35    I left another VM for Will. Returning your call. Call me

1/3/98

8:25    VM from Will. He does need to talk to me. He's out of his office until about 11AM. Call him between 11:00 – 11:30 → 684-2328

11:20    I called + Will answered. We discussed the matter of whether the "rumors" were true → that we intend to file a Claim for Add'l Interest on the Cash Bond monies from 12/90 that were refunded to us in 1997 without interest? Sure, we always have + _____ 1988-1991 Settlement they agreed to treat these payments, both the 1988 and 1990 pymt, as prepayments of tax and deductible interest and not to treat them as cash bond payments, we SB entitled to interest on the refund of these payments.

SCRIPPS 00400

WILL- This issue of Interest on the Cash bonds was never brought up in the mtg

MWC- No, it was not specifically addressed it was not a 1988-91 audit issue + we were negotiating a settlement of all of the 1988-91 Audit issues

WILL- He agrees we were + did

MWC- We feel that at that meeting (on 1/22/98) we settled all 1988-1991 Audit issues with the IRS, in good faith + that both sides should now abide by our agmt.

The matter of our 1983-87 Claim for Interest on the "Cash Bond" monies returned to us is not a new issue nor is it a 1988-1991 Audit issue

The IRS was aware that we were planning to file a Claim for this Interest

We have always said that the 12/90 pymts were intended to be and were supposed to be prepayment of tax and deductible Interest and not cash bonds + we argued this ever since did raised the issue several years ago

While we considered the benefit of our getting this interest in settling the 1988-91 issues with you, it is not a 1988-91 issue + our 1988-91 Settlement s/b abided to by both sides

SCRIPPS 00401

Will agrees that both sides reached an
agreement on all 1988-1991 issues
+ they will follow it + close the case

but they only dropped the (5701 #2) issue
" to get the case closed "
"They never retracted their position
that these are cash bond payments"

\* \* [They will abide by the agreement
+ close the 1988-91 case as we agreed.

If we want to file a claim for interest
\* \* on these Cash Bond monies refunded to us
Go ahead and file the Claim
When they receive it
They will Disallow it
as it is still their position that
they were cash bond payments
+ we are not entitled to interest on them

+ They will have to take my Claim
to Appeal
\* \* This is what we've been planning to do all along
If they deny it, we will take it to Appeal
but I'd hope that they'd agree to it
___ since will offered (+ Clarified
with ___ what ___ and then
we accepted to treat their payment

not as cash bond payment
but as prepayment of tax and interest
in settling this issue & all of the other
1988-1991 audit issues
so the 1990 payment should also be
treated in the same manner regarding
our be entitled to interest on the portion
of our 1983-87 refund that was a return
of monies that we were deemed by the IRS
to be cash bond pymts + refunded but
with no interest

Well disagreed + again said
Go ahead + file the Claim
the will deny it

SCRIPPS 00403

I again said that's what we will do
+ I hope that they approve the claim
but if not, we will take it to Appeals

I also then decided to at least (suggest) to
him that (we would listen) to him if he would
prefer to _____ on the benefit of this
interest by _____ the settlement in return
for us agreeing not to file the Claim for Interest
so
I said that after Pete had called me
last Tuesday + suggested that if we

intended to file this Claim that we no
longer had a deal settling all the 1988-91
issue

I made DJC aware of this situation
+ DJC agreed

We struck a deal with the IRS
settling all 1988-199) issues
+ both sides should abide by it
but he suggested
to me that
since we based our acceptance
of Will's offer
looking at our NET COST to
settle all of the issues as he offered
+ considered the benefits of this
interest in determining our NET COST
if Will would prefer to redo some
of our agreement if we would agree
not to file the Claim for the interest
we would be willing to listen to any
such proposal from Will
that would make us whole for the
benefit of the interest we'd give up
by not filing the Claim

SCRIPPS 00404

⊛⊛   WILL→ Said (NO WAY) - The (1988-91) Agreement
will not be reversed now

⊛⊛⊛   The IRS will close 1988-91 as we agreed

☆☆ + if we want to file the Claim — go ahead
+ they will disallow it when they get it

⊤☆☆ OK that's what we will do (as we had intended
to do before Pete raised this matter last Tuesday)
(I expected this response from Will)
(but I'll at least let him know that we
are willing to drop the Claim if he
would make us whole for dropping it)

— This ended our conversation
so unless Will calls me back to
(discuss how to make us whole
if we'd agree not to file the Claim)

— The 1988-9) Settlement as agreed on 1/22/98
will remain in place
+ they will close the case following it

— If we file a Claim for Interest on the
12 do pymts refunded to us as "cash bond"
money not entitled to Interest
Will intends to deny it
+ we can take it to Appeals
(as I told him we will if he
does not allow it)

**SCRIPPS 00405**

11:40  I then provided RBS w/ these conclusions
        (JPH was at his Doctor's appt'?)
        (so I'll fill him in later)

11:45  I met w/ DJC + filled him in   ① Will will abide by our '88-91 Agmt
        ② if we file the claim, he will deny it
        DJC believes that Will's actions since we
        agreed to settle all the (1988-1991) issues
        on 1/22/98
        have probably tied his hands to
        abide by our Agreement.

        DJC asked if I mentioned to Will that
        we were willing + listen if he preferred
        to make us whole on our net benefit from
        the interest by revising the 1988-1991
        settlement if we agreed not to file the Claim

        I did, after we did discussed the IRS's
        Concern over our intent to file the Claim
        for Interest on the 1990 prepayment
        monies that were refunded to us in
        1991 as cash bond monies without

        **SCRIPPS 00406**

        he had

        ① Agreed to abide by our 1988-1991 Agreement
        on 1/22/98 + settle all 1988-1991 Audit
        issues as we did
        ② Told me to go ahead + file the Claim, but

when he gets it he will deny it + will have
to take to Appeals, as it is still their
portion that these payments in 1988 and
1990 are cash bond payments + they only
agreed to drop the 1988-1991 audit issue
of when they are deductible
to get the 1988-1991 case agreed + closed
they were not agreeing that these payments
were prepayment of Tax + interest for any other
purpose, as their position is still that
these were cash bond payments.

I feel with the IRS's agreement (on 1/22/98) with us
- to treat the prepayment for the 1988-91 audit
settlement (even if not for any other purpose???)
as "if" prepayments of tax and deductible interest
and NOT as cash bond payments
- + by allowing these prepaid interest portion
of these prepayments to be deductible
in the year paid (as if prepaid interest
and not as cash bonds in which case
the interest is not deductible until the
tax year is closed)
(we S/B strong) in the issue if we must take
our Claim for Interest to Appeal
plus for the 12/90 prepayment, the IRS knows that
our intent and effort, with S/f to help us to do
it right, were for these to be prepayments of

SCRIPPS 00407

tax and deductible interest, and not cash bond
(+ it is only the prepayment, not the 12/88 prepayment,
that is now at issue regarding the Claim)
(although we still must overcome the hurdle of)
(proving that the IRS posted it incorrectly.

(#) Since this issue was put onto a 5701 (#2)
they must explain why they are dropping it
in their final report
although DJC + I both expect them
to (NOW) be very careful in what they
put into their report
knowing that we intend to file the Claim
so they probably won't say much
+ what they do put out will suggest
that they did not agree that these prepayments
were prepayments of tax and deductible interest
instead of cash bond payments
but they still consider them to be cash bond
payments, and only agreed to drop the issue
+ to allow us to deduct the prepaid interest
in 1988 (vs 1991) and in 1990 (vs 1997)
to get the 1988-91 case agreed and closed.

SCRIPPS 00408

(#) But I feel this is a weak position
How can they allow our interest deduction
as if prepaid interest, yet deny us interest
on the refund of these prepayments?

However, since Will (at least presently)
is not considering
to revise the 1988-91 settlement (to make us whole
in exchange for us agreeing not to file
the Claim

we are left
with

Filing the Claim for the Interest

and nothing

If the IRS did pay us too much Interest
with the 9/97 refund
this overpayment of interest being
detected and corrected
to our detriment

As I am intending to do, and as we have
discussed over the past year, DJC said:

#0   Before we file our Claim for this Interest
we need to review/analyze the refund details
↓ 1st determine if we got too much interest
with it
+ 1 year from its receipt (9/97) to file
our claim
so we have plenty of time to carefully
review it ↓ we will
We have not yet reviewed it
as JPH + I were giving top priority

SCRIPPS 00409

to closing the 1988-91 Audit, completing IDR',
& settling the issues, esp the SCT issues,
& as we have successfully now done

So, now I intend to soon have this
refund analyzed very carefully
(before we file our Claim)

1st - by JPH (using new Interest Calc. software
we just got)

2nd - by MWC
3rd - by D&T, IRS Interest Group

AND - If we are entitled to all interest we
received, we should go ahead & file
the Claim

BUT - If we believe that we received too much
interest, we will have to weigh
the benefit vs the risk
of filing the Claim

SCRIPPS 00416

2pm   later w/JPH   - The 1988-91 Settlement will Stand AS IS
                    - will intends to disallow our Claim if filed
                      saying it is still their position that they were
                      cash bond pmts (but if we file, we SB strong
                      with how they agreed to settle the issue for 1988-

So JPH's IRS priorities are:

(1) Close 1997 FAMS (today) with Rob with needed IRS Settlement changes

(2) Work with Sid Pete + Wayde to finalize the Agreed #'s ASAP

(3) Then closely analyze the 9/97 Refund + Interest Calculations (using the Denver Interest Software) to evaluate if we received the correct amount of refund and interest on the refund (except re the return of the deemed cash bond monies $3.5M in 1986 + $491,475 in 1985) (Then I'll review it + then will have I + T analyze it) (After all of this review, we will decide w/DTC if to file the Claim or forget it)

(PS - He will also need to do the 700.4 calculations for its 3/15/98 filing)

**SCRIPPS 00411**

MICHAEL W. CARROLL
CORPORATE TAX DIRECTOR

## SCRIPPS

On JANUARY 22ND

- Last Thursday we settled all 1988-1991 Audit Issues with you, bargaining in good faith. Both sides should abide by our agreement.

Regarding our 1983-87 Interest Claim for Refund
- This is not a new issue, nor is it a 1988-91 audit issue. It is an outstanding matter from the previous 1983-87 cases, + the IRS was aware that we were planning to file a claim for interest on the "cash bond" monies that were refunded to us without any interest in Sept.

After Pete called me about this on Tuesday I made DJC aware of this "problem." He also feels "A Deal Is A Deal" but he said since we based our acceptance of your settlement offer on our TOTAL NET COST of all the issues, including the benefit of getting the interest, we are willing to listen if you would

prefer to restructure our deal so that we come out with the same overall net cost but don't file the claim for the interest



GOVERNMENT'S
EXHIBIT

34

SCRIPPS 00412

any interest in Sept.

After Pete called me about this on Tuesday
I made DJC aware of this "problem." He
also feels "A Deal Is A Deal" but he said
since we based our acceptance of your settlement
offer on our TOTAL NET COST of all the issues,
including the benefit of getting the interest,
we are willing to listen if you would

prefer to restructure our deal
so that we come out with the same
overall net cost but don't file the
claim for the interest

In that regard I've analyzed various
issues & how they could be used to
accomplish this.
- Give it some thought & calling next week.

**SCRIPPS 00413**

IRS Issues — Agreed 1988-91 Settlement
        Add'l Interest on 1983-87 Refund

Points to discuss w/ Will to get Settled (AGAIN!)

We committed to a settlement of all 1988-1991 Audit
    Issues + both sides should abide by it
The matter of whether we are entitled to interest
    on the 12/86 payments that were refunded to us
    was a known open issue, which we have argued w/
IRS + with Syd about ever since he raised it,
    but it is not a part of the 1988-91 Exam or its
    settlement, just related to it in that how we
    settled the treatment of this payment, as a cash
    bond or a payment of tax and deductible interest,
    also determines it. It is not a new issue.
Will offered to concede the issue in our overall
    1988-91 Settlement + I had him clarify what he
    meant and then I repeated to him what I heard
    him to say, that both the 1988 and the 1990
    payments would be treated as prepayments of
    tax deficiency + deductible interest, and they
    would not be treated as cash bond payments
    • • agreed that this would be their treatment.
    you can't say this applies to the interest deductions
    but does not also apply to their treatment for purposes
    of getting interest on those amounts that were refunded
    Whether or not Will considered this in making his
    offer, he should live by his agreement

SCRIPPS 00414

We considered the impact of setting this additional 1983-87 interest when we decided that we were able to settle the way he suggested. We feel that we gave up more than we should have on the 2 Sacramento issues + on some of the other issues, but overall the $'s settled to an amount that DJC could live with, and we also wanted to get these old tax years behind us as does the IRS I'm sure also. After Pete brought up this matter earlier this week depshew DJC. + while we feel that the deal 5/B followed + that we are also now clearly entitled to the add'l interest on these monies - more we based my settlement looking at the total $'s, we are willing to listen if he would prefer to substitute concessions on the other issues in return for our agreement not to file a claim for this add'l interest so that we still end up settling at the same overall net cost to us

**SCRIPPS 00415**

net cost of various issues → AS ASSESED to if CHANGED

Additional interest on 1983-87 Refund
— on $354 ('86) + $491,475 ('85) → $(2,440,000) Gross
~(1,600,000) NET

So will begin up $2,440,000 of interest, in $1.6M NET

Several ways to make us whole in NET $.

GROSS COST    NET COST

1988-1991   Settled Issues

SCT - Settlement Pymts
- We Agreed to (100%) of 20M over 8 yrs   Act = 4.2 M   (2.8 M)
- if 50% = 10M over 8 yrs            2.1   ~ 1.4   (↓1.4)
  if 75% = 15 M over 8              3.2   ~ 2.1   (↓0.7)

SCT - ITC
- We agreed to pick up 1,150,000 in '89-90   TAX 1.15 M   1.15
                                             INT 1.2     0.8
  less depr on 1,150,000                     TAX (0.4)   (0.4)
                                             INT (2.0)   (a.14)
                                                         (1.4 M)
-   if Δ to 600,000 in '90                   ~ 0.7 M (↓0.7)
    if Δ to 800,000 in '90                   ~ 0.9 M (↓0.?)

UFS - Imputed Interest on UMKK loans
- We Agreed to   125,995 in 1988
                 481,643    1989
                  82,622    1990
                 690,260              TAX 0.230   0.230
                                     INT 0.220   0.150
                                                 (0.380)
-   if dropped                                   D (↓0.3.

Space Parts Inventory
- We agreed to   462,826 → 1988 fwd   TAX 0.150   0.150
                                      INT 0.150   0.100
SCRIPPS 00416                                     (0.250) (↓0.2
-   if dropped

GROSS    NET
COST     COST

WMAR legal fees
- We agreed to $374,936 in 1991
        to Goodwill    TAX  0.125        0.125
                        INT  0.100        0.065
                                        0.190 M
                                     to  0.19

- if dropped

| I way to compensate us |
① SCT - #2   we'd concede 25% of 15 M.org 8
    (& IRS still wins 75% of this issue)
② SCT - ITC  - we'd lose $800,000 in 1990
    (IRS still gets 30% on SCT +
    avoids giving us ITC on other systems)

OUR
NET
COST
REDUCTION
↓ 0.7 M

↓ 0.5

③  either
    drop Cable Spare Part issue    0.250
    and WMAR Legal fee issue       0.190
                                   0.440  }  ~ 0.4
    ⑰ drop UFS Imputed Interest issue 0.380

                                   ~ 1.6 M

**SCRIPPS 00417**

4/13/99
am

IRS Appeal — "Cash Bond" Interest Claim
w/ JPH

The 1986 + 1985 RAR's don't add up (as he+ Rick hoped)
to my 12/90 TI increase estimate
of $16M w/ add'l tax of $7.4M

These RAR's (dated in 1996 — more than 5 years later)
when accrual related adjustments are all combined
add up to about add'l taxable income of $6
with most of it for 1986, so add'l 1986 tax on
$5-6M would have been ~ $2.5-3.0M on this

The amounts vary due to many discussions +
refinements of the adjustments on the various
separate accrual items the IRS proposed
over the ensuing 5+ years.

But we had an agreed 1986 TI adjustment
which we could reasonably calculate in 1990
+ we did
we expected to owe add'l tax plus related
interest + we paid it
I did not designate the remittance to be a cash
bond; in fact we stated on the transmittal
+ to said that it was a pymt of tax + interest
+ that it was not a cash bond deposit
(despite how Ind completed the deposit slip)
Per even the IRS cited cases, this prepayment s/s

SCRIPPS 00249

GOVERNMENT'S
EXHIBIT
46

treated as a payment of tax + interest
which is entitled to interest when refunded

(**) I like Rich's point re: our filing of a
Form 1139 to C/B the
1986 NOL when originally filed to earlier
tax years

as Rich indicated
this C/B, done prior to this audit or
prepayment
put our 1986 account at TI of $0
so the 1986 RAR
gave our 1986 tax year
a tax liability
as 1986 TI was increased
by this issue by 5-6M
+ by ALL issues by 33M
(as opposed to the IRS's chief
argument that we never had a 1986
tax liability + we should have
known that we would never have one)
subsequently this 1986 tax liability
was also carried back to prior tax year s
with the 1986 tax year liability ultimately
being $0 after this C/B
BUT we did have a 1986 tax liability
these RAR adjustments increased
1986 taxable income

SCRIPPS 00250

As JPH points out the 1986 RAR end up with add'l TI on this accrual issue of about $5-6M, which resulted in a tax liability of $2.5-3.0, which is close to what we decided to prepay in 12/90.

At least in theory (+ RICK seems to agree with us) + with the support of the cases cited by the IRS we should be entitled to treat our 12/90 remittance as a pymt of tax + interest + not as a cash bond + therefore we SB entitled to interest on the $3.5M returned to us

While reconciling our # to the RAR # is problematic many revisions/agreements of the various facets of this accrual method change occurred from 12/90 to the RAR in 1996. + it S/N matter if the #'s can be reconciled It is only relevant that we had a tax liability + we paid a portion of it + we did not designate it to be a cash bond

**SCRIPPS 00251**

THE E. W. SCRIPPS COMPANY
P.O. BOX 5380
CINCINNATI, OHIO 45201
312 WALNUT STREET, SUITE 2800
CINCINNATI, OHIO 45202

CORPORATE TAX DIRECTOR

FAX (513) 977-3090
E-MAIL carroll@scripps.com

 SCRIPPS

**RECEIVED**

August 6, 1999

AUG 11 1999

APPEALS OFFICE
CINCINNATI, OHIO
INTERNAL REVENUE SERVICE

Mr. Richard A. O'Connor
Appeals Officer
IRS Appeals Office  .
312 Elm Street
Room 2330
Cincinnati, OH  45202

RE:    The E. W. Scripps Company

Dear Rick:    ‾

This letter, which supplements my letter dated March 31, 1999, includes Jerome P. Hackman's affidavit and my affidavit. The affidavits evidence that The E. W. Scripps Company's intent was to make a payment of a tax liability and interest thereon (not a cash bond) on December 31, 1990. The affidavits support my letter dated December 31, 1990 which explicitly stated the Company's intent to pay the "1986 adjustments anticipated as a result of our previous settlement with the Internal Revenue Service, which changed our publishing affiliates' method of reporting from the cash method to the accrual method as of 1980". The check hand delivered with the letter (as stated in the letter) was intended to pay (among other things) $2,000,000 increased tax liability (plus $1,500,000 interest) for the Company's 1986 taxable year.

It is clear under the authorities set forth in my letter dated March 31, 1999 and herein that the December 31, 1990 remittance was a payment of tax (plus interest) and that the

PARENT OF THE SCRIPPS HOWARD MEDIA COMPANIES

GOVERNMENT'S
EXHIBIT
47

PENGAD 800-631-6989

250

Mr. Richard A. O Connor
August 6, 1999
Page 2

Company is entitled to interest in excess of $2,245,212 on the amount it paid to the Internal Revenue Service on December 31, 1990 with respect to 1986.

My letter dated December 30, 1990 specifically designated the $3,500,000 remittance as a payment for 1986 of $2,000,000 tax adjustment plus $1,500,000 interest thereon, not a cash bond. In Ameel v. Comm., 426 F.2d 1270 (6th Cir. 1970), the Sixth Circuit, the Court which has jurisdiction over the Company, held that a remittance made "in response to a proposed deficiency asserted by the Government. . . and made by Appellant [taxpayer] intended to satisfy a proposed deficiency and discharge any further tax liability. . . " was a payment of tax. Like the remittance in Ameel, the Company's remittance was made to carry out its agreement with the Internal Revenue Service on Form 870-AD to switch its publishing affiliates from the cash to the accrual method of accounting and, when paid, was paid with the intent to discharge the Company's tax liability. The Sixth Circuit's decision in Ameel is unequivocal support for the claim for refund (as more fully described in my letter dated March 31, 1999).

It is clear from Ewing v. U.S., 914 F2d 499 (4th Cir. 1990) and Moran v. U.S., 63 F.3d 663 (7th Cir. 1995) that formal assessment of tax is unnecessary. What is important is the taxpayer's intent to discharge its tax liability. The Company remitted the tax (plus interest) with the intent of discharging its tax liability. My letter dated December 31, 1990 explicitly states that intent. Further, Jerry Hackman's affidavit and my affidavit both evidence the Company's intent. The Company intended to pay the tax and, as reflected in Jerry Hackman's affidavit and my affidavit, directly communicated that intent to Internal Revenue Service Agent Sidney S. Saewitz. Agent Saewitz's checking a box on an Internal Revenue Service form which the taxpayer had

Mr. Richard A. O'Connor
August 6, 1999
Page 3

never seen before can only be viewed as inadvertent error. It was inconsistent with the taxpayer's intent.

In addition to Jerry Hackman's affidavit (which includes our calculation of the tax due for 1986) and my affidavit, I am enclosing a copy of my earlier letter dated March 31, 1999. I believe our affidavits and the authorities cited in my letter support the Company's position. I would be pleased to discuss this issue with you further if any questions remain as to your allowance of the Company's claim in full.

Very truly yours,

Michael W. Carroll

Michael W. Carroll

cc: Castellini, Hackman, Toomajian

## AFFIDAVIT

I, Michael W. Carroll, am the Corporate Tax Director of The E. W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 11, 1979.

With the approval of the Company's Senior Vice President/Finance and Administration, Daniel J. Castellini, I authorized the Company's $7,000,000 remittance made on December 31, 1990 of the Company's additional 1985 and 1986 consolidated federal income taxes, and the related interest, that the Company believed it owed as the result of the Company's agreement with the Internal Revenue Service ("IRS") on the Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash method to the accrual method as of the tax year 1990. My transmittal letter, dated December 31, 1990 to IRS Agent Sidney S. Saewitz, the IRS Audit Team Coordinator of the ongoing audit of the Company's 1985-1987 consolidated income tax returns, clearly indicated to the IRS that the Company's intent was to pay $2,000,000 in additional 1985 tax, $2,000,000 in additional 1986 tax, $1,500,000 in interest on the additional 1985 tax, and $1,500,000 in interest on the additional 1986 tax.

The June 16, 1988 Form 870-AD agreement bound the Company to change its publishing affiliates' method of accounting from the cash method to the accrual method for tax reporting purposes. In conjunction with that agreement and the closing of the Company's tax years through 1984, the additional tax and interest owed through the Company's 1984 tax year was assessed and paid. Although the IRS audit of the Company's returns for the years 1985, 1986 and 1987 began in early 1990, the additional

tax and interest owed for 1985 and 1986 as a result of the Form 870-AD agreement had not yet been calculated. The Company anticipated a significant additional tax liability for 1985 and 1986 due to this agreement, and wanted to pay what it owed as soon as possible. I asked Agent Saewitz to calculate the amount of additional 1985 and 1986 tax due as a result of this agreed method change so that the Company could pay the additional tax plus interest thereon before the end of 1990. He told me that he would not be able to complete this complex calculation by then. I then told him that the Company wanted to pay most of what it would owe in 1990, in order to both stop the accruing of interest on this known and agreed tax adjustment and also to deduct the payment of the interest on its 1990 return. We undertook the task of determining the additional tax and interest that the Company would owe and to pay it by year-end. Agent Saewitz offered to help submit the payment to the IRS.

The adjustments as a result of the July 16, 1988 Agreement through the Company's 1984 tax year had already been determined, assessed and paid and the Company had already filed its 1987 return using the accrual method of accounting. I instructed Jerome P. Hackman of my staff to calculate the additional tax the Company owed for 1985 and 1986 so that the Company could pay the additional tax and the related interest that it owed. We also researched how to make this payment of tax deficiency and related interest so that it would be treated by the IRS as a payment of tax and interest, and not as a cash bond, so that the Company could properly deduct the interest paid on its 1990 tax return. My transmittal letter that accompanied the Company's payment clearly identified it as a payment of additional tax and the related interest for the tax years 1985

and 1986. It did not request that this payment be treated as a deposit in the nature of a cash bond.

Because I was vacation on December 31, 1990, I asked Mr. Hackman to deliver the Company's $7,000,000 payment, along with my transmittal letter, to the IRS Collections Department. When I returned from vacation early in 1991, Mr. Hackman advised me of his concern that Agent Saewitz, who had accompanied Mr. Hackman to IRS Collections, may have processed the Company's payment incorrectly, despite knowing that the intent was for this payment to be an payment of additional tax and related interest and not a cash bond. He told me that he raised this concern with Agent Saewitz at the time the payment was processed, and that Agent Saewitz had assured him that the payment would be posted and treated by the IRS as the Company intended, as an payment of tax and interest, just as I had designated it to be treated in my transmittal letter. He also assured him that the prepaid interest would be allowed as a 1990 tax deduction.

This December 31, 1990 payment was, in fact, posted to the Company's account as an Advance Payment of Exam Deficiency. We were able to confirm this on Account Transcripts which we later obtained for both tax years. We were therefore confident that the Company's payment had been properly treated by the IRS as intended, as an advance payment of additional 1985 and 1986 taxes owed and the related interest, which was deductible in 1990 the year in which it was paid.

In early 1995, Agent Saewitz informed me that our December 31, 1990 payments were treated as payments of tax and interest, and not as cash bonds. He assured me that the Company would receive interest on any of the monies that were refunded. We were

satisfied with his conclusion. We later learned that he then asked to have an IRS attorney research the issue further and confirm his conclusion.

On October 5, 1995 an Information Document Request was issued asking the Company to provide support for it's 1990 deduction of the interest paid on December 31, 1990. Sometime after this and prior to the April 9, 1996 issuance of the proposed adjustment to disallow the Company's 1990 deduction of this interest, Agent Saewitz made it known to me that he had reversed his position on the December 31, 1990 payment of tax and interest and that it was now his opinion that it should be treated as a cash bond instead. He told me that the Company was not entitled to deduct the interest portion of it in 1990. He also told me that any amounts refunded to the Company would not be entitled to interest. I strongly objected to his recharacterization of the December 31, 1990 payment of tax and interest as a cash bond, especially as Agent Saewitz clearly knew that the Company's intent was for this payment to be an payment of tax and interest, and not to be a cash bond deposit. I reminded him that if the payment had been processed improperly that it was due to his handling of the payment voucher, which Mr. Hackman objected to when he prepared it, and that Agent Saewitz had assured him that the payment would be treated by the IRS as the Company had intended, as a payment of additional 1985 and 1986 tax and deductible interest.

On September 11, 1997 after the Company and the IRS had settled its tax years 1985, 1986 and 1987, the Company received a refund of the $3,500,000 for the 1986 tax year without interest. Subsequently, on January 22, 1998 the Company and the IRS reached an exam settlement of all proposed IRS adjustments for tax years 1988-1991. In

this agreement, the IRS allowed the Company's 1990 deduction of the interest that it had paid on December 31, 1990.

On September 28, 1998 the Company filed its claim, requesting the interest to which it is entitled on the $3,500,000 that was refunded to it, as this money was clearly intended to be a payment of tax and interest, just as the IRS posted it and treated it for years.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

Michael W. Carroll

Michael W. Carroll

## AFFIDAVIT

I, Jerome P. Hackman, am Tax Manager-Federal Audits of The E.W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 16,1984.

