IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE E.W. SCRIPPS COMPANY          )
AND SUBSIDIARIES,                 )          Case No. C-1-01-434
                                  )
              Plaintiff,          )          Judge Dlott
                                  )
vs.                               )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              Defendant.          )
_____)

## UNITED STATES' MEMORANDUM IN RESPONSE TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### Overview

1. Quite simply, Scripps's December 31, 1990 remittance cannot be characterized as a

payment with respect to its 1986 income tax liability because neither Scripps nor the IRS calculated

an additional liability, and in fact, there was no such additional liability. Furthermore, at the time of

the deposit alleged to be a payment, there was no conceivable possibility of a tax liability based on any

anticipated adjustments that were under consideration by the IRS in view of a large net operating loss

that Scripps had *reported on its tax return.* While Scripps preaches that it intended to make a payment, it

does not state how, under the law, it is possible to make a payment on a liability that has not been

computed by the taxpayer or proposed by the IRS and which could not exist in light of known facts.

Before the intent of the taxpayer can even be a factor in whether a remittance is a payment, there

must first be a defined tax liability. As the Sixth Circuit has stated, "a remittance that does not satisfy

an asserted tax liability should not be treated as the 'payment' of a tax." Ameel v. United States, 426

F.2d 1270, 1273 (6th Cir. 1970)(citing Mertens, Law of Federal Taxation, vol. 10, § 58.27 at 79 (1964

ed.)).

In 1988, during the course of an audit of Scripps's 1984 tax year, Scripps and the IRS agreed

that Scripps would change its accounting method from a cash to an accrual basis. As of December



31, 1990, neither Scripps nor the IRS had calculated the amount, if any, that this change would increase Scripps's 1986 taxable income (or, more accurately, reduce its net operating loss) and therefore Scripps objectively had no basis upon which to assume that there would be *any* tax liability, let alone calculate an amount. However, in December 1990, Scripps remitted $ 3,500,000 to the IRS for its 1986 year, allocating $2 million to tax and $ 1.5 million to interest on its books. Scripps claims that this remittance should have been treated as a tax payment, rather than a deposit. It should be noted that, by treating the remittance, made one day before the close of the 1990 year, as reflecting a "payment" of tax and interest on its books, and thus presuming the accrual of such liabilities, Scripps was able to report a $1.5 million deduction for interest expense on its *1990-year tax return* (thus deferring tax on $1.5 million).[1] But, regardless of whether Scripps's's contention that it intended the remittance as a payment was a valid ground upon which to tax a current tax deduction in 1990, the United States contends that because there was no asserted or proposed tax liability for the 1986 taxable year, the remittance cannot, under the Sixth Circuit's Ameel decision, be classified as a payment of a tax liability for purposes of determining entitlement to statutory interest on the $3.5 million during the time it was held by the IRS.

2. Scripps also contends that if its remittance is determined to be a deposit, not a payment, it should nonetheless be able to recover statutory interest on the $3.5 million under the doctrine of equitable estoppel. This assertion is wholly without merit. While there may be a question as to whether equitable estoppel can ever be used against the government, there is no question that the Supreme Court has determined that equitable estoppel cannot be used against the government to obtain funds from the public treasury. See OPM v. Richmond, 496 U.S. 414 (1990). The doctrine of

_____

[1] The IRS's subsequent return of Scripps's $3.5 million remittance should be treated as resulting in $1.5 million in income in the year in which the IRS returned the funds (or any earlier year in which the right to the return of the funds was fixed and determinable for accrual purpose). Under the tax benefit rule, the recovery of money for which a deduction has been claimed must be treated as income. Thus, the deduction of the $1.5 million in interest on the 1990 return only *defers* but does not avoid taxation of that amount of income.

equitable estoppel cannot apply to this case.

## DISPUTED FACTS AND ADDITIONAL FACTS

A.    United States' Statement of Undisputed Facts

1.    In 1988, in closing the audit of Scripps's 1984 taxable year, Scripps and the IRS agreed that Scripps would change its accounting method from a cash basis to an accrual basis. Exhibit 47 at p. 253 to the Carroll Deposition..

2.    On or about December 10, 1990, Michael Carroll asked Jerry Hackman to prepare a calculation of additional taxes and interest Scripps would owe for its 1986 year due to the change in accounting method. Carroll Dep. at p. 9 lines 5-16 & p. 15 - 17; Exhibit 7 to Carroll Deposition.

3.    Carroll is the corporate tax director for Scripps and has been head of the tax department at Scripps since 1982. Carroll Dep. at p. 4 - 5. Hackman is the tax manager of federal audits for the Scripps Corporation. Hackman Dep. at p. 4.

4.    Carroll states that Scripps wanted to make a payment with respect to any increased liability due to the change in accounting method because Scripps wanted to stop the running of any further interest and to deduct the payment of previously incurred interest on its 1990 tax return. Carroll Dep. at p. 11 lines 8 - 11.

