

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **THE E.W. SCRIPPS COMPANY AND SUBSIDIARIES**, | ) | |
| | ) | |
| | ) | CASE NO. C-1-01-434 |
| Plaintiff, | ) | |
| | ) | JUDGE DLOTT |
| vs. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | **E.W. SCRIPPS COMPANY AND** |
| | ) | **SUBSIDIARIES' OPPOSITION TO** |
| Defendant. | ) | **UNITED STATES' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |

## PRELIMINARY STATEMENT

In deciding whether Scripps' $7 million payment was a payment of tax or a cash bond, the Sixth Circuit's "facts and circumstances" test requires that the Court consider (1) when the tax liability was defined; (2) the taxpayer's intent; and (3) the manner in which the IRS internally treated the remittance. As detailed in Scripps' Motion for Summary Judgment, the evidence is indisputable that Scripps *intended* to make a payment of tax, that the IRS *internally treated* the remittance as a *payment of tax*, and that a tax liability was created when Scripps changed from the cash to the accrual method of accounting. After the IRS examined Scripps' internal notes and papers regarding this issue and after deposing the key Scripps personnel, the IRS in fact conceded that Scripps, in good faith, intended to make a payment of tax. After Scripps examined the internal documentation at the IRS and deposed the IRS' 30(b)(6) witness, that witness swore under oath that the IRS internally treated Scripps' remittance as a payment of tax. The IRS also



concedes, as it must, that the change in the accounting method increased Scripps' taxable income for 1986 and therefore increased its overall tax liability.

Faced with this overwhelming barrage of indisputable evidence, the IRS, in a vain effort to escape summary judgment, asks this Court to ignore long settled Sixth Circuit law, to reject the "facts and circumstances" test, to not consider either taxpayers intent or the IRS' internal treatment of the remittance, and to focus only on *one* single factor. In other words, the IRS is asking this Court to return to a "per se" test long rejected by the Sixth Circuit, most other Circuits, and even the IRS itself. This request is contrary to law and must be denied.

## STATEMENT OF FACTS

The IRS' presentation oversimplifies and often mischaracterizes the facts of this case. The IRS ignores significant portions of the record and fails to present the Court with an accurate picture of the undisputed history of this dispute. Scripps has previously set forth the relevant facts in its own motion for summary judgment. Rather than repeat that statement here, Scripps incorporates herein those facts by reference.

## LAW AND ARGUMENT

## I.    THE IRS IGNORES THE FACTS AND CIRCUMSTANCES TEST THAT GOVERNS THIS CASE.

The Sixth Circuit and a majority of other Circuits apply a "facts and circumstances" test to determine whether a remittance is a payment of tax or a cash bond. In its Brief, the IRS ignores this test and, instead, attempts to impose a different, single-factor test – whether, at the time of the remittance, a tax liability had formally been "asserted" or "defined." Not surprisingly, the IRS can cite no supportive authority for this proposition. Simply put, there is no authority to support the IRS' novel position.

In a further attempt to obtain summary judgment, the IRS misconstrues the undisputed

evidence in the record to claim that Scripps' tax liability was neither asserted nor defined, and that, as a result, Scripps' $7 million payment must be characterized as a cash bond. As detailed in Scripps' own Motion for Summary Judgment, the undisputed evidence establishes that Scripps' $7 million payment was a payment of tax. This Court should so rule.

## A.   Courts Look At Each Of Three Separate Factors To Determine Whether A Remittance Is A Payment Of Tax Or A Cash Bond Deposit.

The Sixth Circuit and other courts have made clear that a single factor does not control whether a remittance is properly characterized as a payment of tax or a cash bond. Ameel v. United States, 426 F.2d 1270, 1273 (6th Cir. 1970) ("a number of factors determine what constitutes 'payment'"). The "facts and circumstances test" has three factors and each of them must be considered in applying the test. See Gabelman v. Commissioner, 86 F.3d 609, 613 (6th Cir. 1996); Ameel, 426 F.2d at 1273; Ewing v. United States, 914 F.2d 499, 503 (4th Cir. 1990); Blatt v. United States, 34 F.3d 252, 255 (4th Cir. 1994); Moran v. United States, 63 F.3d 663, 668 (7th Cir. 1995), overruled on other grounds, Malachinski v. Commissioner, 268 F.3d 497 (7th Cir. 2001).

The factors, briefly stated, are: (1) when the tax liability was defined; (2) the taxpayer's intent; and (3) the manner in which the IRS internally treated the remittance. Ameel, 426 F.2d at 1273 (as applied); Ewing, 914 F.2d at 503; Blatt, 34 F.3d at 255; Moran, 63 F.3d at 668. In addition, courts have made clear that, among these factors, a determination of the taxpayer's subjective, good faith intent is of critical import to the analysis. Indeed, taxpayer intent appears to be the overwhelming factor that the courts look to in the determination of the proper categorization of a remittance. E.g., Ameel, 426 F.2d at 1273 ("[A]n essential factor in 'payment' before assessment is the satisfaction or discharge *of what the taxpayer deems a liability*.") (emphasis added); Ewing, 914 F.2d at 504 ("a payment results from the remittance by

3

a taxpayer concomitant with the recognition of a tax obligation whether by filing with a return, resolution of a dispute by an agreement . . . or otherwise"). Nonetheless, it is clear that it is the due consideration of all the facts and circumstances, rather than a single threshold requirement, that is determinative of whether a taxpayer's remittance made during an audit is a payment of tax or a deposit in the nature of a cash bond. E.g., Gabelman, 86 F.3d at 613.

## B.    The IRS' Attempt To Create A Single Factor Threshold Test Is Contrary To Law And The IRS' Own Previously Stated Position.

### 1.    The IRS Fails to Cite Any Supportive Authority for Its Attempt to Circumvent the Facts and Circumstances Test.

As noted above, the facts and circumstances test is controlling in the Sixth Circuit and in most other federal courts. E.g., Moran, 63 F.3d at 667-68 (noting that the Second, Third, Fourth, Sixth, and Federal Circuits, in addition to the Seventh Circuit, apply the facts and circumstances test).[1] In fact, as the IRS' own cited authority expressly states, "the 'per se' rule is now dead, and the character of remittances . . . made prior to assessment now *will be determined on the facts and circumstances of each case.*" Philip M. Jones, The Supreme Court Clarifies the Role of Assessments in Tax Controversies, 92 J. Tax'n 275, 277 (May 2000) (emphasis added).

Notably, the IRS attempts to relegate this controlling test to no more than a footnote in its Brief. (See IRS' Motion at 9 n.2.) Therein, the IRS asserts that the "fact-intensive inquiry sometimes pursued in the so-called 'facts and circumstances' tests of some courts is often wasteful of judicial and taxpayer resources and should almost never be necessary." Not

---

[1] Only the Fifth and Eighth Circuits follow a per se rule that requires the government to formally recognize the taxpayer's liability before a remittance will be deemed a payment. See Thomas v. Mercantile Nat'l Bank, 204 F.2d 943 (5th Cir. 1953); United States v. Dubuque Packing Co., 233 F.2d 453 (8th Cir. 1956). The Fifth Circuit, however, has recognized that the facts and circumstances test, with a strong emphasis on taxpayer intent, "better serves tax policy objectives" and comports with Rosenman v. United States, 323 U.S. 658 (1945), in which the Supreme Court recognized the distinction between payments of tax and cash bond deposits. Ford v. United States, 618 F.2d 357, 359-61 (5th Cir. 1980) (reluctantly applying the per se test because it is the law of the circuit).

4

surprisingly, the IRS makes this baseless claim without citation to a single *supportive* authority.[2]
To be sure, the application of the proper test to the facts of this case results in the inescapable
conclusion that Scripps' $7 million payment was a payment of tax, not a cash bond.

### 2.    The IRS' Attempt to Create a Single-Factor Threshold Test for Characterizing a Remittance as a Payment Is Without Support.

The IRS attempts to advance a single factor threshold test focusing solely on whether a

tax liability had been formally asserted or defined at the time the remittance was made. The IRS

contends that, in the absence of formal assertion or definition of a tax liability, any remittance

cannot be a payment of tax. According to the IRS, none of the other factors of the facts and

circumstances test have any relevance in the absence of an affirmative finding on this threshold

issue. The IRS' position is contrary to controlling law.

At least one court has expressly discussed and rejected the IRS' attempt to focus solely

on an "asserted" tax liability. As summarized by the Fifth Circuit Court of Appeals,

> The Government urges that the intent of the taxpayer at the time of the remittance
> is irrelevant to the consideration whether the moneys constitute tax "payment."
> We disagree; **to disregard taxpayer intent is to place the assertion of tax
> liability as the sole determinant. *Rosenman v. United States* [citation omitted]
> and more recent authorities contemplate that for "payment" the remittance
> should be in satisfaction of what the taxpayer "deems" a liability.** There is
> less support for the Government's position than for the hard-and-fast [per se] rule
> of *Mercantile National Bank*.

Ford v. United States, 618 F.2d 357, 360 n.3 (5th Cir. 1980) (emphasis added).

