IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| The E.W. Scripps Co. & Subsidiaries | : | |
| | : | Case No. C-1-01-434 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER |
| United States of America | : | |
| | : | |
| Defendant | : | |

This matter comes before the Court on Plaintiff The E.W. Scripps Company and Subsidiaries' Motion for Summary Judgment (doc. #22) and the United States' Motion for Summary Judgment (doc. #23). Plaintiff The E. W. Scripps Company and Subsidiaries ("Scripps") filed suit against Defendant United States of America, claiming that it is entitled to recover interest accrued on its overpayment of taxes for the 1986 tax year. The United States argues that Scripps is not entitled to that interest because Scripps's remittance for the 1986 tax year was a deposit rather than a payment. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion, **DENIES** Defendant's motion, and **GRANTS** summary judgment to Defendant on Plaintiff's claim of equitable estoppel.

## I.    STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the

evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted). For those issues on which the moving party will not have the burden of proof at trial, the movant must "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Although "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, a court should not grant summary judgment merely because the nonmovant's case appears weak. The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

2

The standard on summary judgment is somewhat more complicated when opposing parties both have moved for summary judgment. In essence, both parties assert that no question of material fact remains, and each claims to be entitled to prevail as a matter of law. "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 at 327-28 (2d ed. 1998). See B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d 587, 592 (6th Cir. 2001). Similarly, "'the fact that both parties make motions for summary judgment does not require the Court to rule that no fact issue exists.'" B.F. Goodrich, 245 F.3d at 592 (quoting Begnaud v. White, 170 F.2d 323, 327 (6th Cir. 1948)). Rather, "'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Id. (quoting Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)).

## II.   FACTUAL BACKGROUND[1]

Scripps is a large media corporation. Due to the size and complexity of Scripps's business operations, IRS agents are assigned to Scripps's corporate office to audit its tax returns. During the relevant time period, Sidney Saewitz was one of those agents.

Prior to 1988, Scripps used the cash method of accounting for tax purposes. In June 1988, Scripps entered into a binding agreement with the IRS to switch to the accrual method of accounting. See generally Treas. Reg. § 1.446-1(c) (distinguishing between cash and accrual methods of accounting). This agreement required Scripps to apply the accrual method retroactively beginning in the 1980 tax year, even though Scripps already had filed its tax returns through at least 1986 using

---

[1] Except as otherwise indicated, the following facts are undisputed.

3

the cash method. Scripps anticipated that the change in accounting method would increase its taxable income during the covered years.

Scripps decided in 1990 that it wanted to remit money to the IRS for two purposes: 1) to stop the accrual of interest on any additional tax liability it incurred for the 1985 and 1986 tax years as a result of the change in accounting method; and 2) to be able to deduct its payment of previously incurred interest on its 1990 tax return. Consequently, during the fall of 1990, Scripps's Corporate Tax Director Michael Carroll asked Agent Saewitz to calculate before the end of the year the additional taxes and interest that Scripps owed for the 1986 tax year. Agent Saewitz told Carroll that he would not be able to complete the requested calculations in the allotted time. Thus, in early December 1990, Carroll instructed Scripps's Federal Tax Supervisor Jerome Hackman to make the calculation instead. In compliance with this directive, Hackman deducted the known income adjustments resulting from the change in accounting method for the 1980, 1981, 1982, 1983, 1984, and 1987 tax years from the known total income adjustment for tax years 1980 through 1987 to arrive at the combined income adjustment for tax years 1985 and 1986. He then divided that adjustment evenly between the two years and, using the relevant tax rate for each year, calculated the increased tax liability and interest already accrued thereon. These calculations yielded a total increased tax liability and interest of approximately $9,782,000. In order to avoid overpayment, Scripps adjusted this amount downward and cut a check to the IRS in the amount of $7 million.

Hackman took the check for $7 million to the Cincinnati Field Office of the IRS on December 31, 1990, along with a letter to Agent Saewitz from Carroll. The letter requested that $3.5 million of the remittance be applied to each year, with $2 million used to pay each year's increased tax liability and $1.5 million used to pay any interest on that liability. The letter also set forth Scripps's reason for making the remittance:

4

> As we have discussed previously, The E.W. Scripps Company and subsidiaries[] desire to prepay and thereby stop the interest accumulation on the 1985-86 adjustments anticipated as a result of our previous settlement with the Internal Revenue Service, which changed our publishing affiliates' method of reporting from the cash method to the accrual method as of 1980.
>
> Our check for $7,000,000 is being hand-delivered with this authorization letter by our Jerome P. Hackman to you today.