On December 31, 1990, I hand delivered to the Internal Revenue Service Exam Division at its office on 550 Main Street, Cincinnati, Ohio, the Company's check dated December 31, 1990 in the amount of $7,000,000 to the Internal Revenue Service ("IRS"). The $7,000,000 check was attached to a letter dated December 31, 1990 from Michael W. Carroll, the Corporate Tax Director of the Company, to Internal Revenue Agent Sidney S. Saewitz, which letter specifically designated $3,500,000 of the $7,000,000 as payment of $2,000,000 of tax (plus $1,500,000 interest thereon) for 1986.

The $7,000,000 remittance was intended to pay additional tax (plus interest thereon) that the Company calculated it owed for its 1985 and 1986 taxable years as a result of the Company's agreement with the IRS on Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash to accrual method.

In December 1990 Michael W. Carroll made the decision to make the payment to the IRS to satisfy the additional tax (plus interest thereon) for 1985 and 1986 resulting from the June 16, 1988 agreement with the Internal Revenue Service to change the Company's publishing affiliates' method of accounting from the cash to accrual method. The payment was intended not only to stop future interest accumulation on the additional 1985 and 1986 tax, but also to be deductible in 1990, to the extent of the portion designated as interest.

I calculated the additional 1985 and 1986 "cash to accrual switch" tax (plus the interest thereon). To calculate the additional tax I prepared a schedule of "Cash to Accrual Adjustments" on a cumulative basis comparing the December 31, 1986 Cash to Accrual Balance Sheets. A net cumulative Section 481(a) adjustment was computed by subtracting the Section 481(a) liabilities from Section 481(a) assets. Attached as an example is a copy of Denver Publishing's "Cash to Accrual Adjustments" schedule. The cash to accrual adjustments for tax years 1981 through 1984 had been computed by the Internal Revenue Service and agreed to by the Company prior to December 31, 1990. Therefore, I calculated the amount of tax and interest liability as of December 31, 1990. The amount of $16,140,533 represented the total Section 481(a) adjustments for the two-year period of 1985 and 1986 for the newspaper affiliates. As the schedule labeled, "Cash to Accrual Adjustment For All Scripps Howard Newspapers & United Feature Syndicate From 1/1/82 to 1/1/87 By Year and Cumulative To 1/1/82" indicates, I multiplied the total 1985 and 1986 Section 481(a) adjustment by the 46% corporate tax rate to calculate an additional tax liability of $7,424,645 for 1985 and 1986. I allocated the additional tax liability equally between the two tax years. I then calculated interest that would be due on this tax liability and included tax liabilities resulting from years 1982 through 1984 less an earlier Company remittance of $5,500,000. Total tax of $6,475,637 remained and I calculated interest on this amount to be $3,306,363. The total tax and interest liability was $9,782,000. Since the Company did not want to overpay on its liability, and as my calculation of it relied on many complex calculations done by various people in the Tax Department and the IRS, the Company

258

decided to round the tax and interest numbers down to a total of $7,000,000 split equally between years 1985 and 1986.

Mr. Carroll was on vacation, so I was assigned the task of hand delivering the $7,000,000 payment of tax and interest along with his transmittal letter. On December 31, 1990 Agent Saewitz and I walked to the IRS office. When we arrived there, Agent Saewitz stamped Mr. Carroll's transmittal letter and the $7,000,000 check as received on December 31, 1990. At this point, while I waited, Agent Saewitz located a Form 3244- A "Payment Posting Voucher Examination" and had a secretary type various information on the Form 3244-A. Agent Saewitz explained to me that the IRS uses Form 3244-A internally to post payments to taxpayer accounts and Agent Saewitz then provided me with a copy of the document. Upon examination of Form 3244-A, I noticed that the "Cash Bond Box" had been erroneously checked. Immediately, I objected to the characterization of the payment as a cash bond. I explained to Agent Saewitz that the $7,000,000 represented an advance payment of additional tax and related interest. Agent Saewitz responded that it would eventually be posted as the taxpayer designated it in the transmittal letter, but that for purposes of processing by the IRS collections department he was required to check either the "cash bond" box or the "Section 316 (C)" box. Since Agent Saewitz believed that Section 316 definitely did not apply, he said that he checked the "cash bond" box by default. He explained that the remittance would be posted as a payment of tax on the Company's transcript and that the interest would be deductible in 1990 by doing it this way. Again, I vigorously protested the checking of the "cash bond" box, but Agent Saewitz replied again that it had to be checked or "Collections" would not be able to process and accept the payment. Agent Saewitz acknowledged that he could understand my uneasiness and said that since he was the IRS Audit Team Coordinator for the Company that he would allow the interest expense as a deduction upon audit of the 1990 tax year. Agent Saewitz then suggested that he could have his secretary type the words

| TAX ADJ | 2,000,000 |
|---------|-----------|
| INTEREST | 1,500,000 |
| | 3,500,000 |

for each year on the Form 3244-A. Agent Saewitz said that by doing this the Company's intent to make a payment of tax and interest would be clearly evident. At this point having been told by Agent Saewitz that I had no other options, I delivered the payment as Agent Saewitz had arranged it.

On October 5, 1995 I received Information Document Request Number 12 regarding the 1988 through 1991 IRS Audit of the Company. This IDR requested workpapers on how the 1990 payment was handled on the Company's tax return. On April 9, 1996 I received "Form 5701 Number 2 Notice of Proposed Adjustment" regarding disallowance of the Company's 1990 interest deduction resulting from the December 31, 1990 payment. Sometime between October 5, 1995 and April 9, 1996 I realized that Agent Saewitz no longer considered the Company's December 31, 1990 payment to be a payment of tax and interest, but now considered the payment to be a deposit in the nature of a cash bond.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

259

Jerome P. Hackman

JPH 12/21/90

TIPPS HOWARD NEWSPAPERS & UNITED FEATURE SYN... TE
FROM 01/01/82 TO 01/01/87 BY YEAR
AND CUMULATIVE TO 01/01/82

| COMPANY | TOTAL 481 ADJ.TOTAL 481 ADJ.&TOTAL 481 ADJ.& ESTIMATE OF TOTAL 446 ADJ.TOTAL 446 ADJ. TOTAL 446 ADJ. TOTAL 446 ADJ. TOTAL 446 ADJ. BY YEAR | BY YEAR | BY YEAR | BY YEAR | BY YEAR | |
|---|---|---|---|---|---|---|
| | THRU 1981 | 1982 | 1983 | 1984 | 1985 & 1986 | TOTAL |
| MINGHAM POST | (125,783.50) | 275,921.00 | (238,096.00) | 112,503.00 | (6,026.50) | 20,518.00 |
| CINNATI POST | (758,687.00) | 1,189,512.00 | (6,627,887.00) | 593,556.00 | 5,990,881.00 | 387,375.00 |
| UMBOS CITIZEN JOURNAL | 1,057,510.00 | 480,197.00 | 2,065,323.00 | 1,209,921.00 | (4,793,051.00) | 0.00 |
| RIER | 135,061.50 | 25,306.00 | 25,306.00 | 0.00 | (128,920.50) | 56,743.00 |
| VER PUBLISHING | 4,387,708.50 | 3,406,592.00 | 2,788,752.00 | 2,609,653.00 | 1,138,288.50 | 13,730,994.00 |
| ALD POST | 305,734.50 | 74,599.00 | 46,815.00 | 20,398.00 | (39,602.50) | 407,944.00 |
| PRIS PUBLISHING | 1,826,116.00 | 816,909.00 | 1,716,600.00 | 253,185.00 | 3,545,537.00 | 7,558,347.00 |
| EVILLE NEWS SENTINEL | 493,831.50 | 61,204.00 | 375,082.00 | (267,105.00) | 1,825,953.50 | 2,449,046.00 |
| MEXICO STATE TRIBUNE | 531,362.00 | 31,259.00 | (8,091.00) | (26,652.00) | (483,347.00) | 44,531.00 |
| TSBOROH PRESS | 2,204,559.00 | (222,201.00) | (165,660.00) | 587,200.00 | 8,861,679.00 | 11,265,585.00 |
| ART NEWS | 267,462.50 | (26,995.00) | (166,065.00) | 418,148.00 | (155,317.50) | 631,273.00 |
| TATTLER | 782,146.00 | 763,052.00 | 86,441.00 | 30,419.00 | (258,168.00) | 803,890.00 |
| IED | 50,817.50 | (118,786.00) | 123,600.00 | 12,531.00 | (26,868.00) | 50,018.50 |
| SCRIPPS-HOME OFFICE | 83,911.00 | (884,339.00) | 80,560.00 | 409,792.00 | 450,772.00 | 368,036.00 |
| | 389,770.50 | 191,775.00 | (31,376.00) | (104,026.00) | 52,508.00 | -498,658.00 |
| 'LY COMPANY | (8,462.00) | 30,046.00 | (34,527.00) | 22,510.00 | (8,803.00) | 766.00 |
| ED FEATURE SYNDICATE | 1,002,028.00 | 82,848.00 | (2,032,770.00) | 1,361,788.00 | 186,278.00 | 597,364.00 |
| | | | | | | |
| OME BY YEAR | 12,619,176.00 | 5,784,211.00 | (3,755,993.00) | 7,265,229.00 | 16,140,533.50 | 38,853,156.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| OME BY YEAR | | 5,784,211.00 | (3,755,993.00) | 7,265,229.00 | 16,140,533.00 | 26,033,980.50 |
| RATE | | 46% | 46% | 46% | 46% | 46% |
| BY YEAR | | 2,660,737.06 | (1,451,756.78) | 3,342,005.34 | 7,424,645.18 | 11,975,631.83 |
| S CASH TAX BOND PAYMENT ON 12/20/88 | | 3,000,000.00 | 0.00 | 2,500,000.00 | 0.00 | 5,500,000.00 |
| AL TAX BUE | | (339,262.94) | (1,451,756.78) | 842,005.34 | 7,424,645.18 | 8,475,631.83 |

GOVERNMENT'S EXHIBIT 50

PENGAD 800-631-6989

SCRIPPS 00153

1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
2                     WESTERN DIVISION

3                       —   —   —

4    THE E.W. SCRIPPS COMPANY  :

5    AND SUBSIDIARIES             :

6           PLAINTIFF          : CASE NO. C-1-01-434

7    VS                          :

8    UNITED STATES OF AMERICA   :

9           DEFENDANT            :

10                      —   —   —

11

12           Deposition of JEROME HACKMAN, a

13   witness herein, taken by the plaintiff as upon

14   cross-examination pursuant to the Federal Civil

15   Rules of Procedure and pursuant to agreement among

16   counsel as to time and place and stipulations

17   hereinafter set forth, at the offices of Baker &

18   Hostetler, 312 Walnut Street, Suite 3200,

19   Cincinnati, Ohio 45202, before Ross A. Giglio,

20   official Court Reporter within and for the State

21   of Ohio.

22                      —   —   —

23            GIGLIO REPORTING SERVICES
                 3 CYPRESS GARDEN
24            CINCINNATI.   OHIO 45220
                 (513( 861-2200
25                                    ORIGINAL

```
 1    APPEARANCES:

 2

 3

 4                ON BEHALF OF THE PLAINTIFF:

 5                     PAUL EYRE, ESQ
                       BAKER & HOSTETLER
 6                     3200 NATIONAL CITY CENTER
                       1900 E. NINTH STREET
 7                     CLEVELAND, OHIO 44114-3485

 8

 9

10

11

12                ON BEHALF OF THE DEFENDANT:

13                     STACY SUZANNE HALLETT, ESQ.
                       TAX DIVISION
14                     P.O. BOX 55
                       WASHINGTON, DC.   20044-0055
15

16

17                          _   _   _

18

19

20

21

22

23

24

25
```

```
 1              E X H I B I T  S

 2    GOVERNMENT 1

 3    Letter to Elliot from Carroll

 4    GOVERNMENT 4

 5    Letter from Saewitz to Carroll

 6    GOVERNMENT 5

 7    Posting voucher examination - 3244-A

 8    GOVERNMENT 6

 9    Corporate income tax return

10    GOVERNMENT 47

11    Letter from Carroll to O'Connor

12    GOVERNMENT 48

13    Handwritten note from Hackman to Carroll

14    GOVERNMENT 49

15    Cash to accrual adjustment

16    GOVERNMENT 52

17    Letter from Hackman to Castelini

18              -  -  -

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | Proceedings, December 5, 2002 | |
| 2 | | JEROME HACKMAN |
| 3 | A witness herein, being duly sworn, was examined | |
| 4 | and deposed as follows: | |
| 5 | | CROSS-EXAMINATION |
| 6 | BY MS. HALLETT: | |
| 7 | Q. | State your name. |
| 8 | A. | Jerome Hackman. |
| 9 | Q. | Your address, sir? |
| 10 | A. | Home? |
| 11 | Q. | Yes. |
| 12 | A. | 2488 Highcrossing Drive, Crescent |
| 13 | Springs, Kentucky. | |
| 14 | Q. | Okay. Are you currently employed? |
| 15 | A. | Yes. |
| 16 | Q. | Where are you employed? |
| 17 | A. | E.W. Scripps Company. |
| 18 | Q. | How long have you been employed by |
| 19 | E.W? | |
| 20 | A. | Since 1984, eighteen years. |
| 21 | Q. | Okay. What is your current job |
| 22 | title? | |
| 23 | A. | I'm the tax manager, federal audits. |
| 24 | Q. | Okay. How long have you had that job |
| 25 | title, tax manager, federal audits? | |

```
 1              A.    I don't know off-hand.  At least a
 2     few years.  At least two years, at least.
 3              Q.    What was your job title before that?
 4              A.    I was a supervisor, federal tax
 5     supervisor.
 6              Q.    Okay.  Can you just briefly tell me
 7     about your educational background a little bit?
 8              A.    I have a bachelors degree from Thomas
 9     More College, graduating in 1980.  And I'm CPA.
10              Q.    Okay.  Did you major in accounting?
11              A.    Yes.
12              Q.    Okay.  Any post-graduate work?
13              A.    I did take a few tax courses at the
14     University of Cincinnati, but I did not pursue a
15     degree.
16              Q.    Okay.  You said that you graduated in
17     1980?
18              A.    Yes.
19              Q.    Okay.  When you first started working
20     for E.W. Scripps, what was your job title?
21              A.    I was a staff tax accountant.
22              Q.    Okay.  How long were you a staff tax
23     accoun____?
24              A.    Probably three years.  I was promoted
25     to assistant supervisor, and then later to federal
```

```
 1    tax supervisor.  Later to tax manager, federal
 2    audits.
 3            Q.    So you were a staff tax accountant
 4    and then you became an assistant supervisor and
 5    then a supervisor?
 6            A.    Yes.
 7            Q.    And then I lost you after that.
 8            A.    And then my current title.
 9            Q.    Tax manager?
10            A.    Yes.
11            Q.    Okay.  Okay.  So, see if I have this
12    time frame correct.  You were staff tax accountant
13    from, say, 1984 to about 1987?
14            A.    Yes, roughly.  I don't know for sure
15    off-hand.
16            Q.    Okay.  And how long were you an
17    assistant supervisor?
18            A.    I would think three years.  I have to
19    look in my records to be certain.  I just don't
20    remember.
21            Q.    Okay.  Do you recall about
22    approximately how long that you were in the
23    supervisor position?
24            A.    Well, whatever that all would equate
25    to.  Let's see.  I just don't remember.  I would
```

```
 1    have to look in my records.
 2              Q.    That's fine.  Show you an exhibit
 3    that was marked as Exhibit 47.  If you could take
 4    a look at that document for me, please, and in
 5    particular, starting with the page marked at the
 6    bottom, page 258.  You could take a look at the
 7    whole exhibit.
 8              Are you ready?
 9         A.    I guess.
10              Q.    I would like to refer you
11    specifically to pages 258 through 260.  Have you
12    seen this document before?
13         A.    Yes.
14         Q.    Does page 260 contain your signature?
15         A.    Yes.
16         Q.    Is this an affidavit that you signed?
17         A.    Yes.
18         Q.    You may have had a chance already,
19    let me know if you have not, to read the
20    affidavit.  Let me know if everything in the
21    affidavit that you believe to be true and correct
22    today.
23         A.    Yes, I believe it to be true.
24         Q.    Okay.  The second paragraph of the
25    affidavit states on "December 31, 1990, I
```

1    hand-delivered to the IRS examiner division at the

2    office at 555 Main Street, Cincinnati, Ohio,

3    company check dated December 31, 1990 in the

4    amount of $7 million to the Internal Revenue

5    Service.   $7 million check was attached to a

6    letter dated December 31, 1990 from Michael

7    Carroll."

8              I would like for you now to take a

9    look at Exhibit 4.  Tell me if you have seen that

10   document before.

11        A.   Yes, ma'am.

12        Q.   Is this a copy of the letter and

13   check that you referred to in your affidavit?

14        A.   Yes, it is.

15        Q.   Also like to show you, have you look

16   at Government Exhibit 5.  Take a look at this

17   document for me, please.  Let me know if you

18   recognize it.

19        A.   Yes, I do.

20        Q.   Could you tell me what it is?

21        A.   It is a Form 3244-A examination

22   posting voucher.

23        Q.   Okay.  How is it that you recognize

24   this document?

25        A.   When we made our payment of tax and

1    interest on December 31, 1990, since the Internal

2    Revenue agent that I was dealing with, Sidney

3    Saewitz, had a secretary type this up and then he

4    date-stamped it, gave it to me.

5         Q.    Okay.  Did he give you a photocopy of

6    this or did he give you the original document?

7         A.    I believe that he gave me a photocopy

8    of it.

9         Q.    Okay.  The Government Exhibit

10   Number 4, I think that it is, if you could refer

11   to that.  Did you draft that letter?

12        A.    No, I did not.

13        Q.    Okay.

14        A.    Mr. --

15             MR. EYRE:  You were not asked the

16        question who drafted it.

17        Q.    In your affidavit, Government

18   Exhibit 47, you referred to some calculations that

19   you made?

20        A.    Yes.

21        Q.    1985-1986 liability.  Are those

22   calculations reflected in Exhibit Number 4?

23        A.    Yes.  The outcome of those

24   calculations are.

25        Q.    Okay.  I will now show you Government

1    Exhibit 49.  Take look at that document for me,

2    please.

3            A.    Yes.

4            Q.    Have you seen this document before?

5            A.    Yes.

6            Q.    Did you prepare it?

7            A.    Yes, I did.

8            Q.    Okay.  Could you tell me what it is?

9            A.    This is a calculation of -- it's the

10   calculation that was intended to satisfy the

11   additional tax and interest liability that was due

12   to -- due to our method change that was -- due to

13   the change of our method of accounting from cash

14   to accrual basis, that we had reached an agreement

15   with the IRS on June 16, 1988, to change our

16   method of accounting.  This is a calculation of

17   that.

18           Q.    Okay.  This calculation was prepared

19   by you?

20           A.    Yes.

21           Q.    Okay.  On December 31, 1990, when you

22   presented the letter, Exhibit 4, and the check to

23   Sidney Saewitz, did you give him a copy of that

24   calculation?

25           A.    No, I didn't.

```
 1              Q.    Do you recall at any time giving
 2    Mr. Saewitz a copy of that calculation?
 3              A.    No, I do not.
 4              Q.    Okay.  When you presented the letter
 5    and the check to Mr. Saewitz, where were you?
 6              A.    We were at his office at 550 Main
 7    Street.
 8              Q.    IRS?  Was anybody else present?
 9              A.    Well, there were, the room from what
10    I remember, there were other people.  There is,
11    like, a big room and then there is another room
12    off to the side and I think that we were -- I had
13    greeted other agents that I had known from
14    previous audits, but I think that when we sat down
15    we were alone, yes.
16              Q.    You were sitting down when you
17    presented him with the letter and check?
18              A.    Yes.
19              Q.    Do you recall what you told
20    Mr. Saewitz?
21              A.    I told him that here is the letter
22    and here is our check.  We intend to pay the
23    additional tax and interest that we owe for years
24    1985 and 1986 as a result of the June 16th, 1988
25    agreement to -- that I guess it was done on Form
```

1    870 that we had signed, and this is a payment of

2    the tax and interest and that, you know, he knew

3    that our intent was to make this payment before we

4    had -- well, we had asked him to make the

5    calculation and he had said that he did not want

6    to because of the complexities of it.

7        Q.    Let me back up.  You asked him to

8    make which calculation?

9        A.    To do this calculation for us, since

10   the IRS was adjusting our method of accounting.

11       Q.    By that, do you mean the additional

12   liability for the '85 and '86 tax years?

13       A.    Yes.

14       Q.    Okay.  So do you recall when you

15   asked Mr. Saewitz to make the calculation?

16       A.    No, I did not.  My boss, Michael

17   Carroll, asked him and I don't remember if I was

18   present when Mike asked him to do that or not.

19       Q.    Okay.

20       A.    But he didn't want to do it and so we

21   decided that we would do it and we alerted him to

22   what we were trying to do, that we wanted to pay

23   the tax and interest that we owed for years 1985

24   and 1986.  Basically, that's what we did.  We

25   brought the check and Mike's transmittal letter

1      over to the service and we paid the additional tax

2      and interest that we expected to owe.

3          Q.   When you say "we," who are you

4      referring to?

5          A.   Well, it was really me bringing the

6      actual check and the transmittal letter over but,

7      I mean, I was directed to prepare this calculation

8      by Mr. Carroll. And I assume that Mr. Castelini

9      had told him that he wanted this liability paid

10     since the interest would only accumulate if we did

11     not pay it, and by doing this we felt that we

12     would stop the accumulation of any interest on the

13     liability since it was fixed and determinable at

14     that point and also we would obtain the interest

15     deduction on the amounts that we designated as

16     interest.

17         Q.   Okay. Do you recall having any

18     discussions at that time you delivered the check

19     and letter to Mr. Saewitz about the calculation or

20     the amount of additional liability that you had

21     determined?

22         A.   Could you repeat that?

23         Q.   Do you recall having any discussions,

24     conversation, with Mr. Saewitz at the time that

25     you delivered the check and letter to him about

1    how you calculated the liability or about the

2    dollar amount of the liability at all?

3         A.    No.

4         Q.    Okay.   I would like to refer you to

5    Government Exhibit Number 5.   Now, in your

6    affidavit, I believe that you stated that

7    Mr. Saewitz had a secretary prepare this document;

8    is that correct?

9         A.    That's correct.

10        Q.    So to the best of your knowledge,

11   Mr. Saewitz did not prepare this document?

12        A.    No, he did not.

13        Q.    Now, you will notice this document,

14   the cash bond box is checked?

15        A.    Yes.

16        Q.    Did you notice that on

17   December 31, 1990?

18        A.    Yes, I did.   And I alerted

19   Mr. Saewitz that I thought that this was incorrect

20   to do this, that this box should not be checked

21   because we were not making a cash bond payment.

22   He knew that it was not our intent.   Our intent

23   was always to make a payment of tax and interest

24   for the amounts that we owed for the additional

25   tax liabilities that we knew and interest that we

1    owed for years 1985 and 1986.

2         Q.   Okay.  Now, you said that Mr. Saewitz

3    knew that it was your intent to make a payment and

4    not a cash bond.  How do you know that he knew

5    that was your intent?

6         A.   well, if he didn't know up to that

7    time, I told him right at that moment what we were

8    trying to do.  We were trying to make a payment of

9    tax and interest.  But he, I mean, Mike Carroll

10   and I had discussed that we wanted to pay the tax

11   and interest that we expected to owe for years

12   1985 and 1986.  And we wanted to pay the tax and

13   we wanted to pay the interest associated with that

14   liability.  And, I mean, we told him that numerous

15   times.  I mean, he knew that.  And I told him that

16   day again that's what we were doing.

17        Q.   You specifically told him on December

18   31, 1990 that you wanted to make a payment and not

19   a cash bond or deposit?

20        A.   That's correct.

21        Q.   Okay.  Are you sure about that?

22        A.   Yes.

23        Q.   Did Mr. Saewitz say anything to you

24   about why the cash bond box was checked?

25        A.   Yes.  He said for processing purposes

1    for the collection department that they needed to

2    check either the Send 316(c) box or the cash bond

3    box to process it.  And at that point, I said,

4    well, it is incorrect to do this because we are

5    not making a cash bond payment.

6                Basically, we discussed it back and

7    forth and he kept telling me in order for the

8    collection department to process it, that for the

9    transcript to be posted, that one of these two

10   boxes had to be checked or he could not process

11   this payment and that he would not be able to

12   consummate the transaction.

13        Q.    Okay.

14        A.    So then he -- well, then I told him

15   again that I didn't feel that this was correct to

16   do and his response was well, you know, I'm going

17   to be your IRS team coordinator for the 1990 cycle

18   and I know what your intent is and that you want

19   to obtain an interest deduction for the amount

20   specified as interest, and he said that I would

21   allow that in 1990.

22        Q.    Okay.

23        A.    And then he added, said what we could

24   do also is to have the secretary type the words

25   "tax adjustment and interest" for the $2 million

1    of tax adjustment and the million five of interest

2    on the form itself in the remarks box.  I said

3    well, I guess that would help, and he said that

4    will clearly show that your intent was to pay, to

5    make the payment, the payment of interest --

6    excuse me -- the payment of tax and interest and

7    not a bond payment.

8         Q.    Okay.

9              MR. EYRE:  I'm not sure that it was

10             clear.  Maybe you want to clarify the form

11             that he got originally did not have the

12             remarks section.

13        A.    Right.  This was later.  He handed

14   this back to the secretary and had her type this

15   on there, gave it back to me.

16        Q.    So it was Mr. Saewitz's idea to type

17   the --

18        A.    Yes, it was.

19        Q.    Okay.

20        A.    Yes.

21        Q.    On December 31, 1990, during that

22   time period, in your mind, what was the difference

23   between a payment and a cash bond?

24        A.    Well, if it was a cash bond,

25   basically, you would not be able to deduct the

1    interest.  It would stop the accumulation of

2    interest on the -- whereas the payment of tax and

3    interest, if you have a known liability and it is

4    fixed and determinable, you could pay the tax and

5    you could also pay the associated interest with

6    that and you could obtain an interest deduction.

7         Q.    Would it be correct to say that it

8    was Scripps's main purpose was to get an interest

9    deduction in making this payment?

10        A.    Two-fold.  Stop the accumulation of

11   the interest and also to obtain the interest

12   deduction in 1990.

13        Q.    Okay.  December 31, 1990, do you

14   recall your job title with Scripps?

15        A.    I was either tax supervisor or tax

16   manager at that point.

17        Q.    Okay.  What did your job duties

18   entail?

19        A.    Well, we prepared tax returns part of

20   the year.

21        Q.    That would be Scripps's tax return?

22        A.    Yes.

23        Q.    Federal return?

24        A.    Yes, for the Consolidated Group.

25        Q.    Okay.

1         A.     And I was responsible for preparing

2     some returns and reviewing numerous returns that

3     were prepared by others during the year.  And then

4     we would also do estimated tax payments on a

5     quarterly basis.  Then I also, that was about

6     probably fifty percent of my work.  And then the

7     other fifty percent was probably dealing with

8     Internal Revenue agents on the current audit

9     cycles that we were working.

10        Q.     Okay.  Did Scripps prepare the tax

11    returns in-house or would some outside accounting

12    firm prepare them?

13        A.     In-house.

14        Q.     In-house.  Okay.

15        A.     I also did research on, you know,

16    when we received questions, that kind of thing, or

17    if Michael Carroll, the Corporate Tax Director,

18    gave me an assignment or a project to research, I

19    would do that, so it was a mixture of duties.

20        Q.     Okay.  They were all tax-related

21    duties?

22        A.     Yes.

23        Q.     At that time, about how many people

24    were in the tax department of Scripps?

25        A.     Well, depends upon what time frame.

1              Q.    December 31, 1990.

2              A.    I would say the most that we ever had

3    was ten.

4              Q.    Okay.

5              A.    And now we are down to five.  So I

6    would think back then we probably had six or

7    seven, I guess.

8              Q.    Okay.  Okay.  When you prepared this

9    calculation for the 1985 and 1986 tax year, did

10   you refer to the 1986 tax return, the Scripps 1986

11   tax return in making those calculations?

12             A.    No, I didn't.

13             Q.    Do you know what you referred to in

14   making the calculation?  Any other documents?

15             A.    Well, I mean, these, the numbers.  Do

16   you want to know where the numbers came from?

17             Q.    Yes.  Exactly.

18             A.    Is that what you are asking?

19             Q.    Yes.  Exactly.

20             A.    The total column, well, let's take

21   one step back.  We were mandated by the change in

22   the legislation to adopt the accrual method of

23   accounting as of 1/1/87.  With the 12/31/86 return

24   that we filed, we had done -- we had calculated

25   the amount of the Section 481 adjustment in total

```
 1   that we would on a cumulative basis the difference
 2   between the method that we had been on, the cash
 3   basis, and the accrual basis.  And that difference
 4   is represented in this number $38,653,757.
 5          Q.    Okay.
 6          A.    And so that it is the cumulative
 7   affect of the accounting method change from cash
 8   to accrual.  And the numbers that you see for
 9   years '81, '82, '83 and '84, these were
10   adjustments that had been made due to that method
11   change by the IRS.
12          Q.    Okay.  So if I could stop you there.
13   The '82, '83, '84 numbers were numbers that the
14   IRS came up with?
15          A.    Yes, ma'am.
16          Q.    Were these numbers that Scripps
17   agreed with?
18          A.    Yes.
19          Q.    Okay.  Okay.
20          A.    And so --
21          Q.    Well, how was it that you determined
22   the '85 and '86 numbers?
23          A.    Okay.  What I knew was that we had,
24   cumulatively, we had a change totaling $38,653,757
25   and what I then had to do was to go back and
```

1    figure out what the amounts would be for 1985 and
2    1986.  In order to do that, I took the adjustments
3    that the IRS had already calculated for '81, '82,
4    '83 and '84, put them all into the spread sheet by
5    company.  In some cases, I had to -- they would do
6    a 446 adjustment, which is the year increment, and
7    then we had a 481 KLA calculation, which is a
8    four-year spread.  The way that they had done it,
9    I had to go back.  They had done it piecemeal, so
10   I had to go back and piece together, you know,
11   who, which company did the 481(a) adjustment
12   belong to.

13               Once I did that, I added that to the
14   446 increment for each year and then I knew and I
15   knew in total the total agreed to each of the
16   total IRS adjustments for each year, so I knew
17   that I had everything in the right category.

18               Because later on, we would use this
19   to, you know, to set up the tax liabilities owed
20   by each company, so we used it internally also.
21   So anyway, what I did then was to simply, the '85
22   and '86 amounts were simply squeezed out by
23   subtracting from the cumulative total the amounts
24   for 1981, '82, '83 and '84 from that.
25        Q.    Okay.