5.    Before asking Hackman to make this calculation, Carroll had asked the IRS agent to calculate the amount of additional taxable income, if any, that would result in respect to the 1985 and 1986 tax years due to the change in accounting method. Carroll Dep. at p. 13 lines19-22. In response, the Revenue Agent stated that he would not be able to make any such calculations before the 1990 year-end. Carroll Dep. at p. 13 lines 22-24.

6.    When Hackman prepared his calculation, he did not refer to Scripps's 1986 tax return that had been previously filed with the IRS. Hackman Dep. at p. 20 lines 8-12.

7.    Scripps had previously filed a 1986 income tax return reflected a net operating loss of

$ 62 million, or in other words Scripps had negative taxable income in the amount of $ 62 million. Carroll Dep. at p. 24 line7; Exhibit 6 to Hackman Dep. Scripps carried back the 1986 net operating loss to its 1983 & 1984 taxable years. Carroll Dep. at p. 26 lines 6-9; Hackman Dep. at p. 31.

8. Hackman's calculation consisted of estimating the increase in income created by the change in accounting method for the 1985 and 1986 tax years together, and then simply dividing by two to allocate half of the estimated combined increased income to the 1985 tax year and half to the 1986 tax year. Hackman Dep. at p. 23 lines7-9; Exhibit 49 to Hackman Deposition. As Exhibits 47 and 49 to his deposition indicate, the total increased income for the 1985 and 1986 tax years was calculated to be $ 16,140,533.50. After dividing this figure in half for each year, Hackman then multiplied the increase in income by the applicable federal corporate income tax rate for each tax year. Hackman Dep. at p. 24 lines17-25; Exhibit 49 to Hackman Deposition.

9. Based upon Hackman's estimates, Scripps's total income for 1986 would have been increased by just over $ 8 million. Hackman Dep. at p. 30 lines7-17.

10. Based upon the $62 million net operation loss on the tax return previously filed by Scripps for its 1986 tax year, however, the increase in $ 8 million in income for 1986 would not increase Scripps's tax liability for that year. (Hackman Dep. at p. 30 lines 17 - 25 & p. 31 lines 1-2 & lines 6-10; Exhibit 6 to Hackman Deposition.) An $ 8 million increase in income for the 1986 taxable year would have still left Scripps with a $ 56 million net operating loss for the year. As such, Hackman's calculation bore no resemblance to the actual effect the change in accounting method would have on Scripps's 1986 tax liability.

11. Apart from the failure to reexamine its own 1986-year tax return to consider the actual impact on the tax for that year from any increase in income, Scripps was unable to determine how much of the increased income went to the 1985 vs. the 1986 taxable year and, therefore, it divided the figure by two. Hackman Dep. at 27 - 28.

-4-

12.     Carroll looked at the summary Hackman prepared, but did not look at the details behind the summary. Carroll Dep. at p. 9 lines 14-16.

13.     On December 31, 1990, E.W. Scripps, Inc. delivered a check in the amount of $ 7,000,000.00 to the Internal Revenue Service stating that the funds were to "prepay and thereby stop the interest accumulation on the 1985-86 adjustments anticipated..." The letter accompanying the remittance designated how the funds should be applied to the 1985 and 1986 tax accounts of E.W. Scripps. Exhibit 4 to Carroll Deposition; Carroll Dep. at p. 7 - 8. Scripps took a $ 3 million interest deduction on its 1990 income tax return for the amount of interest it stated it was payment with respect to the December 31, 1990 remittance for the 1985 and 1986 years combined (with $2 million in tax and $1.5 million in interest allocated to each year). Hackman Dep. at 43.

14.     The letter and check in the amount of $ 7,000,000 were hand-delivered to the IRS by Hackman. Exhibit 47 to Hackman Deposition; Hackman Dep. at p. 7 - 8.

15.     Scripps had previously sent remittances to the IRS stating that the funds were to "prepay and thereby stop the interest accumulation on the 1982 - 1984 adjustments anticipated...," and yet recognized they would be treated as a deposit. The letter accompanying the remittance stated that the funds were to be treated as a cash bond and designated how the funds should be applied to the 1982, 1983, and 1984 tax accounts of Scripps, but also stated it was to "prepay.". Exhibit 1 to Carroll Deposition; Carroll Dep. at p. 7 - 8.

16.     When Hackman delivered the December 31, 1990 remittance to the IRS, he was given a photocopy of a Form 3244-A, IRS Payment Posting Voucher, that indicated the remittance was being treated as a cash bond by the IRS. Hackman Dep. at p. 8 lines 15-25 & p. 9 line 8.

B.     United States' Statement of Disputed Facts

Scripps states:

1.     "It is undisputed that application of the accrual method thus increased Scripps'

-5-

taxable income and overall tax liability for the 1985 and 1986 tax years. As a result, Scripps believed that it owed significant additional taxes for 1985 and 1986." Scripps's Memo at 3.

2.      "After informing Agent Saewitz that it would do so, Scripps internally calculated its additional liability for 1985 and 1986." Scripps's Memo at 4.

3.      "Over a period of approximately three weeks, Mr. Hackman and his staff gathered the necessary information from each of Scripps' 17 publishing affiliates and performed the calculations necessary to determine Scripps' additional tax liability for the 1985 and 1986 tax years." Scripps's's Memo at 4 n. 3.