The cases the IRS cites at page 9 of its brief likewise do not call for a threshold

---

[2]   Ewing, the only case the IRS cites, in no way endorses this wholly contrived assertion. To the
contrary, the Ewing court expressly states that there is no bright-line rule, such as formal assessment of a
tax by the government, for determining whether a remittance constitutes a payment or a cash bond.
Instead, the "clear weight of authority" requires courts to look at all the facts and circumstances
surrounding the remittance, and, in particular, the three factors described in Section I.A., supra. Ewing,
914 F.2d at 503. Ewing conclusively does *not* state that this test applies only in limited circumstances.

requirement to be met – rather, they apply the facts and circumstances test.[3] Although the Ameel court does state that, "where there is no tax liability computed and proposed, a remittance is to be treated as a cash bond to stop the running of interest on the amount 'dumped' . . . or deposited until a more definite determination of tax liability is asserted by the Government," Ameel, 426 F.2d at 1272, the IRS has taken this statement out of context. It is apparent from even a cursory reading of that case that that statement referred to the fact that, "in general," remittances will be considered to be cash bonds where there has been no effort to calculate the tax liability in question or where the parties have stipulated that a defined tax liability would not take place until assessment. Id. at 1272-73.

Significantly, the Ameel court went on to apply the facts and circumstances test and found that the remittance in question was a payment of tax. While mentioning that the remittance was made in response to a proposed deficiency, the court relied primarily on the taxpayer's subjective intent in making the remittance, noting that at the time of her voluntary remittance, the taxpayer (like Scripps) had not intended to contest owing the money paid, but intended instead to discharge any further tax liability. Id. at 1273. The court also noted that the IRS did *not* send the taxpayer a notice (such as a 316(c) notice) indicating that the IRS was treating the remittance as a cash bond and did not otherwise internally treat the remittance as a cash bond. Id. at 1271 & n.1, 1273.

Similarly, in claiming that the Malachinski court "found that *because* the remittance was made well before any liability was defined, it was a deposit" (IRS Motion at 9-10 (emphasis

---

[3] Of the authority cited, only the Thomas and Dubuque cases apply a per se rule requiring that the government formally assess the taxes due before a remittance will constitute a payment. As discussed in Section I.D., infra, the Sixth Circuit and the vast majority of other circuits have expressly rejected this per se test, which is contrary to Rosenman itself, and have held that formal assessment is only one of many things to consider.

6

added)), the IRS again has misstated the court's analysis. Although the Malachinski court did

conclude that the remittance was a cash bond deposit, it did so only after analyzing several

factors, including the taxpayer's intent upon making the remittance and the manner in which the

IRS treated the remittance upon receipt. In stark contrast to the present situation, the

Malachinski taxpayer *never* indicated that his remittance was intended to be a payment, and the

IRS internally treated the remittance as a cash bond. Malachinski, 268 F.3d at 508.[4]

Despite its assertion that a single factor threshold test should be applied in this instance,

the IRS is apparently not really sure of the proper test to utilize in order to determine the proper

characterization of a taxpayer's remittance. In other cases, the IRS has clearly argued for the

application of the facts and circumstances test. For example, the IRS has stated:

> Whether a remittance is a payment or a deposit is a question of fact **to be
> determined by examining all the relevant facts and circumstances.**
> Ewing v. United States, 914 F.2d 499, 503 (4th Cir. 1990); Ameel v.
> United States, 426 F.2d 1270, 1273 (6th Cir. 1970); Gabelman v.
> Commissioner, T.C. Memo. 1993-592. **Relevant facts include (1) when
> the tax liability is defined, (2) the taxpayer's intent in remitting the
> money, and (3) how the Service treated the remittance upon receipt.**
> Blatt v. United States, 34 F.3d 252, 255 (4th Cir. 1994); Ewing, 914 F.2d
> at 503; Gabelman, T.C. Memo. 1993-592. **A crucial fact is the intent of
> the taxpayer at the time the remittance was made.** Blatt, 34 F.3d at
> 255; Gabelman, T.C. Memo. 1993-592. See also Ford v. United States,
> 618 F.2d 357, 360 (5th Cir. 1980). Generally, **a remittance is considered**

---

[4] In addition, contrary to the IRS' characterization, Consolidated Edison Co. of New York, Inc. v. United States, 941 F. Supp. 398 (S.D.N.Y. 1996), is not "factual similar" to the present case. Although the taxpayer in that case was in an overpayment situation, the case in no way concerned the characterization of a remittance made by the taxpayer. Thus, in contrast to this case, there was no issue regarding whether a particular remittance constituted a payment of tax versus a cash bond. Instead, the court was simply looking at whether the IRS' interim *offset* of a credit taken by the taxpayer and later denied by the IRS against the taxpayer's overpayment for the same tax year constituted a payment for statute of limitations purposes.

Notably, even if the IRS were correct that Consolidated Edison stands for the proposition that there can be no overpayment of tax for years in which it turns out that, in fact, there is no additional tax liability, the case would be inconsistent with 26 U.S.C. § 6401(c). That statute expressly provides, "Rule where no tax liability. An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid."

> **a payment** if the taxpayer intends that the remittance satisfy **what the taxpayer regards as an existing tax liability.** Rosenman, 323 U.S. 658 at 661-662; Blatt, 34 F.3d at 255; Ameel, 426 F.2d at 1273; Hill v. United States, 263 F.2d 885, 886 (3d Cir. 1959); Lewyt Corp. v. Commissioner, 215 F.2d 518, 522-523 (2d Cir. 1954), aff'd in part and rev'd in part on other grounds, 349 U.S. 237; Gabelman, T.C. Memo. 1993-592.

IRS Tech. Adv. Mem. 96-13-001, at *6-7 (Dec. 14, 1995) (emphasis added) (a copy is Exhibit A hereto) (where taxpayer remitted $100,000 for what turned out to be less than $13,000 of tax due, finding the remittance was a payment because the taxpayer indicated its intent to satisfy what it believed to be a liability by noting on the check that the remittance was for "estimated taxes," and later requested refund of its "overpayment" rather than return of its deposit). To say the least, it seems that the IRS has a rather "flexible" approach to deciding upon the proper analysis. It is blatantly unfair and improper for the IRS to take inconsistent positions.

## C. The Undisputed Evidence Establishes That Scripps Had A Defined, Asserted Tax Liability When It Made Its $7 Million Payment.

### 1. Scripps' Tax Liability Was Defined When It Made Its $7 Million Payment.

When Scripps made its $7 million payment to the IRS, Scripps' additional tax liability due as a consequence of applying the accrual method to the 1985 and 1986 tax years was defined. As the IRS concedes, in 1988 Scripps and the IRS agreed that Scripps would change its accounting method from the cash to the accrual basis and that this change bound Scripps to apply retroactively the accrual method to the 1985 and 1986 (among other) tax years. (See IRS Motion at 1.) Upon entering into this agreement, both Scripps and the IRS knew that Scripps' taxable income for each of the affected years (including 1985 and 1986) would increase, thereby raising Scripps' overall tax liability for the entire affected period. (E.g., Declaration of Mike Carroll ("Carroll Dec.") ¶4, attached as Exhibit B hereto; Declaration of Jerome Hackman ("Hackman Dec.") ¶2, attached as Exhibit C hereto.) Scripps settled the 1981 through 1984 tax years with

8

the IRS, agreed on how its income would be adjusted for those years due to the method change, and paid the additional taxes owed as a result. In December 1990, Scripps wanted to pay what remained of this additional known tax liability. (Carroll Dec. ¶5; Hackman Dec. ¶¶2-3.)

The IRS is not now contending and has never contended that the Scripps' taxable income and associated liability did not increase because of the method switch.

### 2. Contrary to the IRS' Misrepresentation, Scripps Did Calculate and Assert Its Additional Tax Liability.

The IRS misrepresents to the Court that "[a]s of December 31, 1990, neither Scripps nor the IRS had calculated the amount, if any, that this change would increase Scripps's 1986 tax liability" and that "there was no tax liability defined by either Scripps or the IRS." (IRS Motion at 1, 7.) In fact, the undisputed facts establish that Scripps did not simply "estimate" or "guess" what it owed; instead, Scripps made a very complex and detailed calculation of the effect the method change would have on Scripps' tax liability and, in making its $7 million payment, attempted in good faith to pay this liability in December 1990.[5]

More specifically, in December 1990, Scripps had already calculated and knew that the method change had increased its income by a total of $38,653,757 for the period 1980 through 1986. At that time, the IRS had already determined (and Scripps had already agreed to) the specific adjustments resulting from the method change for 1980 through 1984. Because Scripps wanted to pay its remaining additional tax liability, it asked the IRS to calculate what it still owed. The IRS claimed that it was too busy and, therefore, did not have the time to calculate the

---

[5] Mr. Hackman explained the detailed nature of his calculation when the IRS deposed him. (See Hackman Dep. at 10, 20-32 and Exhibits 47 and 49 thereto.) In his declaration, Mr. Hackman has provided additional details about which he was not deposed. Scripps has previously cited the portions of the record that support many of the facts described herein in its Motion for Summary Judgment. Rather than repeat those cites in this brief, Scripps cites only to the additional information provided in the attached declarations.