(Doc. #22 exh. B.)[2]  Upon delivery of the check, Hackman received a copy of two IRS Payment

Posting Vouchers, Form 3244-A, one each for the 1985 and 1986 tax years, that had been prepared

by an IRS secretary.  (See id.)  The vouchers describe each $3.5 million remittance as an "Advance

payment on deficiency."  In a section labeled "Remarks," each form includes two boxes, one labeled

"Cash bond" and the other labeled "Send 316(C)."  On both forms, the "Cash bond" box is checked,

and the "Send 316(C)" box is not.[3]

---

[2] A similar letter accompanied a remittance of $9 million targeted to the 1982 and 1984 tax years that Scripps made on December 22, 1988, stating:

> As we discussed previously, The E.W. Scripps Company and subsidiaries[] desire to prepay and thereby stop the interest accumulation on the 1982-84 adjustments anticipated as a result of our recent settlement with the Internal Revenue Service, which changed our method of reporting from the cash method to the accrual method as of 1980.
>
> This cash bond is being hand-delivered with this authorization by our Jerome P. Hackman to your Team Coordinator, George B. Imwalle on Thursday, December 22, 1988 . . . .

(Doc. #23 exh. 1 to deposition of Michael W. Carroll.)

[3] According to IRS policy, when the "Cash bond" box is checked on Form 3244-A, the "Send 316(C)" box also should be checked to ensure that the IRS informs the payor that the remittance is being treated as a cash bond.  (Doc. #23 exh. F.)

Noticing that the "Cash bond" boxes were checked on the vouchers, Hackman told Agent Saewitz that Scripps wanted to prepay its taxes, not post a cash bond. Agent Saewitz informed Hackman that the form had to be filled out in that manner. Hackman testified at deposition that Agent Saewitz then suggested that the form include a breakdown of the remittances in the "Remarks" section to ensure that they be treated as payments. Agent Saewitz does not remember whether he made such a suggestion. Nevertheless, the "Remarks" section of the voucher designates $2 million of each remittance toward any tax adjustment and $1.5 million toward interest. The IRS also assigned the 1986 tax year remittance a document locator code that labeled it as a payment.

Eventually, the IRS determined that Scripps had incurred no additional tax liability for the 1986 tax year because of the change in accounting method. Around that time, in 1995 or 1996, Agent Saewitz informed Scripps that the IRS would treat the 1990 remittance as a cash bond and not allow Scripps to deduct the interest portion of the remittance on its 1990 tax return. Scripps protested that decision. The IRS and Scripps reached a settlement in 1998 that permitted Scripps to take the interest deduction. The IRS issued a refund to Scripps of the $3.5 million remittance it made for the 1986 tax year on September 5, 1997. The refund did not include any interest accrued since the date of remittance. On September 28, 1998, Scripps filed a claim with the IRS Cincinnati Service Center requesting payment of interest on the $3.5 million. The IRS disallowed Scripps's claim on November 6, 2000. Scripps filed suit against the United States on June 27, 2001, asserting that it is entitled to recover the interest under federal statute and the doctrine of equitable estoppel.

## III.    ANALYSIS

### A.    Statutory Claim

26 U.S.C. § 6611 requires the IRS to pay interest "upon any overpayment in respect of any internal revenue tax." However, not all remittances to the IRS are considered payments and thus

eligible to be deemed overpayments under section 6611. See Rosenman v. United States, 323 U.S. 658, 662-63 (1945). Rather, some remittances are held by the IRS "as a deposit made in the nature of a cash bond for the payment of taxes thereafter found to be due." Id. at 662. A deposit or cash bond stops the running of interest on any tax deficiency, but payment is considered not to have been made for purposes of determining interest until the deficiency has been determined and satisfied by the deposited funds. See id. at 662-63; Ameel v. United States, 426 F.2d 1270, 1272 (6th Cir. 1970). The sole issue here with respect to the United States' liability is whether Scripps's $3.5 million remittance for the 1986 tax year was a payment – and, thus, an overpayment – or a cash bond. If it was a payment, then Scripps is entitled to interest; if it was a cash bond, then Scripps is not.