```
1              A.    That gave me a number which
2    represented '85 and '86.
3              Q.    Okay.  That's what that is.  So this
4    is -- this number represents, am I correct, the
5    total in income for the '85 and '86 tax years?
6              A.    That's correct.
7              Q.    So the $16,140,533.50 adjustment is
8    the increase of income from 1985 and 1986?
9              A.    That's correct.
10             Q.    Is this based strictly on the change
11   from cash to the accrual method?
12             A.    Yes.
13             Q.    Okay.  Is there any way -- well, back
14   up.  Are those your initials on the top of this
15   form?
16             A.    Yes.
17             Q.    Dated 12/21/1990?
18             A.    Yes.
19             Q.    Is that the date that you prepared
20   this?
21             A.    That's the day that the final
22   calculation was done, but it took me more time
23   than one day to do it.
24             Q.    Okay.  Do you recall approximately
25   how much time that you spent doing it?
```

```
 1          A.    Well, significant time.  I'm sure
 2    that we worked on our 12/15 estimates, but I would
 3    say Mike gave me this project in early December
 4    and so I probably worked off and on probably from
 5    roughly December, roughly speaking, from probably
 6    around December 1st through December 21st on it.
 7          Q.    Okay.  Did anyone review your
 8    calculations for accuracy?
 9          A.    Mike Carroll examined this.  He did
10    not do a thorough review.
11          Q.    Okay.
12          A.    These calculations were very complex
13    and with the amount of -- Mike was also going on
14    vacation.  Due to that and the complexity of these
15    calculations, I'm assuming that he did not feel
16    that he had time to do a thorough review of it.
17          Q.    Now, I see here that you have
18    multiplied the $16 million by 46 percent?
19          A.    That's correct.
20          Q.    Is that the effective tax rate for
21    Scripps for the year?
22          A.    That's the federal income tax rate at
23    that time.
24          Q.    And you came up with the $7 million
25    tax figure; is that correct?
```

1           A.     Yes, ma'am.

2           Q.     That's for the combined years of '85

3     and '86?

4           A.     Yes.

5           Q.     Okay.  Now, I noticed in the letter

6     that Mr. Carroll sent, the December 31, 1990

7     letter, that there was the total of $7 million

8     remitted.  And there was a breakdown between the

9     1985 and 1986 tax years; is that correct?

10          A.     Yes.

11          Q.     How is it determined how much --

12    well, how is it determined that the $7 million

13    payment would be made in the first place?

14          A.     Well, Mr. Carroll determined that we

15    would pay $7 million.

16          Q.     Do you know how he made that

17    determination?

18          A.     If I do, I don't remember.

19          Q.     Okay.  That's fine.  Do you know how

20    it was determined that there would be $2 million

21    applied to tax for '85 and $2 million applied to

22    tax for '86?

23          A.     Yes.  What we did, as you go back to

24    the schedule here, Exhibit 49, if you go to the

25    total column, when you come up to the total

```
 1    column, if you go to tax by year --
 2            Q.    Okay.
 3            A.    That's a running total starting from
 4    '82, a combination of the '82, '83, '84 and the
 5    '85 and '86 amounts.
 6            Q.    Okay.
 7            A.    And that was the total amount of tax
 8    that was owed for the switch from cash to the
 9    accrual method of accounting.
10            Q.    Okay.
11            A.    And we had made a payment on
12    12/31/88.  I think that says 12/20.  Maybe we did
13    make.  I believe that we did make it earlier than
14    12/31.  But we paid $3 million of tax in 1982 and
15    we made a payment of $2.5 million of tax in '84,
16    so that totals $5.5 million.
17                  So what I did was I took the total
18    tax, less the amount that we had already paid for
19    the preceding years, and that left us with a
20    liability of $6,475,633.
21            Q.    Okay.
22            A.    And then what I did, since we could
23    not at that point sit down and actually calculate
24    the yearly increments, 1985 and 1986 yearly
25    increments to the dollar, we could only make a
```

```
 1    reasonable calculation that both years would be
 2    roughly equal, so what I did was I just divided
 3    the tax liability in two.  I took half of the tax
 4    and assumed that it was owed for 1985 and I took
 5    the other half and I assumed that it would be owed
 6    for 1986.
 7             Q.    Okay.
 8             A.    So, roughly, what would that be?
 9    $3,200,000 of tax for each year.  And I could not
10    speak for Mr. Carroll, but I assumed that because
11    of the complexities of the calculation and, you
12    know, we later agreed that we should round it down
13    some, but I don't know how he decided to round it
14    down to that exact number.
15             Q.    Okay.
16             A.    But we agreed that due to the
17    complexities of this that, you know, we didn't
18    want to overpay the liability to the IRS.
19             Q.    Okay.  Now, you stated that you could
20    not determine exactly the dollar amount for 1985
21    and the dollar amount for 1986.  Why is that?
22             A.    Because you would have to take all of
23    the balances for each year, compare the 12/31/84
24    numbers to the 12/31/85 numbers and make your
25    calculations on that, and then do the same thing
```

```
 1      for the year-end balances for years, for 12/31/85
 2      and 12/31/86.
 3              Q.    Okay.
 4              A.    And, I mean, you're talking hundreds
 5      of calculations.
 6              Q.    Okay.
 7              A.    Maybe to explain more this
 8      $38 million number.
 9              Q.    The total?
10              A.    Yeah, on the total.  All these
11      calculations in the total column had been done
12      previously.
13              Q.    Who did these?
14              A.    Well, I did the Denver Publishing
15      Company myself.  I came up with the $13,730,994.
16              Q.    Okay.
17              A.    That's the only one that I did
18      myself.  Rest of these were done by other tax
19      accountants in our tax department.
20              Q.    Okay.
21              A.    So, I mean, these took quite a bit of
22      time to do each company, and that's what you would
23      need to do to actually calculate the 1985 amount
24      and the 1986 amount.  And that's what the IRS
25      actually did with the preceding years.  That's why
```

```
 1    Sid Saewitz did not want to do this because he
 2    didn't feel that he had enough time to do the
 3    calculations.  And that was his feeling on it.
 4         Q.   Okay.
 5         A.   But I do want to add that, you know,
 6    the liability was fixed and determinable.  We
 7    could measure what the liability was.  I think
 8    that this is a valid measure of it.
 9         Q.   Okay.  I would like to refer you to
10    Government Exhibit 6.  Take a look at that and
11    tell me if you have ever seen that before or not.
12         A.   Yes, I recognize it.
13         Q.   Could you tell me what it is?
14         A.   This is a tax return for the year
15    1986 for the Scripps Company, U.S. Corporate
16    Income Tax Return, Form 1120.
17         Q.   Did you prepare this form?
18         A.   No, I didn't.
19         Q.   Do you know who did?
20         A.   Well, this is a consolidated form, so
21    it was either, I believe Jeff Frazier, I believe,
22    in our tax department prepared it.  Or it could
23    have been Rob Stafford.  I don't know which
24    gentleman prepared it.  But it was one or the
25    other.
```

```
 1              Q.    Okay.  So if I am correct about
 2    Mr. Carroll's letter to Sid Saewitz, he has
 3    proposed a $2 million dollar tax adjustment for
 4    1986, and a $1.5 million interest payment for
 5    1986; is that correct?
 6              A.    That's correct.
 7              Q.    Okay.  Now, based upon your
 8    calculations that you did for the '85 and '86
 9    year, if the tax adjustment was divided by two,
10    would it be correct then to divide the increase in
11    income by two, by the '85 and '86 years?
12              A.    I guess that you could say that, yes.
13              Q.    Okay.  So that would mean
14    approximately an $8 million increase in income for
15    '85 and an $8 million increase for '86?
16              A.    That would be correct.
17              Q.    Okay.  So if looking at the '86
18    return, if you increased the income by $8 million,
19    can you tell me if that would have any effect upon
20    the tax liability for 1986?
21              MR. EYRE:  Objection.  You can
22         answer.
23              A.    This tax return by itself, no, it
24    would not change.
25              Q.    Okay.  It would not change or it
```

1   would not affect the tax liability?

2          A.    Wouldn't affect the tax liability.

3          Q.    Which numbers would it change?

4          A.    Except for we did carry this loss

5   back to 1983.

6          Q.    Okay.   Which loss?   Can you refer to

7   the line on the tax return so that I am with you?

8          A.    The $62 million loss.

9          Q.    That would be line 30?

10         A.    Yes.

11         Q.    Okay.   You know that the $62 million

12  was carried back to '83?

13         A.    Yes.

14         Q.    All $62 million was carried back?

15         A.    No, part of it went into, I believe,

16  1984.   I don't believe that it all was to be used

17  in '83.

18         Q.    Do you recall approximately how much

19  went to each year?

20         A.    Not off-hand, no.

21         Q.    Okay.   Okay.   Would an increase in

22  inc  ⁻⁻ for 1986 by $8 million change the amount of

23  the tax loss ⁝⁚⁚ ⁚⁚⁚ ⁚⁚⁚ ⁝⁝

24               MR. EYRE:   Objection.

25         A.    Well, the increase of $8 million was

1    our, again, was our calculation of what we would

2    owe, the additional tax and interest that we would

3    owe for years 1985 and '86 from, you know, from

4    the switch from the cash method to the accrual

5    method of accounting.

6            Q.    Right.  But my question is if you

7    increased income, gross income by $8 million for

8    the '86 year, would that change the amounts of the

9    net operating loss, the $62 million loss?

10           A.    Yes.

11           Q.    Would that change, then, 1983 or 1984

12   income tax liability?

13           A.    Yes, it would.

14           Q.    Okay.  Do you recall what the 1983

15   tax liability was?

16           A.    No.

17           Q.    How about '84?

18           A.    No, I do not.

19           Q.    Okay.  Okay.  I would show you what

20   was marked as Government Exhibit Number 48.  If

21   you could take a look at that document for me,

22   please.  Have you seen this document before?

23           A.    Yes.

24           Q.    Could you identify it?

25           A.    Yes.  I prepared it back, well, dated

```
 1    December 28, 1990.
 2          Q.    Okay.  Is this -- what is this?
 3          A.    Research.
 4          Q.    Okay.  Is it addressed to Mike?
 5          A.    Yes.  It says "Mike."
 6          Q.    Okay.  I hate to ask you to do this.
 7    I had a hard time reading this.  Could you -- this
 8    is in your handwriting?
 9          A.    Yes.
10          Q.    Could you just read it in the record?
11                MR. EYRE:  We hope that you could
12          read your own writing.
13          A.    I hope so.
14                MR. EYRE:  If not, I have trouble.
15          Q.    It was not that bad.
16          A.    Sure.  "DJC called 12/27 saying he
17    would like to delay the $7 million payment until
18    1/4/91 because banks would charge a higher
19    interest rate on a year-end loan than by waiting
20    until first week of 1991.  His question was could
21    deduct $3 million of interest in 1990 if we waited
22    to make $7 million payment until 1991?  They will
23    set up a $3 million interest accrual for books.
24    Seems to me we would have to at least pay the $4
25    million in tax by year-end in order to set up the
```

1   liability for interest" -- and I think that this

2   word over here is fixed liability.

3       Q.    Okay.

4       A.    "Seems to me that we would have to at

5   least pay the $4 million in tax by year-end in

6   order to set up the liability for interest since

7   an RAR for 1985 and 1986 has not been delivered to

8   Scripps Howard by IRS. Although" in parentheses,

9   Although under 461(f), all events have occurred to

10  fix the liability -- IRS switched us to accrual in

11  1980 -- the amount can be accurately determined,

12  $3 million for interest, economic performance

13  occurs since interest economically accrues for

14  accrual basis companies.

15            Payment of tax, without calling it a

16  cash bond (call it tax owed for cash to accrual

17  switch from newspaper group) would have same

18  effect as filing an amended return by December 31,

19  1990 and paying the tax, which would establish an

20  interest deduction for 1990.  DJC says that he

21  would definitely like to deduct $3 million in

22  interest in 1990 and not just stop the

23  accumulation of further interest.

24            Therefore, if we need the $7 million,

25  if we made that $7 million paid by 12/31/90 he

1  will authorize it, but he prefers to wait until

2  1/4/91 to make payment if possible and maintain a

3  $3 million dollar interest deduction.

4         Doug and I ironed out our differences

5  on cash to accrual numbers on Wednesday.  He had a

6  $700,000 mistake on Pittsburgh Press and I forgot

7  to back out, take pre-1954 adjustment of $3

8  million.  After we were done, our difference was

9  within $500,000 of taxable income on the overall

10  adjustment.  We still had small individual company

11  differences.  Instead of $4.4 million of tax it

12  should be about $4.7 million of tax.

13         Mike, my main concern with DJC is do

14  we have an actual liability under 461(f) and then

15  since we have no RAR only 1980 settlement forcing

16  us to switch to accrual basis for which we could

17  deduct $3 million of interest in 1990 or even in

18  1991, should we word our letter differently.

19         A cash bond only serves to stop the

20  running of interest and does not give rise to an

21  interest deduction.  Whereas it appears that if we

22  do not designate the payment as a cash bond, but

23  call it "tax due for switch from cash to accrual

24  basis of accounting," the interest appears to be

25  deductible in the year paid per Revenue Ruling

```
 1   8.9-6.  I will discuss further with you on Monday.
 2   We deducted interest on last cash bond payment in
 3   1988, whether correct or not.  I doubt if an agent
 4   would challenge a cash payment for interest.
 5   Laskey will need to know by 11:00 Monday.  If we
 6   make no payment until 1991, I don't believe that
 7   we could deduct the $3 million of interest in 1990
 8   since we have no RAR for years 1985 and 1986.
 9   Jerry."
10        Q.    Okay.  Does Mike refer to Mike
11   Carroll?
12        A.    Yes.
13        Q.    Who is DJC?
14        A.    Dan Castelini.
15        Q.    Who is the Doug referred to?
16        A.    Doug Lyons.
17        Q.    Who is Doug Lyons?
18        A.    Presently the director of accounting.
19        Q.    He is employed with Scripps?
20        A.    Yes, he is.
21        Q.    Okay.  Who is the Laskey that is
22   referred to in the letter?
23        A.    He was the assistant treasurer for
24   the Scripps Company.
25        Q.    Okay.  Like to show you what was
```

```
 1      marked as Government Exhibit Number 1.   If you
 2      could take a look at that.   Tell me if you have
 3      seen this before.
 4              A.    Yes, I have.
 5              Q.    Could you tell me what this is?
 6              A.    This is a letter dated December 22,
 7      1988, to the Internal Revenue Service case
 8      manager.
 9              Q.    Okay.   Is this written by Mike
10      Carroll?
11              A.    Yes.
12              Q.    Okay.   Now, Exhibit Number 48 is
13      dated December 28, 1990, refers to interest
14      deduction on a cash bond payment made in 1988; is
15      that correct?
16              A.    Yes.
17              Q.    Okay.   Is the interest referred to in
18      your letter the interest figure that showed up on
19      Exhibit 1?
20              A.    Yes.
21              Q.    Okay.   So Scripps took an interest
22      deduction for the interest paid as reflected in
23      this letter dated December 22nd, 1988?
24              A.    Yes.
25              Q.    Who made that decision that Scripps
```

```
 1    would take the interest deduction?
 2              A.    Well, the preparer of the return
 3    prepared a tax adjustment for that.
 4              Q.    Do you know who the preparer of the
 5    return was?
 6              A.    I don't know for sure.  I believe
 7    that it was Jeff Frazier, but I don't remember for
 8    sure.
 9              Q.    But would that deduction have to be
10    approved by anybody?
11              A.    Yes.
12              Q.    Who would have to approve it?
13              A.    The reviewer and then the reviewer of
14    the return and then, ultimately, Mike Carroll, who
15    was Corporate Tax Director.
16              Q.    Do you know who the reviewer of the
17    return was?
18              A.    I don't remember.  It was either
19    probably me or possibly one other person.
20    Probably -- well, I don't want to give you a name
21    because I'm not sure.
22              Q.    That's fine.  Okay.  That's fine.
23    Okay.  I want to go back to the December 31, 1999
24    payments that you delivered to Mr. Saewitz, the
25    check for $7 million.
```

```
 1              A.    Yes.

 2              Q.    Okay.  Now, you stated earlier that

 3    you were clear that you indicated to Mr. Saewitz

 4    that Scripps wanted to make a payment and not a

 5    cash bond; is that correct?

 6              A.    Yes.

 7              Q.    Okay.  Do you recall how much time

 8    that you spent talking to Mr. Saewitz about this

 9    $7 million check?

10              MR. EYRE:  Meaning at that moment?

11              Q.    Yes.  At that time.

12              A.    Do you mean when we were over at the

13    office?

14              Q.    Exactly.

15              A.    How long that I was there?

16              Q.    Yes.

17              A.    I'm sure that I was there at least an

18    hour.

19              Q.    Did you spend the whole hour talking

20    about how the payment of the $7 million, how it

21    was to be treated?

22              A.    I don't remember how much time

23    exactly was spent.  I greeted some of the other

24    agents.  We had discussions, you know, about

25    family, this kind of thing, how are you, have not
```

```
 1    seen you in a long time, health issues, I'm sure.
 2              MR. EYRE:   Are you saying that you
 3          had not seen Mr. Saewitz in a long time
 4          when you say "long time"?
 5         A.    No.  His predecessor, George Imwalde,
 6    was our IRS agent.  I spoke to him.  I knew some
 7    of the other fellows.  I don't recall names.  I do
 8    remember speaking to George, but there were, you
 9    know, more than two or three people in the room.
10         Q.    All right.
11         A.    In the big room.
12         Q.    Did you talk to any of these other
13    agents employed by the IRS about the $7 million
14    payment treated as a cash bond or a payment?
15         A.    Well, since we had done one
16    previously in 1988, had made a payment that was,
17    that we considered to be a cash bond payment, when
18    I walked through the door, they knew that I was
19    going to make another payment.
20         Q.    Okay.
21         A.    Because I guess Sid Saewitz had told
22    them that I was to be expected in their offices
23    that day to make a payment of tax and interest on
24    our liability for years '85 and '86.  So --
25         Q.    I guess that the question is, after
```

```
 1    you had observed that Sid had marked the cash bond
 2    box on, I guess that it was Exhibit Number 5, did
 3    you have any discussions with any of the other
 4    employees or agents of the IRS regarding how the
 5    $7 million was to be treated, whether it would be
 6    a payment or a cash bond?
 7              MR. EYRE:  Objection.  That question
 8         assumes facts not in evidence.  I don't
 9         believe that he said that he observed
10         Mr. Saewitz checking that box.
11         Q.    That's correct.  After you observed
12    that the box was checked as cash bond, did you
13    have any discussions?
14         A.    With the other agents in the room?
15         Q.    Yes.
16         A.    I don't remember.  I don't believe
17    that I did.  I'm sure that -- I'm sure that Sid
18    and I discussed it amongst ourselves.
19              Now, who was around?  I don't know if
20    somebody was, you know, standing behind us or,
21    because I was pretty intent on this because I
22    thought that it was an error that the IRS was
23    making by checking this cash bond box.  And I
24    assumed that it was just Sid and I, and I would
25    think probably the secretary that had typed this
```

1    was in hearing distance because I would assume

2    that she was because she was only a few feet away

3    from us when she typed this. So I would think

4    that she was still in the room, but, that part of

5    it, you know, I don't know if other people were

6    around.

7         Q.    Do you recall the name of the

8    secretary who typed the form?

9         A.    No, I don't. All that I could tell

10   you is that she was a female and that's all that I

11   know --

12        Q.    Okay.

13        A.    -- at this point.

14        Q.    Okay. After you had delivered the

15   check and the letter, had conversation with Sid,

16   when you left the IRS, how did you think that the

17   IRS was going to treat the $7 million check, as a

18   cash bond or as a payment?

19        A.    I thought that the IRS would treat it

20   as a payment because I had reiterated to Sid time

21   and time again that we were making a payment of

22   tax and interest and he understood what we were

23   doing. And he said just for collection purposes,

24   this box had to be checked, and he assured me that

25   it was a payment of tax and interest. I trusted

```
 1    him.  I really, you know, took him to his word
 2    that when we audited 1980, that he would allow it
 3    as a deduction.  And I had no reason to doubt him
 4    up to that point.  Our relationship was always
 5    honest and I had respect for Sid and I think that
 6    he respected me.  I just had no doubt that what he
 7    said to me would hold true.
 8         Q.   Okay.  Okay.
 9         A.   So I did want to add, I mean, you
10    know, I did reiterate more than once at that point
11    in time and he understood that we were making a
12    payment of tax and interest and not a cash bond.
13    And you know, he assured me that it was to be
14    posted correctly and I guess that later on, we
15    never received any notices to the contrary to
16    indicate that it was, that the IRS was going to
17    say it was a cash bond, and we deducted that on
18    our December 31, 1990 return, and after the
19    examination of that year was over, it was allowed
20    as a deduction.
21         Q.   Okay.  At some point in time, did you
22    learn that perhaps the IRS was not treating this
23    $7 million check as a payment, but rather treated
24    it as a cash bond?
25              MR. EYRE:  Objection.  You asked him
```

1           does he know how it was treated internally?

2                MS. HALLETT:  No.  At some point in

3           time, did he learn.

4                MR. EYRE:  What they thought it was

5           and how it was treated?  That's two

6           different things.

7           A.    I learned how -- well, Mr. Saewitz

8    had led me to believe that the posting of it was

9    as posted as a payment of tax and interest and not

10   a cash bond.  Up until probably October of 1995, I

11   believe, and we had a discussion earlier in 1995

12   in February where we had made another payment and

13   we realized that we had made an over-payment.  Had

14   an incorrect calculation in our numbers and we had

15   made a payment of $45 million in December of '94.

16   And we asked if we could get some of that money

17   back and Mr. Saewitz responded no because that was

18   a payment of tax and interest and it was not a

19   cash bond.  He reiterated that you could only get

20   monies back on a cash bond.  You have to wait

21   until the actual tax years are closed when you

22   make a payment of tax and interest.

23                So even in February of '95, I

24   believed that our 1990 payment would still be

25   treated as a payment of tax and interest.  And I

1   guess that the first inkling that I had that it
2   may not be treated as such was we received an
3   information document request in October of 1995
4   requesting our work papers on how we handled the
5   1990 portion that we designated as interest on the
6   tax return and we did deduct that, and I gave -- I
7   responded to that IDR and gave him a copy of the
8   work paper which showed that we deducted that
9   interest.

10          Q.    Okay.

11          A.    And I did not hear much from him on
12   it until I guess that it was between that time and
13   April of '96.  In April, we received a Form 5701
14   which was disallowing the interest expense.  So I
15   guess that I knew from his information document
16   request that he had a problem with that or he was
17   wondering about it, or he was, you know, he was
18   investigating or examining the payment, but I
19   didn't know until April of '96 that he was going
20   to actually disallow it.

21          Q.    Okay.  Okay.  Now, you had said that
22   you had some discussion with Mr. Saewitz in
23   February of 1995 regarding a December 1994
24   payment?

25          A.    Right.

1           Q.     Amount of $45 million that was made?

2           A.     Yes.

3           Q.     Now, during that discussion, at any

4    time, did the December 31, 1990 payment ever come

5    up?

6           A.     No.

7           Q.     Okay. So would it be correct to say

8    that from December 31, 1990, up until the time

9    that you received the information document request

10   in October of 1995, that whole time period you

11   thought that the IRS has treated the $7 million as

12   a payment and not as a cash bond?

13          A.     That would be correct.

14          Q.     Okay. Do you recall what point in

15   time that it was that the 1986 liability had been

16   determined?

17                 MR. EYRE:   Object to the form of the

18          question. Do you mean when it was done,

19          the audit?

20                 MS. HALLETT:   Whatever time that

21          Scripps or the IRS came to some agreement

22          to the '86 total liability.

23          A.     I presume that you mean the

24   settlement for the tax years 1985 through '87?

25          Q.     If it was settled, yeah.

```
 1              A.    That would be -- I believe it to be
 2     in May of 1997, I believe.  I would have to double
 3     check on that to be totally sure.
 4              Q.    Okay.  At some point in time, did you
 5     realize that Scripps was not going to have an
 6     additional tax liability for the 1986 year?
 7              A.    Yes.
 8              Q.    Do you recall when that was?
 9              A.    No, I don't.
10              Q.    Do you know if it was before May of
11     1997?
12              A.    Well, I mean, until you reach a
13     settlement, you don't know what your tax liability
14     is going to be.
15              Q.    Okay.
16              A.    So I would say that I knew in May of
17     1997 for sure.
18              Q.    Okay.
19              A.    I don't think that you could actually
20     -- well, until we came to an agreement with the
21     IRS, I would say that you could not determine
22     that.
23              Q.    Okay.  Okay.  At any point in time,
24     did Scripps ask for a return of the $7 million?
25              A.    No.  Well, let me think here.  No, we
```

1    believed it to be a payment of tax and interest

2    and until the years were closed, I mean, we didn't

3    think that we could get the money back.

4         Q.   Okay.  After the year was closed, did

5    Scripps ask for the money back?

6         A.   It was refunded to us in the Fall of

7    1997.

8         Q.   Was it done by request of Scripps, do

9    you know?

10        A.   It was done because the case was

11   closed and when they close the case, we basically

12   settle up.  I mean, if they owe us money they

13   refund it with interest.  If we owe them money we

14   make a payment.

15        Q.   Okay.  The Exhibit Number 1, the

16   December 22, 1988 letter, it refers to the

17   $9 million as a cash bond; is that correct?

18        A.   Yes.

19        Q.   Do you know why Scripps wanted to

20   treat that $9 million as a cash bond?

21        A.   Stop the running of interest on -- to

22   stop the running of interest.

23        Q.   Okay.  Were you involved with the

24   decision to call it a cash bond or to make it a

25   cash bond?

```
 1          A.    No, I was not.

 2          Q.    Okay.  You said that it was the Fall

 3   of 1997 that Scripps received the $7 million back?

 4   Is that what you said, $7 million?

 5          A.    Well, we received whatever -- we

 6   received more money than that.  I think that it

 7   was -- I don't remember the exact total, but it

 8   was more than $7 million.  It was for all of the

 9   years.  It was for all of tax years '83 through

10   1987.