4.      Based upon its calculations, Scripps believed it owed $ 9,782,000 for the additional tax liability and interest for those years. Scripps's Memo at 4.

5.      "[S]ince it knew the actual cash to accrual adjustment numbers for 1980 through 1984 and for 1987, Scripps was able to determine with reasonable certainty the increase in Scripps' tax liability for 1985 and 1986 associated with the change to the accrual method of accounting. Scripps's Memo at 4 n. 3.

**The first statement is not only unsupported by the record to which Scripps cites, but is contradicted by the testimony of Scripps's Tax Manager Jerome Hackman. Scripps cites to page 7 of the Carroll Deposition for its proposition. However, page 7 of the Carroll Deposition has no reference at all to Scripps's 1985 and 1986 tax liabilities. Page 7 of the Carroll Deposition refers to a remittance Scripps made with respect to its 1982, 1983, & 1984 tax liabilities.**

**In addition, the United States disputes each of the above factual assertions. Each of the above-referenced factual statements are contradicted by the testimony of Jerome Hackman. Hackman only computed the increase in income the change in accounting method would produce for the 1985 and 1986 taxable years. Michael Carroll asked Jerry**

-6-

Hackman to prepare a calculation of additional taxes and interest Scripps would owe for its 1985 and 1986 year due to the change in accounting method. Carroll Dep. at p. 9 lines 5-16 & p. 15 - 17; Exhibit 7 to Carroll Deposition. Hackman's calculation consisted of estimating the increase in income created by the change in accounting method for the 1985 and 1986 tax years and dividing by two to allocate the increased income between the 1985 and 1986 tax years. Hackman Dep. at p. 23 lines7-9; Exhibits 47 & 49 to Hackman Deposition. As Exhibits 47 and 49 to his deposition indicate, the total increased income for the 1985 and 1986 tax years was calculated to be $ 16,140,533.50. Hackman then divided this figure in half and multiplied the increase in income by the applicable federal income tax rate for each tax year. Hackman Dep. at p. 24 lines17-25; Exhibits 47 & 49 to Hackman Deposition. Based upon Hackman's estimates, Scripps's total income for 1986 would have been increased by slightly over $ 8 million. Hackman Dep. at p. 30 lines7-17. When Hackman prepared his calculation, he did not refer to Scripps's 1986 tax return that had been previously filed with the IRS. Hackman Dep. at p. 20 lines8-12. However, the tax return previously filed by Scripps for its 1986 taxable year, reflected a $ 62 million loss and an increase in income by $ 8 million would not increase Scripps's tax liability for the 1986 taxable year. Hackman Dep. at p. 30 lines17 - 25 & p. 31 lines 1-2; Hackman Dep. at p. 31 lines 6-10; Exhibit 6 to Hackman Deposition. An $ 8 million increase in income for the 1986 taxable year would have still left Scripps with a $ 56 million income loss for the year. As such, Hackman's calculation bore no resemblance to the actual effect the change in accounting method would have on Scripps's 1986 tax liability. There is simply nothing in the record to reflect what change an increase in income for the 1985 taxable year would have on Scripps's 1985 tax liability. As such, not only is Scripps's statement incorrect with respect to its 1986 tax year, there is no evidence as to the truth of the

statement with respect to the 1985 taxable year.[2]

In this regard, it is not appropriate for Scripps to lump the 1985 and 1986 tax years together, thus obfuscating the undisputed facts pertaining to the only tax year at issue in this lawsuit. There is not even a triable issue of fact on whether there was any increase in Scripps's "overall tax liability" for 1986 when viewed separately. Scripps's 1986 tax return with the reported huge net operating loss makes its assertion that there was an increase in its "1986 and 1986" tax liabilities an unreasonable assertion with respect to 1986 and that assertion cannot, by its mere inclusion in a brief with no supporting evidence, give rise to a triable issue of fact. What Scripps is really saying is that there is no dispute that its 1985 tax liability increased. The 1985 year is not at issue (and we make no admissions in respect thereto).

6. Scripps states: "In connection with the delivery of the $ 7 million payment to the IRS' Cincinnati Field Office, Agent Saewitz prepared and submitted a 'Form 3244-A Payment Posting Voucher'." Scripps's Memo at 6.

This statement is not true and Saewitz repeatedly stated that he did not prepare the Form 322-A Payment Posting Voucher. Saewitz Dep. at 38, 40, 41. That Scripps makes this factual assertion, while acknowledging it is not a true statement in footnote 6 of its memorandum is baffling.

7. Scripps states: "Agent Saewitz claims to not recall the other events and details that Mr. Hackman remembers." Scripps's Memo at 7.

Not only is this statement unsupported by the record, it is contradicted. See Saewitz Deposition. While it is certainly true that there are some things Saewitz did not recall (that Hackman claims occurred), there are other items that he did recall. Scripps's statement is

---

[2] Of course since it is only the 1986 tax year at issue in this suit, the statement is also not material with respect to Scripps's 1985 tax year.

simply not true.