9

tax owed. Rather than accumulate additional interest and lose the interest deduction to which it was entitled, Scripps therefore took it upon itself to calculate its additional tax liability. (Carroll Dec. ¶5; Hackman Dec. ¶¶2-3, 5, 7 & Ex. 1 thereto.)

It took Scripps approximately three weeks to make these calculations (not to mention the hundreds of additional hours Scripps initially spent calculating the underlying figures for these calculations). (Hackman Dec. ¶¶4-6.) To do so, Scripps first made sure that it had properly calculated the cumulative increased taxable income for each of the 17 subsidiary companies that were part of Scripps' consolidated tax group and that were affected by the method change. Scripps then had to "piece together" each of the several adjustments that the IRS had made for 1980, 1981, 1982, 1983, and 1984 for each of the 17 subsidiaries. Scripps then applied each of the IRS' adjustments to each of these 17 subsidiaries to calculate the amount by which each subsidiary's taxable income had increased on a yearly basis for 1980 through 1984. Scripps was then able to determine its total increased income for the two-year period of 1985 and 1986.[6] (Hackman Dec. ¶¶4-3, 7-8 and Exs. 1&2 thereto.) Scripps multiplied this additional income by the 46 percent corporate income tax rate to determine the additional tax owed for the 1985 and 1986 period because of the method change. (Hackman Dec. ¶9.)

Based on the adjustments agreed to with the IRS, Scripps had already made additional tax payments for its increased 1980 through 1984 income caused by the method change. Taking these payments into account, Scripps determined that in December 1990, it still owed $6,475,637 due to the method switch. Scripps calculated that the interest due on this amount was $3,306,363 and that, in total, it owed $9,782,000. (Hackman Dec. ¶2, 10 & Ex. 2 thereto.)

---

[6] Due to time pressures and the hundreds of additional calculations that would be necessary to separate 1985 from 1986, Scripps did not determine its increased income for 1985 and 1986 separately. (Hackman Dec. ¶9.)

10

Scripps did not want to overpay its liability because it knew that it could invest its money more profitably in the market. (Carroll Dec. ¶6.)[7] Thus, given the complexity of the calculations and the fact that it relied on many other complex calculations done by various persons at Scripps and the IRS, Scripps decided to round its tax and interest liability downward, with the intention of paying at least most of its additional tax liability and related interest without overpaying what it owed. Scripps informed the IRS of its intentions and paid $7 million to the IRS to discharge this liability.[8] (Carroll Dec. ¶¶6-7; Hackman Dec. ¶11.)

In arguing that Scripps did not compute its additional tax liability, the IRS appears to be claiming that because Scripps did not refer to its 1986 consolidated tax return, it was not aware of a $62 million net operating loss ("NOL"). According to the IRS, if Scripps would have referred to its return, it would have known that it would not owe additional tax in 1986. The IRS

---

[7] Contrary to the IRS' unsupported assertion, Scripps did not intend to "dump" its money on the IRS as some sort of "investment" that would earn interest at the below-market government rate. The way that Scripps manages its cash requires it to borrow any payments of this kind from a bank. Scripps has to pay interest on the funds it borrows. Thus, Scripps would not benefit from recklessly "dumping" funds with the IRS as the IRS suggests. Further, to the extent that Scripps does have extra cash on hand, it reinvests that money in its existing businesses or uses it to make business acquisitions or other market investments. Scripps believes that these are far better uses for its available cash than the generally below-market interest rates that the IRS pays on overpayments of tax. (Carroll Dec. ¶ 6.)

Moreover, Scripps' "pursuit of an interest deduction" lends no support to the IRS' contrived dumping theory. If Scripps had recognized the carryback issue at the time it made the $7 million payment and instead designated the payment for an earlier tax year, Scripps would still have been entitled to deduct the interest that it paid on its 1990 tax return.

[8] The IRS implies that Scripps' liability was not "defined" simply because Scripps' $7 million payment was a "round number." The Sixth Circuit, as well as the Fourth Circuit, however, have previously rejected this contention, finding that the fact a taxpayer did not precisely calculate the amount of a tax liability or submit the exact amount of tax due does not prevent a remittance from constituting a payment of tax. Gabelman, 86 F.3d at 610; Blatt, 34 F.3d at 255.

Further, Holtvogt v. United States, 887 F. Supp. 994 (S.D. Ohio 1995), cited by the IRS, does not support this proposition. In Holtvogt, after making a remittance of $9,006, the taxpayer attempted to argue that the remittance was a *cash bond deposit*, rather than a payment of tax. It was in response to this argument that the court stated, "it is certainly more likely that one would deposit a round amount than a precise figure like $9,006," and found that the remittance was intended to be a payment of tax. Id. at 1000. It does not logically follow that the reverse is therefore true.

misses the point entirely. There is no question that, as a result of the change in the tax method, Scripps had an additional tax liability.[9]  (Carroll Dec. ¶8.)

Under the tax laws, however, losses may be carried back and applied against profits in previous tax years. Thus, although Scripps' 1986 taxable income did in fact increase due to the method change, the actual effect of the increase was to decrease the NOL and, consequently, decrease the amount of loss carried back to previous tax years. In other words, although Scripps still owed additional tax on the increased income for 1986, as a bookkeeping matter, the tax was actually owed for an earlier year.[10]  That does not change the fact that Scripps' tax liability resulting from the method change was defined, due, and owing at the time Scripps made the $7 million payment. Scripps calculated this additional tax liability, acknowledged and asserted that it owed additional money, and attempted to discharge what it legitimately thought was due.[11]

(Carroll Dec. ¶8; Hackman Dec. ¶¶12-13.)

---

[9]  Scripps had no reason to refer to the 1986 consolidated tax return to calculate its additional taxable income and resulting additional tax liability due to the method change; instead, it only needed to look at the cumulative subsidiary schedules, work papers, and IRS-computed adjustments for the subsidiaries affected by the method change to determine the additional amounts. Therefore, although Scripps was aware of the NOL for 1986, it did not focus on this fact in calculating Scripps' additional tax liability. (Hackman Dec. ¶ 12.)

[10]  While it may now appear that Scripps' designated tax and interest payment for 1986 should have instead been made for 1983, because the 1985 through 1987 tax years were under audit when Scripps made its $7 million payment, it was possible that IRS-proposed adjustments could have eliminated the NOL and resulted in Scripps having positive 1986 taxable income. Therefore, although the tax was in fact owed and although Scripps was able to calculate accurately the amount that it owed, it could not determine beyond a doubt, as a matter of bookkeeping, to which year this tax would ultimately apply. (Hackman Dec. ¶ 12.) This does not, however, change the fact that the discrete effect of the method change increased Scripps' 1986 taxable income and therefore increased the additional tax and interest Scripps owed and paid.

[11]  In fact, the IRS ultimately did collect from Scripps the additional tax owed due to the increase in Scripps' 1986 income as a result of the method switch – the IRS simply did so for an earlier tax year, 1983. The IRS assessed and Scripps paid interest on this additional "1983" tax liability even though, at the same time, the IRS was holding the "1986" payment that Scripps made in December 1990 intending to pay the very same tax liability. In other words, the IRS continued to charge Scripps interest while, at the same time, it was holding Scripps' funds due for the exact same liability. (Hackman Dec. ¶ 14.) In

*(con't)*

**D.    The IRS Essentially Attempts To Return To The Discredited *Per Se* Rule.**

Given the undisputed evidence that the IRS agreed to the method switch; that this switch

increased Scripps' overall tax liability; that Scripps made a detailed calculation of its increased

liability; and that Scripps asserted that it owed the additional money paid, it becomes apparent

that the IRS is really claiming that unless *the government formally* asserts or defines a specific

tax liability, a taxpayer's remittance is per se a deposit in the nature of a cash bond and cannot be

a payment of tax. In essence, the IRS is attempting to resurrect the discredited per se rule that

required formal government recognition of a tax liability through assessment.

The Sixth Circuit has rejected this per se rule, instead making clear that a taxpayer's

remittance to the IRS may constitute a payment of tax even though the government has not

formally assessed the tax at the time the remittance was made. Assessment is only one factor to

consider. Ameel, 426 F.2d at 1273. The vast majority of other Circuits have likewise rejected

this per se rule. See, e.g., Ewing, 914 F.2d at 503; Moran, 63 F.3d at 666-68.

Rejection of such a rule comports with common sense. The vast majority of taxes in this

country are paid voluntarily by taxpayers without the government first proposing or asserting a

specific liability. As the Seventh Circuit has stated, "An assessment is not a prerequisite to tax

liability. . . . Indeed, our tax system would function poorly were not most taxes 'self-assessed.'"

Moran, 63 F.3d at 666; see also Hill v. United States, 263 F.2d 885, 886 (3d Cir. 1959) (payment

results when a taxpayer forwards a remittance along with a tax return, even though the government

has not yet formally assessed, asserted, or otherwise agreed to the taxpayer's tax liability).