In Ameel, as here, the court was faced with "a factual pattern which falls between the standard patterns of the good faith filing of a return to pay a computed liability and the depositing of funds to stop the running of interest on an undefined tax liability." Id. When faced with such facts, the Sixth Circuit teaches that three rules govern whether a particular remittance constitutes a payment:

> This much is clear: (1) a remittance is not per se "payment" of the tax; (2) a remittance that does not satisfy an asserted tax liability should not be treated as the "payment" of a tax; and (3) an essential factor in "payment" before assessment is the satisfaction or discharge of what the taxpayer deems a liability.

Id. at 1273 (quoting 10 Jacob Mertens et al., Law of Federal Income Taxation § 58.27 at 79 (1964 ed.)). In light of these rules, the Ameel court looked at the taxpayer's intent and the treatment of the remittance by the IRS to determine whether the specific remittance should be deemed a payment. Id. Other courts faced with similar questions also have considered when the tax liability was defined

as a factor in their analyses. See <u>Malachinski v. Comm'r of Internal Revenue</u>, 268 F.3d 497, 507

(7th Cir. 2001); <u>Ewing v. United States</u>, 914 F.2d 499, 503 (4th Cir. 1990).[4]

The undisputed facts in this case, examined through the lens of these factors, require the

conclusion that Scripps's remittance was a payment rather than a deposit. First, Scripps intended

to prepay its taxes with the December 31, 1990 check. Carroll's letter accompanying that check

stated Scripps's "desire to prepay and thereby stop the interest accumulation on the 1985-86

adjustments." Unlike the similar letter that Scripps attached to a remittance in 1988, Carroll's 1990

letter did not refer to the remittance as a cash bond. This omission clearly evinces Scripps's intent

that the 1990 remittance, unlike the 1988 remittance, not be treated as a cash bond. Additionally,

---

[4]As an initial matter, the United States argues that because Scripps brings this suit under an
exception to the federal government's sovereign immunity and such exceptions are to be narrowly
construed, <u>see</u> <u>Lehmen v. Nakshian</u>, 453 U.S. 156, 161 (1981), "the Court must narrowly construe
the waiver of sovereign immunity in determining whether the remittance here is a deposit or a
payment." (Doc. #24 at 17.) In other words, the United States argues that it "is entitled to
application of the rule that any doubt must be administered in favor of the government when the
Court determines whether Scripps could possibly have paid a 'tax.'" (<u>Id.</u> at 17 n.8.)

Under the doctrine of sovereign immunity, the United States "'is immune from suit save as
it consents to be sued . . . and the terms of its consent to be sued in any court define that court's
jurisdiction to entertain the suit.'" <u>Lehmen</u>, 453 U.S. at 160 (quoting <u>United States v. Testan</u>, 424
U.S. 392, 399 (1976)). Likewise, once the United States has consented to a suit generally, the
"'limitations and conditions upon which the Government consents to be sued must be strictly
observed and exceptions thereto are not to be implied.'" <u>Id.</u> at 161 (quoting <u>Soriano v. United States</u>,
352 U.S. 270, 276 (1957)). Whether the Government has waived its sovereign immunity in a
particular matter is a question of law. <u>United States v. Commonwealth of Kentucky</u>, 252 F.3d 816,
825 (6th Cir. 2001).

In this case, the Court addressed the United States' claim of sovereign immunity on a motion
to dismiss and found that 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a) together waived the
Government's sovereign immunity to this suit. (Doc. #18.) However, the waiver contained in
section 1346(a)(1) and 7422(a) is not contingent on any condition like that now asserted by the
United States. Specifically, those sections do not require the taxpayer to meet any elevated burden
of proof in order to be entitled to interest and do not dictate narrow construction of the definition of
a payment versus a deposit. In essence, the United States wants sovereign immunity to count twice,
once as a threshold barring suits to which the Government has not consented and again to make suits
to which the Government has consented more difficult to prove. This proposition finds no support
in statute or caselaw.

after seeing the Form 3244-A, Hackman told Agent Saewitz that Scripps wanted the remittance to be treated as a cash bond. The voucher contained a breakdown of the remittance into principal and interest payment, which was necessary only if the money was meant to serve as a payment. Finally, Scripps based the amount of the remittance on Hackman's calculations of its additional tax liability for the 1986 tax year.