11          Q.    Okay.  Did you prepare Scripps 1997

12   tax return?

13          A.    Did I prepare it?  I prepared parts

14   of it.

15          Q.    Okay.  Do you know if the 1997 return

16   included $1.5 million in interest for the return

17   of the payment?

18          A.    No, I don't.  If I did know, I don't

19   remember now.  And I don't know.

20          Q.    Okay.  That's fine.  Do you know when

21   the IRS started the audit of the 1986 tax?

22          A.    I don't remember the date or the -- I

23   mean, I don't remember off-hand.  I would be able

24   to probably find out, I guess.

25          Q.    Do you remember the year?
```

```
 1              A.    We settled the '82 through '84 in May
 2    of 1991.  But I don't know if the next cycle
 3    already had started or if it waited until we were
 4    done.  That was at appeals.
 5                    MR. EYRE:  If you do not remember,
 6            you don't remember.
 7            A.    I don't remember the dates.
 8            Q.    Do you know who the agent was in
 9    charge of the audit of the '86 year, the IRS
10    agent?
11                    MS. LUTZKO:  Did you say for '86?
12                    MS. HALLETT:  Yes.
13            A.    Team coordinator?
14            Q.    Sure.
15            A.    That would be Sid Saewitz.
16            Q.    Okay.
17            A.    You said '85?
18            Q.    '86.
19            A.    Okay.
20            Q.    Audit of '85 and '86 done at the same
21    time?
22            A.    Yes.
23            Q.    Okay.
24            A.    Could I add something?
25            Q.    Sure.
```

```
 1         A.    Sid was on our job the better part of
 2    ten years.  He started as George Imwalde's -- he
 3    moved into the team coordinator position, so
 4    everything just sort of over a ten-year period, he
 5    knew from being the -- moved from being the
 6    assistant on the job to being the team coordinator
 7    so that, you know, we have a ten-year history with
 8    Sid.  Just to tell you some of the background --
 9         Q.    Okay.
10         A.    -- to the case.
11         Q.    Okay.
12         A.    I don't know if that helps you or
13    not.
14         Q.    Okay.  It does.  After you delivered
15    the $7 million check to the IRS and you saw the
16    cash bond box checked on the posting voucher form,
17    did you go back to your office and relay that fact
18    to anybody in your office?
19         A.    Not that day.  Mike was -- Michael
20    Carroll, the Corporate Tax Director, was on
21    vacation.  And I believed Dan Castelini to be on
22    vacation.  That was part of my dilemma was whether
23    to go through and finish the transaction with did
24    as to how we had arranged it, or to take my check
25    and go back to the office and then do, you know,
```

```
 1    don't, you know, don't consummate the transaction.
 2    I guess that at that point I knew -- I could not
 3    ask for help at that point.  I think that -- well,
 4    I think -- well, I don't know for sure that
 5    Mr. Castelini was on vacation, but I believed him
 6    to be.
 7                    So it was up to me to decide whether
 8    to go through with it the way that we had arranged
 9    it with Sid, then having the secretary type "tax
10    adjustment plus interest" on it, and I guess that
11    ultimately I relied upon Sid that he would be, you
12    know, he was trustworthy as far as I was concerned
13    up to that point, and I always felt, you know,
14    that we could trust each other and I trusted him
15    that when he said that it would be posted as a
16    payment of tax and interest, I took him, you know,
17    at his word.
18                    MR. EYRE:  Hold on a second.  Could
19              you read the question back?  I'm not sure
20              that you answered the question.  I'm not
21              sure.  Could you ask the question again?
22                    (The reporter read the question)
23                    MR. EYRE:  Yeah.  That was the
24              question that you were asked.
25         A.    Not on that day.
```

```
 1              Q.    At some point in time, did you?
 2              A.    Yes.
 3              Q.    When was that?
 4              A.    Probably in January of 1991.
 5              Q.    Okay.  Who did you speak to about
 6    this?
 7              A.    The Corporate Tax Director, Mike
 8    Carroll.  I expressed my concerns with what had
 9    happened with the checking of the cash bond box
10    and I told him that I told, you know, well,
11    basically told the whole story, that what happened
12    and I had emphasized with Mike that I reiterated
13    to Sid numerous times that, you know, we were
14    making a payment of -- our intent was to make a
15    payment of tax and interest for the 1985 and 1986
16    tax liabilities and the interest that accrued on
17    those liabilities and, you know, I told him the
18    whole story that Sid -- about the typing of the
19    tax adjustment and interest on there, that Sid
20    felt that our intent would clearly be shown that
21    it was payment of tax and interest, not a cash
22    bond.
23              Q.    What was Mr. Carroll's reaction?
24              A.    He was concerned.  Maybe a little
25    bit -- I don't know if he was mad, upset or
```

1  whatever, but he was concerned.  He wanted the

2  payment to represent, you know, our intention,

3  which was to be a payment of tax and interest, not

4  a cash bond.  And he could not understand why Sid

5  had to check that box.  Part of my dealings with

6  Sid is that I did say in part of our argument, I

7  said, "why don't you just not check the box, just

8  leave it blank?"  And he said, "No, we can't do

9  that.  For collections to process it, one of these

10  two boxes needs to be checked."  I don't know

11  what -- outside of that, I explained to Mike what

12  had happened.  I don't think that he was happy

13  seeing the cash bond box checked, but he clearly

14  stated the IRS knew what our intention was, which

15  was to pay tax and interest for 1985 and '86.

16        Q.    Did you show Mr. Carroll a copy of

17  the posting voucher form?

18        A.    Yes.

19        Q.    Okay.  Did he give you at that time

20  any further instructions with regard to insuring

21  that the $7 million was posted as a payment and

22  not as a cash bond at that point in time?

23        A.    Not -- at some point we asked the IRS

24  to give us a copy of our transcript, I guess.  And

25  I don't even know if that was related to this

1    whole thing, but any payment that we had was

2    marked the same way.  I think they called it an

3    advance payment of an exam, advance payment on

4    examination or something like that.  So there was

5    nothing to indicate that it was being treated as a

6    cash bond, and we assumed that it was still being

7    recognized, I guess, as a payment of tax and

8    interest for those years.

9           Q.    Okay.  Would it be correct to say

10   that you continued to think that until October of

11   1995?

12          A.    Yes.

13          Q.    Okay.  I would like to refer you to

14   your affidavit, I believe that's Exhibit 47, page

15   marked 259 at the bottom.

16          A.    Yes.

17          Q.    Okay.  In the first full paragraph

18   there, about three-quarters of the way down, you

19   talked about a cash bond box or the section 316(c)

20   box.  Do you see that?

21          A.    Yes.

22          Q.    Okay.  Does that section 316(c)

23   referenced in your affidavit refer to the

24   Government Exhibit 5 posting voucher that says

25   "Send 316(c)"?

```
 1              A.    Yes.  I guess that's a typo.  That
 2    should be Send 316(c).
 3              Q.    Okay.  Do you know what a 316(c) is?
 4                    MR. EYRE:  Objection to the extent
 5              that your answer calls for any discussions
 6              that you had with me, okay?
 7                    You can't tell or you can't testify
 8              to something that you might have learned
 9              from me.  Do you understand the difference?
10                    If you learned independently of me,
11              you could answer the question.
12                    MS. HALLETT:  He could testify if he
13              knows what a 316(c) is.
14              A.    I don't want to answer this on the
15    advice of my legal counsel.
16                    MS. HALLETT:  Is the objection
17              attorney-client privilege?
18                    MR. EYRE:  Based upon attorney-client
19              privilege, unless he had some prior
20              knowledge as to what a 316(c) is.
21                    MS. HALLETT:  I disagree.
22                    MR. EYRE:  Okay.
23              Q.    In December 31 of 1990, did you know
24    what a 316(c) was?
25              A.    No.
```

1          Q.    Did you ask Mr. Saewitz?

2          A.    No.  He told me that that definitely

3     did not apply, and I trusted him.  Well --

4               MR. EYRE:  You answered the question.

5          You answered the question.

6          Q.    Did Mr. Saewitz tell you at any time

7     that the cash bond box or the Send 316(c) box must

8     be checked?

9          A.    Yes.  He told me that a box had to be

10    checked in order for the collections department of

11    the Internal Revenue Service to accept the payment

12    and to post it to our transcript.  Without that,

13    he could not process this transaction.  He was

14    going to hand me the check back.

15               MS. HALLETT:  I don't have any

16          further questions.  I thank you for your

17          time.

18                    (Deposition concluded)

19

20

21

22

23

24

25

```
1                        CERTIFICATE

2    E.W. SCRIPPS              :
                              :  SS:
3    UNITED STATES            :

4               I, Ross A. Giglio, notary public in

5    and for the State of Ohio, do hereby certify that

6    before the giving of his deposition, the said

7    JEROME HACKMAN was by me first duly sworn to

8    testify the truth, the whole truth and nothing but

9    the truth; that the foregoing deposition was given

10   at said time and place by JEROME HACKMAN, to

11   counsel herein set forth; that said deposition was

12   taken in stenotypy by me, afterwards transcribed.

13               I do further certify that said

14   deposition was submitted to the witness for

15   examination and signature, and that I am not a

16   relative, counsel or attorney to any party herein,

17   or otherwise interested in the outcome of this

18   action.

19               IN WITNESS WHEREOF, I hereunto set my

20   Hand and seal of office at Cincinnati, Ohio this

21   _13th__ day of __JAN_____, 2002.

22               _____
                 Ross A. Giglio
23               Notary Public - State of Ohio