8.     Scripps also asserts that the IRS treated the remittance as a payment.

While it is true that the document locator number on the IRS transcript reflects that the remittance was a payment, the Form 3244-A reflects that the remittance was a deposit. In addition, the IRS has repeatedly told Scripps that the remittance was a deposit and not a payment. See Exhibits A - D. The IRS' internal documents also reflect that it treated the remittance as a deposit, not a payment. As such, the most that can be said is that the IRS transcript is not consistent with the Form 3244-A designation of a cash deposit or the correspondence and documents it sent to Scripps stating that the IRS considered the remittance a deposit, not a payment. However, for Scripps to assert that the IRS treated the remittance as a payment is more than an overstatement. If the IRS had treated the remittance as a payment, the characterization of the remittance would not be before this Court as a dispute between the parties. As noted by the Court in United States v. Tate & Lyle North American Sugars, 228 F. Supp.2d 308, 324 (S.D. N.Y. 2002), when the internal documents of the IRS are not consistent, they are not persuasive as to either a deposit or payment interpretation. Further, in Malachinski v. Commissioner, 268 F.3d 497, 508 (7th Cir. 2001), where the payment posting voucher was inconclusive, the Court held that the IRS apparently treated the funds as a cash bond because it did not remit interest to the taxpayer. Here, the document locator code is inconsistent with the payment posting voucher. However, the fact that the IRS did not remit interest to Scripps should be a strong indicator that the IRS considers the remittance a deposit. Finally, the document locator code is hearsay as it merely reflects the inputting of a computer code by an IRS employee[3] who was presumably recording

---

[3] The document locator number was neither assigned nor input into the IRS computer by Saewitz. Saewitz Dep. at 45, 46, & 47.

the transaction reflected on the underlying IRS forms. While the computer transcript generally meets an exception to the hearsay rule and is thus *admissible evidence*, it is not conclusive and, when hearsay or indirect evidence is contradicted by direct evidence or underlying records, the hearsay or indirect evidence should be considered unreliable.[4]

9.    Scripps, somewhat inconsistent with its statement that the IRS treated the remittance as a payment, implies that the IRS somehow changed its mind in how the remittance was treated.

Scripps has no authority for this assertion. The Form 3244-A that was prepared when by the IRS when the remittance was received indicates that the remittance was treated as a deposit. The United States maintains, still, that the remittance was a deposit and not a payment. As stated above, at most, the IRS transcript – which is secondary evidence in the form of some employee entering a code on a computer to describe the transaction – is inconsistent the IRS' treatment of the remittance as a deposit.

10.    Scripps states: it "asked whether it was possible to have any of the $ 7 million returned." Scripps's Memo at 18.

This factual assertion is not only unsupported by any evidence, but it is contradicted by the statement of Scripps's tax manager Jerome Hackman. Hackman Dep. at 47 - 48. It is also contradicted by the written statements and testimony of Michael Carroll, Scripps's corporate tax director. See Exhibit 23 to Carroll Dep. (stating "[w]e will not request that these prepayments be refunded") & Carroll Dep. at 34 - 35 (stating "I don't think we asked for it back").

---

[4] Thus, the Advisory Committee Note to the proposed rules in respect to Fed.R.Evid. 803(6) observes that "the rule proceeds from the base that records made in the course of a regularly conducted activity will be taken as admissible but subject to authority to exclude if 'the sources of information or other circumstances indicate lack of trustworthiness.'" The same Note to Rule 803(8) states that "the rule, as in Exception [paragraph] (6) [of Rule 803], assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present."

## Argument

### A.    SCRIPPS'S REMITTANCE CANNOT BE CHARACTERIZED AS A PAYMENT OF TAX BECAUSE SCRIPPS DID NOT HAVE A DEFINED TAX LIABILITY

The December 31, 1990 remittance to the IRS by Scripps could not have been a payment on

Scripps's 1986 tax liability because neither Scripps nor the IRS had asserted, proposed, or calculated

an additional tax liability for the 1986 tax year. And no such additional tax liability was ever

determined to be due (and nor could any tax have possibly been due in view of the huge net operating

loss already reported when compared to the estimated increase in income for the 1985 and 1986 years

combined, even of all of that increase had been allocated to 1986). An essential factor in determining

whether a remittance is to be treated as a payment or a deposit is whether the remittance satisfies an

asserted tax liability. "[A] remittance that does not satisfy an asserted tax liability should not be

treated as a 'payment' of tax." Ameel v. United States, 426 F.2d 1270, 1273 (6th Cir. 1970)(citing

Mertens, Law of Federal Taxation, vol. 10, § 58.27 at 79 (1964 ed.)). That essential factor, an asserted

tax liability, is missing in the present case, as there was not a 1986 tax liability defined by either

Scripps or the IRS. Scripps's 1986 return for the year, as filed, reflected a $ 62 million net operating

loss, or negative taxable income in the amount of $ 62 million. Scripps's accountant estimated that

for the 1986 taxable year, the change in accounting method would have increased Scripps's income by

$ 8 million. Adding this $ 8 million of additional income to the $ 62 million net operating loss

reflected on Scripps's previously filed return would have resulted in a $ 56 million net operating loss

for the year and no potential income tax liability.