Indeed, in Rosenman, the Supreme Court acknowledged that *government* assertion of a tax

---

refunding Scripps' payment without interest, the IRS seeks to penalize Scripps by using Scripps' funds
and keeping the interest Scripps paid on the "1983" payment when assessed.

liability is not required for a remittance to constitute a payment. In discussing the relevant considerations, the Court stated, "the taxpayer did not discharge *what he deemed a liability* nor pay one that was asserted." Rosenman, 323 U.S. at 660-62 (emphasis added) (relying on taxpayer's expressed intent to dispute its tax liability to find that the remittance, which the taxpayer made "under protest and duress," "solely for the purposes of avoiding penalties and interest," and while contending "that not all of this sum is legally or lawfully due," constituted a cash bond).[12]

In short, although a remittance constituting a payment *may* be made in response to a tax liability proposed by the government, a proposal by the government is not a prerequisite to liability. E.g., Blatt, 34 F.3d at 253-57.

## III.   THE IRS CONCEDES THAT THE REMAINING TWO FACTORS DEMONSTRATE THAT SCRIPPS' $7 MILLION PAYMENT WAS A PAYMENT OF TAX.

The remaining two factors of the facts and circumstances test demonstrate that Scripps' $7 million payment was a payment of tax and not a cash bond deposit. *The IRS makes no attempt whatsoever to argue to the contrary.* Instead, the IRS simply chooses to ignore the undisputed facts, which Scripps set forth in detail in its own Motion for Summary Judgment. (See Scripps' Motion at 2-11, 13-17.) Those facts are summarized briefly below.

### A.   Scripps Intended To Pay An Additional Tax Liability For 1985 And 1986 And Expressed This Intent To The IRS.

All evidence of record shows that Scripps intended the $7 million payment to be a payment of tax and not a deposit in the nature of a cash bond. Scripps knew that its 1988 agreement to retroactively apply the accrual method of accounting would increase its taxable income for 1986 and that, as a result, it would owe more money than it had already paid. Scripps

---

[12] In finding that the remittance was a cash bond, the Rosenman Court also relied on the fact that the IRS internally treated the remittance as a cash bond by placing it in a "suspense" or escrow account.

14

asked Agent Saewitz to calculate the amount due prior to year-end; when he told Scripps that he
was too busy, Scripps itself made the detailed calculation to determine the extent of its additional
tax liability. Scripps repeatedly told Agent Saewitz before making the payment that it wanted to
pay its additional liability and take the associated interest deduction to which it was entitled.
Agent Saewitz did not object to Scripps' expressed intentions or tell Scripps that it did not have a
liability for 1986 – instead, he offered to help Scripps make the payment.

On December 31, 1990, both orally and in writing, Scripps again expressly told the IRS
that Scripps intended to pay its additional taxes. Compare Binder v. United States, 590 F.2d 68
(3d Cir. 1978) (taxpayer's failure to communicate that the amounts were intended as deposits
supported finding of payment). If Scripps' intent was somehow not clear at that point, it
certainly was made obvious when, in response to Agent Saewitz's marking of the "Cash bond"
box on the payment posting voucher, Scripps vigorously objected to that characterization. As
Agent Saewitz acknowledges, at that point Scripps repeatedly told him that it did *not* intend to
make a deposit in the nature of a cash bond, but wanted instead to make a payment of tax. In
response, Agent Saewitz assured Scripps that the IRS would treat Scripps' $7 million payment as
a payment of tax. Given their past relationship, Scripps believed that it could trust Agent
Saewitz, and because December 31, 1990, was the last day on which Scripps could make a
payment and still get a 1990 interest deduction, Scripps left the money to be processed in
accordance with its expressed intent and Agent Saewitz's assurances. As all of these facts are
undisputed, Scripps' intent to make a payment of tax could not be more evident.

### B.     The IRS Treated The $7 Million Remittance As A Payment Of Tax.

The undisputed evidence also establishes that the IRS internally treated Scripps' $7 million
payment as a payment of tax. In fact, the IRS has explicitly and repeatedly conceded that the IRS
treated Scripps' $7 million payment as a payment of tax. Moreover, the IRS' internal processing

15

of the $7 million payment objectively demonstrates that the IRS treated Scripps' $7 million payment as a payment of tax: the IRS did not mark the 316(c) box on the Form 3244-A payment posting voucher, which it is required to mark when it treats a remittance as a cash bond; no 316(c) notice was ever prepared or sent to Scripps in connection with the payment; Agent Saewitz repeatedly assured Scripps that its payment would be treated as a payment of tax; the IRS assigned the $7 million payment a document locator number that shows that the payment was a payment of tax and not a cash bond; and, finally, consistent with treatment as a payment, the IRS allowed Scripps to deduct the interest portion of the $7 million remittance on its 1990 tax return.

In sum, the undisputed evidence shows that Scripps' $7 million payment was a payment of tax. As such, because Scripps overpaid its taxes by $3,500,000, Scripps is entitled to receive interest on this amount.

## IV.    THE IRS' MOTION IGNORES THE UNDISPUTED FACTS DEMONSTRATING THAT THE IRS IS EQUITABLY ESTOPPED FROM CLAIMING THAT THE $7 MILLION PAYMENT WAS NOT A PAYMENT OF TAX.

Notwithstanding the title of its Motion, the IRS has in fact moved only for *partial* summary judgment. Scripps' First Amended Complaint alleges not only a refund claim, but also an equitable estoppel cause of action. The IRS does not even attempt to argue that it is entitled to summary judgment on Scripps' second cause of action.

Notably, in ignoring Scripps' equitable estoppel claim, the IRS has also left out of its Motion large, undisputed parts of the record that readily demonstrate Scripps' entitlement to relief on this separate, independent ground. For example, the IRS neglects to mention that at the time Scripps made its $7 million payment, the IRS affirmatively assured Scripps that its $7 million payment would be accepted and treated as a payment of tax. The IRS likewise fails to mention that, after Scripps discovered in early 1995 that it had overpaid its tax liability and asked whether it was possible to have any of its overpayments returned, Agent Saewitz continued to

16

represent to Scripps that all of Scripps' overpayments, including the $7 million payment, were being treated by the IRS as a payment of tax. The IRS also conceals the fact that, at the same time, Agent Saewitz also informed Scripps that any overpayment could not be returned until the IRS formally closed the tax year and that any amount returned would bear interest. The IRS similarly fails to divulge that, contrary to its own internal policies, the IRS never sent Scripps a 316(c) notice, and did not otherwise do anything to make Scripps aware of the possibility that the IRS was not treating the payment in accordance with Scripps' expressed intent.

As detailed in Scripps' Motion for Summary Judgment, these and other undisputed facts show that, as a matter of law, the IRS is estopped from claiming that the $7 million remittance was anything but a payment of tax. See, e.g., Heckler v. Community Health Servs., 467 U.S. 51, 59-61 (1984); Reich v. Youghiogheny & Ohio Coal Co., 66 F.3d 111 (6th Cir. 1995); Simmons v. United States, 308 F.2d 938, 945 (5th Cir. 1962).

## CONCLUSION

For the foregoing reasons and the reasons set forth in Scripps' own Motion for Summary Judgment, this Court should deny the IRS' Motion for Summary Judgment, grant summary judgment in favor of Scripps, and award Scripps statutory interest, as allowed by law, on its $3,500,000 overpayment to the IRS for the 1986 tax year.

Respectfully submitted,

Paul P. Eyre (0025756) *Trial Counsel*
William M. Toomajian (0025740)
Thomas R. Lucchesi (0025790)
BAKER & HOSTETLER LLP
3200 National City Center
Cleveland, Ohio 44114-3485
(216) 621-0200
Attorneys for Plaintiff

17

## CERTIFICATE OF SERVICE

A copy of the foregoing E.W. Scripps Company and Subsidiaries' Opposition to United

States' Motion for Summary Judgment was served by first-class U.S. mail, postage prepaid,

upon Stacy S. Hallett, attorney for the defendant, at Tax Division, Department of Justice, P.O.

Box 55, Ben Franklin Station, Washington, D.C. 20044, on this $23^{d}$ day of April, 2003.

*Paul P. Eyre / Pw*
One of the Attorneys for Plaintiff

G:\CLdata\R13825\95070\00020\Pleadings\Opposition to Govt MSJ-2.doc

1 of 1 DOCUMENT

PRIVATE RULING **9613001**

INTERNAL REVENUE SERVICE NATIONAL OFFICE **TECHNICAL ADVICE** MEMORANDUM

"This document may not be used or cited as precedent. Section 6110(j)(3) of the Internal Revenue Code."

SECTION 6511
Limitations on Credit or Refund (Barred v. Not Barred)
-- Payment Date
-- Advance Payment

6511-0201

PRIVATE RULING **9613001**; 1995 PRL LEXIS 2282

DATE: December 14, 1995

REFER REPLY TO: **[\*1]** TR-32-187-95

OUESTION PRESENTED:

Whether Estate's remittance is a payment or a deposit for purposes of section 6511(b)(2)(A) of the Internal Revenue Code?

FACTS:

Decedent died intestate on August 17, 1986. On June 26, 1987, the County Court appointed Commissioner of Finance as the Administrator of Estate. The Commissioner of Finance also acted as Public Administrator for the County. On April 26, 1988, the Administrator submitted a check in the amount of $ 100,000 to the Internal Revenue Service's \* \* \* Service Center. The check was not submitted with a Form 4768, Application for Extension of Time to File U.S. Estate Tax Return, and there is no record of a transmittal letter accompanying the check. The notation on the check stated as follows: "Estate Estimated Taxes \* \* \* "and a death certificate was attached.