The United States contends, however, that Scripps could not have intended the remittance to be a payment because Scripps knew or should have known that it incurred no additional tax liability for the 1986 tax year. Obviously, Scripps may not miscalculate its additional tax liability for the purpose of earning interest on the fraudulent prepayment. See generally Busser v. United States, 130 F.2d 537, 539 (3d Cir. 1942) (remarking on allure of fraudulent prepayment in order to reap "attractive [interest] rates considerably higher than can be secured elsewhere"). Here, there is no direct evidence of fraudulent intent. The evidence shows merely that Hackman erroneously concluded that Scripps incurred additional liability for the 1986 tax year,[5] and that the IRS later determined that Scripps had incurred no additional tax liability because its income for the 1986 tax year was offset by operating losses that Scripps had claimed for that year. The United States, though, argues that this offset should have been obvious to Hackman.

The Court disagrees. The federal tax code is an exceedingly complex statutory body. Cf. Couch v. United States, 409 U.S. 322, 342 (1973) ("Our tax laws have become so complex that very few taxpayers can afford the luxury of completing their own returns without professional assistance.") (Douglas, J., dissenting). As a result, mistakes in applying the tax code are impossible

---

[5] The United States also claims that "Scripps did not calculate its liability." (Doc. #24 at 14.) This is incorrect. Hackman indisputably reached a tabulation of Scripps's additional liability. The United States' complaint is that Scripps did not calculate its liability correctly.

9

to avoid completely, though with the benefit of hindsight one can inevitably pinpoint the source of any error. Here, the United States is quick to chastise Scripps, claiming that it could have avoided the mistake with "[e]ven a glance at the first page of [its] filed return for the [1986 tax] year." (Doc. #23 at 7.) Yet, the United States' claim that Scripps should have known immediately that it had no additional liability is undercut by the difficulty that the IRS had in making the determination for itself. Before Scripps undertook its calculations, Agent Saewitz told Carroll in the fall of 1990 that he could not calculate Scripps's additional tax liability before the end of the year. Then, when the IRS did undertake the calculation, it took nearly seven years to determine conclusively that Scripps was entitled to a return of the $3.5 million. In light of this delay, the United States cannot now argue that the lack of additional tax liability was obvious. Thus, while Hackman clearly erred, the Court finds that his error was not so egregious as to call into question Scripps's good faith intention to satisfy its asserted tax liability.[6]

Second, the IRS treated the remittance as a payment. The Court first notes that the Form 3244-A vouchers are internally inconsistent. On one hand, they state that the remittances were cash bonds. On the other, the "Send 316(C)" boxes were unchecked in contravention of IRS rules, the

_____

[6] The United States also argues that, because the IRS eventually determined that Scripps had not accrued any additional tax liability for the 1986 tax year, Scripps could not have made a payment. (See doc. #24 at 13 (citing Consol. Edison Co. of N.Y. v. United States, 941 F. Supp. 398, 401 (S.D.N.Y. 1996).) In Consolidated Edison, the plaintiff taxpayer received tax refunds for the 1982 and 1984 tax years in 1989. In calculating the refund, the IRS disallowed certain deductions claimed by the plaintiff and subtracted the amount of the deductions from the refund. The plaintiff argued that the offset of its refund constituted a payment of taxes. The court disagreed, finding that no payment occurred in 1989 because the plaintiff did not pay any new tax deficiency at that time. Consol. Edison, 941 F. Supp. at 401. This makes sense. In order to make a payment, a taxpayer must satisfy "what the taxpayer deems a liability." Ameel, 426 F.2d at 1273. In Consolidated Edison, the plaintiff merely received a refund in 1989; that refund satisfied no asserted tax liability. Here, similarly, the refund of the $3.5 million to Scripps in 1997 was not a payment of taxes. Scripps's payment occurred in 1990 when it remitted the money to the IRS to satisfy what it deemed to be a liability for the 1986 tax year.