     My commission expires:
24   April 29, 2004

25
```

- ' -

'81  [2]    21:9;
22:3
'82  [7]  21:9, 13;
22:3, 24;  26:4;
50:1
'83  [8]  21:9, 13;
22:4, 24;  26:4;
31:12, 17;  49:9
'84  [8]  21:9, 13;
22:4, 24;  26:4,
15;  32:17;  50:1
'85  [14]   12:12;
21:22;    22:21;
23:2;   25:2, 21;
26:5;   30:8, 11,
15;    40:24;
50:17, 20
'86  [21]   12:12;
21:22;    22:22;
23:2, 5; 25:3, 22;
26:5;  30:8, 11,
15, 17;  32:3, 8;
40:24;    46:22;
50:9, 11, 18, 20;
54:15
'87 [1]  46:24
'94 [1]  44:15
'95 [1]  44:23
'96 [2]  45:13, 19

- 0 -

00 [1]  36:5

- 1 -

1 [8]  3:2;  20:23;
33:18;    35:2;
37:1, 19;  48:15
1.5  [2]    30:4;
49:16
11 [1]  36:5
1120 [1]  29:16
12  [12]    20:23;
23:17;    24:2;
26:12, 14;  27:23,
24;    28:1,  2;
33:16;  34:25
13,730,994  [1]
28:15
15 [1]  24:2
16 [1]  10:15
16,140,533.50 [1]
23:7
16 [1]  24:18
16th [1]  11:24
1900 [1]  2:6
1980 [5]  5:9, 17;
34:11;    35:15;
43:2

1981 [1]  22:24
1982 [1]  26:14
1983  [3]    31:5;
32:11, 14
1984  [4]    4:20;
6:13;    31:16;
32:11
1985 [18]  11:24;
12:23;  15:1, 12;
20:9; 22:1; 23:8;
25:9;    26:24;
27:4, 20;  28:23;
32:3;  34:7;  36:8;
46:24;    53:15;
54:15
1985-1986    [1]
9:21
1986 [25]  11:24;
12:24;  15:1, 12;
20:9, 10;  22:2;
23:8;    25:9;
26:24;  27:6, 21;
28:24;    29:15;
30:4,  5,  20;
31:22;    34:7;
36:8;    46:15;
47:6;    49:21;
53:15
1987  [2]    6:13;
49:10
1988  [8]   10:15;
11:24;    36:3;
37:7,  14,  23;
40:16;  48:16
1990  [30]   7:25;
8:3,  6;    9:1;
10:21;    14:17;
15:18;  16:17, 21;
17:21;  18:12, 13;
20:1;    23:17;
25:6;  33:1, 21;
34:19,  20,  22;
35:17;    36:7;
37:13;    38:23;
43:18;    44:24;
45:5;   46:4, 8;
56:23
1991  [6]   33:20,
22;  35:18;  36:6;
50:2;  53:4
1994 [1]  45:23
1995  [6]   44:10,
11;    45:3,  23;
46:10;  55:11
1997  [7]    47:2,
11,  17;   48:7;
49:3, 11, 15
1st [1]  24:6

- 2 -

2   [4]    16:25;

25:20, 21;  30:3
2.5 [1]  26:15
20 [1]  26:12
2002   [2]    4:1;
58:21
2004 [1]  58:24
20044-0055    [1]
2:14
21 [1]  23:17
21st [1]  24:6
22   [2]    37:6;
48:16
22nd [1]  37:23
2488 [1]  4:12
258 [2]  7:6, 11
259 [1]  55:15
260 [2]  7:11, 14
27 [1]  33:16
28   [2]    33:1;
37:13
29 [1]  58:24

- 3 -

3 [2]  1:23;  26:14
3,200,000    [1]
27:9
3  [8]   33:21, 23;
34:12, 21;   35:3,
7, 17;  36:7
30 [1]  31:9
31  [25]    7:25;
8:3,  6;    9:1;
10:21;    14:17;
15:18;    17:21;
18:13;  20:1, 23;
25:6;  26:12, 14;
27:23, 24;   28:1,
2;   34:18,  25;
38:23;    43:18;
46:4, 8;  56:23
312 [1]  1:18
316  [10]   16:2;
55:19,  22,  25;
56:2,  3,  13,  20,
24;  57:7
3200  [2]    1:18;
2:6
3244-a [2]    3:7;
8:21
38,653,757    [2]
21:4, 24
38 [1]  28:8

- 4 -

4  [9]   3:4;   8:9;
9:10, 22;   10:22;
33:18, 24;   34:5;
35:2
4.4 [1]  35:11
4.7 [1]  35:12

44114-3485    [1]
2:7
446 [2]  22:6, 14
45   [2]    44:15;
46:1
45202 [1]  1:19
45220 [1]  1:24
46 [1]  24:18
461   [2]    34:9;
35:14
47 [4]  3:10;  7:3;
9:18;  55·14
48   [3]    3:12;
32:20;  37:12
481  [3]    20:25;
22:7, 11
49   [3]    3:14;
10:1;  25:24

- 5 -

5  [6]   3:6;   4:1;
8:16;  14:5;  41:2;
55:24
5.5 [1]  26:16
500,000 [1]  35:9
513 [1]  1:24
52 [1]  3:16
55 [1]  2:14
550 [1]  11:6
555 [1]  8:2
5701 [1]  45:13

- 6 -

6 [1]  3:8
6,475,633    [1]
26:20
6 [1]  29:10
62  [4]   31:8, 11,
14;  32:9

- 7 -

7  [24]    8:4,  5;
24:24;   25:7,  12,
15;   33:17,  22;
34:24, 25;  38:25;
39:9, 20;  40:13;
41:5;    42:17;
43:23;    46:11;
47:24;  49:3, 4, 8;
51:15;  54:21
700,000 [1]  35:6

- 8 -

8  [6]   30:14, 15,
18;   31:22,  25;
32:7
8.9-6 [1]  36:1
84 [1]  27:23

**85** [2]    27:24;
28:1
**86** [2]    20:23;
28:2
**861-2200**    [1]
1:24
**87** [1]  20:23
**870** [1]  12:1
**88** [1]  26:12

**- 9 -**

**9** [2]  48:17, 20
**90** [1]  34:25
**91** [2]    33:18;
35:2

**- A -**

**able** [3]    16:11;
17:25; 49:23
**about** [22]    5:7;
6:13, 21;    13:19,
25;  14:1;  15:21,
24;    19:5,  23;
30:1;    32:17;
35:12;    39:8, 20,
24;      40:13;
45:17;  53:5, 18;
55:18, 19
**accept** [1]  57:11
**accountant**    [4]
5:21, 23;  6:3, 12
**accountants**    [1]
28:19
**accounting**    [11]
5:10;    10:13, 16;
12:10;      19:11;
20:23;      21:7;
26:9;      32:5;
35:24; 36:18
**accrual**    [15]
3:15;      10:14;
20:22;    21:3, 8;
23:11;      26:9;
32:4;      33:23;
34:10,   14,   16;
35:5, 16, 23
**accrued**    [1]
53:16
**accrues**    [1]
34:13
**accumulate**    [1]
13:10
**accumulation** [4]
13:12;   18:1, 10;
34:23
**accuracy**    [1]
24:8
**accurately**    [1]
34:11
**action** [1]  58:18

**actual** [3]    13:6;
35:14;  44:21
**actually**    [5]
26:23;  28:23, 25;
45:20;  47:19
**add** [3]    29:5;
43:9; 50:24
**added** [2]  16:23;
22:13
**additional**    [8]
10:11;      11:23;
12:11;    13:1, 20;
14:24;      32:2;
47:6
**address** [1]  4:9
**addressed**    [1]
33:4
**adjusting**    [1]
12:10
**adjustment**  [14]
3:15;      16:25;
17:1;      20:25;
22:6,  11;    23:7;
30:3, 9;  35:7, 10;
38:3;      52:10;
53:19
**adjustments**   [3]
21:10;  22:2, 16
**adopt** [1]  20:22
**advance** [2]  55:3
**advice** [1]  56:15
**affect** [3]    21:7;
31:1, 2
**affidavit**    [9]
7:16, 20, 21, 25;
8:13;  9:17;  14:6;
55:14, 23
**after**  [8]    6:7;
35:8;      40:25;
41:11;      42:14;
43:18;      48:4;
51:14
**afterwards**    [1]
58:12
**again** [5]  15:16;
16:15;      32:1;
42:21; 52:21
**agent** [5]    9:2;
36:3;  40:6;  50:8,
10
**agents** [6]  11:13;
19:8;      39:24;
40:13;  41:4. 14
ꞏꞏ꞊ꞏꞏ   ꞏ꞊)
ꞏꞏꞏꞏꞏ    ꞏꞏꞏꞏꞏ
ꞏꞏ ꞏꞏ, ꞏꞏ
**agreement**    [5]
1:15;      10:14;
11:25;      46:21;
47:20
**alerted**    [2]
12:21;  14:18

**all**  [14]    6:24;
14:2;      19:20;
22:4;      27:22;
28:10;  31:14, 16;
34:9;      40:10;
42:9, 10;  49:8
**allow** [2]    16:21;
43:2
**allowed**    [1]
43:19
**alone** [1]  11:15
**already** [4]  7:18;
22:3;      26:18;
50:3
**also** [10]    8:15;
13:14;      16:24;
18:5, 11;  19:4, 5,
15;  22:20;  24:13
**although**    [2]
34:8, 9
**always** [3]  14:23;
43:4; 52:13
**am**  [4]      23:4;
30:1;      31:7;
58:15
**amended**    [1]
34:18
**america** [1]  1:8
**among** [1]  1:15
**amongst**    [1]
41:18
**amount** [15]  8:4;
13:20;      14:2;
16:19;      20:25;
24:13;  26:7, 18;
27:20, 21;  28:23,
24;      31:22;
34:11; 46:1
**amounts**    [7]
13:15;      14:24;
22:1,  22,   23;
26:5; 32:8
**another**    [3]
11:11;      40:19;
44:12
**answer**    [4]
30:22;    56:5, 11,
14
**answered**    [3]
52:20;  57:4, 5
**anybody**    [3]
11:8;      38:10;
51:18
**anyone** [1]  24:7
**anything**    [1]
15:23
**anyway** [1]  22:21
**appeals** [1]  50:4
**appearances**   [1]
2:1
**appears**    [2]
35:21, 24

**applied** [2]  25:21
**apply** [1]  57:3
**approve**    [1]
38:12
**approved**    [1]
38:10
**approximately** [4]
6:22;      23:24;
30:14;  31:18
**april** [4]    45:13,
19;  58:24
**are**  [14]      4:14,
16;    7:8;    9:21,
24;  13:3;  15:21;
16:4;    20:5,  18;
23:14;      39:25;
40:2;  44:21
**argument**    [1]
54:6
**around** [3]    24:6;
41:19;  42:6
**arranged**    [2]
51:24;  52:8
**ask**  [6]      33:6;
47:24;      48:5;
52:3, 21;  57:1
**asked** [10]  9:15;
12:4,  7,  15,  17,
18;      43:25;
44:16;      52:24;
54:23
**asking** [1]  20:18
**assignment**    [1]
19:18
**assistant**    [5]
5:25;    6:4,   17;
36:23;  51:6
**associated**    [2]
15:13;  18:5
**assume** [2]  13:8;
42:1
**assumed**    [5]
27:4,   5,   10;
41:24;  55:6
**assumes**    [1]
41:8
**assuming**    [1]
24:15
**assured**    [2]
42:24;  43:13
**attached** [1]  8:5
**attorney**    [1]
58:16
**attorney-client**
[2]  56:17, 18
**audit** [5]    19:8;
46:19;      49:21;
50:9, 20
**audited** [1]  43:2
**audits** [4]    4:23,
25;  6:2;  11:14
**authorize**    [1]

35:1
**away** [1]  42:2

**- B -**

**b** [1]  3:1
**bachelors**    [1]
5:8
**back** [26]   12:7;
16:6;   17:14, 15;
20:6, 21;   21:25;
22:9, 10;   23:13;
25:23;   31:5, 12,
14;  32:25;  35:7;
38:23;  44:17, 20;
48:3,  5;   49:3;
51:17, 25;  52:19;
57:14
**background**  [2]
5:7;  51:8
**bad** [1]  33:15
**baker** [2]   1:17;
2:5
**balances**    [2]
27:23;  28:1
**banks** [1]  33:18
**based** [3]  23:10;
30:7;  56:18
**basically**    [5]
12:24;      16:6;
17:25;     48:11;
53:11
**basis** [8]   10:14;
19:5;    21:1,  3;
34:14;  35:16, 24
**be** [54]    6:19;
7:21, 23;   14:20;
16:9, 10, 11, 17;
17:25;   18:7, 21;
22:1;   25:13, 20;
27:1, 5, 8;  30:10,
16;    31:9,  16;
34:11;  35:12, 24;
38:9;      39:21;
40:17, 22;   41:5;
42:24;      43:13;
44:24;     45:2;
46:7, 13;  47:1, 3,
14;  48:1;  49:23;
50:15;      51:21;
52:6,   11,   15;
53:20;   54:3, 10;
55:9;  56:2;  57:8,
9
**became** [1]  6:4
**because**     [17]
12:6;      14:21;
16:4;       22:18;
27:10, 22;  29:1;
33:18;     38:21;
40:21;     41:21;
42:1,  2,   20;

44:17;  48:10
**been** [7]   4:18;
21:2, 10;  28:11;
29:23;     34:7;
46:15
**before** [11]  1:19;
5:3;  7:12;  8:10;
10:4;       12:3;
29:11;     32:22;
37:3;      47:10;
58:6
**behalf** [2]   2:4,
12
**behind** [1]  41:20
**being** [6]   4:3;
51:5, 6;  55:5, 6
**believe**     [18]
7:21, 23;    9:7;
14:6;      26:13;
29:21; 31:15, 16;
36:6; 38:6; 41:9,
16;   44:8,  11;
47:1, 2;  55:14
**believed**    [4]
44:24;     48:1;
51:21;  52:5
**belong** [1] 22:12
**best** [1]  14:10
**better** [1]  51:1
**between**     [4]
17:23;     21:2;
25:8; 45:12
**big** [2]    11:11;
40:11
**bit** [3]     5:7;
28:21;  53:25
**blank** [1]  54:8
**bond** [43]  14:14,
21;  15:4, 19, 24;
16:2, 5;  17:7, 23,
24;       34:16;
35:19, 22;  36:2;
37:14;     39:5;
40:14, 17;  41:1,
6, 12, 23;  42:18;
43:12,  17,  24;
44:10,  19,  20;
46:12;  48:17, 20,
24,  25;    51:16;
53:9,  22;   54:4,
13, 22;  55:6, 19;
57:7
**books** [1]  33:23
**boss** [1]  12:16
**both** [1]  27:1
**bottom** [2]   7:6;
55:15
**box** [22]    2:14;
14:14, 20;  15:24;
16:2,  3;   17:2;
41:2, 10, 12, 23;
42:24;     51:16;

53:9;  54:5, 7, 13;
55:19,  20;   57:7,
9
**boxes** [2]  16:10;
54:10
**breakdown**  [1]
25:8
**briefly** [1]  5:6
**bringing** [1] 13:5
**brought**    [1]
12:25
**by** [38]    1:13;
4:6,  18;   10:19;
12:11;  13:8, 11;
19:3;      20:21;
21:11;  22:4, 20,
22;  24:18;  26:1;
28:18;  30:9, 11,
18,  23;   31:22;
32:7;  33:19, 25;
34:5,  8,  18,  25;
36:5;      37:9;
38:10;     40:13;
41:23;      48:8;
58:7, 10, 12

**- C -**

**c** [10]     16:2;
55:19,  22,  25;
56:2,  3,  13,  20,
24;  57:7
**c-1-01-434**    [1]
1:6
**calculate**   [2]
26:23;  28:23
**calculated**   [3]
14:1;      20:24;
22:3
**calculation** [20]
10:9, 10, 16, 18,
24;  11:2;   12:5,
8,  9,  15;   13:7,
19;   20:9,  14;
22:7;      23:22;
27:1, 11;  32:1;
44:14
**calculations** [12]
9:18,  22,   24;
20:11;  24:8, 12,
15;  27:25;  28:5,
11;  29:3;  30:8
**call** [3]   34:16;
35:23;  48:24
**called** [2]  33:16;
55:2
**calling** [1] 34:15
**calls** [1]  56:5
**came** [6]   20:16;
21:14;     24:24;
28:15;     46:21;
47:20

53:9;  54:5, 7, 13;
55:19,  20;   57:7,
9
**boxes** [2]  16:10;
54:10
**breakdown**  [1]
25:8
**briefly** [1]  5:6
**bringing** [1] 13:5
**brought**    [1]
12:25
**by** [38]    1:13;
4:6,  18;   10:19;
12:11;  13:8, 11;
19:3;      20:21;
21:11;  22:4, 20,
22;  24:18;  26:1;
28:18;  30:9, 11,
18,  23;   31:22;
32:7;  33:19, 25;
34:5,  8,  18,  25;
36:5;      37:9;
38:10;     40:13;
41:23;      48:8;
58:7, 10, 12

**can** [5]     5:6;
30:19, 21;   31:6;
34:11
**can't** [3]   54:8;
56:7
**carried**    [2]
31:12, 14
**carroll** [19]   3:3,
5,  11,  13;   8:7;
12:17;      13:8;
15:9;      19:17;
24:9;   25:6, 14;
27:10;      36:11;
37:10;     38:14;
51:20;      53:8;
54:16
**carroll's**    [2]
30:2; 53:23
**carry** [1] 31:4
**case** [5]    1:6;
37:7;  48:10, 11;
51:10
**cases** [1]  22:5
**cash** [53]   3:15;
10:13;  14:14, 21;
15:4,   19,   24;
16:2,  5;   17:23,
24;    21:2,  7;
23:11;      26:8;
32:4;      34:16;
35:5, 19, 22, 23;
36:2,  4;   37:14;
39:5;  40:14, 17;
41:1, 6, 12, 23;
42:18;  43:12, 17,
24;   44:10,  19,
20;      46:12;
48:17, 20, 24, 25;
51:16;   53:9, 21;
54:4,  13,   22;
55:6, 19;  57:7
**castelini**    [5]
3:17;      13:8;
36:14;     51:21;
52:5
**category**    [1]
22:17
**center** [1]  2:6
**certain** [1]  6:19
**certificate**   [1]
58:1
**certify** [2]   58:5,
13
**challenge**   [1]
36:4
**chance** [1]  7:18
**change**     [14]
10:12,  13,  15;
20:21;   21:7, 11,
24;      23:10;
30:24, 25;   31:3,
22;  32:8, 11

charge    [2]
33:18;  50:9
check  [23]    8:3,
5,  13;    10:22;
11:5,  17,  22;
12:25;  13:6, 18,
25;  16:2; 38:25;
39:9;  42:15, 17;
43:23;    47:3;
51:15, 24;  54:5,
7;  57:14
checked    [11]
14:14, 20;  15:24;
16:10;    41:12;
42:24;    51:16;
54:10,  13;  57:8,
10
checking    [3]
41:10, 23;  53:9
cincinnati    [5]
1:19, 24;    5:14;
8:2;  58:20
city [1]  2:6
civil [1]  1:14
clarify [1]  17:10
clear  [2]    17:10;
39:3
clearly [3]  17:4;
53:20;  54:13
cleveland [1]  2:7
close [1]  48:11
closed [4]  44:21;
48:2, 4, 11
collection    [3]
16:1, 8;  42:23
collections    [2]
54:9;  57:10
college [1]  5:9
column    [4]
20:20;    25:25;
26:1; 28:11
combination  [1]
26:4
combined    [1]
25:2
come  [2]    25:25;
46:4
commission  [1]
58:23
companies    [1]
34:14
company    [11]
1:4;  4:17;  8:3;
22:5,  11,  20;
28:15, 22;  29:15;
35:10;  36:24
compare    [1]
27:23
complex    [1]
24:12
complexities  [3]
12:6;  27:11, 17

complexity  [1]
24:14
concern    [1]
35:13
concerned    [3]
52:12;    53:24;
54:1
concerns    [1]
53:8
concluded    [1]
57:18
considered  [1]
40:17
consolidated  [2]
18:24; 29:20
consummate  [2]
16:12;  52:1
contain [1]  7:14
continued    [1]
55:10
contrary    [1]
43:15
conversation  [2]
13:24;  42:15
coordinator  [4]
16:17;    50:13;
51:3, 6
copy  [6]    8:12;
10:23;    11:2;
45:7;  54:16, 24
corporate    [6]
3:9;    19:17;
29:15;    38:15;
51:20;  53:7
correct  [26]
6:12;  7:21;  14:8,
9;  15:20;  16:15;
18:7;  23:4, 6, 9;
24:19, 25;  25:9;
30:1, 5, 6, 10, 16;
36:3;    37:15;
39:5;    41:11;
46:7, 13;  48:17;
55:9
correctly    [1]
43:14
could  [45]    7:3,
6;  8:20;  9:10;
10:8;    13:22;
16:10, 23;  18:4,
5,  6;    21:12;
26:22, 25;  27:9,
19;  29:7, 13, 22;
30:12; 32:21, 24;
33:7, 10, 11, 20;
35:16;    36:7;
37:2, 5;    42:9;
44:16, 19;  47:19,
21;  48:3;  50:24;
52:2, 14, 18, 21;
54:4;  56:11, 12;
57:13

counsel [4]  1:16;
56:15;  58:11, 16
courses [1]  5:13
court [2]  1:1, 20
cpa [1]  5:9
crescent    [1]
4:12
cross-examinatio
n [2]  1:14;  4:5
cumulative    [3]
21:1, 6;  22:23
cumulatively [1]
21:24
current [3]  4:21;
6:8;  19:8
currently    [1]
4:14
cycle [2]  16:17;
50:2
cycles [1]  19:9
cypress [1]  1:23

- D -

dan  [2]    36:14;
51:21
date  [2]    23:19;
49:22
date-stamped [1]
9:4
dated [7]  8:3, 6;
23:17;    32:25;
37:6, 23
dates [1]  50:7
day  [7]    15:16;
23:21, 23;  40:23;
51:19;    52:25;
58:21
dc [1]  2:14
dealing [2]    9:2;
19:7
dealings [1]  54:5
december    [29]
4:1;  7:25;  8:3,
6;  9:1;  10:21;
14:17;    15:17;
17:21;    18:13;
20:1;  24:3, 5, 6;
25:6;    33:1;
34:18;  37:6, 13,
23;    38:23;
43:18;    44:15;
45:23;  46:4, 8;
48:16;  56:23
decide [1]  52:7
decided    [2]
12:21; 27:13
decision    [2]
37:25;  48:24
deduct    [6]
17:25;    33:21;
34:21;    35:17;

36:7;  45:6
deducted    [3]
36:2;    43:17;
45:8
deductible    [1]
35:25
deduction    [14]
13:15;    16:19;
18:6,  9,  12;
34:20;  35:3, 21;
37:14, 22;  38:1,
9;  43:3, 20
defendant    [2]
1:9;  2:12
definitely    [2]
34:21;  57:2
degree  [2]    5:8,
15
delay [1]  33:17
delivered    [6]
13:18, 25;  34:7;
38:24;    42:14;
51:14
denver [1]  28:14
department    [6]
16:1,  8;  19:24;
28:19;    29:22;
57:10
depends    [1]
19:25
deposed [1]  4:4
deposit    [1]
15:19
deposition    [6]
1:12;    57:18;
58:6, 9, 11, 14
designate    [1]
35:22
designated    [2]
13:15; 45:5
determinable  [3]
13:13;    18:4;
29:6
determination [1]
25:17
determine    [2]
27:20; 47:21
determined    [8]
13:21;    21:21;
25:11, 12, 14, 20;
34:11; 46:16
didn't    [10]
10:25;    12:20;
15:6;    16:15;
20:12;    27:17;
29:2, 18;  45:19;
48:2
difference    [5]
17:22;  21:1, 3;
35:8;  56:9
differences  [2]
35:4, 11

different    [1]
44:6
differently    [1]
35:18
dilemma    [1]
51:22
directed [1]  13:7
director    [5]
19:17;    36:18;
38:15;    51:20;
53:7
disagree    [1]
56:21
disallow    [1]
45:20
disallowing    [1]
45:14
discuss [1]  36:1
discussed    [3]
15:10;    16:6;
41:18
discussion    [3]
44:11;    45:22;
46:3
discussions    [6]
13:18, 23;  39:24;
41:3, 13;  56:5
distance [1]  42:1
district [2]  1:1
divide [1]  30:10
divided [2]  27:2;
30:9
division [3]  1:2;
2:13;  8:1
djc    [4]    33:16;
34:20;    35:13;
36:13
document    [16]
7:4, 12;  8:10, 17,
24;  9:6;  10:1, 4;
14:7,  11,  13;
32:21, 22;  45:3,
15;  46:9
documents    [1]
20:14
does    [6]    7:14;
35:20;    36:10;
44:1;    51:14;
55:22
doing [4]  13:11;
15:16;    23:25;
42:23
dollar  [6]  14:2;
26:25;  27:20, 21;
30:3;  39:23
done  [14]  11:25,
20:24;  22:8, 9;
23:22;  28:11, 18;
35:8;    40:15;
46:18;  48:8, 10;
50:4, 20
door [1]  40:18

double [1]  47:2
doubt  [3]    36:3;
43:3, 6
doug  [4]    35:4;
36:15, 16, 17
down  [7]    11:14,
16;  20:5;  26:23;
27:12, 14;  55:18
draft [1]  9:11
drafted [1]  9:16
drive [1]  4:12
due  [7]    10:11,
12;    21:10;
24:14;    27:16;
35:23
duly  [2]    4:3;
58:7
during [3]  17:21;
19:3;  46:3
duties [3]  18:17;
19:19, 21

- E -

e  [7]  1:4;    2:6;
3:1;    4:17,  19;
5:20;  58:2
each  [9]    22:14,
15, 16, 20;  27:9,
23;    28:22;
31:19;  52:14
earlier [3]  26:13;
39:2;  44:11
early [1]  24:3
economic    [1]
34:12
economically  [1]
34:13
educational    [1]
5:7
effect [2]  30:19;
34:18
effective    [1]
24:20
eighteen    [1]
4:20
either [4]  16:2;
18:15;    29:21;
38:18
elliot [1]  3:3
else [1]  11:8
emphasized  [1]
53:12
economic d    [5]
4:1, 5,  16,  18;
7:19;  40:13
employees    [1]
41:4
enough [1]  29:2
entail [1]  18:18
equal [1]  27:2
equate [1]  6:24

error [1]  41:22
esq [2]  2:5, 13
establish    [1]
34:19
estimated    [1]
19:4
estimates    [1]
24:2
even  [3]    35:17;
44:23; 54:25
events [1]  34:9
ever  [3]    20:2;
29:11;  46:4
everything    [3]
7:20;    22:17;
51:4
evidence    [1]
41:8
exact [2]  27:14;
49:7
exactly    [5]
20:17, 19;  27:20;
39:14, 23
exam [1]  55:3
examination  [5]
3:7;  8:21;  43:19;
55:4;  58:15
examined    [2]
4:3;  24:9
examiner [1]  8:1
examining    [1]
45:18
except [1]  31:4
excuse [1]  17:6
exhibit [21]  7:2,
3,  7;    8:9,  16;
9:9, 18, 22;  10:1,
22;  14:5;  25:24;
29:10;    32:20;
37:1,  12,  19;
41:2;    48:15;
55:14, 24
expected    [3]
13:2;    15:11;
40:22
expense    [1]
45:14
expires [1]  58:23
explain [1]  28:7
explained    [1]
54:11
expressed    [1]
53:8
extent [1]  56:4
eyre  [20]    2:5;
9:15;    17:9;
30:21;    31:24;
33:11, 14;  39:10;
40:2;    41:7;
43:25;    44:4;
46:17;    50:5;
52:18, 23;  56:4,

18, 22;  57:4

- F -

f [2]  34:9;  35:14
fact [1]  51:17
facts [1]  41:8
fall  [2]    48:6;
49:2
family [1]  39:25
far [1]  52:12
february    [3]
44:12, 23;  45:23
federal [8]  1:14;
4:23, 25;  5:4, 25;
6:1;    18:23;
24:22
feel  [3]    16:15;
24:15; 29:2
feeling [1]  29:3
feet [1]  42:2
fellows [1]  40:7
felt  [3]    13:11;
52:13; 53:20
female [1]  42:10
few  [3]    5:2, 13;
42:2
fifty [2]  19:6, 7
figure  [3]    22:1;
24:25;  37:18
filed [1]  20:24
filing [1]  34:18
final [1]  23:21
find [1]  49:24
fine  [5]    7:2;
25:19;    38:22;
49:20
finish [1]  51:23
firm [1]  19:12
first  [6]    5:19;
25:13;    33:20;
45:1;    55:17;
58:7
five  [2]    17:1;
20:5
fix [1]  34:10
fixed [4]  13:13;
18:4; 29:6;  34:2
follows [1]  4:4
forcing [1]  35:15
foregoing    [1]
58:9
forgot [1]  35:6
form  [13]    8:21;
11:25;  17:2, 10;
23:15;  29:16, 17,
20;  42:8;  45:13;
46:17;    51:16;
54:17
forth  [3]    1:17;
16:7;  58:11
four-year    [1]

22:8
**frame** [2]  6:12;
19:25
**frazier** [2]  29:21;
38:7
**from** [33]  3:3, 5,
11, 13, 17;  5:8;
6:13;  8:6;  10:13;
11:9, 13;  20:16;
21:7;  22:23, 24;
23:8, 11;  24:4, 5;
26:3, 8;  32:3, 4;
34:17;    35:23;
42:3;  45:11, 15;
46:8;  51:5;  56:9
**full** [1]  55:17
**further**    [5]
34:23;    36:1;
54:20;    57:16;
58:13

**- G -**

**garden** [1]  1:23
**gave** [8]  9:4, 7;
17:15;    19:18;
23:1;  24:3;  45:6,
7
**gentleman**    [1]
29:24
**george** [3]  40:5,
8;  51:2
**get** [4]    18:8;
44:16, 19;  48:3
**giglio** [4]   1:19,
23;  58:4, 22
**give** [7]  9:5, 6;
10:23;    35:20;
38:20;  54:19, 24
**given** [1]  58:9
**giving** [2]  11:1;
58:6
**go** [11]    21:25;
22:9, 10;    25:23,
24;  26:1;  38:23;
51:17,  23,  25;
52:8
**going** [9]  16:16;
24:13;    40:19;
42:17;    43:16;
45:19;  47:5, 14;
57:14
**got** [1]  17:11
**government** [17]
3:2, 4, 6, 8, 10,
12, 14, 16;  8:16;
9:9, 17, 25;  14:5;
29:10;    32:20;
37:1;  55:24
**graduated**   [1]
5:16
**graduating**   [1]

5:9
**greeted**    [2]
11:13;  39:23
**gross** [1]  32:7
**group** [2]  18:24;
34:17
**guess** [18]  7:9;
11:25;    17:3;
20:7;    30:12;
40:21, 25;  41:2;
43:14;  45:1, 12,
15;  49:24;  52:2,
10;  54:24;  55:7;
56:1

**- H -**

**h** [1]  3:1
**hackman**    [7]
1:12;  3:13, 17;
4:2, 8;  58:7, 10
**had** [78]  4:24;
7:18;  9:3;  10:14;
11:12, 13;  12:1,
4,  5;  13:9, 20;
14:7;    15:10;
16:10;    17:14;
20:2, 6, 24;  21:2,
10, 23, 24, 25;
22:3, 5, 7, 8, 9,
10, 17;  24:16;
26:11, 18;  28:11;
29:2;  33:7;  35:5,
10;  39:24;  40:3,
15, 16, 21;  41:1,
25;    42:14,  15,
20, 24;  43:3, 5,
6;  44:8, 11, 12,
13, 14;  45:1, 16,
21, 22;  46:15;
50:3;    51:24;
52:8;  53:8, 12;
54:5, 12;  55:1;
56:6, 19;  57:9
**half** [2]  27:3, 5
**hallett** [9]  2:13;
4:6;  44:2;  46:20;
50:12;  56:12, 16,
21;  57:15
**hand** [2]  57:14;
58:20
**hand-delivered**
[1]  8:1
**handed** [1]  17:13
**handled** [1]  45:4
**handwriting**  [1]
33:8
**handwritten**  [1]
3:13
**happened**   [3]
53:9, 11;  54:12
**happy** [1]  54:12

**hard** [1]  33:7
**hate** [1]  33:6
**having** [3]  13:17,
23;  52:9
**he** [81]  9:3, 5, 6,
7;  12:2, 5, 20;
13:9;  14:12, 22;
15:4, 6, 9, 15, 25;
16:7, 11, 14, 20,
23;  17:3, 11, 13;
24:9,  15,  16;
25:16;    27:13;
29:1, 2;    30:2;
33:16;  34:20, 25;
35:1, 5;    36:19,
20, 23;    41:9;
42:22, 23, 24;
43:2, 6, 11, 13;
44:1,  3,  19;
45:16, 17, 19;
51:2, 4;    52:11,
12, 15;    53:24,
25;    54:1, 4, 8,
12,  13,  19;
56:12, 19;    57:2,
9, 13
**health** [1]  40:1
**hear** [1]  45:11
**hearing** [1]  42:1
**help** [2]    17:3;
52:3
**helps** [1]  51:12
**her** [1]  17:14
**here** [6]    11:21,
22;    24:17;
25:24;    34:2;
47:25
**hereby** [1]  58:5
**herein** [4]  1:13;
4:3;  58:11, 16
**hereinafter**  [1]
1:17
**hereunto**    [1]
58:19
**highcrossing** [1]
4:12
**higher** [1]  33:18
**him** [28]    10:23;
11:17, 21;    12:4,
7,  17,  18,  21;
13:9,  25;    15:7,
14,  15,  17;
16:14;    40:6;
43:1, 3, 25;  45:7,
11;  52:5, 14, 16;
53:10, 17;  57:3
**his** [9]    11:6;
16:16;    29:3;
33:20;    40:5;
43:1;    45:15;
52:17;  58:6
**history** [1]  51:7

**hold** [2]    43:7;
52:18
**home** [1]  4:10
**honest** [1]  43:5
**hope** [2]    33:11,
13
**hostetler**    [2]
1:18;  2:5
**hour** [2]    39:18,
19
**how** [32]    4:18;
24;  5:22;  6:16,
22;  8:23;  14:1;
15:4;    19:23;
21:21;    23:25;
25:11, 12, 16, 19;
27:13;    31:18;
32:17;  39:7, 15,
20, 22, 25;  41:4;
42:16;  44:1, 5, 7;
45:4;  51:24
**howard** [1]  34:8
**hundreds**    [1]
28:4

**- I -**

**i'm** [13]    4:23;
5:9;  16:16;  17:9;
24:1, 15;  38:21;
39:17;    40:1;
41:17;  52:19, 20
**idea** [1]  17:16
**identify**    [1]
32:24
**idr** [1]  45:7
**imwalde** [1]  40:5
**imwalde's**   [1]
51:2
**in-house**    [3]
19:11, 13, 14
**included**    [1]
49:16
**income** [13]  3:9;
23:5, 8;  24:22;
29:16;  30:11, 14,
18;  31:22;  32:7,
12;  35:9
**incorrect**   [3]
14:19;    16:4;
44:14
**increase**    [6]
23:8;  30:10, 14,
15;  31:21, 25;
**increase**    [5]
30:15,  23,  7
**increment**   [2]
22:6, 14
**increments**   [2]
26:24, 25
**independently** [1]
56:10

**indicate** [2] 43:16; 55:5
**indicated** [1] 39:3
**individual** [1] 35:10
**information** [3] 45:3, 15; 46:9
**initials** [1] 23:14
**inkling** [1] 45:1
**instead** [1] 35:11
**instructions** [1] 54:20
**insuring** [1] 54:20
**intend** [1] 11:22
**intended** [1] 10:10
**intent** [10] 12:3; 14:22; 15:3, 5; 16:18; 17:4; 41:21; 53:14, 20
**intention** [2] 54:2, 14
**interest** [80] 9:1; 10:11; 11:23; 12:2, 23; 13:2, 10, 12, 14, 16; 14:23, 25; 15:9, 11, 13; 16:19, 20, 25; 17:1, 5, 6; 18:1, 2, 3, 5, 6, 8, 11; 30:4; 32:2; 33:19, 21, 23; 34:1, 6, 12, 13, 20, 22, 23; 35:3, 17, 20, 21, 24; 36:2, 4, 7; 37:13, 17, 18, 21, 22; 38:1; 40:23; 42:22, 25; 43:12; 44:9, 18, 22, 25; 45:5, 9, 14; 48:1, 13, 21, 22; 49:16; 52:10, 16; 53:15, 16, 19, 21; 54:3, 15; 55:8
**interested** [1] 58:17
**internal** [5] 8:4; 9:1; 19:8; 37:7; 57:11
**internally** [2] 22:20; 44:1
**into** [3] 22:4; 31:15; 51:3
**investigating** [1] 45:18
**involved** [1] 48:23
**ironed** [1] 35:4
**irs** [30] 8:1;

10:15; 11:8; 12:10; 16:17; 21:11, 14; 22:3, 16; 27:18; 28:24; 34:8, 10; 40:6, 13; 41:4, 22; 42:16, 17, 19; 43:16, 22; 46:11, 21; 47:21; 49:21; 50:9; 51:15; 54:14, 23
**issues** [1] 40:1
**it's** [1] 10:9
**itself** [2] 17:2; 30:23

**- J -**

**january** [1] 53:4
**jeff** [2] 29:21; 38:7
**jerome** [5] 1:12; 4:2, 8; 58:7, 10
**jerry** [1] 36:9
**job** [8] 4:21, 24; 5:3, 20; 18:14, 17; 51:1, 6
**june** [2] 10:15; 11:24

**- K -**

**kentucky** [1] 4:13
**kept** [1] 16:7
**kind** [2] 19:16; 39:25
**kla** [1] 22:7
**knew** [17] 12:2; 14:22, 25; 15:3, 4, 15; 21:23; 22:14, 15, 16; 40:6, 18; 45:15; 47:16; 51:5; 52:2; 54:14
**know** [69] 5:1; 6:14; 7:19, 20; 8:17; 12:2; 15:4, 6; 16:16, 18; 19:15; 20:13, 16; 22:10, 19; 25:16, 19; 27:12, 13, 17; 29:5, 19, 23; 31:11; 32:3; 36:5; 38:4, 6, 16; 39:24; 40:9; 41:19, 20; 42:5, 11; 43:1, 10, 13; 44:1; 45:17, 19; 47:10, 13; 48:9, 19; 49:15, 18, 19, 20; 50:2, 8;

51:7, 12, 25; 52:1, 4, 12, 13, 16; 53:10, 13, 17, 25; 54:2, 10, 25; 56:3, 23
**knowledge** [2] 14:10; 56:20
**known** [2] 11:13; 18:3
**knows** [1] 56:13

**- L -**

**laskey** [2] 36:5, 21
**last** [1] 36:2
**later** [6] 5:25; 6:1; 17:13; 22:18; 27:12; 43:14
**learn** [2] 43:22; 44:3
**learned** [3] 44:7; 56:8, 10
**least** [6] 5:1, 2; 33:24; 34:5; 39:17
**leave** [1] 54:8
**led** [1] 44:8
**left** [2] 26:19; 42:16
**legal** [1] 56:15
**legislation** [1] 20:22
**less** [1] 26:18
**let** [5] 7:19, 20; 8:17; 12:7; 47:25
**let's** [2] 6:25; 20:20
**letter** [25] 3:3, 5, 11, 17; 8:6, 12; 9:11; 10:22; 11:4, 17, 21; 12:25; 13:6, 19, 25; 25:5, 7; 30:2; 35:18; 36:22; 37:6, 18, 23; 42:15; 48:16
**liabilities** [4] 14:25; 22:19; 53:16, 17
**liability** [30] 9:21; 10:11; 12:12; 13:9, 13, 20; 14:1, 2; 15:14; 18:3; 26:20; 27:3, 18; 29:6, 7; 30:20; 31:1, 2; 32:12, 15; 34:1, 2, 6, 10; 35:14;

40:24; 46:15, 22; 47:6, 13