Scripps, however, did not consult its previously filed tax return, nor did it make any

computation other than the estimate of the combined increase in income for its 1985 and 1986 tax

years. Rather, Scripps, in pursuit of an interest deduction for its 1990 tax year, multiplied its increased

income figure (divorced from any consideration of its other transactions during the year) by the tax

-11-

rate and guessed that tax would be $2 million and that interest would be $ 1.5 million. It then "dumped" the $ 3.5 million with the IRS. Even a glance at the first page of Scripps's filed return for the year would have born out the conclusion that an additional $ 8 million in income would not have produced an income tax liability. This in no way was an attempt to calculate whether it had an actual increased tax liability and cannot possibly be an attempt to satisfy a deficiency or liability proposed or determined by the IRS. Since there was no asserted or proposed liability, the remittance cannot be considered a payment as there was no proposed liability to discharge.

There are numerous cases that discuss the characterization of a remittance. While some circuits apply a strict requirement that there must be an assessment before a remittance can be characterized as a payment ( See New York Life Insurance Company, 118 F.3d 1553 (Fed. Cir. 1997)); other circuits look to various facts and indicia in characterizing a remittance as a deposit or a payment. (See Ewing v. United States, 914 F.2d 499 (4th Cir 1990)). However, while the standards applied in making such a determination are not unanimous between the circuits, the one common factor, reflected in the Sixth Circuit's Ameel decisions, is that there must be at least some proposed or determined liability before a remittance will be considered a payment. See also New York Life Insurance Company, 118 F.3d 1553 (Fed. Cir. 1997); Ewing v. United States, 914 F.2d 499 (4th Cir 1990) ("a payment results from the remittance by a taxpayer concomitant with the recognition of a tax obligation whether by filing with a return, resolution of a dispute by an agreement . . . or otherwise."); Fortugno v. Commissioner, 353 F.2d 429 (3rd Cir. 1965)(holding there must be acquiescence of a proposed deficiency or assessment before a remittance is a payment); Moran v. United States, 63 F.3d 663 (7th Cir. 1995) (because notice of deficiency issued, the remittance was a payment as the taxpayers remittance was made in response to the notice of deficiency) overruled on different grounds Malachinksi v. Commissioner, 268 F.3d 497 (7th Cir. 2001); Dubuque Packing v. United States, 233 F.2d 453 (8th Cir. 1956); Thomas v. Mercantile Nat. Bank, 204 F.2d 943 (5th Cir. 1953); Lewyt Corp. v.

Commissioner, 215 F.2d 518 (2d Cir. 1954) affirmed in part and reversed in part on other grounds, 349 U.S. 237 (1955). In those cases where the liability was proposed or determined, the remittance is generally held to be a payment (save in circuits requiring an assessment). In those cases where there is no determined liability, the remittance is held to be a deposit.

For example, in Malachinski v. Commissioner, 268 F.3d 497 (7th Cir. 2001), a remittance was made during the course of an audit, but before a report proposing a deficiency was prepared. The Seventh Circuit found that because the remittance was made well before any liability was defined, it was a deposit. Id. at 508. However, in Ewing v. United States, 914 F.2d 499 (4th Cir. 1990), the taxpayers and the IRS had reached an agreement as to the amount of their deficiency. The next day, the taxpayers forwarded their remittance to the IRS. The Fourth Circuit held that because the remittance was "concomitant" with the recognition of a tax liability, it had to be a payment. Id. at 504. In a factually similar case to the present, Consolidated Edison Company of New York, Inc. v. United States, 941 F. Supp. 398 (S.D. N.Y. 1996), Con Edison had already satisfied its tax obligations and incurred no tax deficiency for the years at issue. As such, the court held that Con Edison had no liability to be discharged and therefore there could be no payment of a tax for the years in which there was no additional tax liability. Id. at 401. Each of these cases is consistent with the Sixth Circuit's Ameel decision in that without, at a minimum, a proposed or ascertained tax deficiency or liability, there can be no payment as there is no known liability to be extinguished.

While under Ameel, there is no requirement that a final determination of the tax liability be made before a remittance can be characterized as a payment, it is clear that some specific liability must be asserted.

> In general, a tax is considered 'paid' for purposes of the running of the
> period of limitations when a taxpayer files his return accompanied by his payment. . .
> On the other hand, where this is no tax liability computed and proposed, a
> remittance is to be treated as a cash bond to stop the running of interest on the
> amount 'dumped,' Busser v. United States, 130 F.2d 537 (3d Cir. 1942), or
> deposited until a more definite determination of the tax liability is asserted

> by the Government. Rosenman v. United States, 323 U.S. 658 (1945). In such cases, 'payment' occurs when the indefinite tax liability is further defined; such as by a formal assessment of a definite amount.