The circumstances surrounding the Administrator's remittance of the $ 100,000 check are relevant to the issue whether the remittance is a payment or a deposit. Decedent was the last of five brothers and sisters to die from January 1, 1973, to her death on August 17, 1986. Each of the five lived in the family home and each died intestate. Decedent's brother died on December 14, **[\*2]** 1985, less than a year before decedent.

The Administrator appointed to administer Estate was also appointed to administer her brother's estate. The Taxpayer states that the Administrator was an elected public official with no expertise in estate taxes. According to the Taxpayer, the Administrator hired another individual, who was neither a CPA nor an attorney, to prepare the estate tax returns of both estates, but that individual did not prepare any returns. The Taxpayer also states that the Administrator did not succeed in gathering the assets or records of either decedent.

In November 1987, Administrator lost his bid for reelection as Commissioner of Finance. The Court directed the Administrator to file an intermediate account for the period of his administration, ending April 25, 1988. On April 26, 1988, the Administrator sent checks to both the Internal Revenue Service and the \* \* \* State Department of Taxation and Finance for both estates as follows:

| Estate | Remittance to IRS | Remittance to |
|--------|-------------------|---------------|
| Decedent | $ 100,000 | $ 60,000 |

**EXHIBIT A**

Case 1:01-cv-00434-SJD   Document 25   Filed 04/25/2003   Page 20 of 34

Brother                          5,000                   2,000

The Taxpayer alleges that at the time the original Administrator made the remittances, he did not have sufficient information [*3] to calculate the estate taxes due for either estate. The Taxpayer states that no calculations were made to determine the estate tax due and the remittances bore no relation to the tax ultimately determined to be due.

On July 21, 1993, the Estate filed its Form 706, United States Estate Tax Return. The Form 706 showed $ 12,989 estate tax due, "Prior payments" of $ 100,000, and an "overpayment" in the amount of $ 87,011. Decedent's brother's United States Estate Tax Return filed June 3, 1993, showed $ 32,692 estate tax due, $ 5,000 in prior payments, and a $ 27,692 balance due.

The $ 100,000 remittance was posted to Estate's account on May 6, 1988. The Service has treated Estate's Form 706 as a Claim for refund of the $ 100,000 payment.

LAW & ANALYSIS:

Background.

Section 6018(a)(1) of the Internal Revenue Code requires a return with respect to the estate tax in all cases where the gross estate at the death of a citizen or resident exceeds $ 600,000.

Section 6075(a) of the Code provides that returns made under section 6018(a) shall be filed within 9 months after the date of the decedent's death.

Section 6151(a) of the Code provides, in part, that when a return of tax is required, the [*4] person required to make such return shall, without assessment or notice and demand from the Secretary, pay such tax at the time and place fixed for filing the return (determined without regard to any extension of time for filing the return).

Under section 6511(a) of the Code a claim for credit or refund of an overpayment of tax must be filed within 3 years from the time the return was filed or 2 years from the time the tax was paid. Under section 6511(b)(2)(A), if the claim is filed within 3 years of the time the return was filed, the amount of the credit or refund is limited to the tax paid within the three year period (plus any period of extension of time to file the return) preceding the filing of the claim.

Estate filed its return on July 21, 1993. This return has been treated as an informal claim for refund, despite the fact that it was not made on Form 843, as required by section 301.6402-2(c) of the Income Tax Regulations. Since the claim for refund and the return were filed simultaneously, the claim for refund was filed within three years of filing the return. See Rev. Rul. 76-511, 1976-2 C.B. 428. Where, as is the case here, the claim is filed within the three-year period [*5] set forth in section 6511(a) of the Code, the amount of the claim is limited to any tax paid within the three-year period (plus any period of extension of time for filing the return) immediately preceding the claim. Section 6511(b)(2)(A). The $ 100,000 remittance sent on April 26, 1988, clearly was not paid in the three-year period immediately preceding the July 21, 1993, claim for refund. Consequently, the July 21, 1993, claim for refund does not reach that remittance.

Payment or deposit.

The period of limitations set forth in section 6511(a) of the Code applies to overpayments of tax and the limitation of section 6511(b)(2)(A) applies to tax paid during the three-year period preceding the refund claim. Section 6511 does not apply to deposits of tax, as distinguished from payments of tax. Rosenman v. United States, 323 U.S. 658 (1945). Consequently, if a remittance is a deposit, the taxpayer may obtain a return of the deposit despite the running of the period of limitations on refunds of overpayments set forth in section 6511. Estate claims that the remittance made April 26, 1988, is a deposit, and seeks a return of the deposit.

Whether a remittance is a payment or a deposit is a [*6] question of fact to be determined by examining all the relevant facts and circumstances. Ewing v. United States, 914 F.2d 499, 503 (4th Cir. 1990); Ameel v. United States, 426 F.2d 1270, 1273 (6th Cir. 1970); Gabelman v. Commissioner, T.C. Memo. 1993-592. Relevant facts include (1) when the tax liability is defined, (2) the taxpayer's intent in remitting the money, and (3) how the Service treated the remittance upon receipt. Blatt v. United States, 34 F.3d 252, 255 (4th Cir. 1994); Ewing, 914 F.2d at 503; Gabelman, T.C. Memo. 1993-592. A crucial fact is the intent of the taxpayer at the time the remittance was made. Blatt, 34 F.3d at 255; Gabelman, T.C. Memo. 1993-592. See also Ford v. United States, 618 F.2d 357, 360 (5th Cir. 1980). Generally, a remittance is considered a payment if the taxpayer intends that the remittance satisfy what the taxpayer regards as an existing tax liability. Rosenman, 323 U.S. 658 at 661-662; Blatt, 34 F.3d at 255; Ameel, 426 F.2d at 1273; Hill v.

United States, 263 F.2d 885, 886 (3d Cir. 1959); Lewyt Corp. v. Commissioner, 215 F.2d 518, 522-523 (2d Cir. 1954) aff'd in part and rev'd in part on other grounds, 349 .S. 237; Gabelman, T.C. Memo. 1993-592. [*7]

The objective manifestations of Estate's intent in remitting the $ 100,000 indicate that Estate intended the remittance to be a payment. First, Estate noted on the check that the remittance was for "Estate Estimated Taxes". This notation suggests that the Estate acknowledged the existence of an estate tax liability, had made an estimate of the estate tax due, and was remitting its estimate of the liability. Second, Estate's later communication to the Service corroborates the intent communicated to the Service with the remittance. Estate sought repayment of the remittance, not by asking for return of a deposit, but by claiming refund of an "overpayment". See Blatt, 34 F.3d at 255.

The circumstances surrounding the remittance, including the Administrator's alleged lack of experience in estate taxes generally and his performance with respect to Estate specifically, do not convert Estate's remittance into a deposit. The factual circumstances surrounding the remittance are consistent with the conclusion that the Administrator was making a payment, i.e., remitting money with the intent of satisfying a liability acknowledged to be due. The payment of tax was due May 17, 1987, when the estate [*8] tax return was due. Rather than suggesting that the Administrator had no intention of satisfying an existing liability, the facts suggest merely that the Administrator did not carefully calculate the amount of the liability he recognized was due. Where a tax liability is not precisely calculated, and the taxpayer is not even aware of the consequences of a payment versus a deposit, the remittance is nonetheless a payment as long as the taxpayer believed taxes were owed. Blatt, 34 F.2d 252, 255-256 (4th Cir. 1994). Even a clear mistake in the amount remitted does not convert a payment with respect to an acknowledged liability into a deposit. See United States v. Miller, 315 F.2d 354 (10th Cir. 1963); Hill v. United States, 263 F.2d 885 (3d Cir. 1959).

Thus, we conclude the remittance was a payment, not a deposit. As a result, the limitation on refunds set forth in section 6511(b)(2)(A) bars refund of the payment since the claim for refund was filed more than three years (plus any period of extension of the time to file) after the payment was made.

Estate argues that, under Rev. Proc. 64-13, 1964-1 (part 1) C.B. 674, an advance payment that is not assessed is required to be treated as [*9] a deposit in the nature of a cash bond. Rev. Proc. 64-13 was replaced by Rev. Proc. 82-51, 1982-2 C.B. 839, and is effective only for remittances made before the effective date of Rev. Proc. 82-51. Sec. 7 of Rev. Proc. 82-51, 1982-2 C.B. 839, 841. Section 6 of Rev. Proc. 82-51 states that it is effective for all remittances made after 1982. Rev. Proc. 82-51 was superseded by Rev. Proc. 84-58, 1984-2 C.B. 501, which is effective for remittances made on or after October 1, 1984. Estate's remittance, made in 1988, clearly is governed by Rev. Proc. 84-58, not Rev. Proc. 64-13. Rev. Proc. 84-58 contains no such general rule that an advance payment is treated as a deposit until assessed. Instead, Rev. Proc. 84-58 contains specific procedures that can be followed by a taxpayer that is under examination, or has completed an examination, in order for a remittance to be treated as a payment or a deposit. When Estate made its remittance, it had not yet been under examination. Further, Estate's situation is not covered by any of the specific factual circumstances addressed in Rev. Proc. 84-58. Consequently, Rev. Proc. 84-58 has no bearing on the issue whether Estate's remittance was a deposit [*10] or a payment.