10

"Remarks" sections contained breakdowns of each remittance into payment for tax liability and interest in accordance with the policy of the Cincinnati Field Office for dealing with payments, and the amounts remitted were listed as payments. Because the voucher is inconsistent, the Court will disregard it as inconclusive. See Malachinski, 268 F.3d at 508 n.7. Nevertheless, the document locator code that the IRS assigned to the remittance identified it as a payment.[7] Moreover, the Rule 30(b)(6) expert produced by the IRS, Amy Ravenscraft, testified that the IRS computer records show that the remittance was treated as a payment. The United States responds by noting that the IRS treated the remittance as a cash bond when it refused to return interest on the $3.5 million refund. The IRS's ultimate treatment of the remittance is of extremely limited relevance. A taxpayer cannot argue for the first time, after years of actively asserting and passively accepting that a remittance is a cash bond, that it intended to make a payment. United States v. Tate & Lyle N. Am. Sugars, Inc., 228 F. Supp. 2d 308, 324 (S.D.N.Y. 2002). Likewise, the IRS may not contend that, after years of treating a remittance internally as a payment, it actually treated the remittance as a cash bond because of its ultimate, self-serving refusal to award interest.[8]

---

[7] The United States argues that the document locator code should be disregarded as unreliable hearsay. The code is admissible as an exception to hearsay as public records under Federal Rule of Evidence 803(8). Evidence admissible under this rule should not be considered, however, if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Fed. R. Evid. 803(8). The United States does not contend that the source of the locator code or the method by which the document containing that code was prepared were inherently unreliable. Rather, the United States wants the Court to disregard the locator code because it is inconsistent with the Form 3244-A and their version of the facts. This the Federal Rules of Evidence do not allow and the Court will not do.

[8] In its response to Scripps's motion for summary judgment, the United States cites to "Exhibits A - D" in support of its assertion that "the IRS repeatedly told Scripps that the remittance was a deposit and not a payment." (Doc. #24 at 9.) No exhibits are attached to that filing, and the Court is unable to discern to what exhibits the United States refers.

Third, the IRS did not finalize its determination that Scripps accrued no additional tax liability for the 1986 tax year until September 1997 at the latest, when it issued the $3.5 million refund. While the extended uncertainty about Scripps's final liability weighs in favor of finding that the remittance was a deposit, it is not dispositive. Ameel, 426 F.2d at 1273-74 (finding that remittance constituted a "payment" without considering fact that no formal assessment had been made at time of remittance). Considering Scripps's clear intent and the IRS's handling of the remittance as a payment, those factors outweigh the fact that Scripps's tax liability was not finalized when Scripps made its remittance. The Court therefore concludes from the undisputed facts that the $3.5 million remittance for the 1986 tax year was a payment as a matter of law and an "overpayment" under 26 U.S.C. § 6611 on which Scripps is entitled to recover interest.

## B. Equitable Estoppel

Scripps also moves for summary judgment on its claim of equitable estoppel. "[A]ffirmative misconduct by a government actor is required to succeed in equitably estopping the Government." Reich v. Youghiogheny & Ohio Coal Co., 66 F.3d 111, 116 (6th Cir. 1995). Scripps contends that Agent Saewitz engaged in affirmative misconduct when he falsely assured Scripps that the remittance would be treated as a payment rather than a cash bond. As set forth above, the Court finds that Scripps made a payment in 1990 and is entitled to interest under 26 U.S.C. § 6611. Thus, Agent Saewitz's alleged assurance to Scripps was not false, and Scripps cannot recover under its equitable estoppel theory.[9] Therefore, the Court **DENIES** Scripps's motion for summary judgment

---

[9] The Court notes that even if the remittance in question is found to be a deposit, Scripps still may not recover under its theory of equitable estoppel. "[J]udicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized." Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 426 (1990). The United States Code does not authorize payment of interest on cash bonds. See Rosenman, 323 U.S. at 662-63 (recognizing that taxpayers are not entitled to interest on cash bonds). Consequently, if Scripps's remittance was a

on its equitable estoppel claim. Additionally, because there exists no dispute of material fact remaining on this claim and Scripps had ample opportunity to argue the issue, the Court **GRANTS** summary judgment to the United States on Scripps's equitable estoppel claim, even though the United States did not so move.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** The E.W. Scripps Company and Subsidiaries' Motion for Summary Judgment (doc. #22), **DENIES** United States' Motion for Summary Judgment (doc. #23), and **GRANTS** summary judgment to the United States on Scripps's claim of equitable estoppel. While the above rulings dispose of all issues of liability in this case, questions of fact remain as to the proper calculation of the award of interest. This matter will proceed on that issue alone.

IT IS SO ORDERED.

Susan J. Dlott
United States District Judge

---

cash bond, then the payment of interest on the remittance is not authorized by statute and Scripps's equitable estoppel claim must fail.

13