**like** [11] 7:10; 8:8, 15; 11:11; 14:4; 29:9; 33:17; 34:21; 36:25; 55:4, 13
**line** [2] 31:7, 9
**little** [2] 5:7; 53:24
**loan** [1] 33:19
**long** [9] 4:18, 24; 5:22; 6:16, 22; 39:15; 40:1, 3, 4
**look** [11] 6:19; 7:1, 4, 6; 8:9, 15, 16; 10:1; 29:10; 32:21; 37:2
**looking** [1] 30:17
**loss** [6] 31:4, 6, 8, 23; 32:9
**lost** [1] 6:7
**lutzko** [1] 50:11
**lyons** [2] 36:16, 17

**- M -**

**ma'am** [3] 8:11; 21:15; 25:1
**mad** [1] 53:25
**made** [15] 8:25; 9:19; 21:10; 25:13, 16; 26:11, 15; 34:25; 37:14, 25; 40:16; 44:12, 13, 15; 46:1
**main** [4] 8:2; 11:6; 18:8; 35:13
**maintain** [1] 35:2
**major** [1] 5:10
**make** [23] 12:3, 4, 8, 15; 14:23; 15:3, 8, 18; 17:5; 26:13, 25; 27:24; 33:22; 35:2; 36:6; 39:4; 40:19, 23; 44:22; 48:14, 24; 53:14
**making** [9] 14:21; 16:5; 18:9; 20:11, 14; 41:23; 42:21; 43:11; 53:14
**manager** [6] 4:23, 25; 6:1, 9;

18:16; 37:8

**mandated** [1] 20:21

**many** [1] 19:23

**marked** [7] 7:3, 5; 32:20; 37:1; 41:1; 55:2, 15

**may** [6] 7:18; 45:2; 47:2, 10, 16; 50:1

**maybe** [4] 17:10; 26:12; 28:7; 53:24

**me** [45] 5:6; 7:4, 19, 20; 8:9, 17, 20; 9:4, 7; 10:1, 8; 12:7; 13:5; 16:7; 17:6, 15; 19:18; 23:1, 22; 24:3; 29:11, 13; 30:19; 32:21; 33:24; 34:4; 37:2; 38:19; 42:24; 43:6, 7, 13; 44:8; 47:25; 52:7; 56:6, 9, 10; 57:2, 9, 14; 58:7, 12

**mean** [17] 12:11; 13:7; 15:9, 14, 15; 20:15; 28:4, 21; 30:13; 39:12; 43:9; 46:18, 23; 47:12; 48:2, 12; 49:23

**meaning** [1] 39:10

**measure** [2] 29:7, 8

**method** [12] 10:12, 13, 16; 12:10; 20:22; 21:2, 7, 10; 23:11; 26:9; 32:4, 5

**michael** [4] 8:6; 12:16; 19:17; 51:19

**might** [1] 56:8

**mike** [16] 12:18; 15:9; 24:3, 9, 13; 33:4, 5; 35:13; 36:10; 37:9; 35:13; 51:19; 53:13; 54:11 million's [1] 12:25

**million** [62] 8:4; 16:25; 17:1; 24:18, 24; 25:7, 12, 15, 20, 21; 26:14, 15, 16; 28:8; 30:3, 4, 14,

15, 18; 31:8, 11, 14, 22, 25; 32:7, 9; 33:17, 21, 22, 23, 25; 34:5, 12, 21, 24, 25; 35:3, 8, 11, 12, 17; 36:7; 38:25; 39:9, 20; 40:13; 41:5; 42:17; 43:23; 44:15; 46:1, 11; 47:24; 48:17, 20; 49:3, 4, 8, 16; 51:15; 54:21

**mind** [1] 17:22

**mistake** [1] 35:6

**mixture** [1] 19:19

**moment** [2] 15:7; 39:10

**monday** [2] 36:1, 5

**money** [6] 44:16; 48:3, 5, 12, 13; 49:6

**monies** [1] 44:20

**more** [7] 5:9; 23:22; 28:7; 40:9; 43:10; 49:6, 8

**most** [1] 20:2

**moved** [2] 51:3, 5

**mr** [51] 9:14, 15; 11:2, 5, 20; 12:15; 13:8, 19, 24; 14:7, 11, 19; 15:2, 23; 17:9, 16; 25:6, 14; 27:10; 30:2, 21; 31:24; 33:11, 14; 38:24; 39:3, 8, 10; 40:2, 3; 41:7, 10; 43:25; 44:4, 7, 17; 45:22; 46:17; 50:5; 52:5, 18, 23; 53:23; 54:16; 56:4, 18, 22; 57:1, 4, 6

**ms** [9] 4:6; 44:2; 46:20; 50:11, 12; 56:12, 16, 21; 57:15

**much** [6] 23:25; 25:11; 31:18; 39:7, 22; 45:11

**multiplied** [1] 24:18

**must** [1] 57:7

**my** [14] 6:8, 19; 7:1; 12:16; 19:6;

32:6; 35:13; 51:22, 24; 53:8; 54:5; 56:15; 58:19, 23

**myself** [2] 28:15, 18

**- N -**

**name** [3] 4:7; 38:20; 42:7

**names** [1] 40:7

**national** [1] 2:6

**need** [3] 28:23; 34:24; 36:5

**needed** [1] 16:1

**needs** [1] 54:10

**net** [1] 32:9

**never** [1] 43:15

**newspaper** [1] 34:17

**next** [1] 50:2

**ninth** [1] 2:6

**notary** [2] 58:4, 23

**note** [1] 3:13

**nothing** [2] 55:5; 58:8

**notice** [2] 14:13, 16

**noticed** [1] 25:5

**notices** [1] 43:15

**now** [16] 8:8; 9:25; 14:5, 13; 15:2; 20:5; 24:17; 25:5; 27:19; 30:7; 37:12; 39:2; 41:19; 45:21; 46:3; 49:19

**number** [13] 9:10, 22; 14:5; 21:4; 23:1, 4; 27:14; 28:8; 32:20; 37:1, 12; 41:2; 48:15

**numbers** [12] 20:15, 16; 21:8, 13, 16, 22; 27:24; 31:3; 35:5; 44:14

**numerous** [3] 15:14; 19:2; 53:13

**- O -**

**o** [1] 2:14

**o'connor** [1] 3:11

**object** [1] 46:17

**objection** [6]

30:21; 31:24; 41:7; 43:25; 56:4, 16

**observed** [3] 41:1, 9, 11

**obtain** [4] 13:14; 16:19; 18:6, 11

**occurred** [1] 34:9

**occurs** [1] 34:13

**october** [4] 44:10; 45:3; 46:10; 55:10

**off-hand** [4] 5:1; 6:15; 31:20; 49:23

**office** [7] 8:2; 11:6; 39:13; 51:17, 18, 25; 58:20

**offices** [2] 1:17; 40:22

**official** [1] 1:20

**ohio** [9] 1:1, 19, 21, 24; 2:7; 8:2; 58:5, 20, 23

**okay** [133] 4:14, 21, 24; 5:6, 10, 12, 16, 19, 22; 6:11, 16, 21; 7:24; 8:23; 9:5, 9, 13, 25; 10:8, 18, 21; 11:4; 12:14, 19; 13:17; 14:4; 15:2, 21; 16:13, 22; 17:8, 19; 18:13, 17, 25; 19:10, 14, 20; 20:4, 8; 21:5, 12, 19, 23; 22:25; 23:3, 13, 24; 24:7, 11; 25:5, 19; 26:2, 6, 10, 21; 27:7, 15, 19; 28:3, 6, 16, 20; 29:4, 9; 30:1, 7, 13, 17, 25; 31:6, 11, 21; 32:14, 19; 33:2, 4, 6; 34:3; 36:10, 21, 25; 37:9, 12, 17, 21; 38:22, 23; 39:2, 7; 40:20; 42:12, 14; 43:8, 21; 45:10, 21; 46:7, 14; 47:4, 15, 18, 23; 48:4, 15, 23; 49:2, 11, 15, 20; 50:16, 19, 23; 51:9, 11, 14; 53:5; 54:19;

55:9, 13, 17, 22;
56:3, 6, 22
**once** [2]    22:13;
43:10
**one** [8]    16:9;
20:21;    23:23;
28:17;    29:24;
38:19;    40:15;
54:9
**only** [7]    13:10;
26:25;    28:17;
35:15, 19;    42:2;
44:19
**operating**    [1]
32:9
**order** [5]    16:7;
22:2;    33:25;
34:6;  57:10
**original** [1]  9:6
**originally**    [1]
17:11
**other** [15]  11:10,
13;  19:7;  20:14;
27:5;    28:18;
29:25;    38:19;
39:23;  40:7, 12;
41:3, 14;    42:5;
52:14
**others** [1]  19:3
**otherwise**    [1]
58:17
**our** [32]    8:25;
10:12, 13, 15;
11:22;  12:3, 10;
14:22;    24:2;
28:19;    29:22;
32:1;  35:4, 8, 18;
40:6, 24;    43:4,
18;  44:14, 24;
45:4;    51:1;
53:14, 20;  54:2,
6, 14, 24;  57:12
**ourselves**    [1]
41:18
**outcome**    [2]
9:23;  58:17
**outside**    [2]
19:11;  54:11
**over** [6]  13:1, 6;
34:2;    39:12;
43:19;  51:4
**over-payment** [1]
44:13
**overall** [1]  35:9
**overpay**    [1]
27:18
**owe** [7]    11:23;
13:2;    15:11;
32:2, 3;    48:12,
13
**owed** [8]    12:23;
14:24;    15:1;

22:19;    26:8;
27:4, 5;  34:16
**own** [1]  33:12

- P -

**p** [1]  2:14
**page** [4]    7:5, 6,
14;  55:14
**pages** [1]  7:11
**paid** [7]    13:1, 9;
26:14, 18;  34:25;
35:25;  37:22
**paper** [1]  45:8
**papers** [1]  45:4
**paragraph**    [2]
7:24;  55:17
**parentheses**    [1]
34:8
**part** [7]    18:19;
31:15;    42:4;
51:1, 22;  54:5, 6
**particular**    [1]
7:5
**parts** [1]  49:13
**party** [1]  58:16
**paul** [1]  2:5
**pay** [13]    11:22;
12:22;    13:11;
15:10, 12, 13;
17:4;    18:4, 5;
25:15;    33:24;
34:5;  54:15
**paying** [1]  34:19
**payment**    [71]
8:25;    12:1, 3;
14:21, 23;  15:3,
8, 18;  16:5, 11;
17:5, 6, 7, 23;
18:2, 9;  25:13;
26:11, 15;  30:4;
33:17, 22;  34:15;
35:2, 22;  36:2, 4,
6;  37:14;  39:4,
20;    40:14, 16,
17, 19, 23;  41:6;
42:18, 20, 21, 25;
43:12, 23;  44:9,
12, 15, 18, 22,
24, 25;    45:18,
24;    46:4, 12;
48:1, 14;  49:17;
52:16;  53:14, 15,
21;  54:2, 3, 21;
55:1, 3, 7;  57:11
**payments**    [2]
19:4; 38:24
**people** [4]  11:10;
19:23;    40:9;
42:5
**per** [1]  35:25
**percent** [3]  19:6,

7;  24:18
**performance**  [1]
34:12
**perhaps**    [1]
43:22
**period** [3]  17:22;
46:10;  51:4
**person** [1]  38:19
**photocopy**    [2]
9:5, 7
**piece** [1]  22:10
**piecemeal**    [1]
22:9
**pittsburgh**    [1]
35:6
**place** [3]    1:16;
25:13;  58:10
**plaintiff** [3]   1:6,
13;  2:4
**please** [4]    7:4;
8:17;    10:2;
32:22
**plus** [1]  52:10
**point** [18]  13:14;
16:3;    18:16;
26:23;    42:13;
43:4,    10,    21;
44:2;    46:14;
47:4,  23;    52:2,
13;  53:1;  54:22,
23
**portion** [1]  45:5
**position**    [2]
6:23;  51:3
**possible** [1]  35:2
**possibly**    [1]
38:19
**post** [1]  57:12
**post-graduate** [1]
5:12
**posted** [5]  16:9;
43:14;    44:9;
52:15;  54:21
**posting** [6]   3:7;
8:22;    44:8;
51:16;    54:17;
55:24
**pre-1954**    [1]
35:7
**preceding**    [2]
26:19;  28:25
**predecessor**  [1]
40:5
**prefers** [1]  35:1
**prepare** [9]   5:5;
13:7;    14:7    1;
19:10, 12;  25:17,
49:11, 13
**prepared**    [10]
10:18;    18:19;
19:3;    20:8;
23:19;  29:22, 24;

32:25;    38:3;
49:13
**preparer**    [2]
38:2, 4
**preparing**    [1]
19:1
**present** [2]  11:8;
12:18
**presented**    [3]
10:22;  11:4, 17
**presently**    [1]
36:18
**press** [1]  35:6
**presume**    [1]
46:23
**pretty** [1]  41:21
**previous**    [1]
11:14
**previously**    [2]
28:12;  40:16
**prior** [1]  56:19
**privilege**    [2]
56:17, 19
**probably**    [13]
5:24;    19:6,   7;
20:6;    24:4,   5;
38:19, 20;  41:25;
44:10;    49:24;
53:4
**problem**    [1]
45:16
**procedure**    [1]
1:15
**proceedings**  [1]
4:1
**process**    [5]
16:3, 8, 10;  54:9;
57:13
**processing**    [1]
15:25
**project**    [2]
19:18;  24:3
**promoted**    [1]
5:24
**proposed**    [1]
30:3
**public** [2]    58:4,
23
**publishing**    [1]
28:14
**purpose** [1]  18:8
**purposes**    [2]
15:25;  42:23
**pursuant**    [2]
1:14,    2
**pursue** [1]  5:14
**put** [1]  22:4

- Q -

**quarterly**    [1]
19:5

question [14]
9:16;       32:6;
33:20;      40:25;
41:7;    46:18;
52:19, 20, 21, 22,
24;  56:11;  57:4,
5
questions [2]
19:16; 57:16
quite [1] 28:21

- R -

rar [3]    34:7;
35:15; 36:8
rate [3]    24:20,
22; 33:19
rather [1] 43:23
reach [1] 47:12
reached    [1]
10:14
reaction    [1]
53:23
read [5]    7:19;
33:10, 12;  52:19,
22
reading [1] 33:7
ready [1] 7:8
realize [1] 47:5
realized    [1]
44:13
really [2]    13:5;
43:1
reason [1] 43:3
reasonable   [1]
27:1
recall [15]  6:21;
11:1, 19;  12:14;
13:17, 23;  18:14;
23:24;    31:18;
32:14;    39:7;
40:7;     42:7;
46:14; 47:8
received    [8]
19:16;    43:15;
45:2, 13;   46:9;
49:3, 5, 6
recognize    [3]
8:18, 23; 29:12
recognized   [1]
55:7
record [1] 33:10
records [2] 6:19;
7:1
refer [9]    7:10;
9:10;      14:4;
20:10;     29:9;
31:6;    36:10;
55:13, 23
referenced   [1]
55:23
referred    [6]

8:13;      9:18;
20:13; 36:15, 22;
37:17
referring    [1]
13:4
refers [2]  37:13;
48:16
reflected    [2]
9:22; 37:22
refund [1] 48:13
refunded    [1]
48:6
regard [1] 54:20
regarding    [2]
41:4; 45:23
reiterate    [1]
43:10
reiterated    [3]
42:20;    44:19;
53:12
related [1] 54:25
relationship [1]
43:4
relative    [1]
58:16
relay [1] 51:17
relied [1] 52:11
remarks    [2]
17:2, 12
remember    [18]
6:20, 25;  11:10;
12:17;    25:18;
38:7, 18;  39:22;
40:8;     41:16;
49:7, 19, 22, 23,
25;  50:5, 6, 7
remitted [1] 25:8
repeat [1] 13:22
reporter    [2]
1:20; 52:22
reporting    [1]
1:23
represent    [1]
54:2
represented [2]
21:4; 23:2
represents    [1]
23:4
request [4] 45:3,
16;  46:9; 48:8
requesting    [1]
45:4
research    [3]
19:15, 18; 33:3
respect [1] 43:5
respected    [1]
43:6
responded    [2]
44:17; 45:7
response    [1]
16:16
responsible   [1]

19:1
rest [1] 28:18
result [1] 11:24
return [22]   3:9;
18:21, 23;  20:10,
11,  23;   29:14,
16;   30:18, 23;
31:7;    34:18;
38:2, 5, 14, 17;
43:18;    45:6;
47:24; 49:12, 15,
16
returns     [4]
18:19; 19:2, 11
revenue [6]  8:4;
9:2;  19:8; 35:25;
37:7; 57:11
review [3]   24:7,
10, 16
reviewer     [3]
38:13, 16
reviewing    [1]
19:2
right [6]    15:7;
17:13;    22:17;
32:6;     40:10;
45:25
rise [1] 35:20
rob [1] 29:23
room [7]     11:9,
11;  40:9,  11;
41:14; 42:4
ross [3]    1:19;
58:4, 22
roughly [5]  6:14;
24:5; 27:2, 8
round [2]  27:12,
13
rules [1] 1:15
ruling [1] 35:25
running [4] 26:3;
35:20; 48:21, 22

- S -

s [2] 3:1; 29:15
saewitz [28] 3:5;
9:3; 10:23; 11:2,
5,  20;   12:15;
13:19, 24;  14:7,
11, 19;  15:2, 23;
29:1;      30:2;
38:24;  39:3, 8;
40:3, 21;  41:10;
44:7, 17;  45:22;
50:15; 57:1, 6
saewitz's    [1]
17:16
said [23]   5:16;
12:5;   15:2, 25;
16:3,  20,   23;
17:2,  3;   41:9;

42:23;     43:7;
45:21;   49:2, 4,
50:17;    52:15;
54:7, 8;  58:6, 10,
11, 13
same [4]   27:25;
34:17;    50:20;
55:2
sat [1] 11:14
satisfy [1] 10:10
saw [1] 51:15
say [15]    6:13;
13:3;     15:23;
18:7; 20:2; 24:3;
30:12;    40:4;
43:17;    46:7;
47:16, 21;  50:11;
54:6; 55:9
saying [2] 33:16;
40:2
says [4]   26:12;
33:5;     34:20;
55:24
schedule    [1]
25:24
scripps [25]  1:4;
4:17;     5:20;
18:14; 19:10, 24;
20:10;    21:16;
24:21;    29:15;
34:8;  36:19, 24;
37:21, 25;  39:4;
46:21;  47:5, 24;
48:5, 8, 19;  49:3,
11; 58:2
scripps's    [2]
18:8, 21
seal [1] 58:20
second [2]  7:24;
52:18
secretary    [7]
9:3; 14:7; 16:24;
17:14;    41:25;
42:8; 52:9
section    [4]
17:12;    20:25;
55:19, 22
see [5]  6:11, 25;
21:8;     24:17;
55:20
seeing [1] 54:13
seems [2]  33:24;
34:4
seen [8]    7:12;
8:9; 10:4; 29:11;
32:22;     37:3;
40:1, 3
send [4]    16:2;
55:25;     56:2;
57:7
sent [1] 25:6
serves [1] 35:19

service [4]  8:5;
13:1;      37:7;
57:11
services [1]  1:23
set  [7]    1:17;
22:19; 33:23, 25;
34:6; 58:11, 19
settle [1]  48:12
settled    [2]
46:25; 50:1
settlement    [3]
35:15;    46:24;
47:13
seven [1]  20:7
she [5]   42:2, 3,
4, 10
sheet [1]  22:4
should    [5]
14:20;    27:12;
35:12, 18; 56:2
show  [7]    7:2;
8:15; 9:25; 17:4;
32:19;    36:25;
54:16
showed    [2]
37:18; 45:8
shown [1]  53:20
sid [20]    29:1;
30:2;     40:21;
41:1,  17,   24;
42:15, 20;  43:5;
50:15;   51:1, 8,
23;   52:9, 11;
53:13,  18,  19;
54:4, 6
side [1]  11:12
sidney [2]   9:2;
10:23
signature    [2]
7:14; 58:15
signed [2]  7:16;
12:1
significant   [1]
24:1
simply [2]  22:21,
22
since  [11]   4:20;
9:1; 12:9; 13:10,
13;  26:22;  34:6,
13;  35:15;  36:8;
40:15
sir [1]  4:9
sit [1]  26:23
sitting [1]  11:16
six [1]  20:6
small [1]  35:10
some [17]   9:18;
19:2, 11; , 22:5;
27:13;   39:23;
40:6;    43:21;
44:2, 16;  45:22;
46:21;    47:4;

51:8;    53:1;
54:23; 56:19
somebody    [1]
41:20
something    [3]
50:24;    55:4;
56:8
sort [1]  51:4
southern [1]  1:1
speak [2]  27:10;
53:5
speaking    [2]
24:5; 40:8
specifically   [2]
7:11; 15:17
specified    [1]
16:20
spend [1]  39:19
spent [3]  23:25;
39:8, 23
spoke [1]  40:6
spread [2]  22:4,
8
springs [1]  4:13
squeezed    [1]
22:22
ss [1]  58:2
stacy [1]  2:13
staff  [4]   5:21,
22; 6:3, 12
stafford    [1]
29:23
standing    [1]
41:20
started [4]  5:19;
49:21;    50:3;
51:2
starting [2]  7:5;
26:3
state  [4]   1:20;
4:7; 58:5, 23
stated [4]  14:6;
27:19;    39:2;
54:14
states [4]  1:1, 8;
7:25; 58:3
stenotypy    [1]
58:12
step [1]  20:21
still [4]   35:10;
42:4;    44:24;
55:6
stipulations   [1]
1:16
stop [8]    13:12;
18:1, 10;  21:12;
34:22;    35:19;
48:21, 22
story [2]   53:11,
18
street [4]   1:18;
2:6; 8:2; 11:7

strictly [1]  23:10
submitted    [1]
58:14
subsidiaries   [1]
1:5
subtracting   [1]
22:23
such [1]  45:2
suite [1]  1:18
supervisor   [9]
5:4, 5, 25;   6:1,
4, 5, 17, 23;
18:15
sure  [19]   6:14;
15:21;     17:9;
24:1;    33:16;
38:6,  8,   21;
39:17;    40:1;
41:17;  47:3, 17;
50:14, 25;  52:4,
19, 21
suzanne [1]  2:13
switch [5]   26:8;
32:4;    34:17;
35:16, 23
switched    [1]
34:10
sworn  [2]    4:3;
58:7

- T -

t [1]  3:1
take [14]    5:13;
7:3, 6;  8:8, 16;
10:1;    20:20;
27:22;    29:10;
32:21;    35:7;
37:2;     38:1;
51:24
taken [2]    1:13;
58:12
talk [1]  40:12
talked [1]  55:19
talking [3]  28:4;
39:8, 19
tax  [111]   2:13;
3:9;   4:23, 25;
5:4, 13, 21, 22;
6:1,  3,  9,  12;
8:25;    10:11;
11:23;  12:2, 12,
23;  13:1;  14:23,
25;  15:9, 10, 12;
16:25;   17:1, 6;
18:2, 4, 15, 19,
21;  19:4, 10, 17,
24;  20:9, 10, 11;
22:19;    23:5;
24:20,  22,  25;
25:9,  21,  22;
26:1, 7, 14, 15,

18;    27:3,  9;
28:18, 19;  29:14,
16, 22;  30:3, 9,
20, 23;   31:1, 2,
7, 23;  32:2, 12,
15;  33:25;  34:5,
15,  16,   19;
35:11,  12,  23;
38:3, 15;  40:23;
42:22, 25; 43:12;
44:9, 18, 21, 22,
25;  45:6;  46:24;
47:6, 13;   48:1;
49:9,  12,   21;
51:20;  52:9, 16;
53:7, 15, 16, 19,
21;    54:3,  15;
55:7
tax-related    [1]
19:20
taxable [1]  35:9
team  [4]   16:17;
50:13;  51:3, 6
tell  [13]    5:6;
8:9,  20;   10:8;
29:11, 13;  30:19;
37:2,  5;   42:9;
51:8; 56:7; 57:6
telling [1]  16:7
ten  [2]    20:3;
51:2
ten-year    [2]
51:4, 7
testify [3]  56:7,
12; 58:8
than  [7]   23:23;
26:13;   33:19;
40:9;     43:10;
49:6, 8
thank [1]  57:16
that's [27]   7:2;
12:24;    14:9;
15:16, 20·  23:3,
6,  9, 21;   24:19,
22;   25:2,  19;
26:3;  28:17, 22,
24,  25;   30:6;
38:22;    41:11;
42:10;    44:5;
49:20;    55:14;
56:1
their [1]  40:22
them [4]   19:12;
22:4;     40:22;
48:13
then [27]    5:25;
6:4, 5, 7, 8;  9:3;
11:11;  16:14, 23;
19:3, 5, 6;  20:6;
21:25;  22:7, 14,
21;     26:22;
27:25;    30:10;

32:11;    35:14;
38:13, 14;  51:25;
52:9
**there** [16]    11:9,
10,  11;    17:15;
21:12;    23:13;
25:7,   8,    20;
39:15, 17;   40:8;
53:19;  55:4, 18
**therefore**     [1]
34:24
**these** [12]   16:9;
20:15;   21:9, 16;
24:12, 14;  28:10,
13,   18,    21;
40:12;  54:9
**they** [12]    16:1;
19:20;  22:5, 8, 9;
33:22;    40:18;
44:4;   48:11, 12;
55:2
**thing** [4]   19:16;
27:25;    39:25;
55:1
**things** [1]  44:6
**think** [21]    6:18;
9:10;   11:12, 14;
20:6;     26:12;
29:7;     34:1;
41:25;   42:3, 16;
43:5;   47:19, 25;
48:3; 49:6;  52:3,
4;    54:12;   55:2,
10
**this** [77]    6:11;
7:12, 16;    8:12,
16,  24;   9:3, 6;
10:4, 9, 16, 18;
12:1, 3, 9;   13:7,
9,  11;   14:7, 11,
13, 19, 20;  16:4,
11,  15;    17:13,
14;  18:9;   20:8;
21:4;     22:18;
23:3, 4, 10, 14,
20;     24:3,    9;
27:17;     28:7;
29:1, 8, 14, 17,
20;  30:23;  31:4;
32:22; 33:2, 6, 7;
34:1;   37:3, 5, 6,
9, 23;   39:8, 25;
41:21,  23,   25;
42:3,  13,   24;
43:22;     53:6;
54:25;     56:14;
57:13; 58:17, 20
**thomas** [1]  5:8
**thorough**     [2]
24:10, 16
**those** [6]    9:21,
23;     20:11;

23:14;    53:17;
55:8
**thought**    [5]
14:19;    41:22;
42:19;    44:4;
46:11
**three** [3]   5:24;
6:18;  40:9
**three-quarters**
[1]  55:18
**through** [8]  7:11;
24:6;    40:18;
46:24;    49:9;
50:1;    51:23;
52:8
**time** [43]   1:16;
6:12;    11:1;
13:18, 24;   15:7;
17:22;  19:23, 25;
23:22, 25;    24:1,
16,  23;   28:22;
29:2; 33:7;  39:7,
11, 22;  40:1, 4;
42:20, 21; 43:11,
21;  44:3; 45:12;
46:4, 8, 10, 15,
20;   47:4,  23;
50:21;    53:1;
54:19, 22;   57:6,
17;  58:10
**times** [2]  15:15;
53:13
**title** [6]  4:22, 25;
5:3,  20;    6:8;
18:14
**today** [1]  7:22
**together**    [1]
22:10
**told** [15]   11:19,
21;  13:9;   15:7,
14,   15,   17;
16:14;    40:21;
53:10, 11, 17;
57:2, 9
**took** [9]    22:2;
23:22;    26:17;
27:3, 4;   28:21;
37:21;    43:1;
52:16
**top** [1]  23:14
**total** [18]  20:20,
25;     22:15,  16,
23;   23:5;   25:7,
25;  26:3, 7, 17;
28:9,   10,   11;
46:22; 49:7
**totaling**    [1]
21:24
**totally** [1]  47:3
**totals** [1]  26:16
**transaction**   [4]
16:12;    51:23;

52:1;  57:13
**transcribed**  [1]
58:12
**transcript**   [3]
16:9;     54:24;
57:12
**transmittal**  [2]
12:25;  13:6
**treasurer**   [1]
36:23
**treat** [3]    42:17,
19;  48:20
**treated**    [10]
39:21;    40:14;
41:5;    43:23;
44:1, 25;    45:2;
46:11;  55:5
**treating**    [1]
43:22
**trouble** [1]  33:14
**true** [3]  7:21, 23;
43:7
**trust** [1]  52:14
**trusted**    [3]
42:25;    52:14;
57:3
**trustworthy**  [1]
52:12
**truth** [3]  58:8, 9
**trying** [3]  12:22;
15:8
**two**  [8]     5:2;
16:9; 27:3; 30:9,
11;  40:9;   44:5;
54:10
**two-fold**    [1]
18:10
**type**  [5]    9:3;
16:24;  17:14, 16;
52:9
**typed** [3]   41:25;
42:3, 8
**typing** [1]  53:18
**typo** [1]  56:1

- U -

**u** [1]  29:15
**ultimately**    [2]
38:14;  52:11
**under** [2]    34:9;
35:14
**understand**   [2]
34:4;    55:9
**understood**  [1]
42:24;  47:14
**united** [3]  1:1, 8;
58:3
**university**   [1]
5:14
**unless** [1]  56:19
**until** [15]    33:17,

20,  22;    35:1;
36:6;   44:10, 21;
45:12, 19;   46:8;
47:12, 20;   48:2;
50:3;  55:10
**up**  [20]     9:3;
12:7;    15:6;
21:14;    22:19;
23:14;    24:24;
25:25;    28:15;
33:23, 25;   34:6;
37:18;    43:4;
44:10;   46:5,  8;
48:12; 52:7, 13
**upon** [6]    1:13;
19:25;  30:7, 19;
52:11; 56:18
**upset** [1]  53:25
**us**  [9]     12:9;
26:19;    34:10;
35:16;    41:20;
42:3;    48:6, 12;
54:24
**use** [1]  22:18
**used** [2]    22:20;
31:16

- V -

**vacation**     [4]
24:14;  51:21, 22;
52:5
**valid** [1]  29:8
**very** [1]  24:12
**voucher** [5]   3:7;
8:22;     51:16;
54:17;  55:24
**vs** [1]  1:7

- W -

**w**  [5]   1:4;   4:17,
19;  5:20;  58:2
**wait** [2]    35:1;
44:20
**waited** [2]  33:21;
50:3
**waiting** [1]  33:19
**walked** [1]  40:18
**walnut** [1]  1:18
**want** [12]    12:5,
20;     16:18;
17:10;    20:16;
27:18;   29:1,  5;
38:20, 23;   43:9;
56:14
**wanted**     [9]
12:22;    13:9;
15:10, 12, 13, 18;
39:4;     48:19;
54:1
**washington**  [1]

2:14

**way** [5]    22:8;
23:13;        52:8;
55:2, 18

**we** [139]    8:25;
10:14;    11:6, 12,
14, 15, 22, 23;
12:1, 3, 4, 20, 21,
22, 23, 24;  13:1,
2, 3, 10, 11, 14,
15;    14:21,  24,
25;   15:7, 8, 10,
11, 12, 13, 14,
16;   16:4, 6, 23;
18:19;    19:4,  9,
16;    20:2, 5, 6,
21, 24;   21:1, 2,
23, 24;  22:7, 18,
20;  24:2; 25:14,
23;    26:11, 12,
13, 14, 15, 18,
22, 25;    27:12,
16, 17;    29:6;
31:4;    32:1, 2;
33:11,  21,  24;
34:4,  24,  25;
35:8, 10, 14, 15,
16, 18, 21;  36:2,
5, 7, 8;   39:12,
24;   40:15, 17;
42:21, 22;   43:2,
11,  14,  17;
44:11, 12, 13, 14,
16;  45:2, 4, 5, 6,
8, 13;  47:20, 25;
48:2, 3, 11, 13;
49:5;    50:1, 3;
51:7, 24;    52:8,
14;  53:13;  54:8,
23;  55:1, 6

**wednesday**  [1]
35:5

**week** [1]  33:20

**well** [35]   6:24;
11:9;  12:4; 13:5;
15:6;    16:4, 14,
16;    17:3,  24;
18:19;    19:25;
20:15, 20;  21:21;
23:13;    24:1;
25:12, 14;  28:14;
29:20;    31:25;
32:25;  38:2, 20;
40:15;    44:7;
47:12,  20,  25;
49:5;    52:3,  4;
53:10;  57:3

**went** [2]    31:15,
19

**were** [42]   5:22;
6:3, 12, 16, 22;
9:15;  11:5, 6, 9,

10, 12, 15, 16;
12:22;    14:21;
15:7, 8, 16;  19:3,
9, 20, 24;  20:21;
21:9,  13,  16;
22:22;    24:12;
28:18;    35:8;
39:3, 12;   40:8;
42:5,  21,  22;
43:11;  48:2, 23;
50:3;    52:24;
53:13

**western** [1]  1:2

**whatever**    [4]
6:24;    46:20;
49:5; 54:1

**where** [4]   4:16;
11:5;    20:16;
44:12

**whereas**    [2]
18:2; 35:21

**whereof**    [1]
58:19

**whether**    [4]
36:3;     41:5;
51:22; 52:7

**which** [14]  12:8;
22:6, 7, 11;  23:1;
29:23;   31:3, 6;
34:19;    35:16;
45:8,  14;   54:3,
14

**who** [18]   9:16;
13:3;    22:11;
28:13;    29:19;
36:13, 15, 17, 21;
37:25;   38:4, 12,
14, 16;   41:19;
42:8; 50:8;  53:5

**whole** [7]   7:7;
39:19;    46:10;
53:11, 18;   55:1;
58:8

**why** [6]   15:24;
27:21;   28:25;
48:19;  54:4, 7

**will** [7]    9:25;
14:13;     17:4;
33:22;     35:1;
36:1, 5

**within** [2]   1:20;
35:9

**without**    [2]
34:15;  57:12

**witness** [4] 1:13;
4:3; 58:14, 19

**wondering**    [1]
45:17

**word** [4]    34:2;
35:18;     43:1;
52:17

**words** [1]  16:24

**work** [4]   5:12;
19:6; 45:4, 8

**worked** [2]   24:2,
4

**working**    [2]
5:19; 19:9

**would** [84]   6:18,
24,  25;    7:10;
8:8;       12:21;
13:10,  12,  14;
14:4;   16:11, 20;
17:3, 25;  18:1, 7,
21;  19:4, 11, 19;
20:2,  6;    21:1;
22:1, 5, 18; 24:2;
25:13,  15,  20;
27:1, 5, 8, 22;
28:22;     29:9;
30:10, 13, 16, 19,
24, 25;   31:1, 3,
9,  21;   32:1, 8,
11,  13,  19;
33:17,  18,  24;
34:4, 17, 19, 21;
36:4; 38:1, 9, 12;
41:5, 24; 42:1, 3,
19;    43:2,  7;
44:24;  46:7, 13;
47:1, 2, 16, 21;
49:23;    50:15;
52:11, 15;  53:20;
55:9, 13

**wouldn't** [1]  31:2

**writing** [1]  33:12

**written** [1]  37:9


- X -

**x** [1]   3:1


- Y -

**year** [21]   18:20;
19:3; 20:9; 22:6,
14,  16;   24:21;
26:1;    27:9, 23;
29:14;     30:9;
31:19, 23;   32:8;
35:25;    43:19;
47:6;      48:4;
49:25; 50:9

**year-end**    [4]
28:1;   33:19, 25;
34:5

**yearly** [2]  26:24

**years** [29]   4:20;
5:2,  24;    6:18;
11:23;  12:12, 23;
15:1,  11;    21:9;
23:5;      25:2;
26:19;     27:1;
28:1, 25;   30:11;

32:3;      36:8;
40:24;     44:21;
46:24;     48:2;
49:9;  51:2;  55:8

**you're** [1]  28:4

**your** [33]   4:7, 9,
21;    5:3, 7, 20;
7:14;  8:13;  9:17;
14:5, 10;  15:3, 5;
16:17, 18;   17:4,
22;   18:14,  17;
23:14;     24:7;
27:24;     30:7;
33:8, 12;   37:18;
47:13;  51:17, 18;
55:14, 23;   56:5;
57:16



## SCRIPPS HOWARD

December 22, 1988

Mr. Jack R. Elliott
Case Manager
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

> re: The E. W. Scripps Company & Subsidiaries
> E.I.N. #34-0517805

Dear Jack:

As we have discussed previously, The E. W. Scripps Company
and subsidiaries' desire to post a cash bond with the Internal
Revenue Service to in effect prepay and thereby stop the
interest accumulation on the 1982-84 adjustments anticipated
as a result of our recent settlement with the Internal Revenue
Service, which changed our method of reporting from the cash
method to the accrual method as of 1980.

This cash bond is being hand-delivered with this authorization
letter by our Jerome P. Hackman to your Team Coordinator,
George B. Imwalle on Thursday, December 22, 1988, is in the
amount of $9,000,000, and covers the following years now under
audit:

|                    | 1982        | 1983  | 1984        | TOTAL       |
|--------------------|-------------|-------|-------------|-------------|
| Tax adjustment     | $3,000,000  | $ 0   | $2,500,000  | $5,500,000  |
| Interest Thereon   | 2,500,000   | 0     | 1,000,000   | 3,500,000   |
|                    | $5,500,000  | $ 0   | $3,500,000  | $9,000,000  |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue Ser-
vice's receipt of this cash bond.

Thank you for your cooperation in this matter.

Sincerely,

Michael W. Carroll

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc.  1 - Letter for receipt purposes

**SCRIPPS 00020**



GOVERNMENT'S EXHIBIT 1

1100   .TRAL TRUST TOWER          MICHAEL W. CARROLL
P.O. BOX 5380                     CORPORATE TAX DIRECTOR
CINCINNATI, OHIO 45201
513 977-3862



## SCRIPPS HOWARD

December 31, 1990

Mr. Sidney S. Saewitz
Internal Revenue Agent
Internal Revenue Service
P. O. Box 476
Cincinnati, Ohio  45201

    re: The E. W. Scripps Company & Subsidiaries
        E.I.N. 34-0517805

Dear Sid:

As we have discussed previously, The E. W. Scripps Company and
subsidiaries' desire to prepay and thereby stop the interest
accumulation on the 1985-86 adjustments anticipated as a result
of our previous settlement with the Internal Revenue Service,
which changed our publishing affiliates' method of reporting
from the cash method to the accrual method as of 1980.

Our check for $7,000,000 is being hand-delivered with this
authorization letter by our Jerome P. Hackman to you today.
It covers the following years now under audit:

|                  | 1985        | 1986        | TOTAL       |
|------------------|-------------|-------------|-------------|
| Tax Adjustment   | $2,000,000  | $2,000,000  | $4,000,000  |