Ameel, 426 F.2d 1270 at 1272. Scripps states that the fact that its previously filed 1986 return reflected that it had a substantial loss for the year and that the estimated increase in income would not produce a tax liability is "irrelevant because the remittance still constituted an overpayment entitled to interest." Scripps's Memo at 13. Scripps's "analysis" defies logic. "[T]o maintain that a payment is a payment is a payment is unsupported by both law and logic." Wiltgen v. United States, 813 F. Supp. 1387, 1392 (N.D. Iowa 1992). Rather, it is precisely because Scripps did not calculate its liability, and if it had it would have determined that it did not have an additional liability, that its remittance could not be a payment. It is not even arguable that Scripps attempted to calculate its tax liability because, by its own admission, all its accountant did was attempt to estimate the increase in income the change in accounting method would produced for the combined 1985 and 1986 taxable year.

The crux of Scripps's argument is based upon what it claims is its intent to pay its additional 1986 tax liability. It states that it deliberately used the words "prepay" and "payment" when referring to the $ 8 million remittance because Scripps was well aware of the difference between a payment of tax and the mere posting of a cash bond.[5] Scripps's Memo at 6. Certainly in some circumstances courts do look to the taxpayer's intent in determining whether a remittance is a deposit or a payment.[6] However, before the taxpayer's intent becomes a factor in how the remittance is characterized, there must be a defined tax liability. Before Scripps could intend to pay a tax liability, there must have been

---

[5] Scripps had previously sent a remittance to the IRS with respect to its 1982, 1983, and 1984 taxable years. The letter accompanying the remittance also used the word "prepay" and nevertheless stated that the funds were to be treated as a cash bond and designated how the funds should be applied to the 1982, 1983, and 1984 tax accounts of E.W. Scripps. Exhibit 1 to Carroll Deposition; Carroll Dep. at p. 7 - 8.

[6] Scripps cites Gabelman, 86 F.3d 609 (6th Cir. 1996), for the proposition that the Sixth Circuit looks to the facts and circumstances of a particular case to determine the correct characterization of a remittance. However, Gabelman, determined that intent was irrelevant because § 6513(b) of the Internal Revenue Code (26 U.S.C.) specifies that such taxes are deemed to have been paid" on the date the return for that year is due and that as a matter of law, such remittances are payments.

some defined liability it intended to pay. See Rosenman v. United States, 323 U.S. 658, 661 (1945) ("There was merely an interim arrangement to cover whatever contingencies the future might define. The tax obligation did not become defined until April 1938."); Malachinksi v. Commissioner, 268 F.3d 497, 508 (7th Cir. 2001) ("payment was made ... well before any liability was defined" and the remittance bore "no perceptible relationship to the amount of the deficiency proposed in the examination report."); and Ameel 426 F.2d 1270 at 1272. ("[W]here there is no tax liability computed and proposed, a remittance is to be treated as a cash bond to stop the running of interest on the amount dumped or deposited until a more definite determination of tax liability is asserted by the Government. In such cases, 'payment' occurs when the indefinite tax liability is further defined; such as by a formal assessment of a definite amount."). The "dumped" language in Ameel, which is particularly fitting in the present case, comes from a line of cases finding that a remittance that is "dumped" on the IRS where there is no indication on a return, or from a proposed liability from the IRS, can only be considered a deposit.  See Wiltgen v. United States, 813 F. Supp. 1387, 1391 (N.D. Iowa 1992) citing Budd v. United States, 252 F.2d 456 (3rd Cir. 1957), Binder V. United States, 590 F.2d 68 (3d Cir. 1978), Charles Leich & Co. v. United States, 329 F.2d 649 (Ct. Cl. 1964); see also, Busser v. United States, 130 F.2d 537 (3rd Cir. 1942) (finding that a taxpayer cannot deposit its money with the Internal Revenue Service to collect an attractive interest rate, considerably higher than could be secured elsewhere).  Dumping is precisely what Scripps did in this case.  Without regard to whether it even had a tax liability, Scripps, apparently in pursuit of an additional $1.5 million interest deduction for its 1990 tax year, dumped its remittance on the IRS.  Under any analysis, Scripps's remittance can only be characterized as a cash bond.

Additionally, for purposes of the waiver of sovereign immunity, 26 U.S.C. § 6511 provides limitations on the credit or refund a taxpayer can receive. In this instance, § 6511(c), which is the subsection that must govern this action (since the taxpayer is relying on its consent to extend the

assessment limitations period to automatically extend the refund claim periods), provides that a refund is limited to the portion of the "tax paid" that was paid either within the normal period of limitations or after the execution of a consent to extend the assessment period. As part of the statutory waiver of sovereign immunity, the terms "tax paid" in § 6511(c)(2) must be narrowly construed in favor of the government.[7] A taxpayer can only claim a refund of a tax. ("Tax," by definition, includes interest paid by the taxpayer, as provided in § 6601(e)(1). But it does not include interest paid by the IRS on an overpayment of tax since there is no similar specification in § 6611. Instead, interest on an overpayment is paid not as a refund of tax or interest paid by the taxpayer, but rather as a statutory obligation of the government when it is required to pay a refund of tax or interest paid by a taxpayer.)