HOLDING:

The $ 100,000 remittance sent April 26, 1988, was a payment refund of which is barred by section 6511(b)(2)(A) of the Code.

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **THE E.W. SCRIPPS COMPANY AND SUBSIDIARIES**, | ) ) |
| | ) CASE NO. C-1-01-434 |
| Plaintiff, | ) |
| | ) HONORABLE SUSAN DLOTT |
| vs. | ) |
| | ) |
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| Defendant. | ) |

I, MICHAEL CARROLL, make the following Declaration pursuant to Section
1746 of Title 28 of the United States Code. I hereby declare and state as follows:

1.     I am currently the Corporate Tax Director for the E.W. Scripps Company
and was so employed in December 1990.

2.     I am over the age of eighteen, have personal knowledge of the matters set
forth in this Declaration and, if asked to testify about them, would be competent to do so. I make
this Declaration in support of the E.W. Scripps Company and Subsidiaries' Motion for Summary
Judgment and Opposition to the United States' Motion for Summary Judgment.

3.     I have read the United States' Motion for Summary Judgment. It
repeatedly and incorrectly suggests and even declares that Scripps intentionally "dumped" our
December 31, 1990 $7 million payment of additional 1985-1986 tax and the related interest on
the IRS simply to obtain a 1990 interest deduction without regard to whether we had an

**EXHIBIT B**

increased tax liability. It also implies that Scripps "dumped" its $7 million payment of tax and related interest on the IRS as some sort of "investment" to "collect an attractive interest rate." Scripps did not do either of these things.

4.     The 1988 settlement between Scripps and the IRS, whereby Scripps agreed to switch from the cash method to the accrual method of reporting its taxable income, in fact increased the amount of Scripps' taxable income for its tax years 1985 and 1986. This increase in income, in turn, increased Scripps' overall tax liability. The IRS has never disputed this.

5.     I asked Agent Sidney Saewitz, who was currently auditing these tax years, to determine for me the additional tax liability that resulted from this increase in income so that we could pay it before the end of 1990. We wanted to make this payment both to stop the running of interest on the taxes we owed and to take a 1990 tax deduction for the interest. Mr. Saewitz told me that he was too busy and therefore would not be able to do this for me prior to the end of the year. The increase in Scripps' taxable income for 1985 and 1986 resulting from the method switch could be determined with reasonable accuracy. Therefore, I asked Mr. Hackman to calculate this additional taxable income and to calculate the resulting additional tax liability.

6.     We wanted to pay our additional tax liability without overpaying it. The way that Scripps manages its cash requires it to borrow any payments of this kind from a bank. Scripps has to pay interest on the funds it borrows. Thus, Scripps would not benefit from recklessly "dumping" funds with the IRS as the IRS suggests. Further, to the extent that Scripps does have extra cash on hand, it reinvests that money in its existing businesses or uses it to make business acquisitions or other market investments. Scripps believes that these are far better uses

2

for its available cash than the generally below market interest rates that the IRS pays on overpayments of tax. Scripps would never "dump" funds with the IRS as some sort of "investment," and it did not do so in this case.

7.    In order not to overpay the additional taxes and related interest that we owed as a result of the method change, we decided to round our payment down to $7,000,000. We paid this amount to the IRS on December 31, 1990. In so doing, we intended to discharge our additional tax liability.

8.    Our 1986 tax return, as filed, did report a sizeable tax loss which was carried back to offset taxable income and tax credits in 1983 and 1984. We did not ignore this situation as the IRS's Motion suggests. While the final outcome of the audit of our 1986 tax return was not yet known, we did know that our 1988 agreement to switch to the accrual method of reporting our taxable income would increase our 1986 taxable income (or reduce the 1986 net operating loss that we had carried back to 1983 and 1984). This switch to the accrual method did, in fact, increase Scripps' overall tax liability. We knew that we owed additional tax and interest as a result of this 1988 agreement, and our purpose in making our December 31, 1990 payment was to pay the majority of the additional tax and related interest owed on this discrete issue.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 24, 2003.

Michael Carroll

MICHAEL CARROLL

G:\CL.data\RI3825\95070\00020\Pleadings\Carroll Declaration-1.doc

3

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **THE E.W. SCRIPPS COMPANY** | ) | |
| **AND SUBSIDIARIES**, | ) | |
| | ) | CASE NO. C-1-01-434 |
| Plaintiff, | ) | |
| | ) | HONORABLE SUSAN DLOTT |
| vs. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Defendant. | ) | |

I, JEROME P. HACKMAN, make the following Declaration pursuant to Section 1746 of Title 28 of the United States Code. I hereby declare and state as follows:

1.     I am currently the Tax Manager of Federal Audits for the E.W. Scripps Company ("Scripps"). In December 1990, I was employed as Scripps Federal Tax Supervisor.

2.     I am over the age of eighteen, have personal knowledge of the matters set forth in this Declaration and, if asked to testify about them, would be competent to do so. I make this Declaration in support of the E.W. Scripps Company and Subsidiaries' Motion for Summary Judgment and Opposition to the United States' Motion for Summary Judgment.

3.     In 1988, Scripps entered into an agreement with the IRS whereby Scripps agreed to change retroactively from the cash method to the accrual method of reporting its publishing affiliates' taxable income for the tax years 1980 through 1986. As of the date of this agreement, this method change increased the amount of Scripps' taxable income that Scripps was

**EXHIBIT C**

required to report in each of the affected years, including tax years 1985 and 1986. This increase

in income, in turn, increased Scripps' overall tax liability. When Scripps settled the 1980

through 1984 tax years, the IRS computed and Scripps agreed how its income would be adjusted

for those years due to the method change. Scripps paid the additional taxes owed as a result.

3.    As of 1990, the adjustments to Scripps' taxable income for 1985 and 1986

had not yet been calculated to account for the method change. Nonetheless, upon entering into

the 1988 agreement, Scripps was liable for the additional taxes resulting from this increased

taxable income. Scripps wanted to pay the additional tax that it owed as result of its increased

1985 and 1986 taxable income before the end of 1990. Scripps wanted to make this payment

both to stop the running of interest on the taxes it owed and to take a 1990 tax deduction for the

related interest it owed and would have to pay. Therefore, after Agent Sidney Saewitz informed

Michael Carroll, Scripps' Corporate Tax Director, that he was too busy to calculate before year-

end the additional tax liability resulting from Scripps' increased taxable income, Mr. Carroll

asked that I make the necessary calculations.

4.    It took me approximately three weeks to calculate the additional tax that

Scripps owed due to the method change. To do this, I first had to calculate the amount that the

method change increased Scripps' 1985 and 1986 taxable income. Seventeen subsidiary

companies within Scripps' consolidated tax group were affected by the method change. I

therefore calculated the resulting increase in each of these subsidiaries' 1985 and 1986 taxable

income.

5.    To do so, I first obtained copies of schedules Scripps had previously

prepared for each affected subsidiary. These schedules showed the cumulative amount by which

the method change caused each subsidiary's taxable income to increase through the end of 1986.

2

I knew that I could use the information from these schedules to calculate accurately the increase in Scripps' 1985 and 1986 taxable income due to the method change. (A copy of one such schedule, for the Denver Publishing Company, is attached hereto as Exhibit 1.)

6.      These schedules had been prepared by seven different Scripps' tax accountants, including myself. Preparation of these 17 schedules each had involved making complex calculations of the effect of the method change on taxable income, and had taken hundreds of hours to perform. I had spent at least 2 full days performing these calculations for the Denver Publishing Company alone.

7.      To calculate Scripps' additional taxable income for 1985 and 1986 in December 1990, I spent several hours reviewing each of these cumulative schedules to ensure that each accurately reflected the subsidiary's increased taxable income. My review included a detailed analysis of the balance sheets and other work papers to make sure that the preparer of the schedule had corrected computed the additional income. Where necessary, I made adjustments to correct the cumulative increase in income each subsidiary experienced because of the method change. I placed each of these cumulative numbers in the "Total" column of a summary schedule I created entitled "Cash to Accrual Adjustment for All Scripps Howard Newspapers & United Feature Syndicate From 1/1/82 to 1/1/87 By Year and Cumulative to 1/1/82" (hereinafter "Summary Schedule"). A copy of the Summary Schedule is attached hereto as Exhibit 2. (It is also Exhibit 49 to my deposition, which was previously filed with the Court along with Scripps' Motion for Summary Judgment.)