| Interest Thereon | 1,500,000   | 1,500,000   | 3,000,000   |
|                  | $3,500,000  | $3,500,000  | $7,000,000  |

Please have the duplicate copy of this letter date-stamped and
given to Mr. Hackman as our evidence of the Internal Revenue
Service's receipt of this payment.

Thank you for your cooperation in this matter.

Sincerely,

*Michael W. Carroll*

MICHAEL W. CARROLL
Corporate Tax Director

MWC/mah
Enc. 1 - Letter for receipt purposes

RECEIVED
EXAMINATION DIVISION

JEC 3 1 1990

GOVERNMENT'S
EXHIBIT
4
PENGAD 800-631-6989

334



SCRIPPS HOWARD

DECEMBER 31, 1990

PAY TO THE ORDER OF

INTERNAL REVENUE SERVICE

P.O. BOX 5380
CINCINNATI, OHIO 45201
513 977-3000

RECEIVED
EXAMINATION DIVISION
DEC 31 1990
DIST. DIR. INT. REVENUE
CINCINNATI, OHIO

Mellon Bank (East) N.A., Philadelphia, PA
Payable through Mellon Bank (DE) N.A., Wilmington, DE

63-4
311

0901062828

7,000,000.00

VOID IF NOT PRESENTED WITHIN
90 DAYS FROM DATE

BY:

⑈0901062828⑈ ⑆0314 00047I⑆ 2⑈925 584⑈

335

**Payment Posting Voucher— Examination**
*Not a taxpayer receipt)*

| | | DLN | SSN/EIN | Form number/ MFT | Tax period | Transaction date |
|---|---|---|---|---|---|---|
| N M F | U L C | Status | 34-0517805 | 1120/02 | 8612 | 12-31-90 |

Taxpayer name, address, and ZIP code

E. W. Scripps Co.
1100 Central Trust Tower Cincinnati, OH 45202

Remarks

Tax Adj   1,000,000
Interest   1,500,000
          3,500,000

R E C E I V E D

DEC 3 1 1990

DIRECTOR INT REV
CINCINNATI

☒ Cash bond   ☐ Send 316(C)

Prepared by (Name and unit symbol)
S. SAEWITZ, RA 1104, DO 31 Room 4504 FOB X2356   X2356

List, in the column below, any Debit amount to be assessed. A maximum of one *Debit* transaction may be shown.

| Amount | Code | Description |
|---|---|---|
| | 170 | ES penalty |
| | 180 | FTD penalty |
| | 360 | Fees and collection cost |
| | 570 | Additional liability pending |
| | | Other debit |
| | | Other debit |

List, in the column below, payments to be posted to the taxpayer's account. A maximum of two *Credit* transactions may be shown.

**Transaction Data**

| Amount | Code | Description |
|---|---|---|
| | 670 | Subsequent payment |
| | 610 | Remittance with return |
| | 620 | Payment for 7004 |
| 3,500,000 | 640 | Advance payment on deficiency |
| | 430 | All other est. tax payments |
| | 660 | 706-ES |
| | 680 | Designated interest |
| | | Other credit |
| 3,500,000 | | Total payment |

Form **3244-A** (Rev. 6-85)
*Dispose of all prior issues*

Part 2
*(Duplicate copy—do not process)*

Department of the Treasury
Internal Revenue Service

---

**Payment Posting Voucher— Examination**
*Not a taxpayer receipt)*

| | | DLN | SSN/EIN | Form number/ MFT | Tax period | Transaction date |
|---|---|---|---|---|---|---|
| N M F | U L C | Status | 34-0517805 | 1120/02 | 8512 | 12-31-90 |

Taxpayer name, address, and ZIP code

E.W. Scripps Co
1100 Central Trust Tower, Cincinnati, OH 45202

Remarks

Tax Adj.   2,000,000
Interest   1,500,000
          3,500,000

R E C E I V E D

DEC 3 1 1990

DIRECTOR INT REV
CINCINNATI

☒ Cash bond   ☐ Send 316(C)

Prepared by (Name and unit symbol)
S. Saewitz, RA1104 DO31 Room 4504FOB X2356

List, in the column below, any Debit amount to be assessed. A maximum of one *Debit* transaction may be shown.

| Amount | Code | Description |
|---|---|---|
| | 170 | ES penalty |
| | 180 | FTD penalty |
| | 360 | Fees and collection cost |
| | 570 | Additional liability pending |
| | | Other debit |
| | | Other debit |

List, in the column below, payments to be posted to the taxpayer's account. A maximum of two *Credit* transactions may be shown.

**Transaction Data**

| Amount | Code | Description |
|---|---|---|
| | 670 | Subsequent payment |
| | 610 | Remittance with return |
| | 620 | Payment for 7004 |
| 3,500,000 | 640 | Advance payment on deficiency |
| | 430 | All other est. tax payments |
| | 660 | 706-ES |
| | 680 | Designated interest |
| | | Other credit |
| 3,500,000 | | Total payment |

Form **3244-A** (Rev. 6-85)   Part 2   Department of the Treasury

GOVERNMENT'S EXHIBIT 5
PENGAD 800-631-6989

340

05/18/87   34-05'   05
THE E. W. SCRIPPS CO. (PARENT)(CONSOLIDATED)

## U.S. Corporation Income Tax Return

**Form 1120**
Department of the Treasury
Internal Revenue Service

OMB No. 1545-0123

For calendar year 1986 or tax year beginning _____ ending _____
► For Paperwork Reduction Act Notice, see page 1 of the Instructions.

**1986**

COPY

| Check if a – | | | |
|---|---|---|---|
| A Consolidated return | X | Use IRS label | Name THE E. W. SCRIPPS CO. (PARENT)(CONSOLIDATED) |
| B Personal Holding Co. | | Other wise please print or type | Number and street P. O. BOX 5380 |
| C Business Code No. (See the list in the Instructions) 6749 | | | City or town, state, and ZIP code CINCINNATI, OHIO    45201 |

B Employer Identification number **34-0517805**
E. Date incorporated **06/22/22**
F. Total assets (see Specific Instructions) **1,977,010,809.**

G. Check box if there has been a change in address from the previous year . . . . . . . . . . . ► [X]

| | | | |
|---|---|---|---|
| 1 Gross receipts or sales | 884,399,981. | Less returns allowances | Balance ► 1c | 884,399,981. |
| 2 Cost of goods sold and/or operations (Schedule A) . . . . . . . . . . . . . . . . . . . . . . . | | 2 | 49,765,333. |
| 3 Gross profit (line 1c less line 2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 3 | 834,634,648. |
| 4 Dividends (Schedule C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 4 | 60,449,182. |
| 5 Interest . . . . . . . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 19. | | 5 | 8,313,708. |
| 6 Gross rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 6 | 783,569. |
| 7 Gross royalties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 7 | 40,813,704. |
| 8 Capital gain net income (attach separate Schedule D) . . . . . . . . . . . . . . . . . . . . | | 8 | 628,755. |
| 9 Net gain or (loss) from Form 4797, line 17, Part II (attach Form 4797) . . . . . . . . . . . . . | | 9 | -2,620,872. |
| 10 Other income (see instructions – attach schedule) . . . . . . . SEE STATEMENT 30. | | 10 | -63,139,566. |
| 11 TOTAL income – Add lines 3 through 10 and enter here . . . . . . . . . . . . . ► | | 11 | 879,863,128. |

| | | | |
|---|---|---|---|
| 12 Compensation of officers (Schedule E) . . . . . . . . . . . . . . . . . . . . . . . . . | | 12 | 2,588,626. |
| 13a Salaries and wages 265,085,023. b Less jobs credit | Balance ► | 13c | 265,085,023. |
| 14 Repairs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 14 | 8,807,627. |
| 15 Bad debts (Schedule F if reserve method is used) . . . . . . . . . . . . . . . . . . . . | | 15 | 2,128,551. |
| 16 Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 16 | 16,499,021. |
| 17 Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . SEE STATEMENT 38. | | 17 | 36,387,019. |
| 18 Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 18 | 34,806,486. |
| 19 Contributions (see instructions for 10% limitation) . . . . SEE STATEMENT 56. | | 19 | |
| 20 Depreciation (attach Form 4562) . . . . . . . 20 | 44,404,724. | | |
| 21 Less depreciation claimed in Schedule A and elsewhere on return 21a | 1,149,949. | 21b | 43,254,775. |
| 22 Depletion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 22 | |
| 23 Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 23 | 13,494,119. |
| 24 Pension, profit-sharing, etc, plans . . . . . . . . . . . . . . . . . . . . . . . . . . | | 24 | 17,231,917. |
| 25 Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 25 | 22,021,514. |
| 26 Other deductions (attach schedule) . . . . . . . . . . . . SEE STATEMENT 78. | | 26 | 420,051,544. |
| 27 TOTAL deductions – Add lines 12 through 26 and enter here . . . . . . . . . . . ► | | 27 | 882,156,222. |
| 28 Taxable income before net operating loss deduction and special deductions (line 11 less line 27) . . | | 28 | -2,493,094. |
| 29 Less: a Net operating loss deduction (see instructions) . . . . 29a | | | |
| b Special deductions (Schedule C) . . . . . . . . . . . . 29b | 60,062,301. | 29c | 60,062,301. |
| 30 Taxable income (line 28 less line 29c) . . . . . . . . . . . . . . . . . . . . . . . . . | | 30 | -62,555,395. |
| 31 TOTAL TAX (Schedule J) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | 31 | 1,477,277. |

| | | | |
|---|---|---|---|
| 32 Payments: a 1985 overpayment credited to 1986 | | | |
| b 1986 estimated tax payments . . . . . | 1,500,000. | | |
| c Less 1986 refund applied for on Form 4466 | | 1,500,000. | |
| d Tax deposited with Form 7004 . . . . . . . . . . . . . . . . | NONE | | |
| e Credit from regulated investment companies (attach Form 2439) . . | | | |
| f Credit for Federal tax on gasoline and special fuels (attach Form 4136) | | 32 | 1,500,000. |
| 33 Enter any PENALTY for underpayment of estimated tax – check ► [ ] if Form 2220 is attached | | 33 | |
| 34 TAX DUE – If the total of lines 31 and 33 is larger than line 32, enter AMOUNT OWED . . . . . | | 34 | |
| 35 OVERPAYMENT – If line 32 is larger than the total of lines 31 and 33, enter AMOUNT OVERPAID | | 35 | 22,723. |
| 36 Enter amount of line 35 you want: Credited to 1987 estimated tax ► | 22,723. Refunded ► | 36 | |

**Please Sign Here**
Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer D. J. CASTELLINI    Date 05/18/87    Title SR. VICE PRESIDENT

**Paid Preparer's Use Only**

| | | | |
|---|---|---|---|
| Preparer's signature | | Date | Check if self-employed [ ] |
| Firm's name (or yours, if self-employed) and address | | | E.I. No. ► |
| | | | ZIP code ► |

6( 1110    1.0F-3

GOVERNMENT'S EXHIBIT    6

05/18/87   34-051   /5
THE E. W. SCRIPPS CO. (PARENT)(CONSOLIDATED)

Form 1120 (1986)                                                                                                    Page 2

## Schedule A    Cost of Goods Sold and/or Operations (See Instructions for line 2, page 1)

| | | |
|---|---|---:|
| 1 Inventory at beginning of year | 1 | 7,007,111. |
| 2 Purchases | 2 | 36,725,076. |
| 3 Cost of labor | 3 | 6,229,917. |
| 4 Other costs (attach schedule) . . . . . . . . . . . . . . . **SEE STATEMENT 113.** | 4 | 5,293,163. |
| 5 Total – Add lines 1 through 4 | 5 | 55,255,267. |
| 6 Inventory at end of year | 6 | 5,489,934. |
| 7 Cost of goods sold and/or operations – Line 5 less line 6. Enter here and on line 2, page 1 | 7 | 49,765,333. |

6 a   Check all methods used for valuing closing inventory:

(i) ☐ Cost   (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4 (see instructions)

(iii) ☐ Writedown of "subnormal" goods as described in Regulations section 1.471-2(c) (see instructions)

(iv) ☐ Other (Specify method used and attach explanation) ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ ☐ _ _

b   Check if the LIFO inventory method was adopted this tax year for any goods (If checked, attach Form 970) . . . . . . . . . ☐

c   If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of

closing inventory computed under LIFO . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6c |

d   If you are engaged in manufacturing, did you value your inventory using the full absorption method (Regulations section 1.471-11)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☐ No

e   Was there any change in determining quantities, cost, or valuations between opening and closing inventory? . . . . . ☐ Yes ☐ No

If "Yes," attach explanation.

## Schedule C    Dividends and Special Deductions (See Schedule C instructions)

| | (a) Dividends received | (b) % | (c) Special deductions: multiply (a) × (b) |
|---|---:|---|---:|
| 1 Domestic corporations subject to section 243(a) deduction (other than debt-financed stock) . . . . . . . . . . . . . . **STMT 133.** | 2,579,208. | see instructions | 2,192,327. |
| 2 Debt-financed stock of domestic and foreign corporations (section 246A) | | see instructions | |
| 3 Certain preferred stock of public utilities . . . . . . . . . . | | see instructions | |
| 4 Foreign corporations and certain FSCs subject to section 245 deduction . | | see instructions | |
| 5 Wholly-owned foreign subsidiaries and FSCs subject to 100% ded. (sections 245(b) and (c)) | | 100 | |
| 6 Total – Add lines 1 through 5. See instructions for limitation . . . . | | | 2,192,327. |
| 7 Affiliated groups subject to the 100% deduction (section 243(a)(3)) | 57,869,974. | 100 | 57,869,974. |
| 8 Other dividends from foreign corporations not included in lines 4 and 5 | | | |
| 9 Income from controlled foreign corporations under subpart F (attach Forms 5471) | | | |
| 10 Foreign dividend gross-up (section 78) . . . . . . . . . . . . . . . | | | |
| 11 IC-DISC or former DISC dividends not included in lines 1 and/or 2 (sec. 246(d)) | | | |
| 12 Other dividends . . . . . . . . . . . . . . . . . . . . . . . | | | |
| 13 Deduction for dividends paid on certain preferred stock of public utilities (see instructions) . | | | |
| 14 Total dividends – Add lines 1 through 12. Enter here and on line 4, page 1 ▶ | 60,449,182. | | |
| 15 Total deductions – Add lines 6, 7 and 13. Enter here and on line 29b, page 1 . . . . . . . . . . . . ▶ | | | 60,062,301. |

## Schedule E    Compensation of Officers (See Instructions for line 12, page 1)

Complete Schedule E only if total receipts (line 1a, plus lines 4 through 10, of page 1, Form 1120) are $150,000 or more.

| (a) Name of officer | (b) Social security number | (c) Percent of time devoted to business | Percent of corporation stock owned (d) Common (e) Preferred | (f) Amount of compensation |
|---|---|---|---|---:|
| **SEE STATEMENT 143** | | % | % % | |
| | | % | % % | |
| | | % | % % | |
| | | % | % % | |
| | | % | % % | |
| | | % | % % | |
| | | % | % % | |

Total compensation of officers – Enter here and on line 12, page 1 . . . . . . . . . . . . . . . .   2,588,626.

## Schedule F    Bad Debts – Reserve Method (See instructions for line 15, page 1)

| (a) Year | (b) Trade notes and accounts receivable outstanding at end of year | (c) Sales on account | Amount added to reserve (d) Current year's provision | (e) Recoveries | (f) Amount charged against reserve | (g) Reserve for bad debts at end of year |
|---|---:|---:|---:|---:|---:|---:|
| 1981 | 6,701,571. | 41,588,473. | 311,406. | 60,867. | 269,275. | 413,939. |
| 1982 | 8,629,843. | 56,409,289. | 863,454. | 24,678. | 652,585. | 649,486. |
| 1983 | 14,577,356. | 79,949,693. | 1,124,981. | 104,869. | 790,575. | 1,088,761. |
| 1984 | 15,663,829. | 77,708,416. | 1,228,100. | 7,596. | 891,710. | 1,432,747. |
| 1985 | 17,792,528. | 89,003,838. | 1,428,787. | 44,892. | 1,264,261. | 1,642,145. |
| 1986 | 27,306,086. | 107,039,001. | 2,128,551. | 170,054. | 2,433,316. | 1,507,434. |

6L1120  1.010

05/18/87    34-0517
THE S. W. SCRIPPS CO. (PARENT) (CONSOLIDATED)

Form 1120 (1986)                                                                                          Page 3

**Schedule J  Tax Computation** (See instructions) (Fiscal year corporations see page 12 of instructions before completing Schedule J)

1 Check if you are a member of a controlled group (see sections 1561 and 1563) . . . . . . . . . . ▶ ☐

2 a If line 1 is checked, see instructions. Enter your portion of each $25,000 taxable income bracket amount:

(i) _ _ _ _ **25,000.** (ii) _ _ _ _ _ **25,000.** (iii) _ _ _ _ **25,000.** (iv) _ _ _ _ **25,000.**

b If your tax year includes July 1, 1987, see instructions and enter share of tax bracket amounts:

(i) _ _ _ _ **50,000.** (ii) _ _ _ _ _ **25,000.**

3 Income tax (see instructions to figure the tax; enter this tax or alternative tax, whichever is less). Check
if alternative tax is used ▶ ☐ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

4 a Foreign tax credit (attach Form 1118) . . . . . . . . . . . . . . | **4a** |
  b Possessions tax credit (attach Form 5735) . . . . . . . . . . . . | **b** |
  c Orphan drug credit (attach Form 6765) . . . . . . . . . . . . . | **c** |
  d Credit for fuel produced from a nonconventional source (see in-
    structions) . . . . . . . . . . . . . . . . . . . . . . . . . | **d** |
  e General business credit. Enter here and check which forms are
    attached ☒ Form 3800  ☒ Form 3468  ☒ Form 5884
              ☐ Form 6478  ☐ Form 8007  ☐ Form 5765
              ☐ Form 8586 . . . . . . . . . . . . . . . . . . . . | **e** |

5 Total - Add lines 4a through 4e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
6 Line 3 less line 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
7 Personal holding company tax (attach Schedule PH (Form 1120)) . . . . . . . . . . . . . . . . . **7**
8 Tax from recomputing prior-year investment credit (attach Form 4255) . . . . . . . . . . . . . . **8** | 1,469,300.
9 Minimum tax on tax preference items (see instructions - attach Form 4626) . . . . . . . . . . . . **9** | 7,977.
10 Total tax - Add lines 6 through 9. Enter here and on line 31, page 1 . . . . . . . . . . . . . . **10** | 1,477,277.

**Additional Information** (See instruction F)                                                      Yes No

H Did the corporation claim a deduction for expenses connected with:
  (1) Entertainment facility (boat, resort, ranch, etc.)? . . . . . . . . . | ☒ |
  (2) Living accommodations (except employees on business)? . . . . . . | | ☒ |
  (3) Employees attending conventions or meetings outside the
      North American area? (See section 274(h).) . . . . . . . . . . | | ☒ |
  (4) Employees' families at conventions or meetings? . . . . . . . . . | | ☒ |
      If "Yes," were any of these conventions or meetings outside
      the North America area? (See section 274(h).) . . . . . . . . . | | ☒ |
  (5) Employee or family vacations not reported on Form W-2? . . . | | ☒ |

I (1) Did the corporation at the end of the tax year own, directly or
      indirectly, 50% or more of the voting stock of a domestic
      corporation? (For rules of attribution, see section 267(c).) | ☒ | |
      If "Yes," attach a schedule showing: (a) name, address, and
      identifying number; (b) percentage owned; (c) taxable income or
      (loss) before NOL and special deductions (e.g., if a Form 1120)
      from Form 1120, line 28, page 1) of such corporation for the tax
      year ending with or within your tax year; (d) highest amount owed
      by the corporation to such corporation during the year; and (e)
      highest amount owed to the corporation by such corporation
      during the year.

   (2) Did any individual, partnership, corporation, estate or trust at
      the end of the tax year own, directly or indirectly, 50% or more
      of the corporation's voting stock? (For rules of attribution, see
      section 267(c).) If "Yes," complete (a) through (e) . . . . . . . | ☒ | |
      (a) Attach a schedule showing name, address, and identifying
          number.
      (b) Enter percentage owned ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
      (c) Was the owner of such voting stock a person other than a
          U.S. person? (See instruction I.) "Notes" If "Yes," the
          corporation may have to file Form 5472. . . . . . . . . . .
          If "Yes," enter owner's country ▶ _ _ _ _ _ _ _ _ _ _ _ _
      (d) Enter highest amount owed by the corporation to such
          owner during the year ▶ _ _ _ _ _ _ _ _ _ _ **NONE**

(e) Enter highest amount owed to the corporation by such                        Yes No
    owner during the year ▶ _ _ _ _ _ _ _ _ _ **NONE**
**Note:** For purposes of (1) and (2), "highest amount owed" includes
loans and accounts receivable/payable.

J Refer to the list in the instructions and state the principal:
  Business activity  ▶ HOLDING COMPANY
  Product or service ▶ INVESTMENTS

K Was the corporation a U.S. shareholder of any controlled foreign
  corporation? (See sections 951 and 957.) . . . . . . . . . . . | | ☒
  If "Yes," attach Form 5471 for each such corporation.

L At any time during the tax year, did the corporation have an interest
  in or a signature or other authority over a financial account in a
  foreign country (such as a bank account, securities account,
  or other financial account? . . . . . . . . . . . . . . . . . | | ☒
  (See instruction F and filing requirements for form TD F 90-22.1.)
  If "Yes," enter the name of foreign country ▶ _ _ _ _ _ _ _ _

M Was the corporation the grantor of, or transferor to, a foreign trust
  which existed during the current tax year, whether or not the
  corporation has any beneficial interest in it? . . . . . . . . . . | | ☒
  If "Yes," the corporation may have to file Forms 3520, 3520-A or 926.

N During this tax year, did the corporation pay dividends (other
  than stock dividends and distributions in exchange for stock) in
  excess of the corporation's current and accumulated earnings and
  profits? (See sections 301 and 316.) . . . . . . . . . . . . . | | ☒
  If "Yes," file Form 5452. If this is a consolidated return, answer
  here for parent corporation and on Form 851, Affiliations Schedule,
  for each subsidiary.

O During this tax year did the corporation maintain any part of its
  accounting/tax records on a computerized system? . . . . . . . | ☒ |

P Check method of accounting:
  (1) ☒ Cash
  (2) ☐ Accrual
  (3) ☐ Other (specify) ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Q Check this box if the corporation issued publicly offered debt
  instruments with original issue discount . . . . . . . . . . ☐
  If so, the corporation may have to file Form 8281.

8

05/18/87   34-05\ .05

THE F. W. SCRIPPS CO. (PARENT)(CONSOLIDATED)

Form 1120 (1986)                                                                 Page 4

## Schedule L   Balance Sheets

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash . . . . . . . . . . . | | 20,435,133. | | 8,384,737. |
| 2 Trade notes and accounts receivable . . . | 66,946,237. | | 70,445,223. | |
| a Less allowance for bad debts . . . . | 2,439,681. | 64,506,556. | 2,329,487. | 68,115,736. |
| 3 Inventories . . . . . . . . . . | | 7,948,527. | | 6,679,709. |
| 4 Federal and state government obligations . | | | | |
| 5 Other current assets (attach STMT 220 | | 177,420,034. | | 71,575,195. |
| 6 Loans to stockholders . . . . . | | 5,597,746. | | 4,289,709. |
| 7 Mortgage and real estate loans . . . | | | | |
| 8 Other investments (attach sch STMT 238 | | 224,894,645. | | 492,156,773. |
| 9 Buildings and other depreciable assets . . | 374,266,491. | | 399,434,555. | |
| a Less accumulated depreciation . . . . | 211,925,700. | 162,340,791. | 214,985,616. | 184,448,939. |
| 10 Depletable assets . . . . . . . . | | | | |
| a Less accumulated depletion . . . . . | | | | |
| 11 Land (net of any amortization) . . . . | | 24,179,765. | | 32,688,908. |
| 12 Intangible assets (amortizable only) . . . | 172,822,431. | | 441,459,268. | |
| a Less accumulated amortization . . . . | 39,146,777. | 133,675,654. | 74,644,422. | 366,814,846. |
| 13 Other assets (attach schedule STMT 245 | | 203,758,953. | | 741,856,257. |
| 14 Total assets . . . . . . . . . . | | 1,024,755,804. | | 1,977,010,809. |
| **Liabilities and Stockholders' Equity** | | | | |
| 15 Accounts payable . . . . . . . . | | 23,571,006. | | 22,851,332. |
| 16 Mtges., notes, bonds payable in less than 1 year | | 29,625,717. | | 27,391,660. |
| 17 Other current liabilities (attach STMT 283 | | 84,348,093. | | 88,158,974. |
| 18 Loans from stockholders . STMT 289 | | 141,152,926. | | 447,763,682. |
| 19 Mtges., notes, bonds payable in 1 year or more | | 98,873,430. | | 595,310,095. |
| 20 Other liabilities (attach schedule STMT 289 | | 45,562,437. | | 90,482,033. |
| 21 Capital stock  a Preferred stock . . . | 639,500. | | 245,350. | |
| b Common stock . . . . | 19,418,164. | 20,057,664. | 18,957,833. | 19,203,183. |
| 22 Paid-in or capital surplus   STMT 298 | | 226,808,425. | | 370,653,509. |
| 23 Retained earnings - Appropriated (attach schedule) | | | | |
| 24 Retained earnings - Unappropriated . . . . | | 373,154,021. | | 329,970,331. |
| 25 Less cost of treasury stock . . . . . | | ( 16,397,915.) | | ( 14,773,990.) |
| 26 Total liabilities and stockholders' equity . . | | 1,024,755,804. | | 1,977,010,809. |

## Schedule M-1   Reconciliation of Income per Books With Income per Return

Do not complete this schedule if the total assets on line 14, column (d), of Schedule L are less than $25,000.

| | | | |
|---|---|---|---|
| 1 Net income per books . . . . . . . | 28,458,931. | 7 Income recorded on books this year not included in this return (itemize) | |
| 2 Federal income tax . . . . . . . . | -8,411,136. | a Tax-exempt interest | 457,567. |
| 3 Excess of capital losses over capital gains | | SEE STATEMENT 340 | 1,284,043. |
| 4 Income subject to tax not recorded on books this year (itemize) | | | |
| SEE STATEMENT 327 | -13,913,201. | 8 Deductions in this tax return not charged against book income this year (itemize) | |
| 5 Expenses recorded on books this year not deducted in this return (itemize) | | a Depreciation . . . . . | 3,082,507. |
| a Depreciation . . . . . . . | 30,890. | b Contributions carryover | |
| b Contributions carryover | 2,628,960. | SEE STATEMENT 355 | 14,700,970. |
| SEE STATEMENT 331 | 6,237,549. | 9 Total of lines 7 and 8 . . . . . . . | 19,525,087. |
| 6 Total of lines 1 through 5 . . . . . | 17,031,993. | 10 Income (line 28, page 1)-line 6 less line 9 | -2,493,094. |

## Schedule M-2   Analysis of Unappropriated Retained Earnings per Books (line 24, Schedule L)

Do not complete this schedule if the total assets on line 14, column (d), of Schedule L are less than $25,000.

| | | | |
|---|---|---|---|
| 1 Balance at beginning of year . . . . | 373,154,021. | 5 Distributions: a Cash . . . . . . . | 76,181,917. |
| 2 Net income per books . . . . . . . | 28,458,931. | b Stock . . . . . . | |
| 3 Other increases (itemize) | | c Property . . . . . . | |
| | | 6 Other decreases (itemize) | |
| SEE STATEMENT 363 | 8,565,566. | SEE STATEMENT 368 | 4,026,270. |
| | | 7 Total of lines 5 and 6 . . . . . | 80,208,187. |
| 4 Total of lines 1, 2, and 3 . . . . . | 410,178,518. | 8 Balance at end of year (line 4 less line 7) | 329,970,331. |

ACL4   1 000