The provisions of § 6511 are conditions to the statutory waiver of sovereign immunity for a refund suit contained in § 7422 of the Internal Revenue Code and 28 U.S.C. § 1346(a)(1). See Dalm v. United States, 494 U.S. 596 (1990). Waivers of sovereign immunity are to be construed strictly in favor of the sovereign and any ambiguity must be resolved in the sovereign's favor. Department of the Army v. Blue Fox, Inc., 525 U.S. 255, 261 (1999). Equally fundamental is the rule that a waiver of sovereign immunity cannot be implied, but must be unequivocally expressed in an Act of Congress. Lehman, 453 U.S. 156, 160 (1981); see also, United States v. King, 395 U.S. 1, 4 (1969). Where Congress has provided for a specific waiver of sovereign immunity, the limitations and conditions upon which the United States consents to be sued must be strictly construed and rigorously enforced, and exceptions thereto are not to be implied. Lehman v. Nakshian, 453 U.S. 156, 160 (1981). As

---

[7] As the United States made clear in its Motion to Dismiss this action, its position is that 26 U.S.C. § 6511 does not apply to this action because this is not a refund action. However, the Court has ruled that this is a refund action under 28 U.S.C. § 1346(a)(1), and, therefore, implicit in that ruling is the application of 26 U.S.C. § 6511. The United States does not waive for purposes of appeal, nor can it, its jurisdictional and sovereign immunity arguments that it made in its Motion to Dismiss. But its motion for summary judgment and its response to Scripps's motion for summary judgment *assumes* that this is a refund suit and therefore assumes that § 6511 applies.

such, for purposes of this action, the Court must narrowly construe the waiver of sovereign immunity in determining whether the remittance here is a deposit or a payment. Of course, since Scripps has no defined tax liability, and since the huge net operating loss made it impossible to anticipate a tax liability for 1986 based on an increase to taxable income of $8 million (or even $16 million), the remittance could not be characterized as a payment of "tax."[8]

In sum, Scripps's remittance cannot be a payment. Scripps did not determine it had any specific additional tax liability for 1986, nor even made such an attempt in isolation from the impact of its change of accounting method on 1985 tax. Of course if such a calculation had been made, it would have been determined that Scripps had no additional tax liability for its 1986 tax year. Without some defined tax liability, Scripps's dumping of the funds on the Internal Revenue Service cannot be considered a payment and Scripps is not entitled to statutory interest.

## B.    SCRIPPS CANNOT PREVAIL UNDER THE THEORY OF EQUITABLE ESTOPPEL

Under the facts propounded by Scripps, there is no possibility that it can recover under a theory of equitable estoppel. Equitable estoppel cannot be used against the United States to obtain a payment of money that is not authorized by Congress. OPM v. Richmond, 496 U.S. 414, 423-24 (1990). As the Richmond Court stated, "[o]pinions have differed on whether this Court has ever accepted an estoppel claim in other contexts..., but not a single case has upheld an estoppel claim against the Government for the payment of money." Id. at 427. There must be some statute that authorizes the payment of funds. Id. at 424. Any equitable estoppel argument must be premised on

---

[8] We recognize that this jurisdictional argument (unlike the jurisdictional argument in our prior motion to dismiss) is co-extensive with the merits argument that, because no tax was determined, there could not be a "payment" but rather only a deposit. The import of the argument is that, because a taxpayer must claim a refund of "tax" in § 6511 before it may file a suit for any overpayment on which a taxpayer is then entitled to interest, the United States is entitled to application of the rule that any doubt must be administered in favor of the government when the Court determines whether Scripps could possibly have paid a "tax" because a refund claim is a condition of the statutory waiver of sovereign immunity for a refund suit. And, without a right to refund of a payment of tax, there can be no right to statutory interest. In contrast, no claim for refund is required for a taxpayer to demand a return of a "deposit."

the conclusion that Scripps's remittance was not a payment, but a deposit. "Equitable estoppel does not rest on the grounds that the claimant is in reality entitled to the benefit or status in question. Rather, equitable estoppel responds to the unfairness inherent in denying the claimant some benefit after it has reasonably relied on the misrepresentations of an adverse party." United States v. Marine Shale Processors, 81 F.3d 1329, 1348 (5th Cir. 1996). There is no statute that authorizes interest payments on deposits. There is also no statute that waives the United States' sovereign immunity to bring an action for the return of a deposit in this Court. See New York Life v. United States, 118 F.3d 1553 (Fed. Cir. 1997). Since applying equitable estoppel here would require a payment to Scripps not authorized by a statute, it cannot be used against the government regardless of the facts Scripps asserts.