8.      After ensuring that these cumulative numbers were accurate, I then calculated the amount by which each subsidiary's taxable income had increased because of the method change on a yearly basis for the years 1980, 1981, 1982, 1983, and 1984. Prior to

3

December 1990, the IRS had already computed the multiple cash to accrual adjustments for 1980 through 1984, and Scripps had already agreed to these adjustments. Therefore, I was able to apply each of these agreed-upon adjustments and determine the effect of the method switch on each subsidiary's income for each of these tax years'. I placed each of these yearly numbers in the appropriate year column on the Summary Schedule. Then, for each subsidiary, I subtracted the yearly amounts from the cumulative total to calculate the increase in that subsidiary's taxable income for the two-year period of 1985 and 1986. I added together the increase in taxable income for each subsidiary to determine that the method change caused Scripps' taxable income for 1985 and 1986 to increase by $16,140,533.50.

9.      Applying the 46% corporate tax rate, I determined that Scripps owed $7,424,625 in additional tax because of the method change for the two-year period of 1985 and 1986. Due to time pressures, the fact that the schedules upon which I relied were calculated on a cumulative basis, and the fact that it would require hundreds of additional calculations, I was not able to calculate separately the taxable income increases for 1985 and 1986. Therefore, I allocated half of the additional tax to each tax year.

10.     I then calculated the interest that Scripps would owe for 1985 and 1986, applied payments that Scripps had already made to pay its additional tax for these earlier years, and determined that Scripps still owed $6,475,637 in tax. Interest on this amount was $3,306,363, for a total additional liability of $9,782,000 due because of the discrete issue of the method change.

11.     Because Scripps did not want to overpay its additional tax liability and because my calculation relied on many complex calculations performed by various Scripps and IRS personnel, Scripps decided to round the tax and interest numbers down so that it could pay

4

the vast majority of its additional tax liability due to the method change without overpaying it. (If Scripps had wanted to "dump" money on the IRS, as the IRS suggests, it would have rounded up.) Consequently, on December 31, 1990, Scripps made a total tax payment of $7 million for 1985 and 1986. In making this payment, Scripps intended to discharge the additional incremental tax and interest that it owed because of the increase in 1985 and 1986 taxable income due to the method change.

12.    When I calculated Scripps' additional taxable income and resulting additional tax liability due to the method change, I had no reason to refer to Scripps' 1986 consolidated tax return. Instead, I only needed to look at the schedules, work papers, and IRS-computed adjustments for the publishing affiliates (and not for all the members of the consolidated group) that I previously described to determine the additional amounts. Therefore, although I was aware that Scripps had a $62 million net operating loss ("NOL") for 1986 that was carried back to earlier tax years, I did not focus on this fact in calculating Scripps' additional tax liability. Moreover, while it may now appear (at least to the IRS) that Scripps' designated tax and interest payment for 1986 should have instead been made for 1983, because the 1985 through 1987 tax years were under audit when Scripps made its $7 million payment, it was possible that IRS proposed adjustments could have eliminated the NOL and resulted in Scripps having positive 1986 taxable income. (As it turned out, IRS adjustments reduced Scripps' 1986 NOL to $28 million.) Therefore, although the tax was in fact owed and although Scripps was able to calculate the amount that it owed, it could not determine beyond a doubt, as a matter of bookkeeping, to which year this tax would ultimately apply. This does not, however, change the fact that the discrete effect of the method change increased Scripps' 1986 taxable income and therefore increased the additional tax and interest Scripps owed and paid.

5

13.    When Scripps filed its 1986 consolidated tax return reflecting a $62 million NOL, it carried back that NOL to the 1983 tax year. Scripps filed for and received a partial return of taxes that it previously paid for this year. In 1990, when Scripps determined the amount by which the method change increased Scripps' 1986 taxable income (and therefore decreased the amount of the NOL that could be carried back), Scripps essentially had to pay back some of the money refunded to it for the previous tax years and did so through its December 1990 payment.

14.    Even though in September 1997 the IRS returned the $3.5 million of Scripps' December 1990 payment that Scripps had designated as its 1986 payment of tax, Scripps nevertheless did ultimately pay additional tax and interest on its increased 1986 taxable income resulting from the method change. It paid this, however, as 1983 tax instead of 1986 tax. The IRS assessed and charged interest on the increase in the 1983 tax resulting from the reduction in the 1986 NOL even though, as of December 31, 1990, the IRS also had in its possession the $3.5 million Scripps designated as 1986 tax for the same increase in 1986 taxable income. In other words, the IRS continued to charge Scripps interest while, at the same time, it was holding Scripps' funds due for the exact same liability.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 25, 2003.

Jerome P. Hackman
JEROME P. HACKMAN

G:\CLdata\RI3825\95070\00020\Pleadings\Hackman Declaration.doc

6

THE DENVER PUBLISHING COMPANY
CASH TO ACCRUAL ADJUSTMENTS
12/31/87

| DESCRIPTION | CASH BALANCE @ 12/31/86 | ACCRUAL BALANCE @ 12/31/86 | TOTAL DIFFERENCES | TAX DIFFERENCES 481(a) | OTHER DIFFERENCES |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| CASH | (670,371.02) | (670,371.02) | 0.00 | | |
| TREASURY FUND | 224,789.93 | 224,789.93 | 0.00 | | |
| ACCOUNTS RECEIVABLE - TRADE | 0.00 | 17,338,626.01 | 17,338,626.01 | 17,338,626.01 | |
| ALLOWANCE FOR DOUBTFUL ACCOUNTS | 0.00 | (355,000.00) | (355,000.00) | (355,000.00) | |
| ACCOUNTS RECEIVABLE - EMPLOYEE ADVANCES | 9,251.00 | 9,251.00 | 0.00 | | |
| ACCOUNTS RECEIVABLE - MISCELLANEOUS | 65,374.92 | 120,106.30 | 54,731.38 | 54,731.38 | |
| NEWSPRINT INVENTORY | 3,020,141.66 | 3,020,141.66 | 0.00 | | |
| STOREROOM INVENTORY | 0.00 | 687,597.76 | 687,597.76 | 687,597.76 | |
| PREPAID PENSION | 0.00 | 206,000.00 | 206,000.00 | | 206,000.00 |
| PREPAID INSURANCE | 0.00 | 80,657.29 | 80,657.29 | 80,657.29 | |
| PREPAID MISCELLANEOUS | 14,564.79 | 134,761.45 | 120,196.66 | 120,196.66 | |
| MISC. CURRENT ASSETS | 0.00 | 0.00 | 0.00 | 0.00 | |
| P.P.&E (NET) | 30,158,924.71 | 45,140,333.77 | 14,981,409.06 | | 14,981,409.06 |
| ADVANCES TO SUBS. | 0.00 | 0.00 | 0.00 | | |
| INVESTMENTS-OTHER | 64,200.00 | 64,200.00 | 0.00 | | |
| LICENSES & OTHER INTANGIBLES(NET) | 0.00 | 0.00 | 0.00 | | |
| NON COMPETITION AGREEMENTS(NET) | 0.00 | 0.00 | 0.00 | | |
| FCC LICENSE(NET) | 0.00 | 0.00 | 0.00 | | |
| NETWORK AFFILIATION CONTRACTS(NET) | 0.00 | 0.00 | 0.00 | | |
| COMPUTER SOFTWARE | 1,091,161.15 | 1,082,205.90 | (8,955.25) | | (8,955.25) |
| FILM CONTRACTS - NON CURRENT | 0.00 | 0.00 | 0.00 | | |
| CSV OF LIFE INSURANCE | 0.00 | 0.00 | 0.00 | | |
| INDUSTRIAL REVENUE BOND | 0.00 | 0.00 | 0.00 | | |
| TRADE DEALS | 0.00 | 0.00 | 0.00 | | |
| GUARANTEE DEPOSITS | 0.00 | 0.00 | 0.00 | | |
| WORKERS' COMP. DEPOSITS | 113,528.37 | 113,528.37 | 0.00 | | |
| DEFERRED CHARGES | 0.00 | 0.00 | 0.00 | | |
| MISC. NON CURRENT ASSETS | 5,206.84 | 11,511.77 | 6,302.93 | 6,302.93 | |
| **TOTAL ASSETS** | 34,096,774.35 | 67,208,340.19 | 33,111,565.84 | 17,933,112.03 | 15,178,453.81 |

see 1986 tax goodwill and beyond FIT valuation for 1986 accrual #5

17,933,112.03
< 4,202,118.20 >
13,730,993.83

JPH 7/11/88

audit fieldwork
cumulative $48/(a)