THE E. W. SCRIPPS COMPANY
P.O. BOX 5380
CINCINNATI, OHIO 45201
312 WALNUT STREET, SUITE 2800
CINCINNATI, OHIO 45202

CORPORATE TAX DIRECTOR

FAX (513) 977-3090
E-MAIL carroll@scripps.com

 **SCRIPPS**

**RECEIVED**

August 6, 1999

**AUG 1 1 1999**

APPEALS OFFICE
CINCINNATI, OHIO
INTERNAL REVENUE SERVICE

Mr. Richard A. O'Connor
Appeals Officer
IRS Appeals Office
312 Elm Street
Room 2330
Cincinnati, OH 45202

RE:     The E. W. Scripps Company

Dear Rick:

This letter, which supplements my letter dated March 31, 1999, includes Jerome P.

Hackman's affidavit and my affidavit. The affidavits evidence that The E. W. Scripps Company's

intent was to make a payment of a tax liability and interest thereon (not a cash bond) on

December 31, 1990. The affidavits support my letter dated December 31, 1990 which explicitly

stated the Company's intent to pay the "1986 adjustments anticipated as a result of our previous

settlement with the Internal Revenue Service, which changed our publishing affiliates' method of

reporting from the cash method to the accrual method as of 1980". The check hand delivered

with the letter (as stated in the letter) was intended to pay (among other things) $2,000,000

increased tax liability (plus $1,500,000 interest) for the Company's 1986 taxable year.

It is clear under the authorities set forth in my letter dated March 31, 1999 and

herein that the December 31, 1990 remittance was a payment of tax (plus interest) and that the

PARENT OF THE SCRIPPS HOWARD MEDIA COMPANIES


GOVERNMENT'S
EXHIBIT
47
PENGAD 800-631-6989

250

Mr. Richard A. O'Connor
August 6, 1999
Page 2

Company is entitled to interest in excess of $2,245,212 on the amount it paid to the Internal
Revenue Service on December 31, 1990 with respect to 1986.

My letter dated December 30, 1990 specifically designated the $3,500,000
remittance as a payment for 1986 of $2,000,000 tax adjustment plus $1,500,000 interest thereon,
not a cash bond. In Ameel v. Comm., 426 F.2d 1270 (6th Cir. 1970), the Sixth Circuit, the Court
which has jurisdiction over the Company, held that a remittance made "in response to a proposed
deficiency asserted by the Government. . . and made by Appellant [taxpayer] intended to satisfy a
proposed deficiency and discharge any further tax liability. . . " was a payment of tax. Like the
remittance in Ameel, the Company's remittance was made to carry out its agreement with the
Internal Revenue Service on Form 870-AD to switch its publishing affiliates from the cash to the
accrual method of accounting and, when paid, was paid with the intent to discharge the
Company's tax liability. The Sixth Circuit's decision in Ameel is unequivocal support for the
claim for refund (as more fully described in my letter dated March 31, 1999).

It is clear from Ewing v. U.S., 914 F2d 499 (4th Cir. 1990) and Moran v. U.S., 63
F.3d 663 (7th Cir. 1995) that formal assessment of tax is unnecessary. What is important is the
taxpayer's intent to discharge its tax liability. The Company remitted the tax (plus interest) with
the intent of discharging its tax liability. My letter dated December 31, 1990 explicitly states that
intent. Further, Jerry Hackman's affidavit and my affidavit both evidence the Company's intent.
The Company intended to pay the tax and, as reflected in Jerry Hackman's affidavit and my
affidavit, directly communicated that intent to Internal Revenue Service Agent Sidney S. Saewitz.
Agent Saewitz's checking a box on an Internal Revenue Service form which the taxpayer had

Mr. Richard A. O'Connor
August 6, 1999
Page 3

never seen before can only be viewed as inadvertent error.  It was inconsistent with the taxpayer's
intent.

      In addition to Jerry Hackman's affidavit (which includes our calculation of the tax
due for 1986) and my affidavit, I am enclosing a copy of my earlier letter dated March 31, 1999.
I believe our affidavits and the authorities cited in my letter support the Company's position.  I
would be pleased to discuss this issue with you further if any questions remain as to your
allowance of the Company's claim in full.

Very truly yours,

Michael W. Carroll

Michael W. Carroll

cc: Castellini, Hackman, Toomajian

**AFFIDAVIT**

I, Michael W. Carroll, am the Corporate Tax Director of The E. W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 11, 1979.

With the approval of the Company's Senior Vice President/Finance and Administration, Daniel J. Castellini, I authorized the Company's $7,000,000 remittance made on December 31, 1990 of the Company's additional 1985 and 1986 consolidated federal income taxes, and the related interest, that the Company believed it owed as the result of the Company's agreement with the Internal Revenue Service ("IRS") on the Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash method to the accrual method as of the tax year 1990. My transmittal letter, dated December 31, 1990 to IRS Agent Sidney S. Saewitz, the IRS Audit Team Coordinator of the ongoing audit of the Company's 1985-1987 consolidated income tax returns, clearly indicated to the IRS that the Company's intent was to pay $2,000,000 in additional 1985 tax, $2,000,000 in additional 1986 tax, $1,500,000 in interest on the additional 1985 tax, and $1,500,000 in interest on the additional 1986 tax.

The June 16, 1988 Form 870-AD agreement bound the Company to change its publishing affiliates' method of accounting from the cash method to the accrual method for tax reporting purposes. In conjunction with that agreement and the closing of the Company's tax years through 1984, the additional tax and interest owed through the Company's 1984 tax year was assessed and paid. Although the IRS audit of the Company's returns for the years 1985, 1986 and 1987 began in early 1990, the additional

tax and interest owed for 1985 and 1986 as a result of the Form 870-AD agreement had not yet been calculated. The Company anticipated a significant additional tax liability for 1985 and 1986 due to this agreement, and wanted to pay what it owed as soon as possible. I asked Agent Saewitz to calculate the amount of additional 1985 and 1986 tax due as a result of this agreed method change so that the Company could pay the additional tax plus interest thereon before the end of 1990. He told me that he would not be able to complete this complex calculation by then. I then told him that the Company wanted to pay most of what it would owe in 1990, in order to both stop the accruing of interest on this known and agreed tax adjustment and also to deduct the payment of the interest on its 1990 return. We undertook the task of determining the additional tax and interest that the Company would owe and to pay it by year-end. Agent Saewitz offered to help submit the payment to the IRS.

The adjustments as a result of the July 16, 1988 Agreement through the Company's 1984 tax year had already been determined, assessed and paid and the Company had already filed its 1987 return using the accrual method of accounting. I instructed Jerome P. Hackman of my staff to calculate the additional tax the Company owed for 1985 and 1986 so that the Company could pay the additional tax and the related interest that it owed. We also researched how to make this payment of tax deficiency and related interest so that it would be treated by the IRS as a payment of tax and interest, and not as a cash bond, so that the Company could properly deduct the interest paid on its 1990 tax return. My transmittal letter that accompanied the Company's payment clearly identified it as a payment of additional tax and the related interest for the tax years 1985

and 1986. It did not request that this payment be treated as a deposit in the nature of a cash bond.

Because I was vacation on December 31, 1990, I asked Mr. Hackman to deliver the Company's $7,000,000 payment, along with my transmittal letter, to the IRS Collections Department. When I returned from vacation early in 1991, Mr. Hackman advised me of his concern that Agent Saewitz, who had accompanied Mr. Hackman to IRS Collections, may have processed the Company's payment incorrectly, despite knowing that the intent was for this payment to be an payment of additional tax and related interest and not a cash bond. He told me that he raised this concern with Agent Saewitz at the time the payment was processed, and that Agent Saewitz had assured him that the payment would be posted and treated by the IRS as the Company intended, as an payment of tax and interest, just as I had designated it to be treated in my transmittal letter. He also assured him that the prepaid interest would be allowed as a 1990 tax deduction.

This December 31, 1990 payment was, in fact, posted to the Company's account as an Advance Payment of Exam Deficiency. We were able to confirm this on Account Transcripts which we later obtained for both tax years. We were therefore confident that the Company's payment had been properly treated by the IRS as intended, as an advance payment of additional 1985 and 1986 taxes owed and the related interest, which was deductible in 1990 the year in which it was paid.

In early 1995, Agent Saewitz informed me that our December 31, 1990 payments were treated as payments of tax and interest, and not as cash bonds. He assured me that the Company would receive interest on any of the monies that were refund .d. We were

satisfied with his conclusion. We later learned that he then asked to have an IRS attorney research the issue further and confirm his conclusion.

On October 5, 1995 an Information Document Request was issued asking the Company to provide support for it's 1990 deduction of the interest paid on December 31, 1990. Sometime after this and prior to the April 9, 1996 issuance of the proposed adjustment to disallow the Company's 1990 deduction of this interest, Agent Saewitz made it known to me that he had reversed his position on the December 31, 1990 payment of tax and interest and that it was now his opinion that it should be treated as a cash bond instead. He told me that the Company was not entitled to deduct the interest portion of it in 1990. He also told me that any amounts refunded to the Company would not be entitled to interest. I strongly objected to his recharacterization of the December 31, 1990 payment of tax and interest as a cash bond, especially as Agent Saewitz clearly knew that the Company's intent was for this payment to be an payment of tax and interest, and not to be a cash bond deposit. I reminded him that if the payment had been processed improperly that it was due to his handling of the payment voucher, which Mr. Hackman objected to when he prepared it, and that Agent Saewitz had assured him that the payment would be treated by the IRS as the Company had intended, as a payment of additional 1985 and 1986 tax and deductible interest.

On September 11, 1997 after the Company and the IRS had settled its tax years 1985, 1986 and 1987, the Company received a refund of the $3,500,000 for the 1986 tax year without interest. Subsequently, on January 22, 1998 the Company and the IRS reached an exam settlement of all proposed IRS adjustments for tax years 1988-1991. In

this agreement, the IRS allowed the Company's 1990 deduction of the interest that it had paid on December 31, 1990.

On September 28, 1998 the Company filed its claim, requesting the interest to which it is entitled on the $3,500,000 that was refunded to it, as this money was clearly intended to be a payment of tax and interest, just as the IRS posted it and treated it for years.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

Michael W. Carroll

Michael W. Carroll

## AFFIDAVIT

I, Jerome P. Hackman, am Tax Manager-Federal Audits of The E.W. Scripps Company (the "Company") and have been employed in the tax department of the Company since June 16,1984.

On December 31, 1990, I hand delivered to the Internal Revenue Service Exam Division at its office on 550 Main Street, Cincinnati, Ohio, the Company's check dated December 31, 1990 in the amount of $7,000,000 to the Internal Revenue Service ("IRS"). The $7,000,000 check was attached to a letter dated December 31, 1990 from Michael W. Carroll, the Corporate Tax Director of the Company, to Internal Revenue Agent Sidney S. Saewitz, which letter specifically designated $3,500,000 of the $7,000,000 as payment of $2,000,000 of tax (plus $1,500,000 interest thereon) for 1986.

The $7,000,000 remittance was intended to pay additional tax (plus interest thereon) that the Company calculated it owed for its 1985 and 1986 taxable years as a result of the Company's agreement with the IRS on Form 870-AD dated June 16, 1988 to change its publishing affiliates' method of accounting from the cash to accrual method.

In December 1990 Michael W. Carroll made the decision to make the payment to the IRS to satisfy the additional tax (plus interest thereon) for 1985 and 1986 resulting from the June 16, 1988 agreement with the Internal Revenue Service to change the Company's publishing affiliates' method of accounting from the cash to accrual method. The payment was intended not only to stop future interest accumulation on the additional 1985 and 1986 tax, but also to be deductible in 1990, to the extent of the portion designated as interest.

I calculated the additional 1985 and 1986 "cash to accrual switch" tax (plus the interest thereon). To calculate the additional tax I prepared a schedule of "Cash to Accrual Adjustments" on a cumulative basis comparing the December 31, 1986 Cash to Accrual Balance Sheets. A net cumulative Section 481(a) adjustment was computed by subtracting the Section 481(a) liabilities from Section 481(a) assets. Attached as an example is a copy of Denver Publishing's "Cash to Accrual Adjustments" schedule. The cash to accrual adjustments for tax years 1981 through 1984 had been computed by the Internal Revenue Service and agreed to by the Company prior to December 31, 1990. Therefore, I calculated the amount of tax and interest liability as of December 31, 1990. The amount of $16,140,533 represented the total Section 481(a) adjustments for the two-year period of 1985 and 1986 for the newspaper affiliates. As the schedule labeled, "Cash to Accrual Adjustment For All Scripps Howard Newspapers & United Feature Syndicate From 1/1/82 to 1/1/87 By Year and Cumulative To 1/1/82" indicates, I multiplied the total 1985 and 1986 Section 481(a) adjustment by the 46% corporate tax rate to calculate an additional tax liability of $7,424,645 for 1985 and 1986. I allocated the additional tax liability equally between the two tax years. I then calculated interest that would be due on this tax liability and included tax liabilities resulting from years 1982 through 1984 less an earlier Company remittance of $5,5... tax ... 6,... 637 remained and I calculated interest on this amount to be $3,306,... The total tax and interest liability was $9,782,000. Since the Company did not want to overpay on its liability, and as my calculation of it relied on many complex calculations done by various people in the Tax Department and the IRS, the Company

decided to round the tax and interest numbers down to a total of $7,000,000 split equally between years 1985 and 1986.

Mr. Carroll was on vacation, so I was assigned the task of hand delivering the $7,000,000 payment of tax and interest along with his transmittal letter. On December 31, 1990 Agent Saewitz and I walked to the IRS office. When we arrived there, Agent Saewitz stamped Mr. Carroll's transmittal letter and the $7,000,000 check as received on December 31, 1990. At this point, while I waited, Agent Saewitz located a Form 3244-A "Payment Posting Voucher Examination" and had a secretary type various information on the Form 3244-A. Agent Saewitz explained to me that the IRS uses Form 3244-A internally to post payments to taxpayer accounts and Agent Saewitz then provided me with a copy of the document. Upon examination of Form 3244-A, I noticed that the "Cash Bond Box" had been erroneously checked. Immediately, I objected to the characterization of the payment as a cash bond. I explained to Agent Saewitz that the $7,000,000 represented an advance payment of additional tax and related interest. Agent Saewitz responded that it would eventually be posted as the taxpayer designated it in the transmittal letter, but that for purposes of processing by the IRS collections department he was required to check either the "cash bond" box or the "Section 316 (C)" box. Since Agent Saewitz believed that Section 316 definitely did not apply, he said that he checked the "cash bond" box by default. He explained that the remittance would be posted as a payment of tax on the Company's transcript and that the interest would be deductible in 1990 by doing it this way. Again, I vigorously protested the checking of the "cash bond" box, but Agent Saewitz replied again that it had to be checked or "Collections" would not be able to process and accept the payment. Agent Saewitz acknowledged that he could understand my uneasiness and said that since he was the IRS Audit Team Coordinator for the Company that he would allow the interest expense as a deduction upon audit of the 1990 tax year. Agent Saewitz then suggested that he could have his secretary type the words

| TAX ADJ | 2,000,000 |
| INTEREST | 1,500,000 |
| | 3,500,000 |

for each year on the Form 3244-A. Agent Saewitz said that by doing this the Company's intent to make a payment of tax and interest would be clearly evident. At this point having been told by Agent Saewitz that I had no other options, I delivered the payment as Agent Saewitz had arranged it.

On October 5, 1995 I received Information Document Request Number 12 regarding the 1988 through 1991 IRS Audit of the Company. This IDR requested workpapers on how the 1990 payment was handled on the Company's tax return. On April 9, 1996 I received "Form 5701 Number 2 Notice of Proposed Adjustment" regarding disallowance of the Company's 1990 interest deduction resulting from the December 31, 1990 payment. Sometime between October 5, 1995 and April 9, 1996 I realized that Agent Saewitz no longer considered the Company's December 31, 1990 payment to be a payment of tax and interest, but now considered the payment to be a deposit in the nature of a cash bond.

Under penalties of perjury, I state and swear that this statement is true, correct and complete, to the best of my knowledge and belief.

Jerome P. Hackman
<u>Jerome P. Hackman</u>

CASH TO ACCRUAL ADJUSTMENT FOR ALL
SCRIPPS HOWARD NEWSPAPERS & UNITED FEATURE SYNDICATE
FROM 01/01/82 TO 01/01/87 BY YEAR
AND CUMULATIVE TO 01/01/82

*JPH 12/21/90*

| COMPANY | TOTAL 481 ADJ.TOTAL 446 ADJ. BY YEAR 1980 1981 | TOTAL 481 ADJ.TOTAL 446 ADJ. BY YEAR 1982 | TOTAL 481- ADJ.& TOTAL 446 ADJ. BY YEAR 1983 | TOTAL 481- ADJ.& TOTAL 446 ADJ. BY YEAR 1984 | ESTIMATE OF TOTAL 446 ADJ. BY YEAR 1985 & 1986 | TOTAL |
|---|---|---|---|---|---|---|
| BIRMINGHAM POST | (125,783.50) | 275,921.00 | (238,096.00) | 112,503.00 | (4,026.50) | 20,518.00 |
| CINCINNATI POST | (758,687.00) | 1,189,512.00 | (6,627,887.00) | 593,556.00 | 5,990,881.00 | 387,375.00 |
| COLUMBUS CITIZEN JOURNAL | 1,057,610.00 | 460,197.00 | 2,065,323.00 | 1,209,921.00 | (4,793,051.00) | 8.00 |
| COURIER | 135,061.50 | 25,306.00 | 25,306.00 | 0.00 | (128,920.50) | 56,743.00 |
| DENVER PUBLISHING | 4,387,708.50 | 3,406,592.00 | 2,188,752.00 | 2,609,853.00 | 1,138,288.50 | 13,730,994.00 |
| HERALD POST | 305,734.50 | 74,599.00 | 46,875.00 | 20,398.00 | 139,602.50 | 407,944.00 |
| MEMPHIS PUBLISHING | 1,826,116.00 | 816,909.00 | 1,116,600.00 | 253,185.00 | 3,545,537.00 | 7,558,347.00 |
| KNOXVILLE NEWS SENTINEL | 493,837.50 | 61,214.00 | 315,082.00 | (247,105.00) | 1,825,953.50 | 2,449,046.00 |
| NEW MEXICO STATE TRIBUNE | 531,362.00 | 31,259.00 | (8,091.00) | (24,852.00) | (482,347.00) | 46,531.00 |
| PITTSBURGH PRESS | 2,204,559.00 | (222,201.00) | (165,660.00) | 587,200.00 | 8,841,679.00 | 11,245,585.00 |
| STUART NEWS | 261,662.50 | (26,955.00) | (66,065.00) | 618,148.00 | 1155,317.50 | 431,273.00 |
| SUN TATTLER | 782,146.00 | 163,052.00 | 88,441.00 | 30,619.00 | 1258,168.00 | 803,890.00 |
| ALLIED | 50,811.50 | (110,786.00) | 123,680.00 | 12,531.00 | (26,068.00) | 50,088.50 |
| S.H. SCRIPPS-HOME OFFICE | 83,911.00 | (664,339.00) | 80,560.00 | 409,192.00 | 458,712.00 | 368,036.00 |
| SCH | 389,776.50 | 191,775.00 | (31,376.00) | (104,026.00) | 52,500.50 | 498,658.00 |
| SUPPLY COMPANY | (8,462.00) | 30,846.00 | (36,527.00) | 22,510.00 | 18,803.00 | 766.00 |
| UNITED FEATURE SYNDICATE | 1,002,828.00 | 82,840.00 | (2,032,770.00) | 1,361,788.00 | 184,278.00 | 597,364.00 |
| INCOME BY YEAR | 12,619,176.00 | 5,784,211.00 | (3,155,993.00) | 7,265,229.00 | 16,140,533.50 | 28,651,156.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| INCOME BY YEAR | | 5,784,211.00 | (3,155,993.00) | 7,265,229.00 | 16,140,533.00 | 26,033,980.50 |
| TAX RATE | | 46% | 46% | 46% | 46% | 46% |
| TAX BY YEAR | | 2,660,737.06 | (1,451,756.78) | 3,342,005.34 | 7,424,645.18 | 11,975,631.03 |
| LESS CASH TAX BOND PAYMENT ON 12/20/88 | | 3,000,000.00 | 0.00 | 2,500,000.00 | 0.00 | 5,500,000.00 |
| TOTAL TAX DUE | | (339,262.94) | (1,451,756.78) | 842,005.34 | 7,424,645.18 | 6,475,631.03 |

PEHGAO 800-631-6989
GOVERNMENT'S
EXHIBIT
49

SCRIPPS 00129

**Hackman, Jerome**

| | |
|---|---|
| **From:** | Hackman, Jerome |
| **To:** | Castellini, Dan |
| **Cc:** | Carroll, Mike; Stafford, Rob |
| **Subject:** | IRS Treatment of $45M Payment for Proposed Audit Adjustments |
| **Date:** | Monday, February 13, 1995 5:43PM |

Per discussion with Sid Saewitz, he has been told by IRS Exam Support Division that the $45M payment made on 12/30/94 has been applied as an "Advance Payment Of a Tax Deficiency." Any overpayment remaining after interest and taxes have been assessed on our proposed adjustments will earn interest at a rate of 6.5% effective 1/01/95. Since this has been recorded by IRS has an "Advance Payment Of a Tax Deficiency" and not a "Cash Bond" it is at IRS discretion whether the overpayment will be refunded to the taxpayer. Sid says typically the IRS will not issue a refund until that year under audit is closed for "APTD" payments. I asked Sid what about payments made for years not yet under audit? He did not know if we could get our money back if overpaid for years 1991-1993.

The Exam Support Division told Sid that since taxpayer did not actually designate the $45M payment as a cash bond it cannot therefore be treated as such. If Scripps Howard had designated the payment as a cash bond we could get a refund upon request. A deposit in the nature of a cash bond would serve to stop the running of interest on a deficiency, but if overpaid the IRS would not be obligated to pay the taxpayer interest.

I told Sid that we need something in writing to document his verbal statements. Sid told me that he does not plan on giving us anything in writing. I suggested that we will probably follow this up with at least a phone call to the Philadelphia account section to obtain a computer printout of the SH account.

Mike--If you want to discuss this issue with Sid tomorrow, you can reach him at 684-2145.

**SCRIPPS 00090**

GOVERNMENT'S
EXHIBIT

52

1/3

12/28/90

Mike:

GOVERNMENT'S
EXHIBIT
48

SCRIPPS 00091

D J c called 12/27 saying he would like
to delay $ 7 M payment until 1/4/91
because banks would charge a higher
interest rate on a year end loan then by waiting
until 1st week of 1991.

His question was could we deduct $ 3 M
of interest in 1990 if we waited to
make $7M payment until 1991? They will set
up a $ 3M interest accrual for books.

It seems to me we would have to at least
pay the $ 4 M in tax by year end in
order to set up the liability for interest
since an RAR for 1985 & 1986 has not
been delivered to Scripps Howard by I.R.S.
(although under 461(f) all events have occurred
to fix the liability — IRS switched us to
accrual in 1980, the amount can be accurately
determined — $ 3M for interest
economic performance occurs since interest
economically accrues for accrual basis companies)

A payment of tax without calling it a cash bond
(call it tax owed for cash to accrual switch
for newspaper group) would have same
effect as k Gin an amended return by 12/31/90

2/3

and purging the tax which would establish
an interest deduction for 1990.

DJC says he would definitely like to
deduct the $ 3M of interest in 1990
and not just stop the accumulation
of further interest, therefore if
we need the $ 7M paid by
12/31/90 he will authorize it
but he prefers to wait until
1/4/91 to make payment if possible
and maintain a $ 3M 1990
interest deduction.

Doug and I ironed out our differences
on cash to accrual it's on
Wednesday. He had a 700,000
mistake on Pittsburgh Press
and I forgot to back out
the pre-1954 adjustment of
$ 3M.
After we were done our differences
were within 500,000 of taxable
income on the overall adjustment. (We
still had small _____ differences)
Instead of $ 4.4 M of tax it should be
about $ 4.7 M of tax.

SCRIPPS 00092

Mike my main concern with DJC is do we have
an actual liability under 461(B) [since we

have no RAR only 1980 settlement forcing us to switch to accrual basis & for which we can deduct $3.M of interest in 1990 or even in 1991. And should we word our letter differently?

A cash bond only serves to stop the running of interest and does not give rise to an interest deduction. Whereas it appears if we do not designate the payment as a cash bond but call it "tax due for switch from cash to accrual basis of accounting" then the interest appears to be deductible in the year paid per Revenue Ruling 84-6.

I will discuss further with you on Monday. We deducted interest on last cash bond payment in 1988 whether correct or not. I doubt if an agent would challenge a cash payment for interest. Lackey will need to know by 11:00 Monday.

If we make no payment until 1991 I don't believe we can deduct the $3M of interest in 1990 since we have no RAR for years 1985 and 1986. Jerry

SCRIPPS 00093