Scripps cites Heckler v. Community Health Servs., 467 U.S. 51 (1984), Reich v. Youghiogheny & Oil Coal Co., 66 F.3d 111 (6thCir. 1995), and Watkins v. United States Army, 875 F.2d 699 (9th Cir. 1989), for the proposition that the only elements it must show for equitable estoppel to apply are an affirmative misconduct on the part of the government, reason to believe that Scripps would rely upon the misconduct, that Scripps changed its position to its detriment based upon its reliance, and that its reliance was reasonable. While the Supreme Court has never stated whether equitable estoppel can ever apply against the Government, it also has not completely foreclosed the possibility. As the Sixth Circuit has noted, "[w]hile the Supreme Court refused to adopt a flat rule that estoppel may never lie against the government, they noted that they have reversed every finding of estoppel they have reviewed." United States v. Guy, 978 F.2d 934, 937 n. 3 (6th Cir. 1992). Regardless, Scripps fails to meet its own test. First, Scripps has not shown any misconduct on the part of the IRS. At most, Scripps's version of the facts show an IRS employee mistakenly said that the IRS would treat the remittance as a payment, not a deposit. Affirmative misconduct requires more than a mistake. Kennedy 965 F.2d at 421. The IRS employee was wrong. Simply being wrong does not rise to the

-18-

level of affirmative misconduct.

Further, a taxpayer may not rely upon an IRS agent's misstatement of the law. United States v. Guy, 978 F.2d 934 (6ᵗʰ Cir. 1992). In Guy, the taxpayer contended that the Government should be equitably estopped from enforcing his tax liability because he had received certain oral assurances from the IRS agent that the IRS would not seek to collect any additional funds from him regarding his 1983 tax liability. The Sixth Circuit noted that refund the taxpayer received was contrary to law and no advice the taxpayer might have received from the IRS could change that fact. Id. at 938. The Guy court cited Heckler for the proposition "that those who deal with the government are expected to know the law and may not rely on the conduct of government agents to the contrary." See also Hollow v. United States, 1998 WL 760908 * 2, 81 A.F.T.R.2d 98-1171, 98-1 USTC ¶ 50,271 (W.D. Tenn. 1998) citing Guy, 978 F.2d 934; Kennedy v. United States, 965 F.2d 413 (7ᵗʰ Cir. 1992); Henry v. United States, 870 F.2d 634 (Fed. Cir. 1989); Coppola v. United States, 938 F. Supp. 204 (S.D.N.Y. 1996). The general rule is that "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." Heckler v. Community Health, 467 U.S. 51, 63 (1984). However, since the Supreme Court says that equitable estoppel cannot be used to obtain money from the government treasury, Scripps's factual assertions are wholly irrelevant to the issue. As a matter of law, Scripps cannot recover interest under the theory of equitable estoppel.[9]

---

[9] Also, as argued near the end of part A above, § 6511(c)(2) would limit any "refund" to "tax paid" (which is defined to include interest paid on tax). But there must be a payment of "tax." Section 6511(c)(2) applies in lieu of § 6511(b) where a claim for refund is only timely by virtue of § 6511(c)(1). In United States v. Brockamp, 519 U.S. 347, 352 (1996), the Supreme Court held that the period in § 6511(b) could not be equitably tolled in light of the unmistakeable intent of Congress in placing strict limits on tax refunds reflected in 6511(b). The same reasoning applies to any claim of equitable estoppel. A taxpayer may claim a refund only of "tax" paid (defined to include interest paid on tax, but not defined to include statutory interest on any alleged overpayment that is not a payment of "tax").

## Conclusion

Scripps made a $ 3.5 million remittance to the IRS without regard to whether it really had any tax liability at all for the 1986 taxable year. It is not entitled to interest on the return of those funds. The United States is entitled to summary judgment on this issue as there is no material fact in dispute that requires a trial. Specifically, there is no dispute that a calculation of Scripps's 1986 tax liability was not made by Scripps, and no dispute that no tax was ever asserted by the IRS. Without at least a proposed liability, there can be no payment, but rather only a deposit to stop the running of interest on tax in the event that a tax may later be determined. Scripps's Motion for Summary Judgment must be denied as it is the United States that is entitled to judgment as a matter of law.[10]

GREGORY G. LOCKHART
United States Attorney

Stacy Hallett by Sewlef F Kamont

STACY HALLETT
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-6499

---

[10] Scripps states: It "should have received interest at that time of $ 2,124,734.22" and that "as of March 15, 2003, the total amount due was $ 2,827,711.91." Scripps's Memo at 11. Assuming Scripps were entitled to interest, Scripps has provided no calculations to support its proposition that the amount of interest due is that stated above. Further, the dates of September 5, 1997 and March 15, 2003, have no bearing on the dates upon which interest would be computed. The amount of interest due Scripps would be a legal determination. As such, Scripps's statement that an evidentiary hearing would be necessary to to determine the interest payable is incorrect. The IRS and Department of Justice both have computer programs that quickly compute interest by inputting the payment day and refund date. Interest would be computed on the $3.5 million from the payment date to the date on which the $3.5 million was returned to Scripps. Interest on that sum (the interest), would then be added from that date until a date within 30 days of the issuances of a refund check. The United States will submit a computation if the Court rules in favor of Scripps so that the Court may then enter specific final judgment.

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' RESPONSE

TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT has been made upon the

following by depositing a copy in the United States mail, postage prepaid, this 25th day of April

2003:

> Paul P. Eyre
> William M. Toomajian
> Thomas R. Lucchesi
> Rebecca C. Lutzko
> Baker & Hostetler LLP
> 3200 National City Center
> Cleveland, Ohio 44114-3485

Bradly F. Kamenda