**EXHIBIT 1**

THE DENVER PUBLISHING COMPANY
CASH TO ACCRUAL ADJUSTMENTS
12/31/87

| DESCRIPTION | CASH BALANCE @ 12/31/86 | ACCRUAL BALANCE @ 12/31/86 | TOTAL DIFFERENCES | TAX DIFFERENCES 481(a) | OTHER DIFFERENCES |
|---|---|---|---|---|---|
| **LIABILITIES & EQUITY** | | | | | |
| FILM CONTRACTS PAYABLE - CURRENT | 0.00 | 0.00 | 0.00 | | |
| ACCOUNTS PAYABLE - TRADE | 0.00 | 844,101.17 | 844,101.17 | 844,101.17 | |
| CURRENT PORTION - NOTES PAYABLE | 0.00 | 0.00 | 0.00 | | |
| ACCOUNTS PAYABLE - PAPER OWED FOR | 2,954,163.45 | 2,954,163.45 | 0.00 | | |
| ACCOUNTS PAYABLE - MISC. | 0.00 | 0.00 | 0.00 | | |
| AMOUNTS WITHHELD FROM PAYROLL | 219,407.13 | 219,407.13 | 0.00 | | |
| ACCRUED PAYROLL - REGULAR | 0.00 | 436,873.80 | 436,873.80 | 436,873.80 | |
| ACCRUED PAYROLL - OVERTIME | 0.00 | 0.00 | 0.00 | | |
| ACCRUED PAYROLL - COMMISSIONS | 0.00 | 0.00 | 0.00 | | |
| ACCRUED PAYROLL - BONUSES | 0.00 | 208,000.00 | 208,000.00 | 208,000.00 | |
| ACCRUED PAYROLL - VACATIONS | 0.00 | 2,073,434.00 | 2,073,434.00 | 2,073,434.00 | |
| ACCRUED FED. UNEMPLOYMENT | 0.00 | 0.00 | 0.00 | | |
| ACCRUED STATE UNEMPLOYMENT | 0.00 | 0.00 | 0.00 | | |
| ACCRUED FICA | 0.00 | 0.00 | 0.00 | | |
| ACCRUED WORKERS COMP. | 0.00 | 0.00 | 0.00 | | |
| ACCRUED FIT | 0.00 | (982,000.00) | (982,000.00) | | (982,000.00) |
| ACCRUED STATE FRANCHISE TAX | 0.00 | 0.00 | 0.00 | | |
| ACCRUED STATE INCOME TAX | 0.00 | (199,000.00) | (199,000.00) | (199,000.00) | |
| ACCRUED LOCAL INCOME TAX | 0.00 | 0.00 | 0.00 | | |
| ACCRUED PROPERTY TAXES | 0.00 | 1,006,620.73 | 1,006,620.73 | 1,006,620.73 | |
| ACCRUED REAL ESTATE TAXES | 0.00 | 0.00 | 0.00 | | |
| ACCRUED ADVERTISING REBATES | 0.00 | 366,506.29 | 366,506.29 | 366,506.29 | |
| ACCRUED SALES TAX | 0.00 | 0.00 | 0.00 | | |
| ACCRUED SELF INSURANCE | 0.00 | 533,802.34 | 533,802.34 | | 533,802.34 |
| ACCRUED COMMISSION - NAT'L REPS | 0.00 | 0.00 | 0.00 | | |
| ACCRUED PENSIONS | 0.00 | 0.00 | 0.00 | | |
| ACCRUED ROYALTY & COPYRIGHT FEES | 0.00 | 0.00 | 0.00 | | |
| ACCRUED INTEREST | 0.00 | 0.00 | 0.00 | | |
| ACCRUED MISCELLANEOUS | 586,000.00 | 1,952,384.55 | 1,366,384.55 | (300,615.45) | 1,667,000.00 |
| PREPAID SUBSCRIPTIONS | 184,958.54 | 184,958.54 | 0.00 | | |
| CIRCULATION SECURITY DEPOSITS | 304,151.94 | 304,151.94 | 0.00 | | |
| DEFERRED COMPENSATION-CURRENT | 0.00 | 0.00 | 0.00 | | |
| MISC. CURRENT LIABILITIES | 233,802.34 | 0.00 | (233,802.34) | (233,802.34) | |
| DEFERRED FIT | 0.00 | 8,039,609.00 | 8,039,609.00 | | 8,039,609.00 |
| NOTES PAYABLE | 0.00 | 9,400,000.00 | 9,400,000.00 | | 9,400,000.00 |
| REVENUE BOND PAYABLE - NONCURRENT | 0.00 | 0.00 | 0.00 | | |
| DEFERRED COMPENSATION-NONCURRENT | 0.00 | 708,000.00 | 708,000.00 | | 708,000.00 |
| MISC. NON CURRENT LIABILITIES | 0.00 | 0.00 | 0.00 | | |
| COMMON STOCK | 9,856.00 | 9,856.00 | 0.00 | | |
| PAID IN SURPLUS | 148,994.00 | 148,994.00 | 0.00 | | |
| TREASURY STOCK | 0.00 | 0.00 | 0.00 | | |
| RETAINED EARNINGS | 29,455,440.95 | 38,998,477.25 | 9,543,036.30 | | 9,543,036.30 |
| **TOTAL LIABILITIES & EQUITY** | 34,096,774.35 | 67,208,340.19 | 33,111,565.84 | 4,202,118.20 | 28,909,447.64 |

CASH TO ACCRUAL ADJUSTMENT FOR ALL
SCRIPPS HOWARD NEWSPAPERS & UNITED FEATURE SYNDICATE
FROM 01/01/82 TO 01/01/87 BY YEAR
AND CUMULATIVE TO 01/01/82

*JPH 12/21/90*

| COMPANY | TOTAL 481 ADJ. TOTAL 446 ADJ. BY YEAR THRU 1981 | TOTAL 481 ADJ. TOTAL 446 ADJ. BY YEAR 1982 | &TOTAL 481 ADJ. TOTAL 446 ADJ. BY YEAR 1983 | TOTAL 481 ADJ.& TOTAL 446 ADJ. BY YEAR 1984 | ESTIMATE OF TOTAL 446 ADJ. BY YEAR 1985 & 1986 | TOTAL |
|---|---|---|---|---|---|---|
| BIRMINGHAM POST | (125,783.50) | 275,921.00 | (238,096.00) | 112,503.00 | (4,026.50) | 20,518.00 |
| CINCINNATI POST | (758,687.00) | 1,189,512.00 | (6,627,887.00) | 593,556.00 | 5,990,881.00 | 387,375.00 |
| COLUMBUS CITIZEN JOURNAL | 1,057,610.00 | 460,197.00 | 2,065,323.00 | 1,209,921.00 | (4,793,051.00) | 0.00 |
| COURIER | 135,051.50 | 25,306.00 | 25,306.00 | 0.00 | (128,920.50) | 56,743.00 |
| DENVER PUBLISHING | 4,387,708.50 | 3,406,592.00 | 2,188,752.00 | 2,609,653.00 | 1,138,288.50 | 13,730,994.00 |
| HERALD POST | 305,734.50 | 74,599.00 | 46,815.00 | 20,398.00 | (39,602.50) | 407,944.00 |
| MEMPHIS PUBLISHING | 1,826,116.00 | 816,909.00 | 1,116,600.00 | 253,185.00 | 3,545,537.00 | 7,558,347.00 |
| KNOXVILLE NEWS SENTINEL | 493,831.50 | 61,284.00 | 315,082.00 | (247,105.00) | 1,825,953.50 | 2,449,046.00 |
| NEW MEXICO STATE TRIBUNE | 531,362.00 | 31,259.00 | (8,091.00) | (24,652.00) | (483,347.00) | 46,531.00 |
| PITTSBURGH PRESS | 2,204,559.00 | (222,201.00) | (165,660.00) | 587,208.00 | 8,841,679.00 | 11,245,585.00 |
| STUART NEWS | 261,462.50 | (26,955.00) | (66,065.00) | 418,148.00 | (155,317.50) | 431,273.00 |
| SUN TATTLER | 782,146.00 | 163,052.00 | 86,441.00 | 30,419.00 | (258,168.00) | 803,890.00 |
| ALLIED | 50,811.50 | (110,786.00) | 123,600.00 | 12,531.00 | (26,068.00) | 50,088.50 |
| E.W. SCRIPPS-ROME OFFICE | 83,911.00 | (664,339.00) | 80,560.00 | 409,192.00 | 458,712.00 | 368,036.00 |
| SCR | 389,776.50 | 191,775.00 | (31,376.00) | (104,026.00) | 52,500.50 | 498,650.00 |
| SUPPLY COMPANY | (8,462.00) | 30,046.00 | (34,527.00) | 22,510.00 | (8,803.00) | 764.00 |
| UNITED FEATURE SYNDICATE | 1,002,028.00 | 82,040.00 | (2,032,770.00) | 1,361,788.00 | 184,278.00 | 597,364.00 |
| INCOME BY YEAR | 12,619,176.00 | 5,784,211.00 | (3,155,993.00) | 7,265,229.00 | 16,140,533.50 | 38,653,156.50 |

| | 1982 | 1983 | 1984 | 1985 & 1986 | TOTAL |
|---|---|---|---|---|---|
| INCOME BY YEAR | 5,784,211.00 | (3,155,993.00) | 7,265,229.00 | 16,140,533.00 | 26,033,980.50 |
| TAX RATE | 46% | 46% | 46% | 46% | 46% |
| TAX BY YEAR | 2,660,737.06 | (1,451,756.78) | 3,342,005.34 | 7,424,645.18 | 11,975,631.03 |
| LESS CASH TAX BOND PAYMENT ON 12/20/88 | 3,000,000.00 | 0.00 | 2,500,000.00 | 0.00 | 5,500,000.00 |
| TOTAL TAX DUE | (339,262.94) | (1,451,756.78) | 842,005.34 | 7,424,645.18 | 6,475,631.03 |

**EXHIBIT 2**

INT FROM
6/1/90 TO
12/31/90

6,475,631
× 11 %
× 7/12
‾‾‾‾‾‾‾
415,520